## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

In re:

ABERDEEN ENTERPRISES, INC.,

    Debtor.

Case No. 23-72834-ast

Chapter 11

## MOTION FOR AN ORDER (I) DISMISSING BANKRUPTCY CASE; OR (II) GRANTING ALTERNATIVE RELIEF

Creditor Bay Point Capital Partners II, LP ("Movant" or "Bay Point"), by and through its undersigned counsel, hereby moves this Honorable Court for an order (i) dismissing the above-captioned bankruptcy case on the grounds that it was filed without corporate authorization; or (ii) granting alternative relief as requested herein.

## PRELIMINARY STATEMENT

1.    The above-captioned bankruptcy case (the "Aberdeen Bankruptcy Case") is the most recent attempt by Louise Blouin ("Ms. Blouin") to continue living a lavish life of luxury that she appears unable afford. For months, Ms. Blouin argued that she needed to have the Brickchurch Bankruptcy Case[1] dismissed because that bankruptcy case was keeping her from selling or refinancing the Properties[2]. In fact, Brickchurch's[3] motion to dismiss remains pending in the Brickchurch Bankruptcy Case. And for months Bay Point, Debtor's[4] and Brickchurch's largest secured creditor, has said that it would consent to a dismissal if Ms. Blouin could produce some

---

[1] The term "Brickchurch Bankruptcy Case" shall refer to that case filed by Brickchurch (as defined herein), which is currently pending before this Court as Case No. 22-70914.
[2] The term "Properties" shall refer, collectively to 366 Gin Lane, Southampton, New York 11968 (the "Aberdeen Property") and 376 Gin Lane, Southampton, New York 11968 (the "Brickchurch Property").
[3] The term "Brickchurch" shall refer to related-party Brickchurch Enterprises, Inc., which itself is a debtor-in-possession in the Brickchurch Bankruptcy Case.
[4] The term "Debtor" shall refer to the debtor in the above-captioned bankruptcy case, Aberdeen Enterprises, Inc.

credible evidence of the ability to refinance or sell the Properties outside of bankruptcy. Ms. Blouin has failed to provide any such evidence. And now, Ms. Blouin appears to have pulled a complete one-eighty by putting Debtor into bankruptcy.

2.      However, Ms. Blouin was without corporate authority and her act of authorizing Debtor to file for bankruptcy was *ultra vires*. As Ms. Blouin has been aware of for weeks, Bay Point took action under various of the DIP Loan Documents (defined herein) to remove and replace Debtor's officers and directors (i.e., to replace Ms. Blouin and her husband, Mathew Kabatoff ("Mr. Kabatoff"), as the director and officer of Debtor).[5] Notice of the removal and replacement of Debtor's officers and directors was provided to Ms. Blouin's residence, Debtor's statutory agent in Delaware, Debtor's parent company in the British Virgin Islands, and to Brickchurch's counsel in the Brickchurch Bankruptcy Case. Bay Point also filed notice of its actions in the Brickchurch Bankruptcy Case. Despite undoubtedly having notice of her removal as an officer and/or director of Debtor, and without ever raising a single argument – publicly or privately – as to why such removal was improper or unauthorized, Ms. Blouin filed the Aberdeen Bankruptcy Case in a clear effort to further delay and frustrate her creditors and the creditors of Debtor and Brickchurch.

3.      For the reasons stated below, and based on the authority cited herein, Bay Point respectfully moves this Court for an order dismissing the Aberdeen Bankruptcy Case as an *ultra vires* filing so that Bay Point can (i) continue forward with the plan confirmation and sale process identified in the Joint Letter filed in the Brickchurch Bankruptcy Case [Brickchurch ECF No. 283]; or (ii) update such plan confirmation and sale process as may be approve by this Court.

---

[5] Although this Motion focuses on the replacement of Debtor's directors and officers, Bay Point was granted identical rights with respect to Brickchurch and took identical action to remove the directors and officers of Brickchurch.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

5.      The statutory basis for the relief requested herein is 11 U.S.C. § 1112 and any other applicable provisions of title 11 of the United States Code (the "Bankruptcy Code").  As such, this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtor consents to entry of a final order by the Court in connection with this Motion.

6.      Venue of these cases and related proceedings is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### *The Brickchurch Bankruptcy Case and DIP Loan*

7.      On April 30, 2022, Ms. Blouin caused Brickchurch to file for bankruptcy in an effort to avoid a foreclosure sale of the Properties by prior secured creditor JGB.[6]

8.      In the ensuing months, Ms. Blouin failed to cause Brickchurch to make any meaningful progress towards exiting bankruptcy.

9.      Finally, when faced with the prospect that this Court would grant JGB relief from stay to continue its foreclosure proceedings, Ms. Blouin took her most meaningful step to reorganizing and restructuring the relevant debts when she agreed to terms of financing the Bay Point that would result in Ms. Blouin having an additional seven-plus months to find permanent alternative financing, sell the Properties, or some combination of the two.

10.      On or around October 21, 2022, Debtor and Brickchurch, as borrowers (collectively, the "Borrowers"), and Bay Point, as lender, finalized the terms of proposed financing

---

[6] The term "JGB" shall collectively refer to JGB Partners, LP; JGB Capital, LP; JGB (Cayman) Ancona, Ltd.; and JGB Plymouth Rock, LLC.

(the "<u>DIP Loan</u>") and executed a Loan and Security Agreement (the "<u>DIP Loan Agreement</u>"). A true and correct copy of the DIP Loan Agreement is attached hereto as <u>Exhibit A</u>.

11.    On November 17, 2022, this Court approved the terms of the DIP Loan Agreement (ECF No. 172, the "<u>DIP Financing Order</u>"). Pursuant to the terms of the DIP Financing Order, the automatic stay applicable in the Brickchurch Bankruptcy Case was modified to permit Bay Point to exercise any remedies available to it under the DIP Financing Order, the DIP Loan Agreement, the other DIP Loan Documents, and any applicable law immediately, and without further modification of the automatic stay, upon, *inter alia*, (i) the Borrowers' failure to pay off the DIP Loan or substantially consummate a plan in the Brickchurch Bankruptcy Case by the Maturity Date (as defined herein); or (ii) the occurrence of an "Event of Default" under the DIP Loan Agreement or any of the other DIP Loan Documents.[7]

12.    On December 9, 2022, Borrowers executed a Promissory Note (the "<u>Bay Point Note</u>") in favor of Bay Point in the original principal amount of sixty-two million dollars ($62,000,000). A true and correct copy of the Bay Point Note is attached hereto as <u>Exhibit B</u>.

13.    Also on December 9, 2022, Debtor's parent company, Aberdeen Enterprises (BVI) Ltd. ("<u>Aberdeen BVI</u>"), and various other related individuals and companies (including Ms. Blouin) (collectively, the "<u>Guarantors</u>"), executed a Guaranty Agreement (the "<u>Guaranty</u>") whereby the Guarantors guaranteed all of Borrowers' obligations under the DIP Loan Agreement and all related and ancillary documents (collectively. the "<u>DIP Loan Documents</u>"). A true and correct copy of the Guaranty is attached hereto as <u>Exhibit C</u>.

14.    Also on December 9, 2022, each of the Guarantors secured Borrowers' obligations under the DIP Loan Documents, and their own respective obligations under the Guaranty, by

---

[7] The Court can take judicial notice of the DIP Order, which is filed in the Brickchurch Bankruptcy Case as ECF No. 172.

4

executing Pledge and Security Agreements in favor of Bay Point whereby the Guarantors pledged their complete, one hundred percent ownership interest in Debtor, Aberdeen, and various of their related companies (the "Pledged Equity"). The Pledge Agreement executed by Aberdeen BVI, whereby Aberdeen BVI pledged the complete, one hundred percent ownership of Debtor, is attached hereto as Exhibit D (the "Pledge Agreement").

15.    The DIP Loan funded on December 9, 2022, and certain of the DIP Loan proceeds were paid to JGB in return for JGB's assignment of its loan documents, state court judgment, and various other rights to Bay Point. Certain other of the DIP Loan proceeds were paid to Morgan Stanley Private Bank National Association ("MSPBNA") to obtain MSPBNA's agreement to a forbearance agreement with a term commiserate with the Bay Point Note.

16.    On December 9, 2022, the Debtor and Brickchurch had effectively been given a second life.

### Borrowers and Guarantors Default Under the DIP Loan Documents

17.    But Ms. Blouin wasted that opportunity. In the ensuing months, Ms. Blouin failed to secure refinancing of the DIP Loan – and appears to have taken minimal, if any, steps towards securing a sale of one or both properties. Instead, Ms. Blouin and Mr. Kabatoff enjoyed the use of the luxury estate for the summer.

18.    The maturity date of the Bay Point Note was June 9, 2023 (the "Maturity Date"). Borrowers had the right to unilaterally extend the maturity date, conditioned upon, *inter alia*, there being a contract for sale of the Properties in place on the Maturity Date.

19.    With no sale contract in place, and with no money to pay the outstanding balance of the DIP Loan, Borrowers defaulted on their respective obligations thereunder. Likewise,

Guarantors defaulted on their respective obligations under the Guaranty and Pledge Agreements by not timely and fully performing their obligations under the Guaranty and Pledge.[8]

20.    On June 16, 2023, Bay Point sent Borrowers notices of the above-referenced defaults (the "Borrowers Notice of Default") and called an Event of Default under the DIP Loan Documents. A true and correct copy of the Borrowers Notice of Default is attached hereto as Exhibit E.

21.    On June 16, 2023 and July 5, 2023, Bay Point sent notices of default and Events of Default to the Guarantors (collectively, the "Guarantor Notices of Default"). True and correct copies of the Guarantor Notices of Default are attached hereto as Exhibit F.

22.    Despite receiving notice of the above-referenced Events of Default, Borrowers and the Guarantors failed to cure the same.

### ***Bay Point's Rights Under the DIP Loan Documents***

23.    Under the DIP Loan Documents, Bay Point was given various rights to ensure that it could protect its collateral (i.e., the Properties and the Pledged Equity).

#### *Bay Point is irrevocably appointed Borrowers' attorney-in-fact.*

24.    Pursuant to Section 9.3 of the DIP Loan Agreement, upon an Event of Default, Bay Point was irrevocably appointed Borrowers' attorney-in-fact with power of attorney to assign, transfer, or otherwise dispose of the shares of the Borrowers (the "Power-of-Attorney"). Specifically, Section 9.3 provides as follows:

> Exercisable only upon the occurrence and during the occurrence of an Event of Default, each Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as

---

[8] In addition, because Ms. Blouin failed to remit full payment of the debt owed to MSPBNA, and because she could not extend the same due to the lack of any contract for the sale of the Aberdeen Property, the MSPBNA forbearance agreement expired by its own terms. As a result, MSPBNA reinstituted its efforts to foreclose on the Aberdeen Property through state court proceedings. The MSPBNA was scheduled for August 3, 2023. On August 2, 2023, Bay Point purchased MSPBNA's debt, which resulted in the MSPBNA foreclosure sale being canceled.

> Borrower's true and lawful attorney to . . . (i) sell, assign, transfer, pledge, compromise, discharge or otherwise dispose of any Collateral; . . . and (k) do all acts and things necessary to expedient, in furtherance of such purposes.

DIP Loan Agreement, § 9.3. The term "Collateral," as it is used in Section 9.3, is defined as:

> all tangible and intangible property, real and personal of any Person that is or purports to be the subject of a Lien in favor of Lender to secure the whole or any part of the Obligations, including, without limitation, the Mortgaged Property and the Pledged Equity.

DIP Loan Agreement, § 1.1. The term "Pledged Equity" is defined as:

> those shares, certificates, membership interests, or other evidence of ownership interest, whether in physical or electronic form, whether certificated or uncertificated, including any entries in any books and records, evidencing and constituting the complete, undiluted, and undivided ownership interest in Aberdeen, Brickchurch, Aberdeen Enterprises Holdings, Ltd., Aberdeen Enterprises, Ltd., and Brickchurch Enterprises Ltd.

DIP Loan Agreement, § 1.1. The term "Aberdeen" as it is used in the DIP Loan Agreement means the Debtor. DIP Loan Agreement, § 1.1. The term "Event of Default" includes that situation where "any Borrower fails to pay, when due, any principal due and payable under [the DIP Loan Agreement] or, [] any Borrower fails to pay, when due, any interest or other amounts due and payable under [the DIP Loan Agreement] or any other portion of the Obligations."  DIP Loan Agreement, § 8.

### *Bay Point is given authority to transfer the voting rights associated with Borrowers' shares.*

25.     Pursuant to Section 6 of the Pledge Agreement, Aberdeen BVI relinquished, transferred, and assigned Bay Point all right, power, and authority to authorize any direct or indirect change, transfer, sale, conveyance, encumbrance, or other alienation of any stock, voting interest, economic interest, or otherwise, or any assets owned by Aberdeen BVI. Pledge Agreement, § 6.

26.    Moreover, pursuant to Section 9 of the Pledge Agreement:

> Upon the occurrence of an Event of Default, and after the expiration of any applicable notice and cure period set forth in the Loan Documents, in addition to any and all other rights and remedies which Lender may then have [under the Pledge Agreement], under the UCC or otherwise, Lender may, at its discretion and without notice to Pledgor unless required by applicable law, do any one or more of the following, without liability except to account property actually received by it, Pledgor having agreed that it is commercially reasonable for Lender to do any of the following: (a) transfer to or register in its name or the name of its nominee (if the same has not already been done) any of the Collateral with or without indication of the security interest herein created, and whether or not so transferred or registered, receive the income, dividends and other distributions thereon and hold them or apply them to the Obligations in any order of payment as decided by Lender in its sole and absolute discretion; (b) exercise or cause to be exercised all voting and corporate powers with respect to any of the Collateral so registered or transferred, including all rights to conversion, exchange, subscription or any other rights, privileges or options pertaining to such Collateral, as the absolute owner thereof.

Pledge Agreement, § 9. The following definitions are relevant to the rights granted to Bay Point under Section 9:

(a)    The term "Event of Default" includes the "[f]ailure by Pledgor to perform any of its monetary Obligations under this [Pledge] Agreement, the Guaranty, or any of the other Loan Documents." Pledge Agreement, § 2.

(b)    The term "Obligations" includes "all advances to, and debts, liabilities, obligations, covenants and duties of, any Guarantor arising under any Loan Document or otherwise with respect to the Loan. Pledge Agreement at 1 n.1 (incorporating definition in the DIP Loan Agreement); DIP Loan Agreement, § 1.1.

(c)    The term "Guaranty" is defined as "that certain Guaranty of even date herewith in favor of Lender, pursuant to which Pledgor absolutely and unconditionally guaranteed, *inter alia*, all Borrowers' Obligations to Lender under the Loan Documents." Pledge Agreement at 1.

(d)    The term "Loan Documents" includes all documents and agreements entered into in connection with the DIP Loan Agreement, as the same may be modified from time to time, including the Guaranty, the Pledge Agreements, and the DIP Loan Agreement. Pledge Agreement at 1 n.1 (incorporating definition in the DIP Loan Agreement); DIP Loan Agreement, § 1.1.

(e)     The term "Collateral" means one hundred percent (100%) of the shares of Debtor. Pledge Agreement, Schedule A.

27.     The effect of the above-referenced provision is that, upon an Event of Default, Bay Point has the right to, *inter alia*, become the shareholder of record of the Pledged Equity of Debtor and vote that Pledged Equity to replace Debtor's board of directors and corporate officers.

### ***Bay Point Exercises Rights Under DIP Loan Documents***

28.     In addition to squandering her opportunity to sell or refinance the Properties, on or around July 17, 2023, Bay Point learned that Ms. Blouin was further derelict in her corporate responsibilities by failing to take the necessary steps, including the payment of necessary fees and the filing of necessary corporate filings, to keep Debtor and Brickchurch in good standing under Delaware law.

29.     On July 18, 2023, Bay Point took a series of actions along two coordinated tracks to exercise its rights under the DIP Loan Documents to protect its collateral thereunder.

### *The Proxy Track*

30.     As part of one track (the "Proxy Track"), Bay Point exercised its proxy voting rights under the Pledge Agreement to act on behalf of Aberdeen BVI, as the sole stockholder of Debtor, in replacing Debtor's director(s) with Charles Andros ("Mr. Andros"). A true and correct copy of the Written Consent of the Sole Stockholder of Aberdeen Enterprises, Inc. in Lieu of Meeting is attached hereto as Exhibit G.

31.     Notice of the exercising of such proxy voting rights was provided to Debtor via hand delivery by courier at the following locations:

(a)     Debtor's principal place of business as listed on this bankruptcy petition, (Aberdeen Enterprises, Inc., 376 Gin Lane, Southampton, New York, 11968); and

(b)     Debtor's registered agent in Delaware (Aberdeen Enterprises, Inc. c/o The Corporation Trust Company, as registered agent for Aberdeen Enterprises, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801).

An affidavit of the courier service confirming the same is attached hereto as <u>Exhibit H</u>.

32.    Notice of the exercising of such proxy voting rights was provided to Aberdeen BVI via hand delivery by courier at the following location: Aberdeen Enterprises (BVI) Ltd. c/o Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, VG1110, Virgin Islands, British. A true and correct copy of the notice provided to Aberdeen BVI is attached hereto as <u>Exhibit I</u>. Confirmation of delivery of the same is attached hereto as <u>Exhibit J</u>.

33.    Pursuant to the terms of Debtor's then-existing Certificate of Incorporation, a true and correct copy of which is attached hereto as <u>Exhibit K</u> (the "<u>Original Certificate of Incorporation</u>"), and corporate Bylaws, a true and correct copy of which is attached hereto as <u>Exhibit L</u> (the "<u>Original Bylaws</u>"), Mr. Andros then took action as the duly appointed director of Debtor (in such role, the "<u>Director</u>") to remove Debtor's officer(s) and appoint himself as Debtor's sole officer in the roles of President and Chief Executive Officer, Treasurer, and Secretary (in such role, the "<u>Officer</u>"). *See* Unanimous Written Consent of the Board of Directors of Brickchurch Enterprises, Inc., attached hereto as <u>Exhibit M</u>.

34.    As the duly appointed Director and Officer of Debtor, Mr. Andros also took certain actions to effectuate the following:

(a)    authorize and direct Debtor's Officer to file Debtor's 2022 and 2023 annual reports with the Secretary of State of Delaware and to pay the associated Delaware franchise taxes for such years (Ex. M);

(b)    authorize and direct Debtor's Officer to appoint a registered agent for Debtor in the State of Delaware as required by Delaware law (Ex. M);

(c)    cancel Debtor's previously issued shares and issue new shares in the name of Bay Point Capital Partners II, LP, as the shareholder of record, pursuant to Bay Point's rights under certain of the DIP Loan Documents (Unanimous Written Consent of the Board of Directors of Brickchurch Enterprises, Inc., attached hereto as <u>Exhibit N</u>); and

(d)    update Debtor's Register of Shareholders to reflect that Bay Point is the record shareholder (Register of Shareholders, attached hereto as <u>Exhibit O</u>);

35.     Notice of the foregoing actions identified in paragraph 34 was provided to Aberdeen BVI via hand delivery by courier at Aberdeen BVI's registered office in the British Virgin Islands: Aberdeen Enterprises (BVI) Ltd. c/o Trident Trust Company (B.V.I.) Limited; Trident Chambers; P.O. Box 146; Road Town; Tortola; VG1110; Virgin Islands, British. Aberdeen Enterprises (BVI) Ltd. c/o Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, VG1110, Virgin Islands, British. A true and correct copy of the notice provided to Aberdeen BVI is attached hereto as <u>Exhibit P</u>. Confirmation of delivery of the same is attached hereto as <u>Exhibit Q</u>.

36.     Bay Point's counsel also provided Brickchurch's bankruptcy counsel with email notice of the corporate actions undertaken by Bay Point, the Director, and the Officer as discussed in paragraphs 30, 33, and 34 hereof. A true and accurate copy of the email notice provided to Brickchurch's bankruptcy counsel is attached hereto as <u>Exhibit R</u>.

37.     As a result of the actions of Bay Point and Mr. Andros, including the payment of necessary fees and the filing of necessary documentation, Debtor and Brickchurch are now in good standing with the State of Delaware.

### *The Power-of-Attorney Track*

38.     As part of the other track (the "<u>Power of Attorney Track</u>"), Bay Point exercised the Power-of-Attorney granted to it pursuant to the DIP Loan Agreement to assign and transfer record ownership of the Pledged Equity of Debtor. A true and accurate copy of the Stock Power transferring the Pledged Equity is attached hereto as <u>Exhibit S</u>. A true and accurate copy of the updated Register of Shares executed by Bay Point pursuant to the Power-of-Attorney is attached hereto as <u>Exhibit T</u>.

39.     As the record shareholder, Bay Point then took action to remove Debtor's director(s) and replace the same with Mr. Andros (in such role, the "Director"). A true and correct copy of the Written Consent of the Sole Stockholder of Aberdeen Enterprises, Inc. in Lieu of Meeting is attached hereto as Exhibit U. Notice of the foregoing action was provided to Debtor via hand delivery by courier at the following locations:

(a)     Debtor's principal place of business as listed on this bankruptcy petition, (Aberdeen Enterprises, Inc., 376 Gin Lane, Southampton, New York, 11968); and

(b)     Debtor's registered agent in Delaware (Aberdeen Enterprises, Inc. c/o The Corporation Trust Company, as registered agent for Aberdeen Enterprises, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801).

An affidavit of the courier service confirming the same is attached hereto as Exhibit V.

40.     As the duly elected Director, and pursuant to the Original Certificate of Incorporation, and Original Bylaws, Mr. Andros took actions to effectuate the following:

(a)     remove Debtor's officer(s) and appoint himself as Debtor's sole officer (in such role, the "Officer") (Unanimous Written Consent of the Board of Directors of Aberdeen Enterprises, Inc., attached hereto as Exhibit W);

(b)     authorize and direct Debtor's Officer to file Debtor's 2022 and 2023 annual reports with the Secretary of State of Delaware and to pay the associated Delaware franchise taxes for such years (Ex. W);

(c)     authorize and direct Debtor's Officer to appoint a registered agent for Debtor in the State of Delaware as required by Delaware law (Ex. W); and

(d)     cancel Debtor's previously issued shares and issue new shares in the name of Bay Point Capital Partners II, LP, as the shareholder of record (Unanimous Written Consent of the Board of Directors of Aberdeen Enterprises, Inc., attached hereto as Exhibit X).

41.     Bay Point also provided Brickchurch's bankruptcy counsel with email notice of the corporate actions undertaken by Bay Point, the Director, and the Officer as discussed in paragraphs 38-40 hereof. Ex. R.

42.     Notice of the foregoing actions identified in paragraphs 38-40 were provided to Aberdeen BVI via hand delivery by courier at Aberdeen BVI's registered office in the British Virgin Islands: Aberdeen Enterprises (BVI) Ltd. c/o Trident Trust Company (B.V.I.) Limited; Trident Chambers; P.O. Box 146; Road Town; Tortola; VG1110; Virgin Islands, British.

43.     On July 19, 2023, Bay Point filed its *Notice of (i) New Shareholder of Record of Debtor's Equity Interests; and (ii) Replacement of Officers and Directors* (the "Notice of Change of Corporate Control") [Brickchurch ECF No. 278] that provided notice to Brickchurch, Ms. Blouin, and all of Brickchurch's other creditors that receive ECF notice, the Office of the United States Trustee, and the IRS of those actions set forth in paragraphs 30-33 and 38-40 above.[9]

### *Ms. Blouin Attempts to Terminate Brickchurch's Counsel*

44.     Ms. Blouin has sent a series of emails where she purported to act as an officer of Brickchurch to fire Brickchurch's current bankruptcy counsel and hire new counsel – all without any notice or approval from this Court. *See* Emails attached hereto as Exhibit Y.

45.     Bay Point has consistently disputed to Ms. Blouin's attempts to terminate Brickchurch's counsel and indicated that because of the aforementioned corporate actions, Ms. Blouin did not have authority to terminate Brickchurch's counsel. *See* Emails attached hereto as Exhibit Z.

---

[9] The Court can take judicial notice of the Notice of Change of Corporate Control as it was filed in the Brickchurch Bankruptcy Case at ECF No. 278.

### _Ms. Blouin Acts Without Authority to Put Debtor into Bankruptcy_

46.     On August 2, 2023, despite her knowledge of the aforementioned corporate actions, and without raising any basis – publicly or privately – as to why such corporate actions were not valid, Ms. Blouin hired new bankruptcy counsel and instructed such counsel to file a bankruptcy petition on behalf of Debtor.

47.     It is unclear whether Ms. Blouin ever informed this new counsel that she had been removed as an officer and/or director of Debtor in the weeks prior to such filing.

48.     In her Declaration Pursuant to Local Bankruptcy Rule 1007-4 (the "Blouin Declaration") attached to Debtor's bankruptcy petition [ECF No. 1], Ms. Blouin makes several statements under oath that she knows to be false, including the following: "I am also a director and officer of the Debtor and, as such, I am fully familiar with the facts and circumstances set forth herein."

49.     Despite her knowledge of the aforementioned corporate actions, Ms. Blouin (again) failed to raise any opposition to those corporate actions.

### **REQUEST FOR RELIEF AND BASIS THEREFOR**

### _Ms. Blouin was Removed as an Officer and/or Director of Debtor_

50.     Because Debtor is a Delaware corporation, the determination of whether Bay Point validly exercised its rights to remove Ms. Blouin and Mr. Kabatoff as directors and/or officers of Debtor is governed by Delaware law.

51.     The United States Bankruptcy Court for the District of Delaware recently had the chance to consider these same issues under Delaware law and held that the secured creditor's exercise of proxy voting rights granted under its loan documents to replace a pledged company's

officers and directors was valid under Delaware law. *See In re CII Parent, Inc.*, 2023 Bankr.

LEXIS 1003 (Bankr. D. Del. April 12, 2023).

52.     The following are the relevant facts there were before the Delaware Bankruptcy

Court in *CII Parent*:

(a)     The *CII Parent* debtor (the "<u>CII Parent</u>")[10] was a Delaware corporation that served as a holding corporation that owned one hundred percent of the equity interests of various valuable non-debtor subsidiaries (the "<u>CII Subsidiaries</u>");

(b)     The CII Subsidiaries borrowed money (the "<u>CII Loan</u>") from certain financial institutions for which Twin Brook served as agent (the "<u>CII Secured Creditor</u>");

(c)     To secure the CII Loan, CII Parent pledged its equity interest in the CII Subsidiaries and CII Parent and each of the CII Subsidiaries executed an irrevocable proxy coupled with an interest in favor of the CII Secured Creditor (the "<u>CII Proxy</u>");

(d)     On December 21, 2022, the Secured Creditor informed CII Parent and the CII Subsidiaries that it had exercised its rights under the CII Proxy to (i) amend the applicable bylaws, operating agreements, and/or other corporate governance documents as necessary or desirable to, among other things, remove certain directors and/or managers of the CII Subsidiaries; (ii) adjust the size of each board of directors and/or managers, as applicable, of the CII Subsidiaries; and (iii) appoint replacement directors and/or managers for the CII Subsidiaries; and

(e)     Six days later, on December 27, 2022, CII Parent filed for bankruptcy under chapter 11 to challenge the replacement of the CII Subsidiaries' directors and officers.

*CII Parent*, 2023 Bankr. LEXIS 1003, at *5-6.

53.     The Delaware Bankruptcy Court noted the following with respect to the rights that

were granted to the CII Secured Creditor:

> In addition to a guarantee of payment and performance of the Loan and the grant of security interests and/or liens in identified property as collateral, the Guarantee and Collateral Agreement contains an immediate and irrevocable grant of voting rights to [CII Secured Creditor]. In Section 7.1(a), [CII Parent] "hereby" appoints [CII Secured Creditor] as [CII Parent's] "attorney-in-fact and proxy" to act in [CII Parent's] "place and stead" for the purpose of taking numerous enumerated acts. Among those acts are the right to vote

---

[10] The debtor in *CII Parent* occupies the same position as Aberdeen BVI in the Aberdeen Bankruptcy Case. To try and avoid the argument that the company whose officers and directors had been replaced lacked standing to file a bankruptcy petition, the parent company itself filed for bankruptcy instead of the subsidiary.

> the stock in [CII Subsidiaries] on all matters in the manner in which [CII Secured Creditor] deems advisable as well as to take remedial actions authorized under the agreement. This grant encompasses voting at shareholder meetings and by written consent.

*CII Parent*, 2023 Bankr. LEXIS 1003, at *11. The Delaware Bankruptcy Court went on to note that, while broad, the CII Proxy was only exercisable after a default under the CII Loan. *Id.* at *14. The Delaware Bankruptcy Court also noted that the CII guaranty and collateral agreement also provided a remedial section that discussed the CII Secured Creditor's rights after an event of default, including the fact that the CII Secured Creditor "may exercise Debtor's voting rights as if were the outright owner of the [p]ledged [s]tock." *Id.* at *15. The remedial section being discussed by the Delaware Bankruptcy Court is substantively similar[11] to the language found in the DIP Loan Documents now at issue before Your Honor – except that, unlike Bay Point, the CII Secured Creditor was required to give notice that it was exercising its rights (although Bay Point gave notice even though it wasn't required to do so).

54.    The Delaware Bankruptcy Court then went on to discuss and apply Delaware law to the rights granted to CII Secured Creditor. The court stated off by noting that the Delaware Supreme Court and lower courts had relaxed their approach to proxy agreements. *Id.* at *18-19. Specifically, the court stated, "[T]he Delaware Supreme Court has also recognized scholarship that

---

[11]    If an Event of Default shall occur and be continuing, (a) the [CII Secured Creditor] shall have the right to . . . (ii) exercise or permit its nominee to exercise, any and all rights of conversion, exchange and subscription any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (. . . and including with respect to the Pledged Equity, giving or withholding consents of stockholders, partners or members, calling special meetings of stockholders, partners or members and voting at such meetings) and otherwise act with respect to the Investment Property as if [CII Secured Creditor] were the outright owner thereof . . . and (b) the [CII Secured Creditor] shall have the right, substantially concurrently with notice to the applicable Grantor, to (i) receive any and all cash dividends and distributions, payments or other Proceeds paid in respect of the Investment Property constituting Collateral and make application thereof to the Secured Obligations in such order as the [CII Secured Creditor] may determine, and (ii) exercise, or permit its nominee to exercise, all voting and other rights pertaining to such Investment Property as a holder of such Investment Property, with full power of substitution to do so.
*CII Parent*, 2023 Bankr. LEXIS 1003, at *15-16.

classifies interests in stock that may be transferred and employed those classifications in its proxy analysis." *Id.* at \*19. The Delaware Supreme Court now recognizes "formal voting rights" (i.e., the legal right to vote the shares, including the right to instruct someone else how to vote), "economic ownership" (i.e., the economic returns attendant to the shares), and "full ownership" (i.e., both the formal voting rights and the economic ownership, combined). *Id.*

55.    The Delaware Bankruptcy Court then addressed the CII Parent's specific arguments, overruling each of those, and holding that CII Secured Creditor was granted the right to replace the directors and officers of the CII Subsidiaries and had validly done so under the CII corporate documents and Delaware law. *See id.* at \*32. The court then went on to note that its decision was "consistent with rulings made by other courts upholding the prepetition exercise of proxy rights in various contexts. *Id.* at \*32 n. 62.[12]

56.    The rights and authorities granted to Bay Point under the DIP Loan Documents are on point and consistent in all relevant aspects with those granted to the CII Secured Lender in *CII Parent*. Likewise, the actions taken by Bay Point are on point and wholly consistent with the actions taken by the CII Secured Creditor. The well-reasoned and supported analysis undertaken by the *CII Parent* Court is equally applicable here: Ms. Blouin and Mr. Kabatoff were validly removed from their positions as directors and/or officers of Debtor prior to the filing of Debtor's bankruptcy petition.

---

[12]    *See In re Tominaga*, 325 B.R. 653 (Bankr. M.D. Fla. 2005) (reviewing the operative agreement and relevant state law and determining that, upon default, lender was entitled to vote shares of stock; therefore prepetition corporate resolutions replacing directors were valid and debtor was not entitled to a ruling preventing newly appointed directors from acting as such nor to resume control of corporate entities); *In re Lake County Grapevine Nursery Operations*, 441 B.R. 653, 655 (Bankr. N.D. Cal. 2010) (recognizing that "[t]he issue here is whether a pledge of an equity interest is self-executing as to voting rights or whether state law regarding formal transfer of voting rights must be followed [and i]n the absence of a specific state law requiring further proceedings to obtain voting rights, courts generally conclude that the occurrence of a default is sufficient to trigger the transfer of voting rights to the pledgee.").
*CII Parent*, 2023 Bankr. LEXIS 1003 at \* 32 n.62.

**_Debtor's Unauthorized Bankruptcy Petition Should be Dismissed_**

57.     "[O]n request of a party in interest, and after notice and a hearing, the court shall convert . . . or dismiss a case . . . , whichever is in the best interests of creditors and the estate, for cause. . . ." 11 U.S.C. § 1112(b)(1).

58.     Section 1112(b)(4) "provides an 'illustrative, not exhaustive' list of sixteen grounds that constitute cause for purposes of section 1112(b)(1) of the Bankruptcy Code." *In re Adamo*, No. 14-73640-las, 2016 Bankr. LEXIS 694, at \*28 (Bankr. E.D.N.Y. Mar. 4, 2016) (citing *14 C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997)). "The list is not exclusive, and the Court is free to consider other factors." *Id.* (citing *BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010); *In re FRGR Managing Member LLC*, 419 B.R. 576, 580 (Bankr. S.D.N.Y. 2009)).

59.     "It is settled that the lack of authority to file a voluntary chapter 11 bankruptcy petition by the party filing it constitutes an independent ground for 'cause' for relief under" section § 1112(b). *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, No. 18-12043 (JLG), 2018 Bankr. LEXIS 2909, at \*14 (Bankr. S.D.N.Y. Sept. 25, 2018) (listing cases); *In re Carolina Park Assocs., LLC*, 430 B.R. 744, 748 (Bankr. D.S.C. 2010) (listing cases) *vacated on other grounds by* 2010 U.S. Dist. LEXIS 104795 (D.S.C. Sept. 30, 2010). "Therefore, if [Ms. Blouin] did not have the authority to file the petition . . . , then the Debtor's case is subject to dismissal." *In re E. End Dev.*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013) (citing *In re Raljoed Realty Co.*, 277 F. Supp. 225, 226 (S.D.N.Y. 1967) *aff'd per curiam sub nom. In re Park Towers Corp.*, 387 F.2d 948, 967 (2d Cir. 1967)).

60.     As a creditor of Debtor, Bay Point has standing to challenge Ms. Blouin's authority to file the bankruptcy petition on behalf of Debtor. *In re Orchard at Hansen Park, LLC*, 347 B.R.

822, 825 (Bankr. N.D. Tex. 2006) ("[S]everal courts have held that a creditor to a Chapter 11 bankruptcy may have standing to challenge a bankruptcy filing.") (citing *In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir. 1991); *In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 137 (Bankr. D. Me. 1991) (citing *In re Community Book Co.*, 10 F.2d 616 (D. Minn. 1926)); *In re Memphis-Friday's Associates*, 88 B.R. 821, 827 (Bankr. W.D. Tenn. 1989); *In re AT of Maine, Inc.*, 56 B.R. 55 (Bankr. D. Me. 1985)); *see also In re Carolina Park*, 430 B.R. at 748-49 ("[C]reditors have standing to seek dismissal of bankruptcy cases on the basis of the absence of authority to file the petition") (order vacated on other grounds). As stated by the First Circuit:

> The bankruptcy court may dismiss a chapter 11 case on request of a "party in interest," after notice and hearing. Bankruptcy Code § 1109 defines "party in interest" as "including . . . a creditor . . .," and expressly authorizes a "party in interest" to "raise[,] . . . appear and be heard on any issue in a case under this chapter." A "creditor" thus has standing to request dismissal of a chapter 11 case under Bankruptcy Code § 1122(b).

*In re Abijoe Realty Corp.*, 943 F.2d at 124-25 (internal citations omitted); *see also In re Memphis-Friday's Assocs.*, 88 B.R. at 827 ("The court finds that OSP, which is admittedly a creditor of Memphis-Friday's Associates, has standing as a party in interest to contest the validity of the filing.") (citation omitted).

61.    Issues regarding authority to file a bankruptcy petition are properly determined on an expedited basis. *See, e.g., In re D&W Ltd., LLC*, 467 B.R. 427, 430 (Bankr. E.D. Mich. 2012) (setting expedited hearing on motion to dismiss for lack of corporate authority filed shortly after bankruptcy commenced); *In re Carolina Park*, 430 B.R. at 746 (hearing motion to dismiss on expedited basis at creditor's request).

62.    A debtor's authority to file a bankruptcy petition is governed by state law. *In re E. End Dev.*, 491 B.R. at 638 (citing *In re Am. Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996)); *In re 167 W. 133rd St. Hous. Dev. Fund*, 2018 Bankr. LEXIS 2909, at *14. And "[a]s a

general proposition, 'the business of a corporation shall be managed under the direction of its board of directors." *Id.* at *15 (quoting N.Y. Bus. Corp. L. § 701); *see also* N.Y. Bus. Corp. L. § 715(g); N.Y. Bus. Corp. L. § 601(b). To determine who has authority to file a bankruptcy petition on behalf of a corporation, the Court reviews the company's certificate of incorporation and bylaws. *In re 167 W. 133rd St. Hous. Dev. Fund*, 2018 Bankr. LEXIS 2909, at *16 (citing *Mgmt. Techs., Inc. v. Morris*, 961 F. Supp. 640, 646 (S.D.N.Y. 1997) and *ALH Props. Ten v. 306-100th St. Owners Corp.*, 191 A.D.2d 1, 16 (1st Dep't 1993)).

63.     Pursuant to Debtor's bylaws, the business and affairs of the Corporation are managed by Debtor's board of directors. *See* Original Bylaws, § 5.[13] As noted above, on the date upon which Debtor filed its bankruptcy petition, Ms. Blouin was not a director of Debtor and, as such, had no authority to file bankruptcy on behalf of Debtor. Mr. Andros remains Debtor's sole director and officer and, as such, Ms. Blouin remains *without* authority to take any action on behalf of Debtor.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an appropriate order (i) dismissing the above-captioned bankruptcy proceedings; or (ii) alternatively, if the Court believes it appropriate based on the statements of counsel at any hearing that may be had on this Motion, issuing an order confirming that Mr. Andros is the rightful director and officer of Debtor and authorizing Mr. Andros to continue management of Debtor as a debtor-in-possession in the above-captioned bankruptcy proceedings; and (iii) for such further and other relief as the Court deems just.

---

[13] Debtor's bylaws have been updated since the Original Bylaws were promulgated. However, Section 5 of the Original Bylaws has not been updated and still remains applicable.

Dated:  August 7, 2023

Respectfully submitted,

/s/ John C. Allerding
By: John C. Allerding (admitted pro hac vice)
Thompson Hine LLP
3560 Lenox Road, Suite 1600
P: 404.407.3676 / F: 216.566.5800
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*