# Exhibit A

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "<u>Agreement</u>") is entered into as of November 9, 2022, by and between BRICKCHRUCH ENTERPRISES, INC., a Delaware corporation ("<u>Brickchurch</u>"), and ABERDEEN ENTERPRISES, INC., a Delaware corporation ("<u>Aberdeen</u>", and collectively with Brickchurch, the "<u>Borrowers</u>," each being a "<u>Borrower</u>"), as borrowers, and BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership ("<u>Lender</u>"), as lender.

Lender has agreed to make available to Borrowers a term loan upon the terms and subject to the conditions set forth herein. In consideration of the mutual agreements herein, the parties agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

**1.1    Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"<u>Aberdeen Mortgaged Property</u>" means the real property described on <u>Schedule 2</u>, attached hereto and incorporated herein by reference, and any improvements thereon.

"<u>Account Debtor</u>" means "account debtor" as such term is defined in the UCC.

"<u>Accounts</u>" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to any Borrower arising out of the sale or lease of goods or the rendering of services by any Borrower, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by any Borrower and any Borrower's books and records relating to any of the foregoing.

"<u>Administrative Account</u>" has the meaning provided in <u>Section 11.5(a)</u> of this Agreement.

"<u>Affiliate</u>" of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any partner, manager, trustee, officer or director of such Person and (c) with respect to Lender, any entity administered or managed by Lender or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote twenty percent (20%) or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Borrower.

"<u>Anti-Corruption Laws</u>" shall mean all laws, rules and regulations of any jurisdiction applicable to any Borrower and each of their respective Subsidiaries concerning or relating to bribery or corruption.

"<u>Approved DIP Budget</u>" has the meaning provided in Section 6.1(a) of this Agreement.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, §§ 101, *et seq.*

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of New York presiding over the Chapter 11 Case.

"<u>Brickchurch Mortgaged Property</u>" means the real property described on <u>Schedule 1</u>, attached hereto and incorporated herein by reference, and any improvements thereon.

"<u>Broker Fee</u>" has the meaning provided in <u>Section 2.8(f)</u> of this Agreement.

"Business Day" means any day other than a Saturday, Sunday, or legal holiday in Atlanta, Georgia.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Case" means Case No. 22-70914-ast currently pending before the Bankruptcy Court.

"Closing Date" means the date of this Agreement.

"Collateral" means, collectively, all tangible and intangible property, real and personal of any Person that is or purports to be the subject of a Lien in favor of Lender to secure the whole or any part of the Obligations, including, without limitation, the Mortgaged Property and Pledged Equity.

"Collateral Documents" means, collectively, the Security Instruments, each Mortgage Document, each Pledge Agreement, the Subordination Agreement, each collateral report, each account control agreement and any other agreement or instrument pursuant to which any Borrower or any other Person grants or purports to grant Collateral to Lender or otherwise relates to such Collateral.

"Compliance Certificate" means a certificate executed by a Responsible Officer of a Borrower certifying such Borrower's compliance with any one or more of the provisions of this Agreement, including each of the covenants, representations, and warranties hereunder, as shall be requested by Lender in its sole and absolute discretion.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

"Control" of a Person means (i) ownership, control, or power to vote 20% or more of any class of voting securities of such Person, directly or indirectly or acting through one or more other Persons; (ii) control in any manner over the election or appointment of a majority of the directors, trustees, managers or general partners (or individuals exercising similar functions) of such Person; (iii) the direct or indirect power to exercise a controlling influence over the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise; or (iv) conditioning in any manner the transfer of 20% or more of any class of voting securities of such Person upon the transfer of 20% or more of any class of voting securities of another Person.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Debtor Relief Laws" means the United States Bankruptcy Code, as amended, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time-to-time in effect.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"DIP Order" means a final order of the Bankruptcy Court approving this Agreement and entered in the Chapter 11 Case, in form and substance satisfactory to the Lender in its sole and absolute discretion.

"Dollars" means the official currency of the United States commonly referred to as United States Dollars ($).

"Due Diligence Fee" has the meaning provided in Section 2.8(g) of this Agreement.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which any Borrower has any interest.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning provided in Section 8 of this Agreement.

"Excess Cash Flow" means, as measured by the aggregate balance of the Specified Deposit Accounts, that amount of in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) that is not otherwise allocated to the payment of (i) previously earned legal services, accountants, real estate brokers, real estate appraisers, and maintenance and repair costs associated with the Mortgaged Property; (ii) and due and payable taxes.

"Excluded Taxes" means any of the following taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date hereof, and (c) any U.S. federal withholding taxes imposed under FATCA.

"Existing JGB Liens" shall mean all liens and encumbrances resulting from, or otherwise created by, that certain Mortgage, dated July 25, 2018, granted by Brickchurch and Aberdeen, as mortgagors, in favor of JGP Partners, LP; JGB Capital, LP; JGB (Cayman) Ancona Ltd.; and JGB Plymouth Rock LLC, as mortgagees, with respect to the Mortgaged Property.

"Existing Tax Liabilities" shall mean all property tax liabilities relating to the Mortgaged Property that are due and owing as of the Closing Date, and which have already been reduced to a lien on the Mortgaged Property or, if not paid, could result in a lien on the Mortgaged Property senior to that lien granted to Lender pursuant to the Loan Documents.

"Expense Deposit" has the meaning provided in Section 11.5(b) of this Agreement.

"Extension Decision" has the meaning provided in Section 2.9(b) of this Agreement.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

"Extension Fee" has the meaning provided in <u>Section 2.8(d)</u> of this Agreement.

"Extension Period" has the meaning provided in <u>Section 2.9(b)</u> of this Agreement.

"Facility Termination Date" means the date all Obligations arising under the Loan Documents have been indefeasibly paid in full.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the IRC.

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means U.S. generally accepted accounting principles as in effect from time-to-time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Gross Operating Income" means the sum of any and all amounts, payments, fees, rentals, additional rentals, expense reimbursements (including, without limitation, all reimbursements by tenants, lessees, licensees and other users of the Mortgaged Property), discounts or credits to any Borrower, income, interest, and other monies directly or indirectly received by or on behalf of or credited to any Borrower, including, without limitation, from any person with respect to such Borrower's ownership, use, development, operation, leasing, franchising, marketing or licensing of the Mortgaged Property. Gross Operating Income shall be computed on a cash basis and shall include for each monthly statement required to be delivered to Lender hereunder all amounts actually received in such month whether or not such amounts are attributable to a charge arising in such month.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; <u>provided</u> that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means a Person who may from time-to-time provide a guarantee of the Obligations in favor of Lender, including, as of the Closing Date, Louise Blouin.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under capital leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than (i) trade payables repayable in accordance with customary trade practices and (ii) obligations to pay for services provided by employees and independent contractors, in each case with respect to clauses (i) and (ii) incurred in the ordinary course of business which are not past due by more than 30 days), (f) net obligations of such Person under any hedging transactions, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment prior to the date that is 91 days after the Maturity Date in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (h) any obligation of such Person Guaranteeing or intended to Guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (A) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (B) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning provided in Section 11.14 of this Agreement.

"Indemnified Taxes" means (a) taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or any other Obligor under any Loan Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person or entity under any provision of any Debtor Relief Law.

"Intellectual Property" means all of each Borrower's right, title, and interest in and to the following:  Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Interest Reserve Account" has the meaning provided in Section 2.3 of this Agreement.

"Interest Reserve Replenishment Payment" has the meaning provided in Section 2.3 of this Agreement.

"Inventory" means all inventory in which any Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of any Borrower, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and each Borrower's books and records relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to, or other investment in, any Person.

"IRC    " means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Leases" means all leases, tenant contracts, rental agreements, franchise agreements, license agreements or other occupancy or use agreements, whether oral or written, now existing or hereafter entered into, for the use or occupancy of all or any part of the Mortgaged Property, together with all modifications or renewals thereof.

"Lender Party" has the meaning provided in Section 11.15 of this Agreement.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan" means the term loan made by Lender to Borrowers, on the Closing Date pursuant to Section 2.1 in the original principal amount of Sixty-Two Million and 00/100 Dollars ($62,000,000.00); *provided* that, notwithstanding anything to the contrary herein and for the avoidance of doubt, the stated amount of the Loan set forth herein shall be the gross amount of the Loan prior to payment from the Loan proceeds of all fees, deposits, costs, holdbacks, reserves, prepaid interest, amounts to be escrowed, and other amounts as permitted and/or required by the terms of this Agreement.

"Loan Closing Costs" means, collectively, (i) all reasonable and documented out-of-pocket costs and expenses of Lender in connection with the preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith, including Lender's legal fees, documentation fees, recording fees, and the costs and expenses associated with title searches, surveys, and updates to third-party reports; (ii) the Origination Fee; (iv) the Broker Fee; and (vi) the Due Diligence Fee.

"Loan Documents" means, collectively, this Agreement, the Note and any note or notes executed by any Borrower, the Collateral Documents, each Compliance Certificate, and any other agreement entered into in connection with this Agreement, all as amended or modified from time-to-time.

"Maintenance Reserve Account" has the meaning provided in Section 2.10(b) of this Agreement.

"Maintenance Reserve Replenishment Payment" has the meaning provided in Section 2.10(b) of this Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business operations, assets, liabilities, properties, condition (financial or otherwise), or results of operations, of any Borrower, or (b) the ability of any Borrower to repay the Obligations or to perform its obligations under the Loan Documents or (c) the validity or enforceability of Lender's security interests in the Collateral.

"Maturity Date" means the earlier of (i) the Stated Maturity Date, and (ii) the date all or any of the Obligations are accelerated pursuant to Section 9 of this Agreement.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

"Morgan Stanley Mortgage" means that certain Mortgage encumbering the Aberdeen Mortgaged Property granted by Aberdeen in favor of Morgan Stanley Private Bank, National Association in the original principal amount of Fifteen Million Dollars ($15,000,000.00), recorded on February 6, 2012 at Liber 22166, Page 699.

"Morgan Stanley Note" has the meaning provided in Schedule 7.3 of this Agreement.

"Mortgage Documents" means, collectively, the Security Instruments, duly executed by any Borrower, together with, to the extent requested or required by Lender in its sole discretion, each of the following: (a) title insurance policies, current as-built ALTA/ACSM Land Title surveys certified to Lender, zoning letters, building permits and certificates of occupancy, in each case relating to the Mortgaged Property and satisfactory in form and substance to Lender; (b)(i) "Life of Loan" Federal Emergency Management Agency Standard Flood Hazard determinations, (ii) notices, in the form required under the Flood Insurance Laws, about special flood hazard area status and flood disaster assistance duly executed by the applicable Borrower, and (iii) if the improved real property encumbered by any Security Instrument is located in a special flood hazard area, a policy of flood insurance that is on terms satisfactory to Lender; (c) evidence that counterparts of each Security Instrument have been recorded in all places to the extent necessary or desirable, in the judgment of Lender, to create a valid and enforceable Lien (subject to Permitted Liens) on the Mortgaged Property in favor of Lender (or in favor or such other trustee as may be required or desired under local law); (d) an opinion of counsel in the state in which the Mortgaged Property is located in form and substance and from counsel satisfactory to Lender; (e) a duly executed Environmental Indemnity with respect thereto; and (e) such other documents, instruments and agreements as Lender shall reasonably request, each in form and substance satisfactory to Lender, each of the foregoing, including the Security Instruments, being a "Mortgage Document."

"Mortgaged Property" means, collectively, the Brickchurch Mortgaged Property and the Aberdeen Mortgaged Property.

"Note" means a promissory note made by any Borrower in favor of Lender evidencing the Loan made by Lender hereunder, which Note shall be in a form satisfactory to Lender in its sole and absolute discretion.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Borrower arising under any Loan Document or otherwise with respect to the Loan, (b) all fees and expenses of Lender payable by any Borrower hereunder or under any of the other Loan Documents, (c) all advances to, and debts, liabilities, obligations, covenants and duties of, any Guarantor arising under any Loan Document or otherwise with respect to the Loan; (d) all fees and expenses of Lender payable by any Guarantor hereunder or under any of the other Loan Documents; and (e) all other obligations of any Obligor arising hereunder or under any of the other Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, including fees that accrue after the commencement by or against any Obligor, or any Affiliate thereof, of any Insolvency Proceeding naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Obligor" means each Borrower, each Guarantor, and any other Person who has granted a security interest or Lien in favor of Lender to secure all or any portion of the Obligations under the Loan Documents.

"Origination Fee" has the meaning provided in Section 2.8(a) of this Agreement.

"Other Connection Taxes" means, with respect to Lender, taxes imposed as a result of a present or former connection between Lender and the jurisdiction (or political subdivision thereof) imposing such tax

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

(other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning provided in Section 11.3(d) of this Agreement.

"Participant Register" has the meaning provided in Section 11.3(d) of this Agreement.

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Patriot Act" has the meaning provided in Section 11.13 of this Agreement.

"Permitted Indebtedness" means: (a) Indebtedness of any Borrower in favor of Lender arising under this Agreement or any other Loan Document; (b) Indebtedness existing on the Closing Date, after giving effect to the application of the proceeds of the Loan, and described on Schedule 7.3; (c) Indebtedness secured by a lien described in clause (c) of the defined term "Permitted Liens;" (d) Indebtedness, including the endorsement of negotiable instruments for deposit or collection of similar transaction in the ordinary course of business, that is consistent with the then applicable Approved DIP Budget or any prior Approved DIP Budget that was applicable at the time that such indebtedness was incurred; and (e) any other Indebtedness expressly approved in writing by Lender.

"Permitted Liens" means the following: (a) Liens existing on the Closing Date and described on Schedule 7.4 or arising under this Agreement or the other Loan Documents; (b) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, *provided* that the same have no priority over any of Lender's security interests; (c) normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions and Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection; (d) Liens of carriers, warehousemen, mechanics, materialmen and repairmen or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person; and (e) any other Liens expressly approved in writing by Lender.

"Permitted Operating Expenses" means those expenses identified and approved as part of the then applicable Approved DIP Budget.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Pledge Agreements" means, collectively, those certain agreements pursuant to which Lender obtained pledges of the Pledged Equity, including (i) that certain Pledge Agreement, dated

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

contemporaneously herewith, between Lender, as pledgee, and Aberdeen Enterprises Ltd., as pledgor; (ii) that certain Pledge Agreement, dated contemporaneously herewith, between Lender, as pledgee, and Brickchurch Enterprises Ltd., as pledgor; (iii) that certain Pledge Agreement, dated contemporaneously herewith, between Lender, as pledgee, and Aberdeen Enterprises Holdings Ltd., as pledgor; and (iv) that certain Pledge Agreement, dated contemporaneously herewith, between Lender, as pledgee, and Louise T. Blouin, as pledgor.

"Pledged Equity" means those shares, certificates, membership interests, or other evidence of ownership interest, whether in physical or electronic form, whether certificated or uncertificated, including any entries in any books and records, evidencing of constituting the complete, undiluted, and undivided ownership interest in Aberdeen, Brickchurch, Aberdeen Enterprises Holdings Ltd., Aberdeen Enterprises Ltd., and Brickchurch Enterprises Ltd.

"Project Documents" has the meaning provided in Section 6.10 of this Agreement.

"Receivables" means Accounts, chattel paper, documents, investment property, instruments and any other rights or claims to receive money which are general intangibles or which are otherwise included as Collateral.

"Reserve Accounts" mean, collectively, the Interest Reserve Account and Maintenance Reserve Account. (each being a "Reserve Account").

"Responsible Officer" means each of the President, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer or other principal accounting and financial officer of any Borrower (or any other officer or member having similar responsibilities).

"Reserve Replenishment Payments" means, collectively, the Interest Reserve Replenishment Payment and Maintenance Reserve Replenishment Payment (each being a "Reserve Replenishment Payment").

"Sanctioned Country" means, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Person" shall mean, at any time, any Person that is (a) the subject or target of any Sanctions, (b)(i) located, organized, operating or resident in a Sanctioned Country, (ii) an agency of the government of a Sanctioned Country, or (iii) an organization controlled by a Sanctioned Country, or (c) owned or controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time-to-time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control or the U.S. Department of State, (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom or (c) any other relevant sanctions authority.

"Security Instruments" means, collectively, (i) that certain Mortgage, Assignment, Security Agreement and Fixture Filing, dated of even date herewith, granted by Brickchurch in favor of Lender with respect to the Brickchurch Mortgaged Property; and (ii) that certain Mortgage, Assignment, Security Agreement and Fixture Filing, dated of even date herewith, granted by Aberdeen in favor of Lender with respect to the Aberdeen Mortgaged Property (each being a "Security Instrument").

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

"Specified Deposit Accounts" means, collectively, (i) that certain deposit account of Brickchurch ending in 2431, which deposit account is maintained with Wells Fargo Bank, N.A.; and (ii) that certain deposit account of Aberdeen ending in 9605 which deposit account is maintained with Bank of America, N.A. (each being referred to herein as a "Specified Deposit Account").

"Stated Maturity Date" means the later of (i) the May 8, 2023; and (2) the one hundred eightieth (180th) day following the date upon which the DIP Order is entered by the Bankruptcy Court; *provided that* if the one hundred eightieth (180th) day following the entry of the DIP Order is not a Business Day, the "Stated Maturity Date" shall be the next Business Day following that date that would otherwise be the Stated Maturity Date hereunder.

"Subordination Agreement" means that certain Intercreditor and Subordination Agreement, dated contemporaneously herewith, pursuant to which Louise Blouin agreed to subordinate any and all claims that she may have against Brickchurch and Aberdeen to the Obligations created and arising in favor of Bay Point under the Loan Documents.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding Equity Interests as have fifty percent (50%) or more of the ordinary voting power for the election of directors or managers (as applicable) of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to each of the Borrowers' respective Subsidiaries.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of any Obligor connected with and symbolized by such trademarks.

"UCC   " means the Uniform Commercial Code as in effect on the date hereof and from time-to-time in the State of Georgia, provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

    **1.2    Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; *provided* that if at any time any change in GAAP would affect the computation of any covenant (including any financial ratio) or requirement set forth in any Loan Document, and either Borrower or Lender shall so request, Borrowers and Lender shall negotiate in good faith to amend such covenant (including any financial ratio) or requirement to preserve the original intent thereof in light of such change in GAAP; *provided, further*, that, until so amended, (a) such covenant (including any financial ratio) or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) each Borrower shall provide Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto.

    **1.3    Other Interpretive Provisions**.

        (a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

(b)      Section, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The term "including" is not limiting and means "including without limitation."

(c)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."   Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(d)      This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lender, each Borrower, and the other parties thereto and are the products of all parties.  Accordingly, they shall not be construed against Lender merely because of Lender's involvement in their preparation.

(e)      Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC.

(f)      Temporal provisions in this Agreement shall be measured by the prevailing time in Atlanta, Georgia on the specified date.

## 2.      LOAN AND TERMS OF PAYMENT.

**2.1      Loan.**  Subject to and upon the terms and conditions of this Agreement, Lender agrees to make a single term loan to Borrowers on the Closing Date in a principal amount equal to Sixty-Two Million and 00/100 Dollars ($62,000,000.00); *provided* that, notwithstanding anything to the contrary herein and for the avoidance of doubt, the stated amount of the Loan set forth herein shall be the gross amount of the Loan prior to payment from the Loan proceeds of all fees, deposits, costs, holdbacks, reserves, prepaid interest, amounts to be escrowed, and other amounts as permitted and/or required by the terms of this Agreement.  The execution and delivery of this Agreement by Borrowers and the satisfaction of all conditions precedent pursuant to Section 3 shall be deemed to constitute Borrowers' request to borrow the Loan on the Closing Date.  Amounts repaid in respect of the Loan may not be reborrowed.  Borrowers shall use the proceeds of the Loan as provided in Section 6.10 of this Agreement.

**2.2      Promise to Pay.**  Each Borrower promises to pay, jointly and severally, to the order of Lender, in lawful money of the United States of America, (a) the aggregate unpaid principal amount of the Loan; (b) interest on the unpaid principal amount of the Loan at rates in accordance with the terms hereof; and (c) all costs, expenses, fees, reserves, and other Obligations that may become due from time-to-time under the Loan Documents. Lender may, at its option, charge any Obligations which are then due against any operating, investment or other account of any Borrower maintained with or under the control of Lender or any of its Affiliates, including, without limitation, the Administrative Account, the  Reserve Accounts, and, if a deposit account control agreement (or similar control agreement) exists with respect to any Specified Deposit Account, such Specified Deposit Account.

**2.3      Repayment and Prepayment of the Loan.**

(a)      **Principal and Interest Repayment**. On the Closing Date, Lender will disburse a portion of the Loan into an escrow account (the "Interest Reserve Account") in an amount equal to Three

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

Million One Hundred Thousand Dollars and 00/100 Dollars ($3,100,000.00). Upon the occurrence of any Extension Decision made in accordance with Section 2.9(b) of this Agreement, Borrowers shall, jointly and severally, remit a payment to Lender in an amount equal to three (3) months of interest payments at the then applicable interest rate, as calculated on the Loan balance as of the date of such Extension Decision (the "Interest Reserve Replenishment Payment") for deposit into the Interest Reserve Account. Commencing on the last day of the month in which the DIP Order is entered, and continuing on the last day of each month thereafter until the Obligations are paid in full, each Borrower authorizes Lender to make advances from the Interest Reserve Account to pay accrued and unpaid interest on the Loan. Such authorizations are irrevocable and no further direction or authorization shall be required for Lender to make such advances. Notwithstanding anything to the contrary herein, the outstanding principal balance of the Loan and all unpaid interest thereon shall be paid in full on the Maturity Date.

(b)    **Voluntary Prepayments.**    Except as provided in Section 2.8(c), Borrower may prepay the Loan in whole or in part at any time, without premium or penalty.

(c)    **Mandatory Prepayments.**

(i)    **Proceeds of Issuances of Indebtedness or Equity.**    Immediately upon receipt by any Borrower or any Subsidiary of any proceeds from any (A) issuance of Indebtedness (other than Indebtedness permitted by Section 7.3) by any Borrower or any Subsidiary, or (B) issuance of any Equity Interests by any Borrower or any Subsidiary after the Closing Date, the Borrower(s) receiving such proceeds, or otherwise receiving any value or benefit on account of such proceeds, shall prepay the then outstanding principal amount of the Loan and the other Obligations in an amount equal to all of such proceeds (whether or not such proceeds are received by any Borrower), net of reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the respective Borrower(s) in connection therewith (in each case, paid to non-Affiliates). Any such prepayment shall be applied in accordance with Section 2.3(d).

(ii)    **Asset Dispositions and Extraordinary Receipts.**    Immediately upon receipt by any Borrower or any Subsidiary of any proceeds of any sale or disposition by any Borrower or any Subsidiary of any of its respective assets, including the Collateral (other than asset sales or dispositions permitted under Section 7.1), or any proceeds from any casualty insurance policies or eminent domain, condemnation or similar proceedings, the Borrower(s) receiving such proceeds, or otherwise receiving any value or benefit on account of such proceeds, shall prepay the Obligations in an amount equal to all such proceeds (whether or not such proceeds are actually received by any Borrower), net of commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the respective Borrower(s) in connection therewith (in each case, paid to non-Affiliates). Any such prepayment shall be applied in accordance with Section 2.3(d). Notwithstanding anything stated in this paragraph, the Borrower, so long as not otherwise in default of their obligations contained herein, may, consistent with Section 6.5 insurance proceeds to pay for any repairs that gave rise to the casualty insurance payment.

(iii)    **Excess Cash Flow Sweep.**    On or before 2:00 pm on Monday each week, or, if such Monday is not a Business Day, then on or before 2:00 pm of the next Business Day immediately following such Monday, all Excess Cash Flow shall be applied to prepay the Obligations. If any Borrower fails to take appropriate action to timely apply the Excess Cash Flow in accordance with the immediately preceding sentence, Lender may, at its sole and absolute discretion, and is so authorized by each Borrower to, take any actions necessary to apply the Excess Cash Flow as a prepayment of the Obligations.

(d)    **Application of Prepayments.** Any prepayments made by any Borrower pursuant to Section 2.3(b) or (c) shall be applied as follows: first, to Lender's fees and reimbursable expenses then

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

due and payable pursuant to any of the Loan Documents; <u>second</u>, to interest then due and payable hereunder; and <u>third</u>, to the principal installments due on the Loan (in the inverse order of maturity), until the same shall have been paid in full.

### 2.4    Interest Rates, Payments, and Calculations.

(a)    **Interest Rates.**  The outstanding principal amount of the Loan shall bear interest at a fixed rate of ten percent (10.00%) *per annum.*

(b)    **Default Rate.**  Unless Lender otherwise consents in writing, all Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to twenty-four percent (24.00%) percent per annum or the maximum rate permitted by law, whichever is less.

(c)    **Interest Payments**.  The interest accruing on the Loan at the fixed rate of ten percent (10.00%) *per annum* in accordance with <u>Section 2.4(a)</u> shall be due and payable in arrears on the last day of each month during the term of the Loan.

(d)    **Computation**.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

### 2.5    Crediting Payments.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

### 2.6    Withholding.  Payments received by Lender from a Borrower under this Agreement will be made free and clear of and without deduction for any taxes, except as required by any Governmental Authority, applicable law, regulation or international agreement.  Specifically, however, if at any time any Governmental Authority, applicable law, regulation or international agreement requires a Borrower to make any withholding or deduction from any such payment or other sum payable hereunder to Lender, such Borrower hereby covenants and agrees that, if such tax is an Indemnified Tax, the amount due from such Borrower with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required, and such Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority.  Each Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that such Borrower has made such withholding payment; *provided*, however, that a Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by such Borrower.  The agreements and obligations of Borrowers contained in this <u>Section 2.6</u> shall survive the termination of this Agreement.

### 2.7    Additional Costs.  If any Change in Law shall: (a) subject Lender to any taxes (other than (i) Indemnified Taxes, (ii) taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on the Loan, loan principal, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (b) impose, modify or deem applicable any reserve (including, without limitation, any imposed by the FRB), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by

Lender; or (c) impose on Lender or the foreign exchange and interbank markets any other condition affecting this Agreement; and the result of any of the foregoing is to increase the cost to Lender of making, continuing, or maintaining any part of the Obligations or to reduce the amount of any sum received or receivable by Lender under this Agreement by an amount deemed by Lender to be material, then Borrowers, jointly and severally, shall pay to Lender, within fifteen (15) days of any Borrower's receipt of a written notice (coupled with the certificate referenced in the next sentence) from Lender requesting such additional amount or amounts as will compensate Lender for such increased cost or reduction. A certificate of Lender, prepared in good faith and in reasonable detail by Lender and submitted by Lender to any Borrower, setting forth the basis for determining such additional amount or amounts necessary to compensate Lender shall be conclusive and binding for all purposes, absent manifest error.

**2.8**    Fees. Borrowers shall, jointly and severally, pay fees set forth herein.

(a)    **Origination Fee.** On the Closing Date, out of the proceeds of the Loan, Borrowers shall, jointly and severally, pay an origination fee to Lender equal to Five Million Five Hundred Eighty Thousand and 00/100 Dollars ($5,580,000.00) (the "Origination Fee"), which Origination Fee shall be fully-earned immediately as of funding of the Loan and shall be nonrefundable.

(b)    **Exit Fee.** There is no exit fee associated with the Loan.

(c)    **Late Payment Fee.** If Lender has not received the full amount of any Borrower's regularly scheduled monthly interest payments, or any payment due on the Maturity Date, within five (5) days after the due date thereof, then Borrowers shall, jointly and severally, pay a late fee equal to ten percent (10.00%) of the amount of such late payment (including, without limitation, the outstanding principal balance of the Loan owed on the Maturity Date or following an acceleration of the Obligations by Lender); *provided*, that payments due on the Maturity Date shall not have a five (5) day grace period and any such payments are deemed late as of the date immediately after the Maturity Date. Each Borrower agrees that such late charge is not a charge for the use of the money, but is imposed to compensate Lender for some administrative services, costs and losses associated with any default (including a payment default upon maturity) under the Note, and such late charge is fully earned and nonrefundable when accrued. Collection or acceptance by Lender of such late charge shall not constitute a waiver of any remedies of Lender provided herein or otherwise at law.

(d)    **Extension Fee.** If Borrowers elect to extend the maturity date in accordance with the provisions of Section 2.9 of this Agreement, Borrowers shall, in addition to meeting each of the other conditions set forth therein, pay an extension fee equal to one percent (1.00%) of the outstanding principal balance of the Loan (the "Extension Fee"), which Extension Fee shall be fully-earned upon the extension of the Maturity Date in accordance with the provisions of Section 2.9 of the this Agreement and shall be nonrefundable.

(e)    **Prepayment Premium.** There is no prepayment premium associated with the Loan.

(f)    **Broker Fee.** On the Closing Date, Borrowers shall, jointly and severally, pay a broker fee to Nathan Capital Group equal to Three Hundred Ten Thousand and 00/100 Dollars ($310,000.00) (the "Broker Fee"), which broker fee shall be fully-earned at the time of closing on the Closing Date and shall be nonrefundable. If the loan does not fund, no Broker fee is payable nor due.

(g)    **Diligence Fee.** On the Closing Date, Borrowers shall, jointly and severally, pay a nonrefundable due diligence fee to Clifton Property Trust equal to Fifty Thousand and 00/100 Dollars ($50,000.00) (the "Due Diligence Fee"), such Due Diligence Fee having previously been fully-earned.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

**2.9** **Term; Release of Collateral; Extension of Maturity Date.**

(a)     **Term.** This Agreement shall become effective on the Closing Date and shall continue in full force and effect until the Facility Termination Date.

(b)     **Extension of Stated Maturity Date.** Borrowers may decide extend the Stated Maturity Date (the "Extension Decision") for a single period of three (3) months (the "Extension Period"), upon satisfaction of all of the following conditions: (i) no Event of Default has occurred and is continuing; (ii) payment to Lender of the Extension Fee; (iii) payment to Lender of the Reserve Replenishment Payments; and (iv) presentment to Lender of a valid and binding contract for the sale of the Mortgaged Property, which contract shall be in a form and substance satisfactory to Lender in Lender's sole and absolute discretion. For the avoidance of doubt, Borrowers must satisfy each of the subparts (i)-(iv) in the immediately preceding sentence prior to the Maturity Date to effectuate an Extension Decision extending the Maturity Date for the Extension Period. No Extension Decision may be made or otherwise effectuated after the Maturity Date.

(c)     **Release of Collateral.** Lender further agrees to release (and to take any actions necessary to release) any Lien held by Lender against the Collateral upon the occurrence of the Facility Termination Date.

**2.10** **Loan Accounts.** Lender will maintain one or more loan accounts for Borrowers to which Lender will charge all amounts advanced to or for the benefit of Borrower hereunder or under any of the other Loan Documents and to which Lender will credit all amounts collected under the Loan from or on behalf of Borrowers. The unpaid principal amount of the Loan, the unpaid interest accrued thereon, the interest rate or rates applicable to such unpaid principal amount, the balance of any Reserve Account or other account for which a deposit provided for hereunder is held by Lender, and the accrued and unpaid fees, premiums and other amounts due hereunder shall at all times be ascertained from the records of Lender and such records shall constitute *prima facie* evidence of the amounts so due and payable, in the absence of manifest error. Nothing contained herein shall require Lender to set up separate bank accounts or deposit accounts to hold any funds.

(a)     **Maintenance Reserve Account.** On the Closing Date, Lender will disburse a portion of the Loan into an escrow account (the "Maintenance Reserve Account") in an amount equal to Three Hundred Thousand and 00/100 Dollars ($300,000.00). Upon the occurrence of any Extension Decision made in accordance with Section 2.9(b) of this Agreement, Borrowers shall, jointly and severally, remit a payment to Lender in an amount equal to that amount necessary to bring the balance of the Maintenance Reserve Account to Three Hundred Thousand and 00/100 Dollars ($300,000.00) (the "Maintenance Reserve Replenishment Payment") for deposit into the Maintenance Reserve Account; *provided* that no Maintenance Reserve Replenishment Payment shall be required if the balance in the Maintenance Reserve Account on the date of any Extension Decision is equal to or greater than Three Hundred Thousand and 00/100 Dollars ($300,000.00); and *further provided* that, notwithstanding anything to the contrary here, Borrowers shall not be entitled to return of any funds held in the Maintenance Reserve Account on solely on the grounds that the balance of the Maintenance Reserve Account exceeds Three Hundred Thousand Dollars ($300,000.00) on the date of any Extension Decision. Upon receiving written confirmation, in a form and substance satisfactory to Lender in its sole and absolute discretion, that a Borrower has timely paid amounts due and owing for property taxes with respect to the Mortgaged Property, Lender shall apply the same amount from the Maintenance Reserve Payment to the then outstanding Obligations in accordance with Section 2.3(d); *provided* that, notwithstanding anything to the contrary herein, if the amount paid by a Borrower exceeds the balance of the Maintenance Reserve Account, Lender shall apply the amount of the balance of the Maintenance Reserve Account to the then outstanding Obligations in accordance with Section 2.3(d). Any amounts remaining in the Maintenance Reserve

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

Account on the Facility Termination Date shall be refunded to the Borrowers. Notwithstanding anything to the contrary herein, Borrowers remain solely responsible for repair and maintenance of the Mortgaged Property, and Lender shall have no liability for the payment or non-payment of any costs or expenses associated with the maintenance of the Mortgaged Property.

**2.11    Cash Flow Sweep; Specified Deposit Accounts**. At all times during the term of the Loan, each Borrower shall cause all Gross Operating Income to be immediately deposited into their respective Specified Deposit Account. Borrowers shall collectively deliver to Lender, on or before 12:00 pm on Monday of each week, or if such Monday is not a Business Day then on or before 12:00 pm of the next Business Day immediately following such Monday, an accounting of Borrowers' joint calculation of the Excess Cash Flow for the immediately preceding week, which accounting shall be in form and substance acceptable to Lender.

3.    **CONDITIONS TO FUNDING.**

**3.1    Conditions Precedent**. The obligation of Lender to make the Loan is subject to the following conditions precedent:

(a)    The Bankruptcy Court shall have entered a DIP Order in form and substance satisfactory to Lender in its sole and absolute discretion;

(b)    Lender shall have received, in form and substance satisfactory to Lender, the following (all of which shall also be in form and substance acceptable to Lender):

(i)    duly executed counterparts of this Agreement, the Note, the Security Instruments, guaranty agreement executed by a Guarantor, the Pledge Agreements, the Subordination Agreement, each of the other Loan Documents, and each of the other Collateral Documents;

(ii)    such UCC financing statements, and other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Liens granted under this Agreement and the other Loan Documents, together with copies of UCC, tax, judgment, and fixture lien search reports and bankruptcy searches in all necessary or appropriate jurisdictions and under all legal names of Obligors, as requested by Lender, indicating that there are no Liens on any of the Collateral other than Permitted Liens or Liens which, in connection with the Loan, will be terminated or released, as applicable;

(iii)    a certificate of the Secretary, Assistant Secretary or Responsible Officer of each Borrower, attaching and certifying copies of its certificate of formation or other registered organizational documents, limited liability company agreement, or the equivalent, as applicable, certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Borrower, and each other jurisdiction specified therein, and of the resolutions of its members, or comparable organizational documents and authorizations, authorizing the execution, delivery and performance of the Loan Documents and certifying the name, title and true signature of each officer of such Borrower executing the Loan Documents;

(iv)    a duly executed funds disbursement memo;

(v)    copies of all consents, approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any requirement of law, or by any contractual obligation of any Obligor, in connection with the execution, delivery, performance, validity

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect;

    (vi)    all due diligence items, documentation and information from the Obligors reasonably requested by Lender, including financial information relating to the Collateral and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

    (vii)    certificates and endorsements of insurance naming Lender as loss payee or additional insured, as applicable, on each Borrower's and each Obligor's property, casualty and liability policies as may be requested by Lender;

    (viii)    payment of all fees and expenses of Lender due and payable on the Closing Date, including all Loan Closing Costs;

    (ix)    a favorable written opinion of counsel to the Obligors, addressed to Lender, covering such matters relating to the Obligors, the Loan Documents, and the transactions contemplated therein as Lender shall reasonably request;

    (x)    title searches or examinations with respect to title and an ALTA Lender's Policy of Title Insurance in favor of Lender, issued by a national title insurance company acceptable to Lender, in each case, establishing and insuring that (A) title to the Mortgaged Property is properly vested in any Borrower executing a Security Instrument with respect to the same; and (B) after effectuating the transactions contemplated hereby, including any contemplated payoff of existing liens on the Mortgaged Property using proceeds of the Loan, Lender shall have (I) a first priority lien on the Brickchurch Mortgaged Property; and (II) a second priority lien on the Aberdeen Mortgaged Property, subject only to the Morgan Stanley Mortgage.

    (xi)    a property survey meeting American Land Title Association, endorsed to Lender and regarding each Mortgaged Property;

    (xii)    such other documents, and completion of such other matters, as Lender may reasonably request.

    (c)    all representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects as of the date hereof;

    (d)    no Default or Event of Default shall exist as of the date hereof;

    (e)    no "default" or "event of default," as those terms are defined in the Morgan Stanley Mortgage, shall exist as of the date hereof;

    (f)    no event or circumstance shall exist or have occurred as of the date hereof which has had, or which could reasonably be expected to have, a Material Adverse Effect;

    (g)    there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of Lender, prohibits, restricts or imposes a materially adverse condition upon any Borrower or any Guarantor, this Agreement, the Loan Documents, or the exercise by Lender of its rights as a secured party with respect to the Collateral;

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

(h)      all holders of the Existing JGB Liens shall have agreed, or shall have been required by the order of a court of competent jurisdiction, to release the Existing JGB Liens on the Collateral; and

(i)      Lender and Borrowers shall have agreed upon an Approved DIP Budget in form and substance satisfactory to Lender.

## 4.    SECURITY.

**4.1      Grant of Security Interest**. To secure prompt payment of any and all Obligations and prompt performance by each Borrower of its respective covenants and duties under the Loan Documents, each Borrower hereby grants Lender a continuing Lien on, and security interest in, all of such Borrower's right, title and interest in and to all of the following presently existing and hereafter acquired or arising property, wherever located: all Accounts; chattel paper (including tangible and electronic chattel paper); deposit accounts; securities accounts; documents (including negotiable documents); Equipment (including all accessions and additions thereto); general intangibles (including payment intangibles and software); Intellectual Property; goods (including fixtures); instruments (including promissory notes); Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); investment property (including securities and securities entitlements); letter of credit rights; money; commercial tort claims; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. Such security interest constitutes a valid security interest in the presently existing Collateral, and will constitute a valid security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens. Each Borrower hereby authorizes Lender to file financing statements, without notice to the respective Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by Borrower or any other Person, shall be deemed to violate the rights of Lender under the UCC. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

**4.2      Delivery of Additional Items**. Borrowers shall, within two Business Days of receiving any such request from Lender, execute and deliver to Lender all financing statements, deposit account control agreements (or similar control agreements), and other documents, in form reasonably satisfactory to Lender in its sole and absolute discretion, that Lender requests to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.3      Inspection Rights**. Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, to inspect, during such Borrower's usual business hours, each Borrower's books and records (but no more than two such inspections of each Borrower's books and records per year shall be at such Borrower's expense unless an Event of Default has occurred and is continuing), and, at any time, in Lender's sole and absolute discretion, to make copies thereof and to conduct examinations and inspections of the Collateral or check, test, and appraise the Collateral in order to verify any Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral. Except as otherwise expressly provided in this Section 4.3, the costs and expense of any inspection provided for hereunder shall be borne solely at the Borrowers, and Borrowers shall promptly reimburse Lender for any such cost or expense paid for by Lender.

**4.4      Borrower's Accounts, Pledge and Assignment**. As additional security for each Borrowers' performance of their joint and several obligations under the Loan Documents, each Borrower

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

hereby irrevocably grants Lender a security interest in and lien upon all monies at any time deposited in any Administrative Account, Reserve Account, or Specified Deposit Account. Borrowers shall not, whether jointly or severally, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Administrative Account, Reserve Account, or Specified Deposit Account, or any funds on deposit in such accounts, or permit any lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements to be filed with respect thereto, except those naming Lender as the secured party. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Following the occurrence of and during the continuation of an Event of Default, Lender may apply all or any part of the funds on deposit in any Administrative Account, Reserve Account, or Specified Deposit Account against the amounts outstanding under the Loan in any order and in any manner as Lender shall elect in Lender's sole and absolute discretion without seeking the appointment of a receiver, without seeking relief from stay from the Bankruptcy Court, and without adversely affecting the rights of Lender to foreclose the liens and security interests securing the Loan or exercise its other rights under the Loan Documents.

**4.5** **Mortgaged Property**. Borrowers shall execute and deliver to Lender each Security Instrument in recordable form and otherwise in form and substance satisfactory to Lender in all respects, along with each of the other Mortgage Documents requested by Lender from time-to-time.

**4.6** **Assignment of Contracts**. As additional security for each Borrowers' performance of their joint and several obligations under the Loan Documents, each Borrower hereby transfers and assigns to Lender all of such Borrower's right, title and interest, but not its liability, in, under, and to all contracts to which such Borrower is a party or beneficiary of value thereunder. Neither this assignment nor any action by Lender shall constitute an assumption by Lender of any obligation under any such contract, each Borrower hereby agrees to perform all of its respective obligations under all such contracts, and each Borrower shall continue to be liable for all obligations of such Borrower with respect thereto. Without Lender's prior written approval, each Borrower is prohibited from entering into, modifying, amending or terminating any construction, management, leasing, maintenance or other contract pertaining to the Mortgaged Property.

**4.7** **Pledge of Equity**. As more fully described in the Pledge Agreements, Aberdeen Enterprises Ltd., Brickchurch Enterprises Ltd., Aberdeen Enterprises Holdings Ltd., and Louis T. Blouin, have each pledged their respective equity interests in Aberdeen, Brickchurch, Aberdeen Enterprises Ltd., Brickchurch Enterprises Ltd., and Aberdeen Enterprises Holdings Ltd. to Lender as additional security for each Borrowers' performance of their joint and several obligations under the Loan Documents.

**5.    REPRESENTATIONS AND WARRANTIES.**

Each Borrower hereby represents and warrants as follows:

**5.1** **Due Organization and Qualification**. Each Borrower is a corporation duly existing under the laws of the State of Delaware and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect.

**5.2** **Due Authorization; No Conflict**. The execution, delivery, and performance of the Loan Documents by each Borrower and the borrowings and other obligations incurred by each Borrower hereunder and under the other Loan Documents are within each Borrower's powers, have been duly authorized, and do not and will not (a) conflict with or constitute a breach of any provision contained in any Borrower's certificate of formation or operating agreement or other applicable organizational or governing documents, (b) require any consent or approval of any governmental agency or authority (other

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

than any consent or approval which has been obtained and is in full force and effect), (c) conflict in any material respect with any provision of applicable law or any judgment, order or decree, which is binding upon any Borrower or any of its respective properties, or (d) require, or result in, the creation or imposition of any Lien on any asset of a Borrower (other than Liens in favor of Lender created pursuant to the Loan Documents).

     **5.3**    **Validity and Binding Nature**.  This Agreement, as well as each other Loan Document to which any Borrower is a party, is a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms.

     **5.4**    **Financial Condition**.

     (a)    The financial statements of each Obligor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes), present fairly in all material respects the financial condition of such Obligor and its Subsidiaries (as applicable) as of such dates and the results of its operations for the periods then ended, and disclose all Indebtedness and other liabilities (direct or contingent) of such Obligor and its Subsidiaries (as applicable) as of the date thereof.

     (b)    Immediately prior to and after giving effect to the Loan hereunder and the use of the proceeds thereof: (i) the fair value of the assets of the Borrowers is, and will be, greater than the amount of their liabilities, as such value is established and liabilities evaluated in accordance with applicable Debtor Relief Laws; (ii) the present fair saleable value of the Borrowers' assets is, and will be not less than, the amount that will be required to pay the probable liability on their debts as they become absolute and matured; (iii) Borrowers are, and will be able to, realize upon their assets and pay their debts and other liabilities as they mature in the normal course of business; (iv) Borrowers do not intend to, and do not believe that they will, incur debts or liabilities beyond their ability to pay as such debts and liabilities mature in the normal course of business; and (v) Borrowers are not and do not intend to be engaged in business or a transaction for which its property would constitute unreasonably small capital.

     **5.5**    **No Material Adverse Effect**.  No Material Adverse Effect has occurred and is continuing.

     **5.6**    **No Litigation**.  Except as otherwise disclosed relating to the Morgan Stanley Mortgage, no litigation (including derivative actions), arbitration proceeding, or governmental investigation or proceeding is pending or, to any Borrower's knowledge, threatened in writing against any Obligor which could reasonably be expected to have a Material Adverse Effect.

     **5.7**    **Ownership of Properties; Liens**.  Each Borrower owns good and marketable title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear of all Liens, charges and claims except for Permitted Liens or other liens disclosed to Lender in writing.

     **5.8**    **Collateral**.  (i) Each Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder and under the other Loan Documents, free and clear of any and all Liens except Permitted Liens; (ii) the security interest granted herein and in the other Loan Documents constitutes a valid perfected security interest in the presently-existing Collateral, and will constitute a valid perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens; and (iii) no financing statement or other public notice authorized by Borrower with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Liens permitted by the Loan Documents. Each Borrower's exact legal

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

name and jurisdiction of organization are as set forth in the opening paragraph of this Agreement. No Borrower has used any other legal name or changed its legal name or jurisdiction of organization in the five (5) years prior to the Closing Date.

**5.9**    **Compliance with Laws**. Each Borrower and Subsidiary are in compliance in all material respects with the requirements of all laws and all orders, writs, injunctions and decrees applicable to the same or to their respective properties, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.10**    **Governmental and Regulatory Matters**. Each Borrower and Subsidiary have obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary for the continued operation of each Borrower's or Subsidiary's business as currently conducted. Each Borrower and Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from any Borrower's failure to comply with ERISA that could result in a Borrower incurring any material liability. No Borrower is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. No Borrower is engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the FRB).

**5.11**    **Environmental Condition**. No property or assets of any Borrower or Subsidiary, including the Mortgaged Property, has ever been used by any Borrower or Subsidiary or, to any Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law. To each Borrower's knowledge, none of the properties or assets of any Borrower, including the Mortgaged Property, have ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by any Borrower or Subsidiary. No Borrower nor any Subsidiary has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other Governmental Authority concerning any action or omission by any Borrower or Subsidiary resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.12**    **Taxes**. Each Borrower has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns and reports, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on such Borrower's books. Each Borrower has made adequate reserves on its books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.

**5.13**    **Equity Ownership; Subsidiaries**. All issued and outstanding Equity Interests of each Borrower and Subsidiary, and any other Equity Interests included in the Collateral, are duly authorized and validly issued, and all capital stock is fully paid and non-assessable, and free and clear of all Liens other than Permitted Liens, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. All of the authorized, issued and outstanding Equity Interests of each Borrower and Subsidiary are owned as set forth on Schedule 5.13 on the Closing Date. On the Closing Date, except as set forth on Schedule 5.13, there are no pre-emptive or other outstanding

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Equity Interests of any Borrower or Subsidiary.

**5.14    Insurance**.  Each Borrower and each of their respective properties, including the Mortgaged Property, are insured with financially sound and reputable insurance companies which are not Affiliates of any Borrower, in such amounts, with such deductibles, and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where each Borrower respectively operates.

**5.15    Sanctions and Anti-Corruption Laws**.

(a)       No Obligor, nor any of their respective Subsidiaries or directors, officers, employees, agents or affiliates of such Obligor or Subsidiary, is a Sanctioned Person.

(b)       Each Obligor, and each of their respective Subsidiaries and the directors, officers and employees and, to the knowledge of Borrower, the agents of each Obligor and each of their respective Subsidiaries, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions.  Each Obligor and each of their respective Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Anti-Corruption Laws and applicable Sanctions.

**5.16    No Default**.  No Default or Event of Default exists or would result from the incurrence by Borrower of any Obligations hereunder or under any other Loan Document.

**5.17    Full Disclosure**.  No representation, warranty or other statement of any Obligor in any certificate or statement given to Lender, as of the date such representation, warranty, or other statement was made, taken together with all such certificates and statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not materially misleading (it being recognized by Lender that the projections and forecasts provided by Obligors are based on good faith estimates and assumptions believed by each Borrower to be reasonable as of the date of the applicable projections or assumptions, are not viewed as facts, and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results).

**5.18    Compliance with Legal Requirements.**  The improvements on the Mortgaged Property and the use thereof comply with all existing and future laws, codes, ordinances, rules, regulations, orders and decrees of governmental authorities and courts having jurisdiction over the Mortgaged Property or any Borrower and all terms, conditions and requirements of all permits applicable to the improvements on the Mortgaged Property and the use thereof and all public and private restrictions or other agreements affecting the Mortgaged Property, including, without limitation, building codes, special use permits, zoning codes, environmental regulations and applicable requirements of fire underwriters.

**5.19    Zoning.**  The Mortgaged Property is zoned to permit the improvements on the Mortgaged Property and the use thereof without additional variances, exceptions or authorizations.

**5.20    Permits**.  All permits required for the improvements on the Mortgaged Property and the use thereof have been obtained and are in full force and effect with no notices of violation or actual violations with respect thereto.

**5.21    Restrictive Covenants Etc**.  The Mortgaged Property complies with all easements, covenants, conditions and restrictions of record as applicable to the Mortgaged Property.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

    **5.22**    **Representations and Warranties of the Borrower Regarding Leases**.  Each Borrower represents and warrants that no Leases with respect to the Mortgaged Property or any portion thereof are in effect as of the date hereof.

    **5.23**    **Single Purpose Entity**.  Each Borrower has done all things necessary to preserve its respective existence and organizational formalities; and has not amended, modified or otherwise changed its organizational documents (or allowed a general partner, managing member or manager to change its organizational documents) except as has been disclosed to Lender and, in any case, has not made or allowed any such amendment, modification or change which adversely affects such Borrower's, or any such general partner's, managing member's or manager's, existence as a single purpose, single asset "bankruptcy remote" entity.

## 6.    AFFIRMATIVE COVENANTS.

Until the Facility Termination Date:

    **6.1**    **Budgets and Notices**.  Each Borrower shall provide Lender with the following, each of which shall be in form and substance satisfactory to Lender:

    (a)    **Approved DIP Budgets.**  On the Closing Date, and again on the first day of each month subsequent thereto until the Facility Termination Date, Borrowers shall provide to Lender a cash flow forecast, in form satisfactory to the Lender in its reasonable discretion, for the subsequent twelve (12) week period. Lender shall have ten (10) days from the date of receipt of the Borrowers' cash-flow forecast to object to the forecast by providing written notice to Borrowers specifying the objection and, if no objection is made within ten (10) days, then the twelve (12) week cash flow forecast shall to have been approved by Lender without further notice (each, an "Approved DIP Budget").

    (b)    **Notice of Default.**  Promptly (and in any event within three (3) Business Days) after the occurrence of a Default or an Event of Default, notice thereof and a statement of a Responsible Officer of the defaulting Borrower specifying the nature thereof and such Borrower's proposed response thereto.

    (c)    **Litigation.**  Promptly after the occurrence thereof, and in any event within three (3) Business Days after any Borrower knows or has reason to know of the occurrence thereof, notice of the institution of or any adverse development in any action, suit or proceeding or any governmental investigation or any arbitration, before any court or arbitrator or any Governmental Authority against any Borrower or any material property of Borrower, including the Mortgaged Property.

    (d)    **Material Adverse Effect.**  Prompt notice of any other event, condition, development or occurrence that has or results in, or could reasonably be expected to have or result in, a Material Adverse Effect.

    (e)    **Formation of Subsidiaries.**  Promptly upon forming any Subsidiary, notice thereof, together with the capitalization and ownership of such Subsidiary and copies of such Subsidiary's organizational documents.

    (f)    **Other Information.**  Promptly, such additional financial and other information, including financial statements of any Borrower and information regarding the Collateral, as Lender may from time-to-time reasonably request.

6.2 **Good Standing**. Each Borrower shall maintain its, and any Subsidiary's, corporate or other entity existence and good standing within such Borrower's or Subsidiary's jurisdiction of incorporation or formation and maintain qualification in each jurisdiction in which it is required under applicable law except where a failure to do so would not reasonably be expected to have a Material Adverse Effect. Each Borrower shall maintain, and shall cause any Subsidiary to maintain, in force all licenses, approvals and agreements, the loss of which could reasonably be expected to have a Material Adverse Effect.

6.3 **Compliance**. Each Borrower shall comply, and cause any Subsidiary to comply, in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect. Each Borrower shall meet, and shall cause any Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, except where a failure to meet such minimum funding requirements could not reasonably be expected to have a Material Adverse Effect. Without limiting the forgoing, each Borrower shall ensure, and cause any Subsidiary to ensure, that no person who owns a controlling interest in or otherwise controls such Borrower is, or shall become, a Sanctioned Person. Each Borrower shall comply, and cause any Subsidiary to comply, with all applicable Anti-Corruption Laws, Bank Secrecy Act and anti-money laundering laws and regulations. Each Borrower will maintain in effect and enforce policies and procedures designed to promote and achieve compliance by each Borrower, any Subsidiary, and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

6.4 **Taxes**. Each Borrower shall make, and shall cause any Subsidiary to make, due and timely payment or deposit of all federal and material state, local and other taxes, assessments, or contributions required by law, and will execute and deliver to Lender, on demand and in a form satisfactory to Lender in its sole and absolute discretion, appropriate certificates attesting to the payment or deposit thereof; and each Borrower will make, and will cause any Subsidiary to make, timely payment or deposit of all material tax payments and withholding taxes required by applicable laws and will, upon request, furnish Lender with proof satisfactory to Lender in its sole and absolute discretion indicating that each Borrower or any Subsidiary has made such payments or deposits; *provided* that any Borrower's or Subsidiary's failure to comply with the payment and withholding provisions of this <u>Section 6.4</u> shall be excused to the extent that the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by the respective Borrower or Subsidiary.

6.5 **Insurance.**

(a) Each Borrower, at its expense, shall keep the Mortgaged Property insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as ordinarily insured against by other owners of similar real property in the location where the Mortgaged Property is located. Each Borrower shall also maintain (i) insurance relating to each Borrower's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Borrower's business, and (ii) if required pursuant to, and described in, the definition of the Security Documents, flood insurance.

(b) All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender in its sole and absolute discretion. All such policies of property and liability insurance shall contain a lender's loss payable and additional insured endorsement (as applicable), in a form satisfactory to Lender in its sole and absolute discretion, showing, upon Lender's request, Lender as an additional insured and loss payee thereof, and all liability insurance policies shall show Lender as an additional insured and shall specify that the insurer must give at least thirty (30) days'

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

prior notice to Lender before canceling its policy for any reason. Each Borrower shall renew or replace any then-existing insurance policy on or before the thirtieth (30th) day prior to the expiration of such insurance policy; *provided* that any replacement policy must meet the terms and conditions required under this Agreement; and *further provided* that any renewal or replacement policy must have an insured effective date such that there is never a lapse of sufficient insurance coverage for the Collateral, including the Mortgaged Property. Upon Lender's request, each Borrower shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor. After the occurrence and during the continuance of an Event of Default, all proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations. If no Event of Default exists, proceeds with respect to Collateral payable under any policy may be used by the respective Borrower to repair or replace, lost, damaged, or destroyed Collateral or otherwise acquire property useful in its business.

**6.6    Maintenance of Perfected Security Interests; Further Documentation.** Each Borrower shall take all actions reasonably requested by Lender to maintain the security interests created by this Agreement as properly perfected security interests (subject to Permitted Liens) with the same priority as existed on the date upon which the DIP Order was entered by the Bankruptcy Court, after giving effect to the transactions contemplated hereby, and shall defend such security interest against the claims and demands of all Persons whomsoever. From time-to-time, each Borrower will furnish to Lender statements and schedules further identifying and describing the assets and property of such Borrower and such other reports in connection therewith as Lender may reasonably request, all in reasonable detail.

**6.7    Changes in Locations, Name, etc.** Borrowers shall not change their respective jurisdiction of organization or the location of their respective chief executive office. Borrowers shall not change their respective names, identity, or corporate or other organizational structure, in each case except upon thirty (30) days' prior written notice to Lender and delivery to Lender of all additional financing statements and other documents reasonably requested by Lender as to the validity, perfection and priority of the security interests provided for herein.

**6.8    Further Assurances.** At any time and from time-to-time each Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effectuate the purposes of this Agreement.

**6.9    Use of Proceeds.** The proceeds of the Loan shall be used only to (i) fully satisfy the outstanding obligations secured by the Existing JGB Liens and effectuate the release of the Existing JGB Liens; (ii) pay the Existing Tax Liabilities; (iii) fund the Reserve Accounts and the Administrative Account; (iv) pay the Loan Closing Costs; and (v) as otherwise agreed to by the Parties.

**6.10    Project Documents.** Each Borrower shall deliver to Lender, promptly upon receipt, copies of all proposed plans and specifications, construction budgets, contracts for construction, permits for land disturbance or construction, and all other similar documents related to any Borrower and/or the Mortgaged Property and any contemplated construction thereon, including the construction of any Improvements, or renovation thereof (collectively, the "Project Documents"). Each Borrower shall assign any Project Documents to Lender, and each such Project Document shall include language in form and substance acceptable to Lender providing that the rights of the counterparty to each Project Document are subordinate to the Loan and the interests of Lender under the Loan Documents. At Lender's request, each Borrower shall use best efforts to obtain an estoppel and consent from any such Project Document counterparty in favor of Lender.

**6.11    Waiver of Automatic Stay.** Each Borrower hereby irrevocably and unconditionally waives any right to the automatic stay provided under 11 U.S.C. § 362 with respect to the

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

Chapter 11 Case. Each Borrower further agrees that Lender shall be entitled to relief from the automatic stay provided under 11 U.S.C. § 362, or and any similar provision, statute, or right under any other Debtor Relief Law, in any subsequently filed case under the Bankruptcy Code or any other Debtor Relief Law; *provided*, however, that if any Borrower files a case under chapter 11 of the Bankruptcy Code after the Closing Date, the filing Borrower shall have sixty (60) days from such filing to cure any Default or Event of Default existing as of the date of such filing before Lender shall be permitted to exercise its rights, and the filing Borrower shall have the obligation to perform its duties, under this Section 6.11. Each Borrower further covenants that such Borrower will take any and all actions (a) necessary to effectuate such waiver and/or relief that has been agreed upon in this Section 6.11; and (ii) as may be reasonably requested by Lender to effectuate such waiver and/or relief.

      **6.12**    **Single Purpose Entity**. Each Borrower shall do all things necessary to preserve its existence and organizational formalities, and shall not, nor permit any general partner, managing member or manager of any Borrower to, amend, modify or otherwise change such Borrower's organizational documents in a manner which adversely affects any Borrower's or any such general partner's, member's or manager's existence as a single purpose, single asset "bankruptcy remote" entity.

      **6.13**    **Leases**.

      (a)    No Borrower shall enter into any Lease that is not approved by the Lender in its reasonable discretion.

      (b)    Each Borrower covenants that such Borrower (a) will observe and perform all of the obligations imposed upon the landlord in any Leases; (b) will use commercially reasonable efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under any Leases; (c) will not collect any of the rents more than one (1) month in advance of the time when the same become due under the terms of the Leases; (d) will not discount any future accruing rents; (e) will not modify any Lease or surrender, cancel or terminate any Lease, without the prior written consent of the Lender; and (f) will promptly execute and deliver any assignments of Leases and rents in favor of the Lender as the Lender, in its sole and absolute discretion, shall require.

      (c)    From time-to-time, upon Lender's request, each Borrower shall promptly deliver to Lender (a) complete executed originals of each Lease, including any exhibits thereto and any guaranty(ies) thereof; (b) a complete rent roll, or similar document, of the Mortgaged Property in such detail as the Lender may at its sole and absolute discretion require, together with such operating statements and leasing schedules and reports as the Lender in its sole and absolute discretion may require; (c) any and all financial statements of any tenants, subtenants and any lease guarantors to the extent available to a Borrower; (d) such other information regarding tenants and prospective tenants and other leasing information as the Lender may reasonably request; and (e) such estoppel certificates, subordination agreements and/or subordination, nondisturbance and attornment agreements executed by such tenants, subtenants and guarantors, if any, in such respective forms as the Lender may require; *provided*, however, that a Borrower's failure to obtain the items included in subitem (e) above shall not constitute an Event of Default hereunder provided that such Borrower has used commercially reasonable efforts to obtain such items.

      **6.14**    **Mortgaged Property**.

      (a)    Maintenance of Goods. Each Borrower will do all things necessary to maintain, preserve, protect and keep the Mortgage Property and any Equipment located thereat, in good repair and working and saleable condition, except for ordinary wear and tear in respect of such Equipment.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

(b)    <u>Equipment</u>.  No Borrower shall permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property Lender does not have a Lien.  No Borrower shall, without Lender's prior written consent, alter or remove any identifying symbol or number on any Equipment constituting Collateral.

**6.15    Environmental.**  Upon Lender's request, each Borrower shall provide Lender with a Phase I Environmental Site Assessment Reports, consistent with American Society of Testing and Materials (ASTM) Standard E 1527-05, and applicable state requirements, on the Mortgaged Property, prepared by environmental engineers satisfactory to Lender, all in form, scope, substance, and depth satisfactory to Lender an addressed to Lender, and such environmental review and audit reports, including Phase II reports, with respect to the Mortgaged Property as Lender shall have requested, in each case together with letters executed by the environmental firms preparing such environmental reports, in form and substance satisfactory to Lender, authorizing Lender to rely on such reports, and Lender shall be satisfied with the contents of all such environmental reports.

**6.16    Covenants, Conditions and Restrictions.**  Each Borrower shall diligently and timely pay, perform and observe all of the terms, covenants and conditions required to be performed by such Borrower under any homeowners' association declaration, bylaws, or other document, code, or ordinance governing or regulating the use of the Mortgaged Property.

## 7.    NEGATIVE COVENANTS.

Until the Facility Termination Date, each Borrower agrees that it shall not:

**7.1    Dispositions.**  Convey, sell, lease, transfer or otherwise dispose of all or any part of its business or the Mortgaged Property unless (a) the proceeds of such sale will generate sufficient proceeds to fully satisfy all of the outstanding Obligations under the Loan Documents; and (b) Lender provides express written consent.

**7.2    Mergers or Acquisitions.**  Merge or consolidate with or into any other business organization, or acquire all or substantially all of the Equity Interests or property of another Person, except a Subsidiary may merge or consolidate with or into a Borrower (provided that such Borrower is the surviving entity).

**7.3    Indebtedness.**  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.4    Liens.**  Create, incur, assume or suffer to exist any Lien with respect to any of its property, other than Permitted Liens.

**7.5    Restricted Payments.**  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any Equity Interests.

**7.6    Investments.**  Directly or indirectly acquire or make any Investment in or to any Person.

**7.7    Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any transaction with any Affiliate, *provided* that a Borrower may enter into a transaction with an Affiliate that (a) is in the ordinary course of the Borrower's business affairs; and (b) upon fair and reasonable terms

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

that are no less favorable to the Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

        **7.8**    **Agreements Affecting Mortgaged Property**. Enter into or submit the Borrower or the Mortgaged Property to any construction contracts, title encumbrances, or agreements with any other Person for construction, property management, or the transfer of all or any interest in the Mortgaged Property, or direct or indirect interest in any Borrower, in each case without Lender's express written approval, which approval may be withheld in Lender's sole and absolute discretion.

        **7.9**    **Compliance**. Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of the Loan for such purpose; or fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, each as defined in ERISA, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

        **7.10**    **Restrictive Agreements**. Directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of a Borrower or any Subsidiary to create, incur or permit any Lien upon any of its assets or properties in favor of Lender, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Equity Interests, to make or repay loans or advances to any Borrower or Subsidiary, to guarantee Indebtedness of any Borrower or Subsidiary, or to transfer any of its property or assets to any Borrower or Subsidiary, except: (i) restrictions or conditions imposed by law or by this Agreement or any other Loan Document or in connection with any document or instrument governing Permitted Liens (*provided*, that such restrictions only extend to the property subject to such Permitted Liens and do not prohibit such Borrower from granting a security interest in the Borrower's Collateral in favor of Lender); and (ii) restrictions or encumbrances in any agreement, document or instrument in effect on the Closing Date and disclosed to Lender in writing prior to the date hereof, including any renewals or extensions thereof.

        **7.11**    **Change in Business; Accounting Principles or Fiscal Year End**. Engage in any business other than the businesses currently engaged in by the respective Borrower on the Closing Date and any business substantially similar or related thereto (or incidental thereto); or without Lender's prior written consent, change its accounting principles or the date on which its fiscal year ends.

        **7.12**    **Sanctions and Anti-Corruption Laws**. Borrowers will not, nor will Borrowers permit any Subsidiary to, directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions; (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as Lender, underwriter, advisor, investor or otherwise); or (iii) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money or anything else of value to any Person in violation of applicable Anti-Corruption Laws.

        **7.13**    **DIP Budget**. Borrowers shall not, without the prior express written consent of Lender, incur expenses, as measured on a line-item by line-item basis, in excess of those amounts approved by Lender pursuant to the then applicable Approved DIP Budget.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

8.    **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an "Event of Default" under this Agreement:

**8.1    Payments**. (a) If any Borrower fails to pay, when due, any principal due and payable under this Agreement, or (b) if any Borrower fails to pay, when due, any interest or other amounts due and payable under this Agreement or any other portion of the Obligations;

**8.2    Covenants**. If any Borrower fails or neglects to perform or observe, or otherwise violates, any term, provision, condition, covenant contained in this Agreement (other than as otherwise specified in this Section 8), or any Borrower or Obligor fails or neglects to perform or otherwise violates, any term, provision, condition, or covenant contained in any of the other Loan Documents, and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within five (5) days after the earlier to occur of (a) the respective Borrower's or applicable Obligor's receipt of notice thereof from Lender, (b) the respective Borrower or applicable Obligor becoming aware thereof, or (c) any Responsible Officer of the respective Borrower or the applicable Obligor becoming aware thereof;

**8.3    Attachment**. If any material portion of any Collateral is attached, seized, subjected to a writ or distress warrant, or is foreclosed or levied upon, or comes into the possession of any trustee, receiver or Person acting in a similar capacity and such attachment, seizure, writ or distress warrant, foreclosure, or levy has not been removed, discharged or rescinded within twenty (20) days, or if any Obligor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or a material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any portion of any Collateral (other than Liens permitted by the Loan Documents), or if a notice of lien, levy, or assessment is filed of record with respect to any Collateral by any Governmental Authority, and the same is not paid within twenty (20) days after any Borrower or the applicable Obligor receives notice thereof;

**8.4    Insolvency**. Except for any findings or orders entered with respect to Brickchurch in the Chapter 11 Case, if any Obligor is adjudicated insolvent, or if an Insolvency Proceeding is commenced by any Obligor, or if an Insolvency Proceeding is commenced against any Obligor and is not dismissed or stayed within sixty (60) days;

**8.5    Other Agreements**. If there is a default or other failure to perform in any agreement to which any Obligor is a party or by which it is bound either (a) resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000), or (b) which otherwise could reasonably be expected to have a Material Adverse Effect;

**8.6    Judgments**. If a judgment or judgments (a) for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (to the extent not covered by independent third-party insurance), or (b) which individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect, shall be rendered against any Obligor and shall remain unsatisfied and unstayed for a period of thirty (30) days;

**8.7    Misrepresentations**. Any Obligor, or any Person acting for any Obligor, (a) makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Lender, or makes any representation, warranty, or other statement to induce Lender to enter this Agreement or any Loan Document, and such representation, warranty, or other

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

statement is false or misleading in any material respect when made, or (b) fails to inform Lender promptly upon learning that any prior representation, warranty, or other statement made in this Agreement, any Loan Document, or in any writing delivered to Lender, or any representation, warranty, or other statement made to induce Lender to enter into this Agreement or any other Loan Document, (i) was false or misleading in any material respect when made, or (ii) has become false or misleading based on events subsequent to the making of such representation, warranty, or other statement;

**8.8**    **Cessation of Business**. Any Obligor shall commence dissolution proceedings or otherwise shall cease operation of its business as conducted on the Closing Date;

**8.9**    **Loan Documents**. Any material provision of this Agreement or any other Loan Document shall for any reason cease to be valid and binding on, or enforceable against, any Obligor, or any Obligor shall so state in writing, or any Obligor shall bring an action to terminate its obligation under this Agreement or any other Loan Document;

**8.10**    **Liens**. Any Lien on the Collateral in favor of Lender purported to be created under this Agreement or any other Loan Document, shall fail or cease to be, or shall be asserted by any Obligor not to be, a valid and perfected Lien in favor of Lender, with the priority required by the applicable Loan Documents (subject to Permitted Liens);

**8.11**    **Change of Control**. The occurrence of any event resulting in a change of Control; or

**8.12**    **Specified Deposit Account**. Any Borrowers' failure to deposit all Gross Operating Income into a Specified Deposit Account as and when required pursuant to Section 2.11 of this Agreement.

## 9.    LENDER'S RIGHTS AND REMEDIES.

**9.1**    **Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by each Borrower:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable; *provided* that upon the occurrence of an Event of Default described in Section 8.4 of this Agreement, all Obligations shall become immediately due and payable without any action by Lender;

(b)    Exercise any rights and remedies available hereunder, under the other Loan Documents, or under applicable law or equity, with respect to each Obligor, the Collateral, or otherwise;

(c)    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

(d)    Make such payments and take such actions as Lender considers necessary or reasonable to protect its security interest in the Collateral. Each Borrower agrees to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Borrower authorizes Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to each Borrower's owned premises, including the Mortgaged Property, Borrower hereby grants Lender a license to enter into possession of such premises

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(e)     Set off and apply to the Obligations any and all (i) balances and deposits of any Borrower held by Lender, including, without limitation, balances held in the Administrative Account and Reserve Accounts, and, if a deposit account control agreement (or similar control agreement) exists with respect to any Specified Deposit Account, such Specified Deposit Account, or (ii) indebtedness at any time owing to or for the credit or the account of any Borrower held by Lender;

(f)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Lender is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, any Borrower's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing the preparation of, advertising for sale, and sale any Collateral and, in connection with Lender's exercise of its rights under this Section 9.1, any Borrower's rights under all licenses shall inure to Lender's benefit; and

(g)     Dispose of the Collateral by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Borrower's premises) as Lender determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate and Lender may credit bid and purchase at any public sale. Any deficiency that exists after disposition of the Collateral by Lender will be due and payable immediately by Borrowers, jointly and severally.

**9.2     Application of Proceeds.** All proceeds from each sale of, or other realization upon, all or any part of the Collateral by Lender after an Event of Default has occurred and is continuing shall be applied as follows: (a) first, to Lender's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (b) second, to interest then due and payable hereunder; (c) third, to the principal balance of the Loan, until the same shall have been paid in full; and (d) fourth, to the extent any proceeds remain, to Borrowers or as otherwise provided by a court of competent jurisdiction.

**9.3     Power of Attorney.** Exercisable only upon the occurrence and during the continuance of an Event of Default, each Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) receive and open all mail addressed to a Borrower for the purpose of collecting the Accounts; (c) notify all account debtors with respect to the Accounts to pay Lender directly; (d) endorse any Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (e) sign any Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (f) make, settle, and adjust all claims under and decisions with respect to any Borrower's policies of insurance; (g) demand, collect, receive, sue, and give releases to any account debtor for the monies due or which may become due upon or with respect to the Accounts and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Accounts; (h) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (i) sell, assign, transfer, pledge, compromise, discharge or otherwise dispose of any Collateral; (j) execute on behalf of any Borrower any and all instruments, documents, financing statements and the like to perfect Lender's interests in the Accounts and collections and file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; and (k) do all acts and things necessary or expedient, in furtherance of any such purposes. The appointment of Lender

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

as each Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

**9.4    Accounts Collection**.  During the continuance of an Event of Default, each Borrower shall collect all amounts owing to such Borrower for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtors, with proper endorsements for deposit.

**9.5    Payments by Lender**.  If any Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to such Borrower:  (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in Section 6.5 of this Agreement, and take any action with respect to such policies as Lender deems prudent.  Any amounts so paid or deposited by Lender shall constitute Obligations, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral.  Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

**9.6    Lender's Liability for Collateral**.  So long as Lender complies with reasonable practices and applicable law regarding the safekeeping of the Collateral in the possession or under the control of Lender, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by Borrowers.

**9.7    Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on any Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.8    Demand; Protest**.  Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Obligor may in any way be liable.

## 10.    NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, and electronic mail to Borrowers or to Lender, as the case may be, at its addresses set forth below:

If to Brickchurch:        Louise Blouin

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

|  | 376 Gin Lane |
|--|--|
|  | Southampton, NY 11968 |
|  | lt@ltbholding.com |

| with a copy to: | Brett L. Messinger, Esq. |
|--|--|
|  | Duane Morris LLP |
|  | 30 South 17th Street |
|  | Philadelphia, PA 19103 |
|  | Email: blmessinger@duanemorris.com |

| If to Aberdeen: | Louise Blouin |
|--|--|
|  | 376 Gin Lane |
|  | Southampton, NY 11968 |
|  | lt@ltbholding.com |

| with a copy to: | Brett L. Messinger, Esq. |
|--|--|
|  | Duane Morris LLP |
|  | 30 South 17th Street |
|  | Philadelphia, PA 19103 |
|  | Email: blmessinger@duanemorris.com |

| If to Lender: | Bay Point Capital Partners II, LP |
|--|--|
|  | 3050 Peachtree Road NW, Suite 740 |
|  | Atlanta, Georgia 30305 |
|  | Attn: Charles Andros |
|  | Email: charlesandros@bay-pointadvisors.com |

| with a copy to: | John F. Isbell, Esq. |
|--|--|
|  | Law Offices of John F. Isbell LLC |
|  | 3050 Peachtree Road NW, Suite 740 |
|  | Atlanta, Georgia 30305 |

| and additional copy to: | John C. Allerding, Esq. |
|--|--|
|  | Thompson Hine LLP |
|  | 3560 Lenox Road NE, Suite 1600 |
|  | Atlanta, Georgia 30326 |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 11.    GENERAL PROVISIONS.

**11.1    Waiver; Amendments; Integration.**    No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. Neither this Agreement nor the Loan Documents can be amended or terminated orally. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and agreed by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. All prior agreements,

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**11.2    Confirmations.**  Each Borrower and Lender agree that, from time-to-time and upon written request received by it from the other, to provide written confirmation to the other party of the aggregate unpaid principal amount of the Loan then outstanding.

**11.3    Ass          ignments; Participations.**

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of Lender.  No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.

(b)    Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement.

(c)    From and after the effective date of any assignment by Lender of all or any portion of its interest hereunder, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by Lender, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.6, 2.7, 11.4, and 11.15 with respect to facts and circumstances occurring prior to the effective date of such assignment; *provided* that, in the case of the benefits set forth in Section 2.7, Lender shall also be entitled to the rights and benefits of such section with respect to any change in law after the effective date of such assignment).

(d)    Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (each, a "Participant") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Loan owing to it); *provided* that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) each Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement. Notwithstanding the foregoing, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.6 and 2.7 to the same extent as if it were Lender.  To the extent permitted by law, and subject to any agreement between Lender and such Participant, each Borrower agrees that any Participant shall also be entitled to the benefits of Section 11.7 as though it were Lender.  If Lender sells a participation, it shall maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loan or other obligations under the Loan Documents (the "Participant Register"); *provided* that Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in the Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations; and *further provided* that nothing contained herein shall create a fiduciary relationship on the part of Lender, whether with respect to Borrowers or otherwise. The entries in the Participant Register shall be conclusive absent manifest error.

**11.4    Costs, Expenses**.  Borrowers jointly and severally agree to pay promptly after demand therefor, all reasonable and documented out-of-pocket costs and expenses of Lender in connection with the due diligence, preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable) of this Agreement, the other Loan Documents, all of Debtor's actions in connection with the Chapter 11 Case, including the documents related to Brickchurch's request for the DIP Order and all hearings and other actions by Lender with respect thereto, and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable and documented out-of-pocket costs and expenses incurred by Lender after an Event of Default in connection with the collection of the Obligations or the enforcement of this Agreement the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof.  All Obligations provided for in this <u>Section 11.4</u> shall survive repayment of the Obligations and termination of this Agreement and shall be secured by the Collateral.

**11.5    Deposits**.

(a)    Borrower agrees to establish an administrative deposit into an account maintained by Lender, for the benefit of Lender, in the amount of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) for any expenses incurred by Lender during the term of this Agreement (the "<u>Administrative Account</u>"). Lender will provide Borrower with documentation supporting any costs deducted from this deposit in connection with the deduction thereof. Any remaining balance of such deposit shall be returned to Borrower upon the Facility Termination Date.

(b)    Borrower has paid to Lender an amount of Forty-Five Thousand and 00/100 Dollars ($45,000.00) for expenses incurred by Lender (the "<u>Expense Deposit</u>").  The Expense Deposit is nonrefundable; *provided*, however, that if the Loan closes, Borrower shall receive a credit for the Expense Deposit on the loan closing statement.

**11.6    Governing Law; Jurisdiction; Consent to Service of Process**

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof) of the State of Georgia.

(b)    Lender and Borrowers hereby irrevocably and unconditionally agree that the Bankruptcy Court shall retain exclusive jurisdiction over any dispute, action, or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each party irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in <u>Section 10</u>. Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

**11.7    <u>Right of Set-off</u>.**  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Lender shall have the right, at any time or from time-to-time upon the occurrence and during the continuance of an Event of Default, without prior notice to any Borrower, any such notice being expressly waived by each Borrower to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any Borrower at any time held or other obligations at any time owing by Lender to or for the credit or the account of such Borrower against any and all Obligations held by Lender, irrespective of whether Lender shall have made demand hereunder and although such Obligations may be unmatured. Lender agrees promptly to notify the respective Borrower after any such set-off and any application made by Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

**11.8    <u>Severability</u>.**  Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.9    <u>Nature of Remedies</u>.**  All Obligations of Borrowers and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**11.10    <u>Entire Agreement</u>.**  This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by any Borrower of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

**11.11    <u>Counterparts</u>.**  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Lender shall deemed to be originals.

**11.12    <u>Electronic Signatures</u>.**  This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "<u>Communication</u>"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each Borrower agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on Borrower to the same extent as a manual signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of Borrower enforceable against such in accordance with the terms thereof to the same extent as if manually executed.  Any Communication

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include use or acceptance by Lender of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, Lender is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by Lender pursuant to procedures approved by it; *provided*, further, without limiting the foregoing, (a) to the extent Lender has agreed to accept such Electronic Signature, Lender shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of Borrower without further verification, and (b) upon the request of Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time-to-time.

**11.13    Captions.** Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

**11.14    USA Patriot Act Notice.** Lender (for itself and not on behalf of any other party) hereby notifies Borrowers that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of such Borrower and other information that will allow Lender, as applicable, to identify each Borrower in accordance with the Patriot Act.

**11.15    INDEMNIFICATION BY BORROWER. IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDER AND THE AGREEMENT BY LENDER TO EXTEND THE LOAN PROVIDED HEREUNDER, EACH BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, ATTORNEYS, AND AGENTS OF LENDER (EACH A "LENDER PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY PURCHASE OF ASSETS, EQUITY INTERESTS, OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOAN, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED BY BORROWER, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY BORROWER OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH BORROWER OR ITS RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH**

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY THE BANKRUPTCY COURT. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH BORROWER HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 11.15</u> SHALL SURVIVE REPAYMENT OF THE OBLIGATIONS, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL AND TERMINATION OF THIS AGREEMENT.

      **11.16   Nonliability of Lender.** The relationship between Borrowers on the one hand and Lender on the other hand shall be solely that of borrower and lender. Lender has no fiduciary relationship with, or duty to, any Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Borrowers, on the one hand, and Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor. Lender undertakes no responsibility to any Borrower to review or inform such Borrower of any matter in connection with any phase of such Borrower's business or operations. Each Borrower agrees that Lender shall have no liability to such Borrower (whether sounding in tort, contract or otherwise) for losses suffered by such Borrower in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by the Bankruptcy Court that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. **NO LENDER PARTY SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND EACH BORROWER HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).** Each Borrower acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between any Borrower and Lender.

      **11.17   WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.17</u>.

      **11.18   Confidentiality.** The parties hereby agree that, up until the filing of this Agreement with the Bankruptcy Court as part of the approval of Brickchurch's debtor-in-possession financing, the parties will each keep all information regarding the terms set forth in this Agreement and the other Loan Documents (the "<u>Confidential Terms</u>") confidential and shall not divulge any Confidential

Terms to any Person without the prior written consent of Lender, except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities, or other governmental agencies or regulatory bodies, or in order to comply with any applicable federal or state laws including, without limitation, federal securities laws applicable to a Borrower or any Affiliate thereof, or (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant (such as recording Loan Documents pursuant to the terms thereof, etc.); *provided*, however, that nothing herein shall prevent any party from disclosing any such information to its affiliates, employees, directors, agents, attorneys, accountants, or other professional advisors deemed necessary or appropriate in the reasonable judgment of the disclosing party, in each case, who are made aware of and instructed to comply with the provisions of this Section 11.18; and, *further provided* that no disclosure made with respect to this Agreement shall include a copy of this Agreement to the extent that a summary would suffice in lieu thereof.  In this connection, no Borrower shall issue any press releases referencing or regarding the Confidential Terms or Lender without the prior review and written consent to such issuance by Lender.  The provisions set forth in this Section shall survive the termination of this Agreement for a period of one year following such termination.

       **11.19**   **Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

       **11.20**   **Survival**.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect until the Facility Termination Date.  The joint and several obligations of Borrowers to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 11.15 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

       **11.21**   **Tax       Treatment of Interest Payments**.  Borrower shall advise Lender, on or before January 31 of each year prior to the Facility Termination Date, as to the amount of interest paid to Lender by each of the Borrowers under the terms of this Agreement during the preceding calendar year for the purpose of allowing Lender to accurately document the same.

*[Remainder of page intentionally blank; signature pages follow.]*

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWER:**

**ABERDEEN ENTERPRISES, INC.**

By: _~Nathan Knott~_

Printed Name: _MATHEW KABATOFF_

Title: _DIRECTOR_

**BORROWER:**

**BRICKCHURCH ENTERPRISES, INC.**

By: _~Nathan Knott~_

Printed Name: _MATHEW KABATOFF_

Title: _DIRECTOR_

LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

**LENDER:**

**BAY POINT CAPITAL PARTNERS II, LP,**
a Delaware limited partnership

By: Bay Point Advisors, LLC, its general partner

By: *Charles Andros*
Name: Charles Andros
Title: Managing Member

LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

## SCHEDULE 1
## (Brickchurch Mortgaged Property)

**Parcel I:**

All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at a point on the southerly side of Gin Lane, distant westerly 65.95 feet as measured along same from the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

THENCE along lands now or formerly of Aberdeen Enterprises Inc.:

1. RUNNING THENCE South 20 degrees 05 minutes 50 seconds East 178.57 feet;

2. THENCE South 58 degrees 56 minutes 50 seconds West 50.96 feet;

3. THENCE South 03 degrees 20 minutes 09 seconds East 155.09 feet;

4. THENCE South 16 degrees 20 minutes 00 seconds East 213.89 feet to The Atlantic Ocean;

THENCE along Tie Line which marks the General Shore Line of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 129.10 feet to land now or formerly of Susan Wilson;

THENCE along said lands, North 16 degrees 20 minutes 00 seconds West 575.00 feet to a monument in the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds East 200.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00 Block 01.00, Lot 017.014, Suffolk County and also known as Parcel I: 366 Gin Lane, Southampton, NY 11968.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

**SCHEDULE 2**
**(Aberdeen Mortgaged Property)**

Parcel II:

All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

RUNNING THENCE along the westerly side of Wyandanch Lane, South 30 degrees 54 minutes 10 seconds East 531.00 feet to the Atlantic Ocean;

THENCE along a tie line course which marks the general shoreline of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 275.28 feet to land now or formerly of Brickchurch Enterprises Inc.;

THENCE along said lands, the following four courses and distances:

1. North 15 degrees 20 minutes 00 seconds West 213.89 feet;

2. North 03 degrees 20 minutes 09 seconds West 155.09 feet;

3. North 58 degrees 56 minutes 50 seconds East 50.96 feet;

4. North 20 degrees 05 minutes 50 seconds West, 178.57 feet to the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds east 65.95 feet to the westerly side of Wyandanch Lane to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00, Block 01.00, Lot 017.013, Suffolk County and also known as Parcel II: 376 Gin Lane, Southampton, NY 11968.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

**SCHEDULE 5.13**
**(Borrower and Subsidiary Ownership)**

1.  Brickchurch Enterprises Ltd. is the sole parent, owning One Hundred Percent (100.00%) of the outstanding stock, of Brickchurch Enterprises Inc.

2.  Aberdeen Enterprises Ltd. is the sole parent, owning One Hundred Percent (100.00%) of the outstanding stock, of Aberdeen Enterprises Inc.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

## SCHEDULE 7.3
### (Permitted Indebtedness)

1.   That certain Note in the original principal amount of Fifteen Million Dollars ($15,000,000.00) secured by that certain Mortgage encumbering the Aberdeen Mortgaged Property granted by Aberdeen in favor of Morgan Stanley Private Bank, National Association in the original principal amount of Fifteen Million Dollars ($15,000,000.00), recorded on February 6, 2012 at Liber 22166, Page 699 (the "Morgan Stanley Note"); *provided*, however, that no Borrower shall be permitted to amend the Morgan Stanley Note to voluntarily increase the amount of principal indebtedness thereunder.

DocuSign Envelope ID: BEF269AE-70FC-4214-AE3A-7E88B94ABCD5

**SCHEDULE 7.4**
**(Permitted Liens)**

1.  That certain Mortgage encumbering the Aberdeen Mortgaged Property granted by Aberdeen in favor of Morgan Stanley Private Bank, National Association in the original principal amount of Fifteen Million Dollars ($15,000,000.00), recorded on February 6, 2012 at Liber 22166, Page 699; *provided*, however, that no Borrower shall be permitted to amend the Morgan Stanley Mortgage to voluntarily increase the amount of principal indebtedness secured thereby.