| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>---------------------------------------------------------------x<br>In re:<br><br>ABERDEEN ENTERPRISES, INC.,<br><br>        Debtor.<br>---------------------------------------------------------------x | Hearing Date and Time:<br>August 23, 2023 at 12:00 p.m.<br><br>Chapter 11<br><br>Case No. 23-72834-AST |

**DEBTOR'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF
BAY POINT CAPITAL PARTNERS II, LP TO DISMISS THE CHAPTER 11 CASE**

**Preliminary Statement**

  Aberdeen Enterprises, Inc. (the "Debtor") submits this Memorandum of Law in opposition to the motion (the "Dismissal Motion")[1] of Bay Point Capital Partners II, LP ("Bay Point") seeking dismissal of the Chapter 11 case based upon Bay Point's contention that it exercised certain default rights to take control of the Board of Directors , allegedly negating Louise Blouin's corporate authority to act on behalf of the Debtor's sole member, Aberdeen Enterprises (BVI) Ltd. ("BVI"), to commence the instant Chapter 11 case. Ms. Blouin sought bankruptcy for the Debtor in the face of an imminent foreclosure sale that would have wiped out tens of millions of dollars in equity in the Debtor's property at 376 Gin Lane, Southampton, NY (the "376 Property"). While Bay Point's declaration of a default remains subject to fierce dispute, it proceeded without proper documents needed to effectuate a transfer of stock such as an actual proxy and power of attorney conforming to state law. Thus, for all of the reasons set forth below, the Dismissal Motion should be denied as a matter of law.

---

[1] The Dismissal Motion was served with an inadequate notice and requires a full briefing schedule and evidentiary hearing in accordance with Local Rule 9014-2.

1

## Overview

There is no disputing that Bay Point made a short-term DIP loan in the principal sum of $62 million to Brickchurch Enterprises, Inc. ("Brickchurch") which was, *inter alia*, guaranteed by the Debtor and its sole shareholder, BVI. As a guarantor, BVI executed an equity pledge of its 100% stock interest in the Debtor (the "Equity Collateral") pursuant to a certain document entitled Pledge and Security Agreement, dated December 9, 2022 (the "Pledge"). Instead of proceeding with a commercially reasonable UCC Article 9 foreclosure sale of the Equity Collateral, Bay Point effectively utilized self-help to unilaterally transfer the stock of the Debtor to itself and then voted to install a new Board of Directors pursuant to a purported unanimous written consent dated July 18, 2023 signed by Charles Andros.

Bay Point proceeded with this corporate *coup d'état* in furtherance of the Pledge [particularly Section 9(a)] without ever actually obtaining a written proxy authorization form from BVI or a properly attested power of attorney from the Debtor. Thus, the legal question becomes whether the provisions of the Section 9 of the Pledge are self-effectuating without execution of implementing documents conforming to state law.

Contrary to the Dismissal Motion, the determination of proper authority is governed by Georgia law (not Delaware law). While the Debtor is a Delaware corporation, the parties expressly agreed under the Pledge that the "validity, interpretation, enforcement and effect" of the Pledge "shall be governed by, and construed according to the laws of the State of Georgia."[2] (*See*, Pledge, ¶25). *See, Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 331 (Del. 2020) ("When a contract contains a forum selection clause, this court will interpret the forum selection clause in

---

[2] Each one of the loan documents (*i.e.*, the Loan and Security Agreement, Note, Pledge and Guaranty) provide that they are governed by Georgia law.

accordance with the law chosen to govern the contract. Choice of law provisions control so long as the jurisdiction selected bears some material relationship to the transaction. This Court has stated that a material relationship exists where a party's principal place of business is located within a foreign jurisdiction, a majority of the activity underlying the action occurred within the foreign jurisdiction, and where parties to a contract performed most of their services in the foreign state." (internal quotation marks and citations omitted). Since Bay Point, as an Atlanta-based lender insisted on Georgia law, it cannot now argue that the laws of another jurisdiction should control. Hence, any rights conferred under the Pledge or Loan and Security Agreement must be analyzed under Georgia law, which limits voting by proxy or power of attorney.

Because Georgia law controls, Bay Point's reliance on Delaware law and the decision of the Bankruptcy Court *In re CII Parent, Inc.*, 2023 WL 2926571 (Bankr. D. Del. Apr. 12, 2023), permitting proxy voting by a secured creditor to enforce a borrower's default is not controlling. Although Bay Point, as lender, can reserve for itself certain default remedies allowing for the transfer of the stock, the voting rights conferred under the Pledge are not self-effectuating under Georgia law (or Delaware law for that matter). Outside of pointing to Section 9 of the Pledge, Bay Point ignores the mechanics and rules regarding the use of a proxy under Georgia law, rendering the assignment of the Equity Collateral fundamentally flawed.

The rules regarding proxy voting in Georgia are set forth in Georgia Civil Code § 14-3-72 and require execution of a separate proxy appointment form. Absent same, Bay Point acted without proper voting authority when it attempted to flip the Debtor's Board on July 18, 2023. Likewise, Bay Point never obtained a validly attested power of attorney complying with the requirements of Georgia law. Accordingly, the endorsement of BVI's stock certificate by Charles Andros is equally defective. In view of these rules, all actions taken by Bay Point to wrest control

of the Debtor are void and ineffective. As such, Matthew Kabatoff remains the Debtor's sole director and he had the right to designate Louise Blouin to commence a Chapter 11 case on behalf of the Debtor, particularly since the institution of bankruptcy was absolutely essential to preserve the *status quo* and allow the Debtor to attempt to maximize the going concern value of the 376 Property by a sale or refinancing.

## BVI's Challenges to Bay Point's Administration of the DIP Loan

BVI has retained separate counsel in the person of Avrum Rosen, Esq. who previously filed detailed opposition challenging Bay Point's good faith in declaring a default under the DIP loan in view of Bay Point's refusal and delays in releasing funds needed for repairs [ECF No. 30]. Manifestly if Bay Point's declaration of a default was invalid, then the exercise of any remedies under the Pledge are in turn nullified.

Bay Point refinanced loan obligations owed to entities commonly known as JGB with the expectation that the DIP loan would be paid from a sale or further refinancing to occur within six (6) months of closing. In connection with the DIP loans, the Debtor and its affiliate retained Sotheby's as a real estate broker to lead the sale effort.

While Bay Point alleges to be a "savior of sorts", Bay Point's post-closing conduct was abysmal and directly contributed to the Borrowers' inability to timely payoff the DIP loan. The failure to release funds for repairs plainly undermined the opportunity to timely refinance or sell the properties prior to the six-month maturity date. Yet, Bay Point wasted no time in declaring a default right in June and seeking to impose an approximate $6.0 million late fee, plus other default interest charges.

In the meanwhile, Bay Point may have also interfered in the Debtor's efforts to refinance the senior mortgage lien held by Morgan Stanley Private Bank ("Morgan Stanley") which was

subject to pre-petition legal proceedings and entry of a judgment of foreclosure. The Debtor intended to refinance the first mortgage before the scheduled foreclosure sale, and obtained a commitment from a new lender, only to see a complete failure of cooperation by Morgan Stanley regarding an assignment of the mortgage to the new lender. The Debtor suspects that Bay Point had a hand in Morgan Stanley's stonewalling of a refinancing and may very well have acquired the mortgage for itself. In this regard, it is telling that Mr. Andros took absolutely no action on the Debtor's behalf to address the pending foreclosure sale scheduled for August 3, 2023 before the Debtor's Chapter 11 filing on August 2, 2023. However, Louise Blouin, as a true fiduciary, refused to sit back and allow a forfeiture to occur. She invoked the automatic stay on behalf of the Debtor by virtue of the Chapter 11 filing in an effort to maximize the value of the 376 Property, something Mr. Andros showed no interest in doing.

## Legal Analysis

**A. Bay Point Never Obtained an Actual Proxy Appointment Form or Duly Attested Power of Attorney in Accordance with the Requirements of Georgia Law to Vote the Shares of Stock in the Debtor. Accordingly, the Purported Change of Control is Inoperative**

Relying solely on the default remedies under the Pledge, Bay Point alleges that it took control of the Debtor's Board of Directors on July 18, 2023. However, the record indicates that Bay Point acted without sufficient documentation. The analysis begins with a proper understanding that Section 9 of the Pledge does not *per se* constitute an actual proxy or power of attorney, but only confers upon Bay Point the right to obtain such documents in order to implement an actual transfer:

> Upon the occurrence of an Event of Default, and after the expiration of any applicable notice and cure period set forth in the Loan Documents, in addition to any and all other rights and remedies which Lender may then have hereunder, under the UCC or otherwise, Lender may, at its discretion and without notice to Pledgor unless required by applicable law, do any one or more _of the following, without

5

> liability except to account for property actually received by it, Pledgor having agreed that it is commercially reasonable for Lender to so do any of the following: (a) transfer to or register in its name or the name of its nominee (if the same has not already been done) any of the Collateral with or without indication of the security interest herein created, and whether or not so transferred or registered, receive the income, dividends and other distributions thereon and hold them or apply them to the Obligations in any order of payment as decided by landlord in its sole and absolute discretion; (b) exercise or cause to be exercised all voting and corporate powers with respect to any of the Collateral so registered or transferred, including all rights to conversion, exchange, subscription or any other rights, privileges or options pertaining to such Collateral, as if the absolute owner thereof . . .
>
> Pledgor hereby grants to Lender an irrevocable proxy coupled with an interest to exercise as to such Collateral, upon the occurrence of an Event of Default, all rights, powers and remedies of an owner and all of the rights, powers and remedies hereinabove set forth, the proxy herein granted to exist until the Obligations have been satisfied in full.

No evidence has been presented by Bay Point that the Pledge is supported by either an actual proxy document executed by BVI or a power of attorney. Bay Point references two default letters [Exhibits "E" and "F"] issued on June 16, 2023 and July 5, 2023, respectively. While these letters contain reservation of rights following maturity, neither letter contains any notice that Bay Point holds a proxy or power of attorney, or intends to vote the same to change the Debtor's Board of Directors in accordance with state law.

Historically, the common law in Georgia precluded proxy voting. This was changed by statute under GA Code § 14-3-724, which plainly requires a separate proxy authorization form, providing as follows:

> (a) Unless the articles or bylaws prohibit or limit proxy voting, a member may vote in person or by proxy.
> (b) <u>A member or his or her agent or attorney in fact may appoint a proxy to vote or otherwise act for the member by signing an appointment form</u> either personally or by an electronic transmission. An electronic transmission must contain or be accompanied by information from which it can be determined that the member, the member's agent, or the member's attorney in fact authorized the electronic transmission.
> (c) <u>An appointment of a proxy is effective when a signed appointment form or electronic transmission of the appointment is received by the secretary or other</u>

> officer or agent authorized to tabulate votes. An appointment is valid for 11 months unless a different period is expressly provided in the appointment form.
> (d) An appointment of a proxy is revocable by the member.
> (e) The death or incapacity of the member appointing a proxy does not affect the right of the corporation to accept the proxy's authority unless notice of the death or incapacity is received by the secretary or other officer or agent authorized to tabulate votes before the proxy exercises authority under the appointment.
> (f) Appointment of a proxy is revoked by the person appointing the proxy:
>    (1) Attending any meeting and voting in person; or
>    (2) Signing and delivering to the secretary or other officer or agent authorized to tabulate proxy votes either a writing stating that the appointment of the proxy is revoked or a subsequent appointment form.
> (g) Subject to Code Section 14–3–727 and any express limitation on the proxy's authority appearing on the face of the appointment form or in the electronic transmission, a corporation is entitled to accept the proxy's vote or other action as that of the member making the appointment.
> (h) Any copy, facsimile transmission, or other reliable reproduction of the writing or electronic transmission created pursuant to subsection (b) of this Code section may be substituted or used in lieu of the original writing or electronic transmission for any and all purposes for which the original writing or electronic transmission could be used, provided that such copy, facsimile transmission, or other reproduction shall be a complete reproduction of the entire original writing or electronic transmission.
> (i) A corporation may adopt bylaws authorizing additional means or procedures for members to exercise rights granted by this Code section. (*Emphasis supplied*)

The Georgia proxy statute contains two provisions that undermine the notion that the Pledge is self-effectuating without an appointment form. First, there is nothing under the Georgia statute indicating that the terms of the loan documents constitute a separate appointment form or excuses compliance with the statute. Quite to the contrary, the Georgia statute speaks repeatedly of a duly signed appointment form in order to properly vote by proxy. Without such a form, the terms of the Pledge did not fully confer proper proxy rights upon Bay Point and, thus, Bay Point's vote to oust the Board was not in conformity with Georgia law. In fact, even under *In re CII Parent, Inc., supra*, so heavily relied upon by Bay Point, the borrower there executed a separate proxy form to support and implement the terms of the loan documents. The same set of facts are not present here, which is a key distinguishing factor to the application of *In re CII Parent, Inc.*,

even if Delaware law somehow applies. Second, the Georgia statute precludes irrevocable proxies, calling into question the validity of the alleged irrevocable proxy asserted under the Pledge. BVI could only execute a revocable proxy, which can be revoked at any time. This right of revocation further distinguishes Georgia law from Delaware law.

### B. Bay Point Does Not Hold a Valid Power of Attorney

The stock certificate transferring ownership of the BVI shares was signed by Charles Andros pursuant to a purported power of attorney. However, Mr. Andros never actually received a power of attorney which is subject to a separate set of requirements under Georgia law. To begin with, to be effective any power of attorney must run from BVI as the actual shareholder in the Debtor to Bay Point. Here, however, the only document which is cited in the Dismissal Motion as granting a power of attorney is the Loan and Security Agreement, which provides in Section 9.3 that "each Borrower hereby irrevocably appoints Lender . . . as Borrower's true and lawful attorney". While Bay Point carefully quotes definitions of terms such as Collateral, Pledged Equity and Aberdeen, it fails to note that the only defined "Borrowers" are the Debtor and Brickchurch. Because BVI is not even a signatory to either the Loan and Security Agreement or the Note, those documents do not function as a power of attorney.

BVI is a signatory to the Guaranty, but the only power of attorney granted thereunder is found in Section 11, which relates to the subordination of claims of the Guarantors against the collateral. Nor does the Pledge provide a safe harbor to Bay Point since BVI's signature on the Pledge is neither witnessed by a third party nor notarized, as required by GA Code § 10-6B-5. Without a fully conforming and proper power of attorney, the endorsement of the shares to Bay Point by Mr. Andros on July 18, 2023 was ineffective.

### C. Bay Point Has Not Complied with the Applicable Provisions of the UCC for a Strict Foreclosure

Although Bay Point does not specifically address potential rights under the UCC, the rules regarding strict foreclosure are also inapplicable to legitimize Bay Point's possession of the Equity Collateral without a sale. Under GA Code §11-9-620 (formally, Section 11-9-505), a number of requirements must be met to effectuate a strict foreclosure, including proper advance notice. Moreover, the Debtor's consent to the repossession must be given <u>after</u> the default has occurred. This requirement cannot be waived by a pre-default consent. As explained by the Georgia Court of Appeals:

> OCGA § 11–9–505(2) provides for the only situation in which collateral can be retained by a secured party in satisfaction of a debt. Under that Code section, the secured party has the option of retaining the collateral in satisfaction of the obligation, provided the creditor gives written notice of such proposal if he has not signed a statement *after* default renouncing or modifying his rights under this subsection." (Emphasis supplied.) *Willis v. Healthdyne, Inc.,* 191 Ga.App. 671, 673(2), 382 S.E.2d 651. The written notice required by OCGA § 11–9–505(2) must clearly state the creditor's proposal to retain the collateral in satisfaction of the debt and must notify the debtor that he has 21 days in which to raise an objection to such a proposal. Anderson, Uniform Commercial Code, Volume 9, § 9–505:15, p. 807. See *Braswell v. American Nat. Bank,* 117 Ga.App. 699, 700, 161 S.E.2d 420. Compare *Motor Contract Co. of Atlanta v. Sawyer,* 123 Ga.App. 207, 209(3), 180 S.E.2d 282. The purpose of requiring such written notice of a creditor's proposal to retain collateral in lieu of the debt and of prohibiting waiver of such notice before default (in cases not involving the sale of accounts or chattel paper, OCGA § 11–9–502(2); *C C Financial v. Ross,* 250 Ga. 832, 833(2), 301 S.E.2d 262) is to provide the debtor with options for reducing his loss when collateral has a value greater than the debt via redemption pursuant to OCGA § 11–9–506 or liquidation in a commercially reasonable manner as required by OCGA § 11–9–504. *Stensvad v. Miners etc. Bank of Roundup,* 163 Mont. 409, 517 P.2d 715, 717 (1973). Allowing a debtor to reject a secured creditor's proposal to retain collateral in lieu of debt (after default) not only protects the debtor's right to mitigate his loss, it protects the creditor from claims of the debtor that the creditor should have disposed of the collateral. *Herring Mining Co. v. Roberts Bros. Coal Co.,* 747 S.W.2d 616, 619 (1988). See Anderson, Uniform Commercial Code, Volume 9, § 9–505:5, p. 800.

*Chen v. Profit Sharing Plan of Donald H. Bohne, DDS, P.A.*, 216 Ga. App. 878, 880 (1995). *See, also, In re CBGB Holdings, LLC*, 439 B.R. 551 (Bankr. S.D.N.Y. 2010) (similarly interpreting the same section of the UCC in New York). Because the record does not indicate any consent by the Debtor or BVI to the purported transfer of the Debtor's stock, the Equity Collateral remains under the ownership and control of BVI, subject to potential foreclosure rights which can only be conducted in a commercially reasonable manner after proper notice. *See, Chen v. Profit Sharing Plan of Donald H. Bohne, DDS, P.A., supra.*

### D. Bay Point is Barred by the Prevention Doctrine from Declaring a Default

Besides the infirmities in connection with the Pledge, Bay Point's ability to proceed with a default remains in dispute since BVI alleges that Bay Point's bad faith actions impeded all sale efforts. Such conduct gives rise to potential defenses under the so-called "Prevention Doctrine", which holds that "[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused". *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010).

The Prevention Doctrine has been codified in Georgia at Ga. Code § 13-4-23: "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." *See, Travelers Indem. Co. v. W. Georgia Nat. Bank*, 387 F. Supp. 1090, 1095 (N.D. Ga. 1974) ("When the conduct of one party prevents the execution of the exact terms of the contract, he may not then complain of the non-compliance of the other party. Where a defendants prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have resulted from the nonperformance of such condition.").

Thus, even if, *arguendo*, Bay Point obtained all of the required documentation to effectuate a transfer of the Debtor's stock (which it did not) a full evidentiary hearing is still required to determine whether a valid default was declared to trigger remedies under Section 9 of the Pledge in light of the opposition raised directly by BVI.

WHEREFORE, the Dismissal Motion should be denied, and the Debtor should be granted such other and further relief as is just and proper.

Dated: New York, New York
       August 21, 2023

            Goldberg Weprin Finkel Goldstein LLP
            Proposed Attorneys for the Debtor
            125 Park Avenue, 12th Floor
            New York, NY 10017
            (212) 221-5700

            By:  /s/ Kevin J. Nash, Esq.