**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ABERDEEN ENTERPRISES, INC.,<br><br>Debtor. | Case No. 23-72834-ast<br><br>Chapter 11 |

## BAY POINT CAPITAL PARTERS II, LP'S REPLY IN SUPPORT OF MOTION FOR AN ORDER (I) DISMISSING BANKRUPTCY CASE; OR (II) GRANTING ALTERNATIVE RELIEF (ECF NO. 12)

Movant Bay Point Capital Partners II, LP, by and through its undersigned counsel, hereby files this Reply in Support of its *Motion for an Order (I) Dismissing Bankruptcy Case; or (ii) Granting Alternative Relief* (ECF No. 12, the "Motion to Dismiss").

As an initial matter, Bay Point wants to make it clear that it does not oppose Aberdeen Enterprises, Inc. ("Aberdeen") being a debtor in bankruptcy or a jointly administered bankruptcy process with related-party Brickchurch Enterprises, Inc. ("Brickchurch") whereby the luxury real estate owned by each of them can be sold as either a single, combined estate or separate parcels – whatever will maximize the value of the respective Properties.[1] Bay Point supports that process. In fact, that is Bay Point's preferred course of action.

If the Court decides that Bay Point's appointed director, Charles Andros ("Andros"), is in control of Aberdeen and Brickchurch (the "Debtor Companies"), Bay Point believes that Andros will engage Marshall Glade of B. Riley as an independent, third-party chief restructuring officer (the "CRO") and Mintz & Gold as Aberdeen's bankruptcy counsel. Bay Point also believes that

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion to Dismiss.

Andros will take advice from the CRO and Mintz & Gold to lead the Debtor Companies through a jointly administered bankruptcy sale process that will culminate with the sale of the Properties. Bay Point believes that this process, will result in sufficient proceeds to pay all of the Debtor Companies' creditors, pay all administrative claims (including any capital gains taxes generated by the sales), and return value to the current beneficial owner of Debtor Companies' shares (i.e., Louise Blouin).

If it is determined that Andros is not in control, then all the creditors are still on the marry-go-round with Louis Blouin ("Blouin"). In the sixteen months that Brickchurch has been in bankruptcy (the "Brickchurch Bankruptcy Case"), Blouin has failed to move that case forward. Instead, Blouin has repeatedly changed her positions to effectuate a lengthy delay while she has lived rent free in the Properties and utilized Brickchurch's funds to pay her own, personal utility bills. The following is an exchange between this Court and Brickchurch almost 14 months ago is remarkably identical to the position that Aberdeen is taking in this case (the "Aberdeen Bankruptcy Case"):

> THE COURT:  [O]ther than the motion for new counsel, it doesn't appear that anything much has happened since the last hearing.
>
> . . .
>
> [BRICKCHURCH:]  I guess since the decision is to go ahead and move forward, that we were – originally, there was a sale contemplated, and now, our restructuring efforts are to consider a number of options, including one possibility in the refinancing, and that refinancing with the goal to pay creditors, particularly JGB. Refinance the loan to take out JGB's loan.
>
> Another option is to sell 366 Gin Lane in Southampton to get funds in order to fund a restructuring. And there is adjacent property that is not the subject of this bankruptcy that could possibility be sold along with 366 Gin Lane.

So we are right now within the exclusivity period that we're in, where the Debtor is formulating its own plan, are pursuing a number of options. We're moving on parallel tracks.

. . .

THE COURT:  Isn't that exactly where we were thirty-four days ago when the case was first in?

. . .

So the three options that you've outlined, which are the traditional three exit strategies, and at a minimum [in] any real estate case, sell it in a sale or to refinance being the big two. The third one would be a boot-strapping organization, which wasn't in the list, I guess, because the debtor doesn't generate any revenue. But it sounds as if the answer to my questions, has anything happened since the last hearing, is no. . . . At the last hearing, the discussion was going to oversee (indiscernible) in place, move toward a liquidation of this property, worked out – liquidation of the generic sense, not the sell it for the lowest dollar amount – work out some agreement with the adjacent property affiliate so that it doesn't interfere with the sale of this property and/or bundle the two estates for sale.

It sounds as if not only has nothing happened since the last hearing, but the debtor is actually treading backwards.

June 29, 2022 Hearing Transcript in the Brickchurch Bankruptcy Case (Brickchurch ECF No. 46) at 7:22-10:13. Enough is enough.

Bay Point wants off the marry-go-round. Bay Point sees three potential ways (listed in order of Bay Point's preference) of accomplishing this:

- If Andros is found to be in control, Bay Point expects to withdraw the Proposed Brickchurch Plan[2] and support the Debtor Companies through the jointly administered sale process. Bay Point expects that this will result in full payment of all allowed claims in both of the Debtor Companies' bankruptcy cases, full payment of all administrative expense claims (including all capital gains taxes associated with the sales), and a return of capital to Blouin as the current beneficial shareholder of the Debtor Companies. Everybody wins.

- If Blouin is found to be in control, Bay Point will seek confirmation of the Proposed Brickchurch Plan. The Proposed Brickchurch Plan is the best method for

---

[2] *Bay Point Capital Partners II, LP's First Amended Proposed Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (Brickchurch ECF No. 287, the "Proposed Brickchurch Plan").

maximizing the value of the Properties if Blouin remains in control. In this scenario, (i) Bay Point will recover the value of its claims plus any amounts that would otherwise be paid to Blouin on account of her interest in Aberdeen; (ii) the IRS will recover its capital gains tax on the Brickchurch Property, but may not recover the capital gains tax on the Aberdeen Property; (iii) the Aberdeen unsecured creditors and beneficial shareholder (i.e., Blouin) will likely not recover anything; (iv) the creditors of Brickchurch, including the IRS's employment claim, is likely to be paid in full; and (v) Blouin may recover some amount based on her status as the beneficial shareholder of Brickchurch.

- If Bay Point is unable to confirm the Proposed Brickchurch Plan, it will be forced to exercise its state law foreclosure rights. Bay Point already has relief from stay in the Brickchurch Bankruptcy Case due to the default under the DIP Loan Documents. Bay Point will have automatic relief from stay in the Aberdeen Bankruptcy Case on September 1, 2023. In this scenario, (i) Bay Point will either be paid in full at the foreclosure sale or will become the owner of the Properties pursuant to a credit bid; (ii) the Debtor Companies' other creditors, including the IRS, will likely receive nothing; and (iii) the Debtor Companies' beneficial shareholder (i.e., Blouin) will likely receive nothing.

With the above in mind, Bay Point will now respond to the various objections to the Motion to Dismiss.[3]

## I. __Bay Point acted pursuant to a valid proxy__.

Aberdeen[4] argues that Bay Point's appointment of Andros as director pursuant to the voting and proxy rights provided under the Pledge Agreement was invalid because Bay Point's proxy does not comply with Georgia law. Aberdeen's argument misunderstands Delaware's Internal Affairs Doctrine and incorrectly cites Georgia law applicable only to non-profit corporations.

---

[3] For purposes of efficiency and to ease the burden on the parties, Bay Point fully incorporates the Relevant Background section of the (i) *Plan Proponent Bay Point Capital Partners II, LP's Response to the Objection of the Internal Revenue Service to the Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (Brickchurch ECF No. 296, the "IRS Objection Response"); and *Plan Proponent Bay Point Capital Partners II, LP's Response to the Debtor's Objection and Reservation of Rights to the Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (Brickchurch ECF No. 297, the "Brickchurch Objection Response"). Copies of the IRS Objection Response (other than the Motion to Dismiss which was attached thereto as an exhibit) and Brickchurch Objection Response are attached hereto as Exhibit A and Exhibit B, respectively.

[4] For the sake of clarity, Bay Point disputes that the Objection was authorized by the duly appointed officer and/or director of Aberdeen. However, out of an abundance of caution and transparency – and with a full reservation of rights – Bay Point will respond to the various arguments raised by Goldberg Weprin Finkel Goldstein LLP.

        *a. <u>Delaware law applies to the process for exercising the proxy</u>.*

The Delaware Supreme Court recently reaffirmed that Delaware law applies to the voting rights of stockholders:

> [T]he internal affairs of a Delaware corporation are governed by Delaware law. This Court has held that the voting rights of stockholders in particular "fall squarely within the purview of the internal affairs doctrine."

*CCSB Fin. Corp. v. Totta*, 2023 Del. LEXIS 232, *30 (Del. April 19, 2023) (quoting *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005). Proxies – including those granted as part of a pledge agreement and effective upon a borrower's default – are within the scope of voting rights that fall within the internal affairs doctrine. *See, e.g., Uno Broadcasting Corp.*, 167 B.R. 189, (Bankr. D. Ariz. 1994).

In *Uno Broadcasting Corp.*, the debtor's sole shareholder granted debtor's lender an irrevocable proxy with respect to all voting powers pertaining to his stock, which lender could exercise upon default. *Id.* at 192-93. A disagreement ensued regarding whether the law governing the pledge agreement or the law of debtor's state of incorporation applied to the proxy. The bankruptcy court noted that:

> Control over a corporation is very much one of its internal affairs. If the proxy is irrevocable, then the holder of that proxy, [Lender], can control every aspect of the corporation's business, including the election of its board of directors, amendment of bylaws, amendment of its charter, and modification of its capital structure.

*Id.* at 196.

As such, Delaware law – not Georgia law – applies to the exercising of the proxy granted to Bay Point.

b. _Aberdeen's objection attempts to rely on law applicable to non-profit corproations._

Even if Georgia law applied to the Bay Point's proxy, Aberdeen's argument still fails because it is premised on Georgia law only applicable to non-profit corporations. Aberdeen's objection cites to O.C.G.A. § 14-3-724 (i.e., Title 14, Chapter 3). Chapter 3 of Title 14 only applies to non-profit corporations. _See_ O.C.G.A. 14-1-101 ("This chapter shall be known and may be cited as the 'Georgia Nonprofit Corporation Code.'"); O.C.G.A. 14-3-1701(a) and (b) (stating that Chapter 3 applies to nonprofit corporations and expressly excluding corporations organized under any other chapter).

The statute applicable to proxies granted by for-profit corporations is O.C.G.A. § 14-2-722. That statute provides, in relevant part:

> (d) An appointment of a proxy is revocable unless the appointment form or electronic transmission states that it is irrevocable and the appointment is coupled with an interest. Appointments coupled with an interest include the appointment of:
>
> (1) A pledgee;
>
> . . .
>
> (3) A creditor of the corporation who extended it credit under terms requiring the appointment.
>
> . . .

O.C.G.A. § 14-2-722(d). Aberdeen's argument that Georgia law does not recognize irrevocable proxies is simply wrong. In fact, Georgia specifically and expressly permits proxies like the one granted to Bay Point (who is both a pledgee and a creditor that extended credit under terms requiring the appointment).

c. _Georgia law does not require a specific form for proxies._

Aberdeen's misunderstanding of Georgia law does not end there. Aberdeen next argues that Georgia law requires a specific and separate form to create a proxy. Aberdeen cannot cite any

law or statute in support of that argument. That is because there is nothing Georgia law that requires a specific form for a valid proxy. The only requirement is that the proxy be signed by the shareholder or its authorized agent. *See* O.C.G.A. § 14-2-724. In fact, Georgia law specifically recognizes that a pledgee, beneficial owner, or attorney in fact of the shareholder may vote the shares of another so longs as it can produce "evidence acceptable to the corporation of the signatory's authority to sign for the shareholder." O.C.G.A. § 14-2-724. There is no Georgia statute or case that says that the evidence referenced in O.C.G.A. § 14-2-724 cannot be a grant of proxy voting rights in a pledge agreement. In fact, Georgia law contemplates that.

> d. *The Pledge Agreement contains a grant of proxy voting rights.*

Aberdeen argues that the Pledge Agreement does not contain a grant of proxy voting rights. It is incomprehensible how the following language could be read to not grant Bay Point proxy voting rights:

> Upon the occurrence of an Event of Default, and after the expiration of any applicable notice and cure period set forth in the Loan Documents, in addition to any and all other rights and remedies which Lender may then have hereunder, under the UCC or otherwise, Lender may, at its discretion and without notice to Pledgor unless required by applicable law, do any one or more of the following, without liability except to account for property actually received by it, Pledgor having agreed that it is commercially reasonable for Lender to so do any of the following: (a) transfer to or register in its name or the name of its nominee (if the same has not already been done) any of the Collateral with or without indication of the security interest herein created, and whether or not so transferred or registered, receive the income, dividends and other distributions thereon and hold them or apply them to the Obligations in any order of payment as decided by [lender] in its sole and absolute discretion; (b) exercise or cause to be exercised all voting and corporate powers with respect to any of the Collateral so registered or transferred, including all rights to conversion, exchange, subscription or any other rights, privileges or options pertaining to such Collateral, as if the absolute owner thereof . . .
>
> **Pledgor hereby grants to Lender an irrevocable proxy coupled with an interest to exercise as to such Collateral, upon the**

7

> *occurrence of an Event of Default, all rights, powers and remedies*
> *of an owner and all of the rights, powers and remedies*
> *hereinabove set forth, the proxy herein granted to exist until the*
> *Obligations have been satisfied in full.*

Pledge Agreement, § 9 (emphasis added).

       e. *Bay Point was not required to provide Aberdeen with notice of its proxy or notice that it was going to exercise its rights under the same.*

Finally, Aberdeen argues that Bay Point was required to provide Aberdeen with notice that it was going to exercise its proxy rights. Aberdeen's argument is clearly refuted by the Pledge Agreement, which says that Lender may act "at its discretion and without notice to Pledgor unless required by applicable law." Aberdeen fails to cite any applicable law that prevents a Pledgor from granting a proxy that permits the Pledgee to exercise such proxy without notice.

## II.    <u>Bay Point acted pursuant to a valid power of attorney.</u>

Because Bay Point acted pursuant to a valid proxy (i.e., the Proxy Track), it is not necessary for Bay Point to establish that it also has a valid power of attorney (i.e., the Power of Attorney Track). However, out of an abundance of caution, Bay Point will also address Aberdeen's arguments with respect to Bay Point's power of attorney.

       a. *Bay Point exercised its power of attorney on behalf of Aberdeen, not Aberdeen BVI.*

Aberdeen's first argument is that Bay Point attempted to exercise a power of attorney on behalf of Aberdeen BVI when the power of attorney was granted by Aberdeen. That is simply not true.

Bay Point utilized the above-quoted rights provided by Section 9 of the Pledge Agreement to execute a Stack Transfer Certificate on behalf of Aberdeen BVI. *See* Motion to Dismiss, Ex. S. Specifically, Section 9 of the Pledge Agreement gave Bay Point the right to "transfer to or register in its name or the name of its nominee (if the same has not already been done) any of the Collateral." Pledge Agreement, § 9.

Bay Point then utilized the power of attorney granted by the DIP Loan Agreement to execute Aberdeen's Register of Shareholders **on behalf of Aberdeen** – not Aberdeen BVI. *See* Motion to Dismiss, Ex. T.

As the shareholder of record for Aberdeen, Bay Point was able to accomplish the rest of the actions set forth in the Power of Attorney Track without relying on the proxy or the power of attorney.

> b. <u>*Aberdeen's cited Georgia Code expressly excludes powers of attorney granted pursuant to credit documents.*</u>

Aberdeen's argument that Bay Point's power of attorney fails to comply with Georgia law, again, fails to correctly interpret and apply Georgia law. Aberdeen cites O.C.G.A. 10-6b-5 for the proposition that Georgia law requires a power of attorney to be witnessed by a third party and notarized. Aberdeen's Objection at 8. However, O.C.G.A. § 10-6B-3 expressly provides that the requirements of O.C.G.A. §§ 10-6B-1 through 10-6B-23 (including §10-6B-3) does not apply to:

- "A power to the extent it is coupled with an interest in the subject of the power, including a power given to or for the benefit of a creditor in connection with a credit transaction." O.C.G.A. § 10-6B-3(1).

- "A power created by a person other than an individual." O.C.G.A. § 10-6B-3(5).

- "A power given to a transfer agent to facilitate a specific transfer or disposition of one or more identified stocks, bonds, or other financial instruments." O.C.G.A. § 10-6B-3(7).

Each of the above-referenced provisions apply to the instant situation and, as a result, each of them is alone sufficient to defeat Aberdeen's challenge to the validity of Bay Point's power of attorney.

### III.    <u>Bay Point did not perform a strict foreclosure under Article 9.</u>

Plaintiff's next argument is that Bay Point failed to comply with the strict foreclosure provisions of Article 9. Bay Point never asserted to act under the strict foreclosure provisions of Article 9. In fact, Bay Point expressly stated that it was not taking the beneficial interest in the

pledged shares. Bay Point was very clear that it was only exercising the rights under the proxy and power of attorney to become the record owner of the shares. Motion to Dismiss, ¶¶ 27, 34(c), 34(d), 38, 39, 40(d). In fact, the Notice of Change of corporate Control also specifically referenced the fact that Bay Point was only exercising rights to become the shareholder of record.

Bay Point was not confined to the remedies in the UCC. The Pledge Agreement expressly provides that the rights created thereunder are "in addition to any and all other rights and remedies which Lender may then have hereunder, under the UCC or otherwise." Pledge Agreement, § 9.

### IV.    Aberdeen's Unsupported Allegations Do Not Excuse Its Default.

Aberdeen's last argument is that no default exists under the Loan Documents because Bay Point (i) failed to pay for certain repairs requested by Aberdeen; (ii) required the Debtor Companies to make a prepayment and then charged interest on such amount; and (iii) "may have interfered with Aberdeen's efforts to refinance the senior mortgage."

*a.    Bay Point was not obligated to pay for any repairs of the Properties.*

Aberdeen and Aberdeen BVI argue that they are excused from performance under the DIP Loan Documents because Bay Point failed to fund certain requested repairs. This argument is directly contradictory to the express and clear provisions of the DIP Loan Agreement.

The DIP Loan Agreement provided for a Maintenance Reserve Account of $300,000[5] that could be used to fund maintenance on the Properties consistent with a budget approved by Bay Point.[6] The Maintenance Reserve Account provision expressly confirmed that the Debtor Companies were responsible for completing necessary maintenance and repairs at the Properties.

---

[5] Despite the maintenance reserve being limited to $300,000 and having been depleted, Bay Point has agreed to fund various of the Debtor Companies' funding requests as protective advances under the DIP Loan Documents.

[6] As a result of a drafting error, the DIP Loan Provision providing for a maintenance account inadvertently included language applicable to a tax reserve account. *See* DIP Loan Agreement, § 2.10(a). Despite this error, Bay Point – in good faith – agreed to allow the funds in the referenced Maintenance Reserve Account to be used for maintenance and repairs.

DIP Loan Agreement, § 2.10 ("***Notwithstanding anything to the contrary herein, Borrowers remain solely liable for repair and maintenance of the Mortgaged Property***, and Lender shall have no liability for the payment or non-payment of any costs or expenses associated with the maintenance of the Mortgaged Property.") (emphasis added).

Section 6.14 of the DIP Loan Agreement further confirmed that the Debtor Companies, not Bay Point, was liable for preforming all repairs to preserve and protect the Properties. DIP Loan Agreement, § 6.14 (Each Borrower will do all things necessary to maintain, preserve, protect and keep the Mortgaged Property and any Equipment located thereat, in good repair and working and saleable condition, except for ordinary wear and tear with respect of such Equipment.").

Sections 9.1 and 11.4 of the DIP Loan Agreement provided Bay Point with the right – but not the obligation – to make any advances necessary to preserve and maintain the Properties. DIP Loan Agreement, § 9.1(d) (Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election . . . [m]ake such payments and take such actions as Lender considers necessary or reasonable to protect its security interest in the Collateral."); § 11.4 ("Borrowers jointly and severally agree to pay promptly after demand therefor, all reasonable and documented out-of-pocked costs and expenses of Lender in connection with the due diligence, preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable) . . . .").

Aberdeen and Aberdeen BVI's argument that Bay Point somehow breached its obligations under the DIP Loan Agreement by failing to fund all of their demanded maintenance requests is absurdly contradictory to the clear terms of the DIP Loan Agreement.

b. _Bay Point funded all amounts required under the DIP Loan Documents and did not charge interest on prepayments_.

Aberdeen and Aberdeen BVI also argue that Bay Point did not fund the full amount of the DIP Loan because after it funded the full amount, it required Brickchruch to remit certain of those funds back to Bay Point as a prepayment of the DIP Loan. Bay Point's actions in this regard were expressly contemplated by the parties and approved by this Court. The following are the relevant sections with respect to this issue:

- "Excess Cash Flow Sweep. On or before 2:00 pm on Monday each week, or, if such Monday is not a Business Day, then on or before 2:00 pm on the next Business Day immediately following such Monday, all Excess Cash Flow shall be applied to prepay the Obligations." DIP Loan Agreement, § 2.3(c)(iii).

- "'Excess Cash Flow' means, as measured by the aggregate balance in the Specified Deposit Accounts, that amount of [cash] in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) that is not otherwise allocated to the payment of (i) previously earned services, accountants, real estate brokers, real estate appraisers, and maintenance and repair costs associated with the Managed Property; (ii) and due and payable taxes." DIP Loan Agreement, § 1.1.

- "Application of Prepayments. Any prepayments made by any Borrower pursuant to Section 2.3(b) or (c) shall be applied as follows: first, to Lender's fee and reimbursable expenses then due and payable pursuant to any of the Loan Documents; second to interest then due and payable hereunder; and third, to principal installments due on the Loan (in the inverse order of maturity), until the same shall have been paid in full." DIP Loan Agreement, § 2.3(d)

- "Origination Fee. On the Closing Date, out of the proceeds of the Loan, Borrowers shall, jointly and severally, pay an origination fee to Lender equal to Five Million Five Hundred Eighty Thousand and 00/100 Dollars ($5,580,000.00) (the "Origination Fee"), which Origination Fee shall be fully-earned immediately as of funding of the Loan and shall be nonrefundable." DIP Loan Agreement, § 1.1.

To ensure an amount of cash sufficient to pay off all of the Debtor Companies' prior secured debt, mechanics liens, unpaid property taxes, then existing-legal fees, etc., Bay Point reserved $62 million (less the fees and expenses that Bay Point was entitled to under the DIP Loan Agreement) for the DIP Financing. These were funds that Bay Point had to reserve and could not otherwise deploy to other projects during the 3+ months between the proposal and the Closing. As

such, Bay Point was entitled to include such funds in the calculation of the Origination Fee – and Aberdeen expressly agreed to (and this Court approved) the same by agreeing to the specific dollar amount of the Origination Fee.

After funding, it was determined that not all of the amount funded was required to be paid for the various debts, expenses, and reserves contemplated by the DIP Loan Agreement – which caused there to be a balance in Brickchurch's bank account. Pursuant to the agreed upon (and Court-approved) cash flow sweep provision, Brickchurch was required to remit those funds to Bay Point as a prepayment.

Contrary to Aberdeen's and Aberdeen BVI's unsupported allegations, Bay Point did not charge interest on the amount prepaid. The prepayment was applied in accordance with the DIP Loan Agreement's agreed upon (and Court-approved) prepayment application provision – which resulted in the vast majority (if not all) of the prepaid funds being applied to principal (thus, saving the Debtor Companies interest on funds that would otherwise have been sitting idle in its bank account).

      c.   <u>*Aberdeen's unsupported conspiracy theories do not justify depriving Bay Point of its rights under the DIP Loan Documents*</u>.

Aberdeen and Abredeen BVI make ridiculous allegations that Bay Point "may have interfered with Aberdeen's efforts to refinance the senior mortgage." Aberdeen Objection at 4. There is absolutely no support for that accusation and Bay Point vehemently disputes that allegation. Far from interfering with Abredeen's efforts, Bay Point attempted to make Morgan Stanley Private Bank National Association ("<u>Morgan Stanley</u>") comfortable with continuing its relationship with Blouin. But Blouin's lack of credibility and inability to move towards a resolution of Morgan Stanley's debt made that impossible – even when Bay Point offered Morgan Stanley significant payments in return for continued forbearance or postponement of its foreclosure sale.

Morgan Stanley wanted off the marry-go-round. That had nothing to do with Bay Point. That had everything to do with Blouin.

**V.**      **Conclusion[7]**

For the foregoing reasons, as well as those that may be raised at the hearing on the Proposed Disclosure Statement, Bay Point respectfully asserts that Aberdeen's Objection should be overruled.

Dated:  August 23, 2023                           Respectfully submitted,

*/s/ John C. Allerding*_____
By: John C. Allerding (admitted pro hac vice)
Thompson Hine LLP
3560 Lenox Road, Suite 1600
P: 404.407.3676 / F: 216.566.5800
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*

---

[7] Aberdeen and Aberdeen BVI also raise meritless arguments regarding whether Bay Point is entitled to collect a late fee and default interest with respect to the DIP Loan Documents. Debtor agreed to pay late fees and default interest if there was a payment default under the DIP Loan. Debtor asked this Court to approve its payment of the same. And the Court approved the imposition of those fees and interest. Against this backdrop, Bay Point agreed to extend the DIP Loan. Now, Debtor seeks to try to pull a fast one by saying that Bay Point can't collect this fees and default interest under New York law and that this Court could not authorize the payment of the same. The equitable problems with permitting a Debtor to make this argument are obvious.

In addition to the equitable issues, the DIP Order itself prevents Debtor from challenging Bay Point's claim. And the applicable law on the underlying issue of whether a lender can charge default interest and a late fee also favors Bay Point – and will be discussed at the appropriate time.