UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                              Chapter 11

ABERDEEN ENTERPRISES, INC.,                    Case No. 23-72834-AST
BRICKCHURCH ENTERPRISES, INC.                  Case No. 22-70914-AST

                                        Debtor.              Jointly Administered
--------------------------------------------------------x

### <u>DEBTORS' FIRST AMENDED JOINT CHAPTER 11 LIQUIDATING PLAN</u>

Aberdeen Enterprises, Inc. ("<u>Aberdeen</u>") and Brickchurch Enterprises, Inc. ("<u>Brickchurch</u>") (each a "<u>Debtor</u>", and collectively, the "<u>Debtors</u>") hereby propose the following first amended joint Chapter 11 liquidating plan of reorganization (the "<u>Joint Plan</u>") pursuant to the provisions of the Bankruptcy Code (as defined herein).

The Debtors are proceeding with a coordinated Sale of their valuable and iconic, contiguous ocean front properties (as defined herein). The bid procedures governing the Sale are the subject of a separate application filed by the Debtors, and after and subject to approval by the Bankruptcy Court (in such form as approved by the Bankruptcy Court, the "<u>Approved Bid Procedures</u>"), shall be deemed incorporated by reference for purposes of the Joint Plan.

A dispute (the "<u>Control Dispute</u>") currently exists between Debtors and their senior secured lender, Bay Point Capital Partners II, LP ("<u>Bay Point</u>"), as to the identity of the authorized officers and directors of Debtors. This Joint Plan is intended to provide an efficient and effective method for generating proceeds sufficient to repay Debtors' creditors without the need of incurring the cost of litigating the Control Dispute. For that purpose, as set forth herein, Debtors (managed and operated by Mathew Kabatoff ("<u>Kabatoff</u>") and Bay Point) shall collectively make decisions as set forth herein, under the Joint Plan and each agree that both parties shall be entitled to seek

expedited relief from the Bankruptcy Court in the situation where an agreement cannot be reached;

*unless otherwise provided herein.*

# ARTICLE I

## DEFINITIONS

All capitalized terms used herein shall have the meanings set forth below.

1.1    "**Aberdeen**" shall have the meaning ascribe to such term in the introductory section of the Joint Plan.

1.2    "**Aberdeen Administrative Expense Claim**" means an Administrative Expense Claim against Aberdeen.

1.3    "**Aberdeen Priority Claim**" means a Priority Claim against Aberdeen.

1.4    "**Aberdeen Property**" means the means the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

1.5    "**Aberdeen Unsecured Claim**" means an Unsecured Claim against Aberdeen.

1.6    "**Administrative Expense Claims Bar Date**" shall mean the first Business Day that is thirty (30) days after the Confirmation Date.

1.7    "**Administrative Expense Claim**" means a Claim for the costs and expenses of administering the respective Cases allowed under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) the awarded compensation and reimbursement of expenses for the Debtors' respective bankruptcy counsel and other professionals.

1.8    "**Allowed**" means, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period fixed by the Joint Plan; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no objection to allowance has been interposed within the applicable period fixed by the Joint Plan; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

1.9 "**Approved Bid Procedures**" shall have the meaning ascribe to such term in the introductory section of the Joint Plan.

1.10 "**Auction**" shall have the meaning as ascribed to such term in the Approved Bid Procedures.

1.11 "**Bankruptcy Cases**" means, collectively, the above-captioned cases, each being a "**Bankruptcy Case**."

1.12 "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

1.13 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York.

1.14 "**Bankruptcy Fees**" mean all fees and charges against the Estate under section 1930 of title 28 of the United States Code.

1.15 "**Bankruptcy Fees Reserve**" means the segregated account established pursuant to Section 5.3 of the Joint Plan.

1.16 "**Bay Point**" shall have the meaning ascribe to such term in the introductory section of the Joint Plan.

1.17 "**Bay Point Collateral Documents**" means (i) each security instrument, mortgage, deed of trust, document, pledge agreement, subordination agreement, account control agreement, or any other agreement pursuant to which either Debtor or any other Person granted Bay Point a Lien to secure repayment of the DIP Loan Obligations; and (ii) each of the JGB Assigned Documents.

1.18 "**Bay Point Debt**" shall have the meaning ascribed to such term in Section 3.1 of the Joint Plan.

1.19 "**Bay Point Loan Documents**" means, collectively, the DIP Loan Documents, the Morgan Stanley Judgment, and each of the documents related to the debt referenced in the Morgan Stanley Judgment that were assigned to Bay Point.

1.20 "**Blouin**" means Louise Blouin, indirect upstream beneficial equity holder and Creditor of the Debtors.

1.21 "**Brickchurch**" shall have the meaning ascribe to such term in the introductory section of the Joint Plan.

1.22 "**Brickchurch Administrative Expense Claim**" is an Administrative Expense Claim against Brickchurch.

1.23 "**Brickchurch Priority Claim**" means a Priority Claim against Brickchurch.

1.24 "**Brickchurch Property**" means the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

1.25 "**Brickchurch Unsecured Claim**" means an Unsecured Claim against Brickchurch.

1.26 "**Broker**" means the person or firm engaged by the Debtors, with consent of both Decision Makers, and approved by the Bankruptcy Court to market and sell the Properties.

1.27 "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.28 "**Cases**" means, collectively, the above-captioned, jointly administered Chapter 11 cases commenced by the Debtors in the Bankruptcy Court, each being a "**Case**."

1.29 "**Cash**" means lawful currency of the United States of America.

1.30 "**Claim**" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

1.31 "**Claims Objection Deadline**" shall mean one (1) business day prior to the Effective Date of the Joint Plan.

1.32 "**Closing**," means that time at which the Debtors, through the Plan Administrator and after and pursuant to a Sale Approval Order, consummate one or more Sales of the Properties.

1.33 "**Confirmation**" means the entry of the Confirmation Order.

1.34 "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court to consider confirmation of the Joint Plan.

1.35 "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Joint Plan pursuant to 11 U.S.C. § 1129.

1.36 "**Control Dispute**" shall have the meaning ascribe to such term in the introductory section of the Joint Plan.

1.37 "**Credit Bid**" means the right of Bay Point pursuant to 11 U.S.C. §363(k) to bid its Secured Claims at the Auction.

1.38 "**Creditor**" means the holder of a Claim against one or both of the Debtors.

1.39 "**Debtors**" shall have the meaning ascribed to such term in the introductory section of the Joint Plan.

1.40    "**Decision Makers**" means, collectively, Bay Point and Kabatoff, each being a "**Decision Maker**;" *provided that*, notwithstanding anything to the contrary herein, Bay Point shall have the right, in its sole and absolute discretion, to withdraw as a Decision Maker. In the even that Bay Point withdraws as a Decision Maker, the terms "Decision Makers" and "Decision Maker" shall refer only to Kabatoff.

1.41    "**DIP Financing Order**" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

1.42    "**DIP Lender Superpriority Claim**" that Allowed Administrative Claim in the amount of the DIP Obligations, granted to Bay Point pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over all other Administrative Expense Claims, adequate protection and other diminution claims, Unsecured Claims, and all other Claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including Administrative Expense Claims or other Claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code, or any other section of the Bankruptcy Code, whether or not such Administrative Expense Claims or Claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

1.43    "**DIP Loan Documents**" means (i) the Loan and Security Agreement, dated November 9, 2022, by and among Debtor, Aberdeen, and Bay Point, and (ii) each of the Bay Point Collateral Documents.

1.44    "**DIP Loan Obligations**" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

1.45    "**Disclosure Statement**" means the Disclosure Statement for the Joint Plan, including all exhibits, attachments, or amendments thereto, approved by Order of the Bankruptcy Court.

1.46    "**Disputed Claims Reserves**" means, collectively, the segregated account(s) established pursuant to Section 5.2 of the Joint Plan for the payment of Disputed Claims to the extent such Disputed Claim is Allowed by a Final Order, each being a "**Disputed Claims Reserve**."

1.47    "**Disputed**" means, with respect to a Claim, (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been timely filed; (b) any Claim that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Final Order; *provided however, that* until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last

date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in its entirety if: (A) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (B) no corresponding Claim has been listed in the Schedules; *and further provided that* until the earlier of (I) the filing of an objection to a Proof of Claim or (II) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in that amount that the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules. Claims arising from the rejection of Executory Contracts will be treated as Disputed Claims unless and until such Claims have been settled, withdrawn, or determined by a Final Order. Notwithstanding the foregoing, any Claims held by Bay Point shall not be Disputed Claims, but shall be subject to the clawback provisions set forth in Section 5.11.

1.48  "**Distribution Date**" means the Effective Date or such other date as soon as reasonably practicable as may be set by the Debtors for the distribution of Sale Proceeds in accordance with the terms of the Joint Plan.

1.49  "**Effective Date**" means, as it relates to (i) a Sale, the date upon which a Closing occurs; (ii) the Confirmation of the Joint Plan, the date upon which all of the conditions to effectiveness of the Joint Plan as set forth in Section 8.1 of the Joint Plan have been satisfied.

1.50  "**Equity Interests**" means the ownership interests of Aberdeen Enterprises (BVI) Ltd. and Brickchurch Enterprises (BVI) Ltd. in the respective Debtors.

1.51  "**Escrow Agent**" means that person selected by Debtors to hold the Bankruptcy Fees Reserve and/or Disputed Claims Reserves pending disbursements from the same in accordance with the Joint Plan.

1.52  "**Estates**" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "**Estate**."

1.53  "**Estimated Professional Fee Claim**" has the meaning ascribed to such term in Section 2.2 of the Joint Plan.

1.54  "**Estimated Professional Fee Reserve**" means the reserve established pursuant to Section 2.2 of the Joint Plan to pay each Estimated Professional Fee Claim in full, subject to their being deemed an Allowed Claim by a Final Order.

1.55  "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" of the Debtor as such terms are used in section 365 of the Bankruptcy Code.

1.56  "**Exit Advance**" and "**Exit Advances**" have the meaning ascribed to such terms in Section 4.3 of the Joint Plan.

1.57    "**Exit Advance Claim**" and "**Exit Advance Claims**" have the meaning ascribed to such terms in Section 4.3 of the Joint Plan.

1.58    "**Federal Tax Liens**" means, collectively, (a) that certain Lien filed by the IRS on August 17, 2022 against the Aberdeen Property with the Suffolk County Clerk (Recording No: LFED00034063); and (b) that certain Lien filed by the IRS on February 17, 2023 against the Aberdeen Property with the Suffolk County Clerk (Recording No. LFED00034390), each being a "**Federal Tax Lien**;" *provided that,* nothing contained herein shall be an admission or an acknowledgement of the validity of above-referenced Federal Tax Liens, nor shall anything herein prejudice any person's (including either Debtor's or Bay Point's) right to challenge the validity of any Lien asserted against either Property by the IRS.

1.59    "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing.  The possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to an order will not cause it not to be a Final Order.

1.60    "**Goldberg Weprin**" means Goldberg Weprin Finkel Goldstein LLP.

1.61    "**Governmental Unit**" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory a municipality, or a foreign state; or other foreign or domestic government.

1.62    "**Gross Sale Proceeds**" means the gross amount realized from a Sale (excluding the amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code).

1.63    "**Indemnification Reserves**" shall mean Cash held by Bay Point is one or more segregated accounts in an amount reasonably calculated to fully satisfy any potential indemnification obligations that any person has under each of the Bay Point Loan Documents.

1.64    "**IRS**" means the United States Internal Revenue Service.

1.65    "**JGB Assigned Documents**" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

1.66    "**JGB Judgment**" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No.

623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

1.67    "**Joint Plan**" shall have the meaning ascribed to such term in the introductory section of the Joint Plan.

1.68    "**Kabatoff**" shall have the meaning ascribed to such term in the introductory section of the Joint Plan.

1.69    "**Lien**" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

1.70    "**Morgan Stanley Judgment**" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

1.71    "**Net Sale Proceeds**" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, brokerage fees, closing costs, and documentary costs, if any; *provided that*, for the avoidance of doubt, Net Sale Proceeds shall not include the non-cash amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code or otherwise; and *further provided that* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

1.72    "**Petition Date**" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing these Chapter 11 cases were filed.

1.73    "**Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including each Priority Tax Claim.

1.74    "**Priority Tax Claim**" means any Allowed Unsecured Claim of a federal, state or local taxing authority that is entitled to treatment under 11 U.S.C. § 507(a)(8).

1.75    "**Private Sale**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.76    "**Professional**" means a professional employed by a Debtor under section 11 U.S.C. §327.

1.77    "**Professional Fee Claim**" means a Claim for compensation for services rendered, and reimbursement of expenses incurred by a Professional as awarded by a Final Order of the Bankruptcy Court; *provided that*, for the avoidance of doubt, the fees

8

of the Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction shall be paid directly from Gross Sale Proceeds without further order of the Bankruptcy Court and shall not be deemed to have a Professional Fee Claim; *and further provided that* a Broker whose retention has been approved by the Bankruptcy Court that does not solicit and offer that results in a consummated Sale of a Property may have a Professional Fee Claim in accordance with the approved retention application, subject to the rights of Debtors and any party in interest to object to the same.

1.78    "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.79    "**Properties**" means collectively the Aberdeen Property and the Brickchurch Property, each being a "**Property**."

1.80    "**Qualified Bidder**" has the meaning ascribed to such term in the Approved Bid Procedures, and shall, for the avoidance of doubt, include Bay Point by virtue of its Credit Bid rights.

1.81    "**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.82    "**Sale**" shall mean a sale of the Properties, whether through a single transaction or multiple transactions, pursuant to one or more Sale Approval Orders.

1.83    "**Sale Approval Order**" means an order of the Bankruptcy Court authorizing and directing the sale of one or more of the Properties pursuant to 11 U.S.C. § 363 or any other applicable provision of the Bankruptcy Code.

1.84    "**Sale Proceeds**" means the Net Sale Proceeds available from a Sale of a Property.

1.85    "**Sale Process**" shall have the meaning ascribed to such term in Section 4.2 of the Joint Plan.

1.86    "**Schedules**" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtors with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.87    "**Section 1031**" shall have the meaning ascribed to such term in Section 4.7 of the Joint Plan.

1.88    "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to

setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.89    "**Successful Bid(s)**" shall mean the highest and best bid for one or both of the Properties as (i) collectively recommended by Debtors and Bay Point and approved by the Bankruptcy Court; or (ii) as decided by the Bankruptcy Court after notice and hearing of the same if Debtors and Bay Point are not able to agree on the same.

1.90    "**Successful Bidder**" shall mean the Qualified Bidder that submits a Successful Bid.

1.91    "**Transfer Taxes**" means, without limitation, (a) Suffolk County or other applicable local real property transfer taxes, including but not limited to the Peconic Bay transfer tax; (b) New York state TP 584 deed and transfer taxes; and (c) any and all other stamp taxes, similar taxes, or mansion taxes, which, but for the applicability of § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of the Joint Plan.

1.92    "**Transferred Encumbrances**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.93    "**Unsecured Claim**" means an Allowed Claim which is not an Administrative Claim, a Bankruptcy Fee, a Priority Claim, a Post-Petition Administrative Tax Claim, or a Secured Claim.

1.94    "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim against one or both of the Debtors.

## ARTICLE II

## <u>UNCLASSIFIED CLAIMS</u>

Pursuant to Section 1123(a) of the Bankruptcy Code, the Joint Plan does not classify Administrative Expense Claims, Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full in accordance with the terms of the Joint Plan.

2.1    <u>**Administrative Expense Claims**</u>.    Each holder of an Allowed Administrative Expense Claim, including the DIP Lender Superpriority Claim, shall be paid the full amount of such Allowed Claim, in cash, from the Sale Proceeds or Exit Advances on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable

law, or (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim. Except as otherwise set forth herein, requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties.

      2.2    **Professional Fees**.  All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via

email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. The Debtors shall establish, on the basis of the revised estimates (collectively, the "Estimated Professional Fee Claims") and from the Sale Proceeds and/or Exit Advances, a segregated escrow account (the "Estimated Professional Fee Reserve") in such amounts which are reasonably necessary to pay the amount of the Estimated Professional Fee Claims. Subject to allowance by the Bankruptcy Court, the Debtors shall use the funds in the Estimated Professional Fee Reserve to pay the allowed amount of each Professional Fee Claim (a) upon the later of (i) the Distribution Date and (ii) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors. Payments made to a Professional from funds in the Estimated Professional Fee Reserve shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim.

2.3 **Priority Tax Claims**. Subject to Section 5.2 of the Joint Plan with respect to Disputed Claims, Allowed Unsecured Claims of governmental units entitled to priority under 11 U.S.C. § 507(a)(8) shall be paid in full (with post-petition interest at the federal judgment rate) at the Closing, or as soon as practicable thereafter as determined by the Debtors, from the Exit Advances and/or the Sale Proceeds generated by the Sale of the particular Property owned by the Debtor owing such Priority Tax Claim or, in the case of a Sale of both Properties as a single lot, from the Sale Proceeds allocable to the Property owned by the Debtor owing such Priority Tax Claim as determined pursuant to the terms of the Joint Plan in accordance with the priority provisions set forth in Sections 5.8 and 5.9 on the Joint Plan.

2.4    **Bankruptcy Fees**.  The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve. The Debtors shall use the Sale Proceeds and/or Exit Advances to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Joint Plan.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS

Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Joint Plan classifies Claims and Interests as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims of Bay Point | No | No |
| Class 2 | Secured Claim of the IRS | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | Certain Exit Advance Claims | No | No |
| Class 5 | General Unsecured Claims | No | No |
| Class 6 | Equity Interests | N/A | N/A |

**Class 1: Secured Claims of Bay Point**

3.1    **Classification** – Class 1 consists of the Secured Claims of Bay Point, which include the following: (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment (collectively, the "Bay Point Debt"). The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen

Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property).

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Joint Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be *prima facie* good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Joint Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.

For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however, that* nothing contained

herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and *further provided that* Debtors' reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.

**Voting** – Class 1 is unimpaired under the Joint Plan and, therefore, Bay Point is deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Bay Point is not entitled to vote to accept or reject the Joint Plan.

**Class 2: Any Secured Claims of the IRS**

3.2     **Classification** – Class 2 consists of any Secured Claims of the IRS that are secured by a Federal Tax Lien.

**Treatment** – Subject to Section 5.2 of the Joint Plan with respect to Disputed Claims, each Class 2 Secured Claims of the IRS (if any) shall be paid from the Sale Proceeds in accordance with the priority provisions set forth in Sections 5.8 and 5.9, up to the full Allowed amount thereof.

In the event that the Aberdeen Property is sold as a separate lot, the Federal Tax Liens shall attach to the Sale Proceeds thereof with the same validity and priority as such Federal Tax Liens had on the Aberdeen Petition Date, which, for the avoidance of doubt, is subject to a priority

dispute between the IRS and Bay Point – each party reserving their respective rights with respect to the same under the Joint Plan.

In the event that the Brickchurch Property is sold as a separate lot, the IRS shall have a Class 5 unsecured claim to be paid *pro rata* and *pari passu* with other unsecured creditors of Brickchurch.

In the event that the Properties are sold together in a single lot, the IRS shall be entitled to the same Sale Proceeds allocable to each of the respective Properties under the terms of the Joint Plan as the IRS would have been entitled to if the Properties were sold as separate lots.

Pursuant to 11 U.S.C. § 506(b), the IRS shall be entitled to collect post-petition interest, along with reasonable fees, costs, or charges provided for under any applicable non-bankruptcy law, as part of any Allowed Secured Claim held by the IRS.

**Voting** – Class 2 is unimpaired under the Joint Plan and, therefore, the IRS, as a perspective holder of a Class 2 Secured Claim, is deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, IRS is not entitled to vote to accept or reject the Joint Plan on account of any Class 2 Secured Claim.

**Class 3:  Non-Tax Priority Claims**

3.3    **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims, the Claims of Blouin for amounts paid on behalf of Debtors as Exit Advances other than those Exit Advances utilized for the payment of Priority Tax Claims.

**Treatment** – Subject to Section 5.2 of the Joint Plan with respect to Disputed Claims, Allowed Class 3 Priority Claims shall be paid in full (with post-petition interest at the federal judgment rate) at the Closing, or as soon as practicable thereafter as determined by the Debtors, from the Sale Proceeds generated by the Sale of the particular Property owned by the

Debtor owing such Priority Claim or, in the case of a Sale of both Properties as a single lot, from the Sale Proceeds allocable to the Property owned by the Debtor owing such Priority Claim as determined pursuant to the terms of the Joint Plan in accordance with the priority provisions set forth in Sections 5.8 and 5.9 on the Joint Plan.

   **Voting** – Class 3 is unimpaired under the Joint Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, any holders of Class 3 Non-Tax Priority Claims are not entitled to vote to accept or reject the Joint Plan.

**Class 4:  Certain Exit Advance Claims**

  3.4 **Classification** – Class 4 consists of the contingent Exit Advance Claims of Blouin for those amounts funded as Exit Advances to pay Priority Tax Claims pursuant to this Joint Plan.

   **Treatment** – Subject to Section 5.2 of the Joint Plan with respect to Disputed Claims, the holder of an Allowed Class 4 Exit Advance Claim shall be paid (up to 100% of their Allowed Claims with post-petition interest at the federal judgment rate), at Closing, or as soon as practicable thereafter as determined by the Debtors, from the Sale Proceeds generated by the Sale of the particular Property owned by the Debtor on whose behalf the holder of an Allowed Class 4 Exit Advance Claim made the Exit Advance that serves as the basis for such Claim or, in the case of a Sale of both Properties as a single lot, from the Sale Proceeds allocable to the Property owned by the Debtor on whose behalf the holder of an Allowed Class 4 Exit Advance Claim made the Exit Advance that serves as the basis for such Claim, each in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Joint Plan.

   **Voting** – For purposes of voting on the Joint Plan, pursuant to section 502(c) of the Bankruptcy Code, the Allowed amount of the Class 4 Exit Advance Claims is estimated to be

$0.00. As such, the holder of the Class 4 Exit Advance Claims is unimpaired under the Joint Plan and, therefore, such holder of the contingent Class 4 Exit Advance Claims is deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Class 4 Exit Advance Claims is not entitled to vote to accept or reject the Joint Plan.

**Class 5:  General Unsecured Claims**

3.5    **Classification** – Class 5 consists of all Unsecured Claims, including all Unsecured Claims held by Blouin, other than the Unsecured Claims classified into Class 3 and Class 4.

**Treatment** – Subject to Section 5.2 of the Joint Plan with respect to Disputed Claims, the holder of any Class 5 Unsecured Claim shall be paid, on a *pro rata* basis with respect to the entire amount of the Allowed Unsecured Claims (up to 100% of the Allowed Unsecured Claim with post-petition interest at the federal judgment rate), at Closing, or as soon as practicable thereafter as determined by the Debtors, from the Sale Proceeds generated by the Sale of the particular Property owned by the Debtor owing such Unsecured Claim or, in the case of a Sale of both Properties as a single lot, from the Sale Proceeds allocable to the Property owned by the Debtor owing such Unsecured Claim in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Joint Plan.

**Voting** – Class 5 is unimpaired under the Joint Plan and, therefore, any holders of the Class 5 Unsecured Claims are deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, any holders of Class 5 Unsecured Claims are not entitled to vote to accept or reject the Joint Plan.

**Class 6:  Equity Interests**

3.6    **Classification** – Class 6 consists of the Equity Interests in the Debtors.

**Treatment** – No payment shall be made on account of the Equity Interests of the Debtors until all other Claims have been paid in full (including the funding of any Bankruptcy Fee

18

Reserve and Disputed Claims Reserves) and the Cases have been fully administered and closed, unless, in the reasonable determination of the Debtors, an interim distribution can be made to the holders of the Equity Interests after the full payment of all Claims (including the funding of any Bankruptcy Fee Reserve and Disputed Claims Reserves) without jeopardizing the ability of the Debtors to fully administer their respective estates without administrative insolvency.

**Voting** – Class 6 is unimpaired under the Joint Plan and, therefore, the holders of the Equity Interests are deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Equity Interests is not entitled to vote to accept or reject the Joint Plan.

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1    **Authority to Act / Limitation of Liability.**   Each act and every decision to be made by Debtors under the Joint Plan shall be made at the direction, and shall be completely consistent with such direction, of the Decision Makers, such direction being valid and enforceable only upon the mutual agreement of both Decision Makers. If the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Joint Plan. The Decision Makers, solely as a result of their status as a Decision Maker under the Joint Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third

parties as appropriate to assist in the implementation of the Joint Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. The Decision Makers shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. The Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Joint Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Joint Plan.

4.2    **Sale Free and Clear of All Claims, Liens, Taxes and Interests.**   The Joint Plan shall be funded through the Sale of the Properties through the sale process run pursuant to the terms of the Approved Bid Procedures (the "Sale Process"), the funds that were previously distributed by Bay Point to the Debtors pursuant to the DIP Financing Order, and, if necessary, the Exit Advances; *provided that*, for the avoidance of doubt, the Debtors may consummate a Private Sale in accordance with the Approved Bid Procedures.

4.3    **Exit Advances.** If the Net Sale Proceeds generated by the Sale of a Property (or the Net Sale Proceeds allocable to a particular Property in the case where the Properties are sold together as a single lot) are not sufficient to (a) fully satisfy all Allowed Secured Claims, Bankruptcy Fees, Allowed Administrative Expense Claims, and Allowed Priority Tax Claims owed by the Debtor that owned such Property; and (b) fully fund any Disputed Claims Reserve with respect to such Claims pursuant to the terms of the Joint Plan, Blouin shall fund that amount necessary to fully satisfy each such Allowed Claim and each such Disputed Claims Reserve (if any) (the "Exit Advances," and each being an "Exit Advance"). Blouin shall have an Allowed Unsecured Claim for the amount of each Exit Advance that she makes (each, an "Exit Advance

Claim," and collectively, the "Exit Advance Claims") and each such Exit Advance Claim shall be paid in accordance with Sections 5.8 and 5.9 of the Joint Plan. For the avoidance of doubt, except for the payments to which the holder of an Exit Advance Claim is entitled pursuant to Sections 5.8 and 5.9 of the Joint Plan, the holder of an Exit Advance Claim shall not have a lien, whether legal or equitable, for any Exit Advance and shall not be permitted to seek contribution or reimbursement for any amount funded as an Exit Advance. Any holder of an Exit Advance Claim shall be deemed to have knowingly waived and released any rights that such holder may have (or had) under Sections 503(b)(3) and 506(c) of the Bankruptcy Code, and shall likewise be deemed to have knowingly waived and released any similar rights or claims that such holder may have against either Property and/or any third-party for amounts funded as Exit Advances.

4.4    **Provisions Relating to the Sale Process.**

(a)    Approved Bid Procedures.  The Sale Process, including the consummation of one or more Sales, shall be conducted in accordance with the Approved Bid Procedures.

(b)    Free and Clear Sale(s).  All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation.

(c)    Sale Approval Order(s).  Any proposed Sale, including a Private Sale, shall be subject to the approval of the Bankruptcy Court under 11 U.S.C. 363(b) (i.e., a Sale Approval Order).

(d)    Deadline to Close.  The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by December 31, 2023.

(e)    Payment of Sale Transaction Costs.  The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private

Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) the fees and expenses of the Escrow Agent (if any) with respect to the Sale involving such Property; *provided that* if Goldberg Weprin is chosen as the Escrow Agent, Goldberg Weprin shall not be entitled to collect any fees for services provided as Escrow Agent; (iv) any other closing costs associated with the Sale of such Property; and (e) subject to and without waiving Section 4.4 of the Joint Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Joint Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(f)     <u>Vesting of Assets</u>.  The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the Effective Date of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation.  Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing the Plan Administrator and any other necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Joint Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Joint Plan.

4.5     **The Plan Administrator**.

(a)     <u>Plan Administrator Appointment</u>.  The Closing of the Sale(s) provided for under the Joint Plan shall be implemented by the Plan Administrator, who shall be selected by the Debtors to oversee the Closing(s) and to execute all documents required to be signed to consummate the Sale(s) of the Properties. The Confirmation Order shall approve the appointment of the Plan Administrator, with the power and duty to effectuate any of the provisions in the Joint Plan relating to the Sale of the Properties, including the execution of all required conveyancing and transfer documents and instruments needed to consummate and Close the Sale transaction.

(b)     <u>Plan Administrator Protections</u>.  The Plan Administrator shall not be deemed an officer, fiduciary or agent of the Debtors. The Plan Administrator may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Joint Plan. The Plan Administrator shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. The Plan Administrator shall not have, or incur any liability to any entity for any action taken or omitted to be taken in

connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Joint Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Joint Plan, except in the case of gross negligence or willful misconduct.

(c)     Debtors' Attorney-in-Fact.    The Confirmation Order shall also contain appropriate provisions designating the Plan Administrator as each Debtor's attorney-in-fact to execute all documents in the name of the respective Debtor as may be required to consummate the Sale(s), including, without limitation, deeds to the Properties, bills of sale, all required transfer and ACRIS documents, and any other documents in the name of the Debtors as may be required to consummate the Sale(s).

(d)     No Interference.  No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Plan Administrator in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Plan Administrator in the performance of its duties; *provided that*, nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Joint Plan and Approved Bid Procedures.

(e)     Execution of Documents.

(i)     On the Effective Date of a particular Sale, the Plan Administrator, as each Debtor's respective attorney-in-fact, and any other necessary party thereto shall execute, release, and deliver all documents reasonably necessary to consummate such Sale and each other transaction related thereto as contemplated by the Joint Plan.

(ii)    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors, through the Plan Administrator, and any other necessary party shall be authorized, and shall be directed by the Confirmation Order, to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Joint Plan, that is necessary for consummation of the Joint Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

(iii)   If the Debtors are unable to execute or deliver any document or notice in connection with the Sale(s), the Plan Administrator shall be authorized to execute such documents and/or notices, and the Confirmation Order shall expressly so provide.

(f) <u>Filing of Documents</u>.  Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Joint Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Joint Plan.

4.6    **Transfer Taxes**.  The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Joint Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Joint Plan, including an instrument of transfer and deed executed by the Debtors or the Plan Administrator (on behalf of Debtors) shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "<u>Transfer Taxes</u>").  Accordingly, the appropriate officials or agents of state or local governmental unit, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

4.7    **Allocation**.  In the event of a sale of the Properties as a single lot, the proceeds of the Sale shall be allocated pursuant to agreement between Debtors and Bay Point; *provided that* if Debtors and Bay Point cannot agree on an allocation, Debtors and/or Bay Point may file a motion with the Bankruptcy Court to request that the Court determine such allocation and each of the same agrees that the other party shall be entitled to seek expedited relief with respect to the same.

4.8    **Preservation of Causes of Action.**  Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective estates relating to any prior transactions

(including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court.

4.9     **1031 Exchange Provisions.**  Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Joint Plan, nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986 as amended ("<u>Section 1031</u>"), including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

4.10     **Filing of Documents.**  Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Joint Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Joint Plan.

4.11     **Preservation of Insurance.**  The Joint Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor, the Properties (or any individual Property), or any other Person or entity. Likewise, the Joint Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or

disputes under any policy and shall not act to increase or extend any rights of the Debtors or any insurance carrier.

## ARTICLE V

## DISTRIBUTIONS

5.1    **Method of Payment**.  Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Joint Plan shall be made at the times and in the amounts set forth in the Joint Plan by either electronic funds wire transfer or check drawn on a domestic bank.

5.2    **Disputed Claims Reserves**.  No distributions shall be made with respect to any Disputed Claim. Instead, the Debtors shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Joint Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute, including, but not limited to (i) Disputed Secured Claims (ii) Disputed Claims entitled to treatment as Administrative Expenses or as Priority Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (iii) Disputed Claims of Governmental Units for any tax, and (iv) any disputed cure amount. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so

estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a Pro Rata basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Joint Plan. For the avoidance of doubt, the Disputed Claims Reserve with respect to any Disputed Administrative Expense Claim or Disputed Priority Tax Claim shall be funded from the Sale Proceeds or the Exit Advances in accordance with Sections 4.2, 4.3, 5.8, and 5.9 of the Joint Plan.

5.3    **Bankruptcy Fee Reserve.**  The Debtors shall utilize the Sale Proceeds and/or Exit Advances to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Joint Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

5.4    **Prosecution of Objections.**  Debtors shall have the right to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims. Objections to Claims, other than Administrative Expense Claims, shall be served and filed on or before the Claims Objection Deadline, and objections to Administrative Expense Claims shall be served and filed on or before the Administrative Expense Claims Objection Deadline.

5.5    **Distribution After Allowance.**  Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as

practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

5.6    **Distribution After Disallowance.**    The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Joint Plan.

5.7    **Delivery of Distributions.**    Distributions to holders of Allowed Claims shall be made: (i) at the address set forth on the respective Proof(s) of Claim or other request(s) for payment filed by the holder of such Allowed Claim; (ii) at the addresses set forth in any written notices of address change delivered to the Debtors; or (iii) at the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of change of address

5.8    **Distribution of Aberdeen Property Sale Proceeds.**    The Sale Proceeds realized from or allocable to, the Aberdeen Property shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(a)    First, to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

(b)    Second, to Bay Point for funding the Indemnification Reserve for potential claims related to the JGB Assigned Documents or the transactions referred to or referenced therein;

(c)    Third, to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(d)    Fourth, to the IRS for application to any Allowed Secured Claim held by the IRS that is secured by a Federal Tax Lien; *provided that* if any such claims remain Disputed, whether by Debtors or by Bay Point, on the Distribution Date, then the amount of such Disputed Claims shall be paid into a Disputed Claims Reserve; *and further provided that* nothing contained herein shall prevent or otherwise prejudice Bay Point from challenging whether the liens granted to secure the DIP Loan Obligations have priority over any Allowed Secured Claim

held by the IRS; *and further provided that* if Bay Point is successful in asserting such challenge prior to the Distribution Date, then the Claims payable under Section 5.8(e) of the Joint Plan shall be paid in full prior to any payment being made on account of any Allowed Secured Claim held by the IRS;

(e)     <u>Fifth</u>, to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations; and (ii) the outstanding amount of the Allowed DIP Loan Obligations; *provided that*, for the avoidance of doubt, such amount paid to Bay Point shall not be reduced by the amount held in the Secured Claims Disputed Claims Reserve;

(f)     <u>Sixth</u>, to Bay Point for application to the Allowed DIP Lender Superpriority Administrative Claim, to the extent that any such Claim remain after complete payment of the Allowed DIP Loan Obligations;

(g)     <u>Seventh</u>, to (i) the holders of Allowed Aberdeen Administrative Expense Claims, other than the Allowed DIP Lender Superpriority Claim, in the full amount of their Allowed Aberdeen Administrative Expense Claims; and (ii) fund the Disputed Claims Reserve in an aggregate amount equal to the Pro Rata share of the Aberdeen Property Sale Proceeds that each holder of a Disputed Aberdeen Administrative Expense Claim would be entitled to receive if such Administrative Expense Claim was Allowed; *provided that* with respect to the holders of an Allowed Aberdeen Administrative Expense Claim that also constitutes an Allowed Brickchurch Administrative Expense Claim, the holders of such Allowed Aberdeen Administrative Expense Claim shall be paid an amount that promotes the substantial consummation of the Joint Plan and, in any case, shall be paid in full from the aggregate Sale Proceeds of the Properties; *and further provided that* with respect to the holders of a Disputed Aberdeen Administrative Expense Claim that also constitutes an Allowed or a Disputed Brickchurch Priority Claim, a Disputed Claims Reserve shall be funded in an amount equal to the amount that promotes the substantial consummation of the Joint Plan and, in any case, shall ensure that such Administrative Expense Claim will be paid in full from the aggregate Sale Proceeds of the Properties if such Administrative Expense Claim is Allowed; *and further provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.8(g), such payments shall be funded, in an amount to make the requisite payments in full, by the Exit Advances;

(h)     <u>Eighth</u>, to pay Bankruptcy Fees and fund the Bankruptcy Fees Reserve; *provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.8(h), such payments shall be funded, in an amount to make the requisite payments in full, by the Exit Advances;

(i)     <u>Ninth</u>, to (i) the holders of the Allowed Aberdeen Priority Claims in an amount equal to the Pro Rata share of such holder's Allowed Aberdeen Priority Claims; and (ii) fund the Disputed Claims Reserve in an aggregate amount equal to the

Pro Rata share of the Aberdeen Property Sale Proceeds that each holder of a Disputed Aberdeen Priority Claim would be entitled to receive if such Priority Claim was Allowed; *provided that* with respect to the holders of an Allowed Aberdeen Priority Claim that also constitutes an Allowed Brickchurch Priority Claim, the holders of such Allowed Aberdeen Priority Claims shall be paid an amount that promotes the substantial consummation of this Joint Plan and, in any case, shall be paid in full from the aggregate Sale Proceeds of the Properties; *and further provided that* with respect to the holders of a Disputed Aberdeen Priority Claim that also constitutes an Allowed or a Disputed Brickchurch Priority Claim, the Disputed Claims Reserve shall be funded in an amount equal to the amount that promotes the substantial consummation of this Joint Plan and, in any case, shall ensure that such Priority Claim will be paid in full from the aggregate Sale Proceeds of the Properties if such Priority Claim is Allowed; *and further provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.8(i), the Aberdeen Priority Tax Claims shall be funded, in an amount to make such payments in full, by the Exit Advances;

(j)     Tenth, to any holder of an Allowed Exit Advance Claim related to the funding of one or more Claims against Aberdeen in an amount equal to the Pro Rata share of such Allowed Exit Advance Claim;

(k)     Eleventh, to (i) the holders of the Allowed Aberdeen Unsecured Claims in an amount equal to the Pro Rata share of such holder's Allowed Aberdeen Unsecured Claim; and (ii) fund the Disputed Claims Reserve in an aggregate amount equal to the Pro Rata share of Aberdeen Property Sale Proceeds that each holder of a Disputed Unsecured Claim would be entitled to receive if such Unsecured Claim was Allowed; and

(l)     Twelfth, to the holder(s) of any Equity Interest in Aberdeen in the Pro Rata amount of such Equity Interest or otherwise in accordance with the corporate governance documents governing such Equity Interest.

5.9     **Distribution of Brickchurch Property Sale Proceeds.**    The Sale Proceeds realized from, or allocable to, the Brickchurch Property shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(a)     First, to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations and/or the JGB Assigned Documents, including any of the transactions referred to or referenced therein; and (ii) the outstanding amount of the Allowed DIP Loan Obligations;

(b)     Second, to Bay Point for application to the Allowed DIP Lender Superpriority Administrative Claim, to the extent that any such Claim remain after complete payment of the Allowed DIP Loan Obligations;

(c)     <u>Third</u>, to pay Bankruptcy Fees and fund the Bankruptcy Fees Reserve;

(d)     <u>Fourth</u>, to (i) the holders of Allowed Brickchurch Administrative Expense Claims, other than the Allowed DIP Lender Superpriority Claim, in the full amount of their Allowed Brickchurch Administrative Expense Claims; and (ii) fund the Disputed Claims Reserve in an aggregate amount equal to the Pro Rata share of the Brickchurch Property Sale Proceeds that each holder of a Disputed Brickchurch Administrative Expense Claim would be entitled to receive if such Administrative Expense Claim was Allowed; *provided that* with respect to the holders of an Allowed Brickchurch Administrative Expense Claim that also constitutes an Allowed Aberdeen Administrative Expense Claim, the holders of such Allowed Brickchurch Administrative Expense Claim shall be paid an amount that promotes the substantial consummation of the Joint Plan and, in any case, shall be paid in full from the aggregate Sale Proceeds of the Properties; *and further provided that* with respect to the holders of a Disputed Brickchurch Administrative Expense Claim that also constitutes an Allowed or a Disputed Aberdeen Priority Claim, a Disputed Claims Reserve shall be funded in an amount equal to the amount that promotes the substantial consummation of the Joint Plan and, in any case, shall ensure that such Administrative Expense Claim will be paid in full from the aggregate Sale Proceeds of the Properties if such Administrative Expense Claim is Allowed; *and further provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.9(d), such payments shall be funded, in an amount to make the requisite payments in full, by the Exit Advances;

(e)     <u>Fifth</u>, to pay Bankruptcy Fees and fund the Bankruptcy Fees Reserve; *provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.9(e), such payments shall be funded, in an amount to make the requisite payments in full, by the Exit Advances;

(f)     <u>Sixth</u>, to (i) the holders of the Allowed Brickchurch Priority Claims in an amount equal to the Pro Rata share of such holder's Brickchurch Aberdeen Priority Claims; and (ii) fund the Dispute Claims Reserve in an aggregate amount equal to the Pro Rata share of the Brickchurch Property Sale Proceeds that each holder of a Disputed Brickchurch Priority Claim would be entitled to receive if such Priority Claim was Allowed; *provided that* with respect to the holders of an Allowed Brickchurch Priority Claim that also constitutes an Allowed Aberdeen Priority Claim or that is secured by a Lien against the Aberdeen Property, the holders of such Allowed Brickchurch Priority Claims shall be paid an amount that promotes the substantial consummation of this Joint Plan and, in any case, shall be paid in full from the aggregate Sale Proceeds of the Properties; *and further provided that* with respect to the holders of a Disputed Brickchurch Priority Claim that also constitutes an Allowed or a Disputed Aberdeen Priority Claim or that is secured by a Lien against the Aberdeen Property, the Disputed Claims Reserve shall be funded in an amount equal to the amount that promotes the substantial consummation of this Joint Plan and, in any case, shall ensure that such Priority Claim will be paid in full

from the aggregate Sale Proceeds of the Properties if such Priority Claim is Allowed; *and further provided that*, to the extent that the Sale Proceeds are not sufficient to make the payments required by this Section 5.9(f), the Brickchurch Priority Tax Claims shall be funded, in an amount to make such payments in full, by the Exit Advances;

(g)     Seventh, to any holder of an Allowed Exit Advance Claim related to the funding of one or more Claims against Brickchurch in an amount equal to the Pro Rata share of such Allowed Exit Advance Claim;

(h)     Eighth, to (i) the holders of the Allowed Brickchurch Unsecured Claims in an amount equal to the Pro Rata share of such holder's Allowed Brickchurch Unsecured Claim; and (ii) fund the Disputed Claims Reserve in an aggregate amount equal to the Pro Rata share of Brickchurch Property Sale Proceeds that each holder of a Disputed Unsecured Claim would be entitled to receive if such Unsecured Claim was Allowed;

(i)     Ninth, to the holder(s) of any Equity Interest in Brickchurch in the Pro Rata amount of such Equity Interest or otherwise in accordance with the corporate governance documents governing such Equity Interest.

5.10    **Creditor's Right to Accept Lessor Payment**.  For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Joint Plan.

5.11    **Estates' Right to Clawback.**  For the avoidance of doubt, distributions to Bay Point under the Joint Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Joint Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Joint Plan.

5.12    **Order of Distributions and Allocation of Clawback.**  The distributions required by Sections 5.08 and 5.09 of this Joint Plan, and the clawback provisions of Section 5.11 of the Joint Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Joint Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.08 and 5.09 of the Joint Plan.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    **Rejection of Executory Contracts**.  On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2    **Rejection Damages Claims.**    Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Joint Plan shall be treated as Unsecured Claims.

6.3    **Bar to Rejection Claims**. A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Joint Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date.  Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## CONFIRMATION AND CONSUMATION OF THE PLAN

7.1    **Injunction Against Interference with Joint Plan.**    Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtor and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and

affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property. As acknowledged and represented to the Court at the hearing held on August 23, 2023, Blouin shall completely vacate the Properties on or before October 1, 2023 and shall not be present for any showings of the Properties as part of the Sale Process or otherwise. Showings will be conducted by Debtors' listing agent and/or a Potential Bidder's real estate broker/agent. Blouin's failure to abide by her above-referenced agreement shall constitute a violation of the injunction set forth in this Section 7.1 and shall subject Blouin to appropriate punishment for contempt of court. Blouin's agreement as set forth on the record at the October 1, 2023 hearing shall not be contingent on the Confirmation of the Joint Plan or the substantial consummation thereof. Bay Point shall be entitled to enforce such agreement regardless of Confirmation and/or substantial consummation of the Joint Plan.

7.2 **No Discharge.** Pursuant to section 1141(d)(3) of the Bankruptcy Code, as applicable, the Debtor will not be discharged from debts that arose prior to Confirmation.

7.3 **Liens and Claims.** All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Joint Plan, the Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

7.4 **Conditions to Effective Date.** The Joint Plan will not become effective and the

Effective Date will not occur, unless and until:

    (a)    the Confirmation Order has become a Final Order;

    (b)    the Bankruptcy Court shall have entered the Order approving the Sale Transaction;

    (c)    the Sale Transaction shall have closed; and

    (d)    the payments required pursuant to Sections 5.8 and 5.9 of the Joint Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Joint Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Joint Plan.

    7.5    **Binding Effect.**  Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Joint Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Joint Plan and whether such holder accepted the Joint Plan.

## ARTICLE VIII

## RETENTION OF JURISDICTION

    8.1    **Retention of Jurisdiction**.  The Bankruptcy Court shall retain post-confirmation jurisdiction over the following matters:

    (a)    To issue any orders necessary or appropriate to authorize the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code.

    (b)    To adjudicate any dispute relating to the sale of the Properties;

    (c)    To resolve all matters and disputes arising under or relating to the Joint Plan, including, without limitation, (i) disputes relating to the Sale Process; (ii) any disputes relating to,

or involving the amount of the allowance of Claims; and (iii) distribution or disbursement of the Sale Proceeds;

(d)     To Allow or disallow in whole or in part any objections to Claims filed prior to the Closing that have not been previously Allowed or disallowed;

(e)     To grant or deny the applications for allowance of final compensation and reimbursement of expenses of Professionals;

(f)     To enter an order or final decree concluding the Cases following the Sale of the Properties, payment of allowed claims, resolution of all disputes, and distribution of all reserves;

(g)     To compel the Debtors, Blouin, the Plan Administrator, or any other person to take such action and execute such documents, or to refrain from such action, as may be necessary to effectuate the Joint Plan;

(h)     To enter Orders that may be necessary or appropriate to implement or consummate the provisions of the Joint Plan and to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Cases;

(i)     Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Joint Plan or any entity's obligations incurred in connection with the Joint Plan;

(j)     Approve modifications of the Joint Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, and modifications of the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Joint Plan or Disclosure Statement;

(k)     Issue and enforce injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Joint Plan;

(l)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     To enter a Sale Approval Order with respect to the Properties regardless of the failure to timely achieve substantial consummation of the Joint Plan and regardless of whether the Joint Plan shall become effective pursuant to Section 8.1 of the Joint Plan;

(n)     Issue any Orders necessary to consummate a sale of the Properties pursuant to 11 U.S.C. 363 or any other applicable provision of the Bankruptcy Code after any failure to timely achieve substantial consummation the Joint Plan and/or any failure of the Joint Plan to become effective pursuant to Section 8.1 of the Joint Plan; and

(o)     Issue any Orders as may be appropriate to convert the Cases to chapter 7 if the Joint Plan is not substantially consummated or otherwise fails to become effective pursuant to Section 8.1 of the Joint Plan.

## ARTICLE IX

## GENERAL PROVISIONS

9.1     **Orders in Aid of Consummation.**  Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation and/or consummation of the Joint Plan directing the implementation of matters or actions required by the Joint Plan.

9.2     **Compliance with Tax Requirements.**  In connection with the Joint Plan, the Debtors, and where applicable, the Plan Administrator, shall comply with all withholding and

reporting requirements imposed by federal, state and local taxing authorities, and distributions under the Joint Plan shall be subject to applicable withholding and reporting requirements; *provided, however*, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

9.3    **Due Authorization by Creditors.**    Each and every Creditor who elects to participate in the distributions provided for under the Joint Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Joint Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, or modified by the Joint Plan, or obligations undertaken by such Creditor under the Joint Plan.

9.4    **Amendments and Modifications.**    The Joint Plan may be altered, amended or modified by Debtors, solely with the consent of Bay Point, at any time before the substantial consummation of the Joint Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; *provided that* Debtors may only modify the Approved Bid Procedures consistent with the terms of such Approved Bid Procedures.

9.5    **Revocation.**    Debtors, solely with the consent of Bay Point, may revoke or withdraw the Joint Plan at any time prior to the Confirmation Date. If the Joint Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Joint Plan shall be null and void, and nothing contained in the Joint Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

9.6     **Request for Relief under Section 1129(b).**  If the Joint Plan is accepted by one or more, but not all, classes of Creditors that are found to be impaired by the Joint Plan, Debtors or Bay Point may request confirmation under section 1129(b) of the Bankruptcy Code, subject to any modification of the Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

9.7     **Filing of Additional Documents.**  Except as otherwise provided in the Joint Plan, on or before the Effective Date, the Debtor or Bay Point may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Joint Plan.

9.8     **Headings.**  The headings in the Joint Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Joint Plan.

9.9     **Computation of Time.**  In computing any period of time prescribed or allowed by the Joint Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10    **Penalties.**  Unless Allowed by the Court, no distribution shall be made on any Claim of a Governmental Unit for any punitive or exemplary damages or on account of any fine, penalty, or forfeiture.

9.11    **Successors and Assigns.**  The rights, benefits and obligations of any entity named or referred to in the Joint Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.12    **Notices.**  All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein.

If to Brickchurch Enterprises, Inc.:

Simmons Legal PLLC
Camisha L. Simmons, Esq.
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Camisha@SimmonsLegal.Solutions

If to Aberdeen Enterprises, Inc.:

Goldberg Weprin Finkel Goldstein LLP
Kevin Nash
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

If to the holders of the Equity Interests:

The Law Offices of Avrum J. Rosen, PLLC
Avrum J. Rosen
38 New Street
Huntington, New York 11743
arosen@ajrlawny.com

If to Bay Point Capital Partners II, LP:

The Law Offices of John F. Isbell LLC
John F. Isbell, Esq.
3050 Peachtree Road NW, Suite 740
Atlanta, Georgia 30305
John@JFI-Law.com

*-and-*

Thompson Hine LLP
John C. Allerding, Esq.
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to any other Creditor:

At (a) the addresses set forth on the applicable Proofs of Claim or other request for payment filed by such holder, (b) the addresses set forth in any written notices of address changes delivered to the Debtors, or (c) the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

<u>If to any entity that has filed a notice of appearance</u>:

At the address set forth on such notice of appearance.

9.13   **Other Actions**.   Nothing contained herein shall prevent any person from taking such actions as may be reasonably necessary to consummate the Joint Plan, although such actions may not specifically be provided for within the Joint Plan; *provided, however,* that no person shall take action expressly prohibited by or contrary to the express provisions of this Joint Plan.

9.14   **Severability**.   In the event any provision of the Joint Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Joint Plan.

9.15   **Business Day**.   In the event that the Joint Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

9.16   **Quarterly Fees**.   All fees payable pursuant to 28 U.S.C. § 1930, together with any applicable interest thereon, shall be paid by the Debtors until the closing of the Cases under 11 U.S.C. §350(a).

9.17   **Post-Confirmation Reports**.   The Debtors shall file quarterly status reports until the Cases are closed.

9.18   **Continuation of the Debtors**.   The Debtors shall continue in existence, duly authorized to carry out the terms of the Joint Plan and the distribution of the Sale Proceeds. The Debtors shall not be dissolved until after the entry of a Final Decree closing the Cases. If the holders of the Equity Interest determine it desirable for the Debtors to exist after the closing of the Cases, and such continued existence does not prejudice any Creditors, nothing contained herein shall prevent the Equity Interest holders from choosing to continue the corporate existence of the Debtors.

## CLOSING OR CONVERSION OF THE CASE

10.1 **Substantial Consummation.** On or before December 15, 2023, Debtors' shall file a notice with the Bankruptcy Court stating whether the Sale Proceeds expected from a Sale to the Successful Bidder, as the same shall be supplemented by the Exit Advances (if necessary) in accordance with the provisions of the Joint Plan, are sufficient to substantially consummate the Joint Plan, which, for the avoidance of doubt, shall require the full payment of Bay Point's Claims (subject to the Estates' right of clawback pursuant to Section 5.11), any other Allowed Secured Claims, Bankruptcy Fees (including the Bankruptcy Fees Reserve), Allowed Administrative Expense Claims, and Allowed Priority Tax Claims, and the funding of any Disputed Claims Reserves with respect to Disputed Claims that would fall within the above-categories if Allowed. If the Sale Proceeds, as supplemented (if necessary) by the Exit Advances, are sufficient to fully satisfy the foregoing Claims, the Debtors shall promptly move to consummate the Sale(s) (on or before December 31, 2023) and, on the Effective Date, file a notice with the Bankruptcy Court of the substantial consummation of the Joint Plan. Upon the filing of such notice of substantial consummation, the Joint Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code. If the Sale Proceeds are insufficient to substantially consummate the Joint Plan, the Court shall hear and decide the Sale Motion outside of the Plan under Section 363, with all Creditors reserving their rights to support or oppose the same.

10.2 **Closing of the Case.** Within fourteen (14) days following the full administration of the Debtors' Estates, the Debtors shall file, on notice to the United States Trustee's Office, an application and proposed order seeking a final decree, closing the Cases pursuant to Bankruptcy Rule 3022.

10.3 **Failure to Achieve Substantial Consummation.** If the Joint Plan is unable to be

substantially consummated, then the Bankruptcy Court shall enter a Sale Approval Order (a) authorizing and directing the Plan Administrator, as the attorney in fact of the Debtors, to sell the Properties to the Successful Bidder(s), or, if the Successful Bidder with respect to a particular Property shall default under the terms of the asset purchase agreement governing such Sale, to the Backup Bidder, pursuant to 11 U.S.C. § 363(b) and/or any other applicable provision of the Bankruptcy Code provided that the Sale otherwise meets the standard that a debtor must establish for obtaining court approval of transfers under such applicable Bankruptcy Code section(s); (b) ordering the distribution of Sale Proceeds resulting from such Sale to be distributed to the holder(s) of any Secured Claim(s) with respect to the transferred Property/Properties; and (c) ordering that the Sale Proceeds in excess of those necessary to satisfy such Secured Claims be held in the Debtors' respective Estates pending conversion of the Cases to chapter 7 in accordance with Section 10.4 of the Joint Plan.

       10.4    **Conversion or Dismissal of the Cases Following Plan Failure.**  If the Joint Plan is unable to be substantially consummated, then, after entry of any Sale Approval Orders pursuant to Section 10.3 of the Joint Plan, the Bankruptcy Court shall, upon the request of the Debtors or on its own volition, enter an Order (a) converting the Bankruptcy Cases to chapter 7 cases and appointing a chapter 7 trustee; or (b) dismissing the Bankruptcy Cases.

Dated:  New York, NY
       October 11, 2023

Simmons Legal PLLC
*Counsel for Brickchurch Enterprises, Inc.*
1330 Avenue of the Americas, Suite 23A
New York, New York 10019
(212) 653-0667
camisha@simmonslegal.solutions


By:    /s/ Camisha L. Simmons, Esq.

Goldberg Weprin Finkel Goldstein LLP
*Counsel for Aberdeen Enterprises, Inc.*
125 Park Avenue, 12th Floor
New York, New York 10017
(212) 221-5700
tdonovan@gwflaw.com


By:    /s/ J. Ted Donovan, Esq.

BRICKCHURCH ENTERPRISES, INC.

By:    /s/ Mathew Kabatoff
       Mathew Kabatoff

By:   Bay Point Capital Partners II, LP

   By:   Bay Point Advisors LLC, its
         General Partner

      By:  Charles Andros _____

ABERDEEN ENTERPRISES, INC.

By:    /s/ Mathew Kabatoff
       Mathew Kabatoff

By:    Bay Point Capital Partners II, LP

   By:   Bay Point Advisors LLC, its
         General Partner

      By:   Charles Andros _____

ACKNOWLEDGED AND AGREED TO BY:

/s/ Louise Blouin _____
Louise Blouin, in her individual capacity