UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                    Chapter 11

Aberdeen Enterprises, Inc.,                               Case No. 23-72834-AST
Brickchurch Enterprises, Inc.,                            Case No. 22-70914-AST

                                 Debtors.                 Jointly Administered
--------------------------------------------------------x

**Creditor Internal Revenue Service's Objection to Debtors'**
**First Amended Chapter 11 Liquidating Plan (ECF No. 76) and**
**Debtors' First Amended Joint Disclosure Statement (ECF No. 77)**


                                        Respectfully submitted,

                                        DAVID A. HUBBERT
                                        Deputy Assistant Attorney General
                                        U.S. Department of Justice, Tax Division

                                        /s/ Edward J. Murphy
                                        EDWARD J. MURPHY
                                        ERIC A. ASHBY II
                                        Trial Attorneys, Tax Division
                                        U.S. Department of Justice
                                        P.O. Box 55
                                        Washington, D.C.  20044
                                        Tel: 202-307-6064 / 202-514-6508
                                        Fax: 202-514-5238
                                        Edward.J.Murphy@usdoj.gov
                                        Eric.A.Ashby@usdoj.gov

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION………………………………………………………………………...…………1

BACKGROUND…………………………………………………………………………….…1

ARGUMENT………………………………………………………………………………......3

I.     The Plan and Disclosure Statement Do Not Adequately Account for Capital Gains
Tax That the Estates Will Incur Upon Sale of the Properties………………………..………3

     A.     The Capital Gains Tax Is Likely Substantial………………………………………..3

     B.     The Disclosure Statement Contains No Information to Support a Lower Tax……5

     C.     The Tax Cannot Be Deferred Under 26 U.S.C. § 1031…………………………...6

     D.     The Plan May Not Be Feasible Due to Failure to Account for Capital Gains…….9

     E.     The Plan Does Not Properly Provide for the Treatment and Allowance of
Administrative Tax Expenses in Both Cases………………………………………10

II.     The Plan's Treatment of the IRS's Secured Claim in the Aberdeen Case and
Unsecured Priority Claim in the Brickchurch Case Should Be Modified………………12

     A.     The IRS's Claims Should Be Allowed as Filed…………………………………12

          1.     Brickchurch's Objection to the IRS's Claim Should Be Overruled…….. 12

          2.     The IRS's Secured Claim in the Aberdeen Case Is Deemed Allowed….. 13

          3.     The Amount of the IRS's Allowed Claims Should Be Fixed……………14

          4.     The Debtors Have No Other Viable Defense to the IRS's Claims………15

     B.     The IRS's Overlapping Secured and Unsecured Priority Claims in the Two
Cases Should Both Be Treated as a Unitary Tax Claim…………………………18

     C.     To the Extent Claims Need to be Classified as Secured or Unsecured, the
Plan's Treatment of the IRS's Class 2 Secured Claim Should Be Amended……...20

          1.     The Plan Discriminates Against the IRS and in Favor of Bay Point…….21

          2.     The Court Should Bar Any Payment to Blouin Before IRS Is Paid……..22

          3.     The Plan Misclassifies IRS's Priority Claim in the Brickchurch Case…..24

     D.     The IRS Is Impaired Under the Plan and Entitled to Vote…………………….... 25

CONCLUSION……………………………………………………………………………….25

## INTRODUCTION

The creditor United States of America, on behalf of the Department of the Treasury, Internal Revenue Service ("IRS"), objects to both the Debtors' First Amended Joint Chapter 11 Liquidating Plan (ECF No. 76, "Plan") and the Debtors' First Amended Joint Disclosure Statement (ECF No. 77, "Disclosure Statement").[1] The IRS requests that the Plan and Disclosure Statement be supplemented and amended to address the issues raised in this Objection.

As detailed below, the IRS objects on two principal grounds. First, the Plan and Disclosure Statement do not adequately account for the treatment and allowance of the likely substantial income tax on capital gains that the Debtors' estates will incur upon the sale of real property, and that must be paid as an administrative expense, raising feasibility concerns. Second, the Plan should be modified to pay, in accordance with the Bankruptcy Code, the IRS's secured and unsecured priority claims in the two cases, which are for the same underlying liabilities, as allowed and undisputed claims on the effective date, or at least to alter provisions that treat the IRS's claims less favorably than required by the Code.

## BACKGROUND

The IRS has filed a proof of claim in the Chapter 11 case of Debtor Brickchurch Enterprises, Inc. ("Brickchurch"). The IRS has also filed a proof of claim in the Chapter 11 case of Debtor Aberdeen Enterprises, Inc. ("Aberdeen"). The two cases are being jointly administered, though claims for each case continue to be docketed on each individual case claims docket. ECF No. 51. The only major creditor other than the IRS is the DIP lender Bay Point Capital Partners II, LP ("Bay Point").

---

[1] Because the Aberdeen case is the lead case, citations to "ECF No. __" are to the docket numbers in the Aberdeen case. Citations to docket entries in the Brickchurch case are in the form "Brickchurch ECF No. __."

Both Debtors are owned indirectly by Louise Blouin. Ms. Blouin formed these entities in 1998 to hold title to adjacent beachfront properties that she purchased at 366 and 376 Gin Lane, Southampton, New York. For the past 25 years, Ms. Blouin has exercised control over both debtor entities and the real properties titled in their names, which she has used as a vacation home and guest house, respectively. Tax liens for Ms. Blouin's liabilities have attached by operation of law to all of her property and rights to property (*see* 26 U.S.C. § 6321), including the Gin Lane properties. The IRS may collect the underlying tax debts in these bankruptcy cases.

The IRS has a secured claim in the Aberdeen case and an unsecured priority claim in the Brickchurch case, though these claims are for the same tax liabilities and thus need only be paid once. The IRS assessed the liabilities against Ms. Blouin pursuant to 26 U.S.C. § 6672 for her failure to remit withholding taxes for two companies. In the Brickchurch case, the IRS filed a proof of claim (Claim 13-1) on December 1, 2022, that included a priority claim  for $5,685,582.56. Brickchurch filed an objection to the IRS's claim, and that contested matter has been fully briefed, argued, and submitted. Brickchurch ECF Nos. 205, 223, 224, 233, 234. In the Aberdeen case, the IRS filed a proof of claim (Claim 2-1) on September 8, 2023, including a secured claim in the amount of $5,955,355.14 for the same liabilities (the larger amount is for accrued interest through Aberdeen's later petition date). No objection to the IRS's claim in the Aberdeen case has been filed. The IRS's proofs of claim in both cases also include smaller unsecured general claims that are undisputed.

The Plan calls for the sale of both 366 and 376 Gin Lane (either together or separately), and the Debtors' bankruptcy estates will almost certainly incur substantial income tax liabilities due to capital gains. If the two properties are sold together, the Plan (¶ 4.7) permits the Debtors and Bay Point to allocate the proceeds of the sale between the two properties. The Debtors have filed a motion under 11 U.S.C. § 363 to sell the properties free and clear of the tax liens (ECF

No. 46), with creditors' rights to follow the proceeds, and the IRS does not oppose that motion.[2]

The Court previously directed the Debtors to file an application to retain a real estate broker to

sell the properties, but as of this filing no such application has been filed. At the hearing on

September 13, 2023, the Court and the parties also all recognized the desirability of identifying a

stalking horse bidder in order to determine the likelihood that creditor claims will be paid in full,

though as of this filing, no stalking horse bid has been disclosed to the IRS.

## ARGUMENT

I.      **The Plan and Disclosure Statement Do Not Adequately Account for Capital Gains Tax That the Estates Will Incur Upon Sale of the Properties**

The Plan must provide for full payment of the income taxes on the capital gains that will

result from the anticipated sale of real property. These income taxes are an administrative

expense within 11 U.S.C. § 503(b)(1)(B)(i), and thus they are entitled to priority under 11 U.S.C.

§ 507(a)(2). One of the requirements of confirming a Chapter 11 plan is that the plan must

provide for full payment of "a claim of a kind specified in section 507(a)(2)." 11 U.S.C.

§ 1129(a)(9)(A).[3] Due to the lack of information provided thus far, it is unclear whether the

Debtors will be able to satisfy this requirement.

### A.      The Capital Gains Tax Is Likely Substantial

This matter is concerning to the IRS because the capital gains tax bill for selling the

properties is probably going to be quite large. The size of the taxable gain on the sale of real

---

[2] Under § 10.1 of the Plan, however, if the Plan is not substantially consummated, then "the Court shall hear and decide the Sale Motion outside of the Plan under Section 363, with all Creditors reserving their rights to support or oppose the same." In that scenario, the IRS may object to the § 363 sale motion.

[3] Debtors' previous plan indicated that they intended to treat the capital gains tax as an unsecured claim that would be paid pro rata. ECF No. 44, § 3.4. A later amended plan summary then stated that capital gains tax would "be the responsibility of the Debtors' Equity Holders." ECF No. 66 at 3. The Debtors have now abandoned these prior meritless positions by recognizing that capital gains tax is an administrative expense that the Plan must fully provide for. *See* ECF No. 77 at 13.

property is generally equal to the difference between the taxpayer's basis in the property and the property's sale price. *See* 26 U.S.C. § 1222 (defining a "capital gain" as "gain from the sale or exchange of a capital asset"). "The basis of property shall be the cost of such property," 26 U.S.C. § 1012(a), usually the price at which the taxpayer bought it, subject to certain adjustments, *see* 26 U.S.C. § 1016. When the parties to an agreement do not allocate a lump-sum payment for a sale of two properties, the proceeds must be allocated between the two properties in proportion to their respective fair market values on the date of the sale. *In re Ingram-Richardson, Inc.*, T.C. Memo. 1972-157, 1972 WL 2279 (1972).

Ms. Blouin bought the Gin Lane property in 1998, and she has used the property as one of her residences for the past 25 years. Brickchurch ECF No. 21 at 2 (Blouin Affidavit ¶ 5); ECF No. 1 at 7 (Blouin Affidavit ¶ 5). The exact price that she paid for the property in 1998 is uncertain. She testified at a deposition in July 2023 that the 1998 purchase price was "approximately 11 million" (*see* attached Ex. 1, Blouin deposition excerpt at 278:21), though media reports have alternately stated that she paid a higher price of $11.7 million or $13.5 million.[4] Neither Ms. Blouin nor anyone else on behalf of the Debtors has made any showing to date that the tax basis for the property should be adjusted from the 1998 purchase price, nor has any documentation to support such a basis adjustment been provided to the IRS.

The future sale price, of course, will not be known until the property sells, but all parties anticipate that the property will sell for far more than its 1998 price (indeed, nothing other than that would be acceptable to any party in interest). According to the Debtors, "376 Gin Lane has been appraised for as much as $73 million, while 366 Gin Lane has been separately appraised at

---

[4] It is possible that the $11.7 million was the price for 376 Gin Lane and the additional $1.8 million was for 366 Gin Lane, which has a much smaller home in 1998.

$63 million." ECF No. 46 ¶ 12.[5] Assuming that the two properties sell for a combined amount equal to these appraised values, then, the sale price would be $136 million—a gain of $122.5 million over the high-end $13.5 million estimate of the 1998 purchase price.

Any realized gain on the sale of the Brickchurch Property would be income taxable to Brickchurch, and any realized gain on the sale of the Aberdeen Property would be income taxable to Aberdeen. Both debtor entities are organized as domestic corporations and therefore subject to a 21 percent federal income tax rate. 26 U.S.C. § 11. Applying this 21 percent rate of tax to a realized gain of $122.5 million yields a federal income tax of $25.725 million. Even if Debtors' adjusted tax basis in the properties is somewhat higher than the 1998 purchase price, and the aggregate sale price for the properties turns out to be somewhat lower than the appraised values, a federal capital gains tax of between $10 million and $20 million is still plausible.

### B.    The Disclosure Statement Contains No Information to Support a Lower Tax

The Disclosure Statement is inadequate because it does not provide the information needed to estimate what the likely capital gains tax will be. *See In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011) ("where a disclosure statement omits . . . tax consequences under the plan, it does not serve the bankruptcy purpose of enabling a creditor to make an informed decision about the plan."). Most notably, the Disclosure Statement does not even disclose what the Debtors claim as their basis in the properties. While it generally acknowledges that gains "will be recognized based on the difference between the tax basis in the assets that were disposed of and the sale price allocable to such assets," (ECF No. 77 at 35), it never says what this "tax basis" actually is. This omission is inexcusable. A looming administrative expense that could approach or even exceed $20 million cannot be a mere afterthought.

---

[5] These appraisals could serve as a basis for an allocation of the sale proceeds if the properties are sold together.

The IRS requests that the Court order the Debtors to amend the Disclosure Statement to divulge the basis that they claim in each of the two properties, and to provide their basis calculations and all supporting documentation to the IRS for its prompt review.[6] The taxpayer bears "the burden of proving the basis of property for purposes of determining the amount of gain or loss that she realized, and must recognize, on its sale." *Diaz v. Comm'r*, T.C. Memo. 2012-241, 2012 WL 3599604, at *2 (Aug. 22, 2012). In the absence of such proof, the IRS may have to assume that the basis is simply $0.00, or the amount of 1998 purchase price without any adjustment, and doing so could have significant consequences for not only the IRS but all other parties in interest.

### C.    The Tax Cannot Be Deferred Under 26 U.S.C. § 1031

The only fleeting attempt Debtors make in the Plan to address the capital gains tax is in § 4.9, titled "1031 Exchange Provisions."[7] That section says, "nothing contained herein shall prohibit the debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code." The apparent intent is to hold out hope that the substantial capital gains tax on the sale might be deferred and therefore not need to be paid as an administrative expense through the Plan. The Disclosure Statement adds that, "[i]t is anticipated that any realized gains will either be recognized by the Debtors . . . or deferred by one or more of the Debtors pursuant to Section 1031." ECF No. 77 at 35. In other words, § 1031 is the only ground on which the Debtors have suggested that the Plan might not have to provide for a substantial capital gains tax.

The problem is that § 1031 is inapplicable here. Section 1031 is titled "Exchange of real

---

[6] If the Debtors have for some reason claimed depreciation regarding the buildings, that may lower the basis of the properties.

[7] The Plan's definition of "Section 1031" in § 1.87 contains an incorrect cross-reference to § 4.7.

property held for productive use or investment." Its general rule is as follows:

> No gain or loss shall be recognized on the exchange of real property held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment.

26 U.S.C. § 1031(a)(1). "The main purpose of a § 1031 like-kind exchange is to defer capital gains tax resulting from the sale of investment property." *In re the 1031 Tax Group, LLC*, 374 B.R. 78, 82 (Bankr. S.D.N.Y. 2007); *see also In re LandAmerica Financial Group, Inc.*, Case No. 08–35994, 2013 WL 3731757 at *2 (Bankr. E.D. Va. July 15, 2013) ("A 1031 Exchange Transaction allows a taxpayer to defer the payment of tax that otherwise would be due upon the realization of a gain on the disposition of business or investment property.").[8]

The bankruptcy sale of the Gin Lane properties cannot possibly be structured as a § 1031 like-kind exchange because the property being sold through the Plan cannot be "exchanged solely for real property of like kind." § 1031(a)(1). The proceeds of the property are needed to pay creditor claims and other bankruptcy expenses, and for that reason they will not be available to purchase a different property. There will almost certainly be no excess proceeds, and even if there is a small excess, the old property will still not be exchanged "solely" for the new property.

Moreover, § 1031 is inapplicable because the property to be sold is not "held for use in a trade or business or for investment." Ms. Blouin declared in Aberdeen's Chapter 11 petition that "the Debtor does not rent the Property and there are no current leases or tenants." ECF No. 1 at 9 (¶ 16). She similarly declared in the Brickchurch case that "[t]he subject property is residential

---

[8] "In a typical § 1031 exchange transaction, the exchange participant sells an investment property, deposits the sale proceeds from the first property with a [qualified intermediary or "QI"], within 45 days thereafter identifies and enters into a contract to purchase another investment property (with the closing of the purchase to occur within 180 days from the closing of the sale of the initial property), and then uses the funds deposited with the QI to close on the purchase of the new investment property." *In re 1031 Tax Group, LLC*, 420 B.R. 178, 184 (Bankr. S.D.N.Y. 2009).

property and Debtor is not regularly engaged in the business of renting out this property."
Brickchurch ECF No. 21 ¶ 4; *see also* Brickchurch ECF No. 93 at 201:19-20 (Blouin deposition
testimony that the property is "not a commercial real estate"). As she has testified multiple times,
including at Aberdeen's § 341 meeting on September 7, 2023, Ms. Blouin has used the property as
a "vacation home." *See* Ex. 1 (Blouin deposition excerpt at 275:21 – 276:1); *see also*
Brickchurch ECF No. 21 ¶ 5 ("From the time she acquired the compound almost 25 years ago
until recently, Ms. Blouin used the main house as one of her residences, and the second home for
guests."). These facts take the case outside § 1031 because "[p]roperty used primarily for
personal use, like a primary residence or a second home or vacation home, does not qualify for
like-kind exchange treatment." IRS Fact Sheet, Like-Kind Exchanges Under IRC Section 1031,
FS-2008-18, February 2008 (copy attached as Ex. 2); *see Moore v. Comm'r*, T.C. Memo. 2007-
134, 2007 WL 1555852, at *12 (May 30, 2007) (rejecting like-kind exchange where taxpayers'
"primary purpose in acquiring and holding both the Clark Hill and Lake Lanier properties was to
enjoy the use of those properties as vacation homes").

The narrow "safe harbor" in IRS Revenue Procedure 2008-10 ("Like-Kind Exchanges of
Rental Property That Is Used for Personal Purposes") is not available either. It states conditions
"under which a dwelling unit will qualify as property held for productive use in a trade or
business or for investment under § 1031 even though a taxpayer occasionally uses the dwelling
unit for personal purposes." The terms of the safe harbor are as follows:

> A dwelling unit that a taxpayer intends to be relinquished property in a § 1031
> exchange qualifies as property held for productive use in a trade or business or for
> investment if:
>
> (a) The dwelling unit is owned by the taxpayer for at least 24 months immediately
> before the exchange (the "qualifying use period"); and
>
> (b) Within the qualifying use period, in each of the two 12-month periods
> immediately preceding the exchange,

> (i) The taxpayer rents the dwelling unit to another person or persons at a fair rental for 14 days or more, and
>
> (ii) The period of the taxpayer's personal use of the dwelling unit does not exceed the greater of 14 days or 10 percent of the number of days during the 12-month period that the dwelling unit is rented at a fair rental.

Rev. Proc. 2008-16, 2008-10 I.R.B. 547, § 4.02. The Gin Lane Properties do not satisfy these conditions because Ms. Blouin has made personal use of the Gin Lane Properties for far more than 14 days, and 10 percent of the number of days that the Properties have been rented out, in each of the past two years. Consequently, no § 1031 like-kind exchange is possible, and the substantial tax on the capital gain from the sale of the properties cannot be deferred.

### D.    The Plan May Not Be Feasible Due to Failure to Account for Capital Gains

In the event that the sale proceeds are insufficient to pay administrative expenses and other required distributions, the Plan states that Ms. Blouin herself will make up the shortfall through use of her personal funds as "Exit Advances." §§ 1.56, 4.3. But it is not at all clear whether Ms. Blouin actually has liquid assets at her disposal that will be sufficient to do that. The Disclosure Statement gives no information about Ms. Blouin's personal assets and where the funds for the contemplated "Exit Advances" would be coming from. This omission is especially concerning in light of Debtors' apparent failure to realistically consider the likelihood that a substantial capital gains tax may have to be paid through the Plan as an administrative expense. Indeed, their casual wishing-away of the capital gains tax through a vague and unworkable reference to a future § 1031 transaction suggests they may not be able to pay it. That would leave Ms. Blouin to cover the difference. Can she?

The Disclosure Statement leaves this vital question unanswered. The IRS asks that the Court require the Debtors to supplement the Disclosure Statement to include a detailed financial disclosure from Ms. Blouin about the sources and quantity of funds that she has at her disposal to

pay the "Exit Advances" under the Plan. Unless and until this information is provided (along with the Debtors' basis computations and backup), and the IRS is satisfied that the capital gains tax can be paid through the Plan, the IRS objects to confirmation. 11 U.S.C. § 1128(b).

    **E.**    **The Plan Does Not Properly Provide for the Treatment and Allowance of Administrative Tax Expenses in Both Cases**

        A request for payment of an administrative expense is not a claim against the debtor; rather it is a liability incurred by the estate which is created when the bankruptcy petition is filed. Section 503(a) of the Bankruptcy Code authorizes an entity to file a "request for payment" of an administrative expense. Under Section 503(b)(1)(B)(i), administrative expenses include taxes "incurred by the estate." *See* 11 U.S.C. § 503(b)(1)(B)(i); *see also United States v. Flo-Lizer, Inc.*, 916 F.2d 363, 366-67 (6th Cir. 1990). Section 503(b) provides that a request for payment will be allowed only "[a]fter notice and a hearing." *See* 11 U.S.C. § 503(b). A request for payment for a tax, however, does not have to be filed as a condition for it being an allowed administrative expense. 11 U.S.C. § 503(b)(1)(D). A bankruptcy estate is obligated to file tax returns and pay the tax in the ordinary course of business under 11 U.S.C. § 363(c)(1) without any prior court approval. *See* 28 U.S.C. § 960.

        The Plan (¶¶ 1.8 and 2.1) is defective because it improperly imposes a bar date for the filing of administrative-expense claims for tax claims. First, the bar date runs afoul of § 503(b)(1)(D) to the extent it requires a filing. Second, it appears that the bar date would run before the due date of the returns reporting the capital gains and, therefore, the United States will have no way of knowing the Debtors' total tax liability. Moreover, § 505(b) of the Bankruptcy Code sets forth the exclusive procedure for the determination of the tax liability of the bankruptcy estates, and that process requires the estate to file a tax return first. The Debtors, therefore, should not be permitted to circumvent § 505(b) with a bar date that provides for a

release or discharge of any administrative-expense tax claims. The Plan should thus be amended to state that no Administrative Expense Claims Bar Date shall apply to the IRS.

Nor should Plan § 5.2 allow the capital gains tax to be estimated and then, if the estimate turns out to be too low, leave the IRS "no recourse to any assets theretofore distributed." There should no "estimation" at all, other than in accordance with § 505 once the tax has been incurred. *See* In re UAL Corp., 336 B.R. 370, 372-80 (Bankr. N.D. Ill. 2006).  And if the Debtors fail to file tax returns and pay the IRS's administrative claim in full in the ordinary course of business as promised, then the IRS should be able to seek disgorgement from other distributees to pay the balance of its administrative claim. *See also In re Indian Motocycle Co., Inc.*, 261 B.R. 800, 808-10 (1st Cir. BAP 2001) (bankruptcy court should not have estimated postpetition administrative tax claim under 11 U.S.C. § 502 due to § 505). Plan § 5.2 should be modified accordingly.

Furthermore, the Plan is defective because § 4.1 seeks a determination that the Decision Makers are not "officers, fiduciaries or agents of the Debtor" and "have no obligation to file tax returns or similar reports with the appropriate taxing authorities," yet they control all assets of the bankruptcy estates. *See* 26 U.S.C. § 6012(b)(3). The Plan (§4.5(b)) says the same things about the Plan Administrator. The Plan (§§ 4.1 and 4.5(b)) also tries to exculpate them from liability, without any waiver of sovereign immunity. The Court does not have jurisdiction to issue declaratory judgments about the tax effects of the plan. *See In re UAL Corp.*, 336 B.R. at 372-80. The Plan leaves no one at the helm to pay the tax debts of the estates and seeks an avoidance of the payment of taxes. The Plan must provide for the full payment of any allowed administrative tax expense. 11 U.S.C. § 1129(a)(9). It must be amended to clarify that the Debtors must file tax returns and pay taxes as in the normal course of business, and that any exculpation clauses with respect to the Decision Makers and Plan Administrator are invalid as to the IRS.

II.   **The Plan's Treatment of the IRS's Secured Claim in the Aberdeen Case and Unsecured Priority Claim in the Brickchurch Case Should Be Modified**

Aside from the capital gains tax issues detailed above, the IRS also disagrees with the treatment under the Plan of its secured claim in the Aberdeen case and its unsecured priority claim in the Brickchurch case, which are for the same underlying liabilities. The IRS requests that both of these claims be treated as undisputed and allowed in full, and emphasizes that the tax need only be paid once, regardless of whether it is a secured claim or an unsecured priority claim.  To the extent that the IRS's claim needs to be classified as a secured claim, its treatment as a Class 2 creditor in § 3.2 of the Plan should be modified in several respects.

A.   **The IRS's Claims Should Be Allowed as Filed**

The IRS's secured claim in the Aberdeen case and unsecured priority claim in the Brickchurch case are for the same underlying liabilities: trust fund recovery penalties that the IRS assessed against Ms. Blouin pursuant to 26 U.S.C. § 6672 for her failures to remit withholding taxes for two companies, and for which Debtors are liable as her nominees and alter egos. The overlapping liabilities on the IRS's proofs of claim in the two cases need only be paid once. But the Plan permits the Debtors to delay any payment toward these liabilities for an indefinite period into the future simply by interposing an objection and funding a "Disputed Claims Reserve" (§§ 1.45 and 5.2) that need not be distributed even after the effective date of the Plan has passed (§ 7.4(d)). This treatment is unwarranted. Instead, the Court should order that the IRS's claims be treated as allowed and undisputed, and accordingly that they must be paid in full on the effective date.

1.   **Brickchurch's Objection to the IRS's Claim Should Be Overruled**

The IRS's priority claim in the Brickchurch case has already been the subject of a claim objection by Brickchurch, and that objection has been fully briefed, argued, and submitted as of

May 18, 2023. *See* Brickchurch ECF Nos. 205, 223, 224, 233, 234. The IRS respectfully requests that the Court rule on the Brickchurch claim objection prior to confirmation. For the reasons already presented in prior briefs and at oral argument, the Brickchurch objection should be overruled and the IRS's proof of claim in the Brickchurch case should be allowed as filed.

Brickchurch's primary argument in the objection—that the IRS's claim should be disallowed because the IRS filed its proof of claim one month after the bar date—should be rejected in light of case developments since the matter was submitted.[9] Generally speaking, the rationale for sometimes not allowing late claims is that such allowance may be unduly disruptive to case administration. But that is not a concern in this case, where the IRS filed its claim on December 1, 2022, and the Debtor did not even propose a plan with any realistic chance of being confirmed until October 12, 2023, over 10 months later. In fact, Brickchurch's Chapter 11 case is now being jointly administered with the Chapter 11 case of Aberdeen that was not even commenced until more than eight months after the IRS filed its proof of claim in the Brickchurch case. Given this timeline, the late filing of the IRS's claim did not disrupt administration of the Brickchurch case and should be excused. It would also be incongruous in two jointly administered cases to rule that the IRS has a timely claim against one debtor but an untimely claim against the other debtor when the liabilities at issue in the claims are largely the same.

### 2.    The IRS's Secured Claim in the Aberdeen Case Is Deemed Allowed

The IRS timely filed a proof of claim in the Aberdeen case, including a secured claim for the same liabilities as its priority claim in the Brickchurch case. Claim 2-1 (filed September 8,

---

[9] The argument should also be rejected for the other reasons previously briefed, including that the late filing of the proof of claim was due to excusable neglect (Fed. R. Bankr. P. 9006(b)(1)), that the late filing should be permitted because the debtor failed to give the required notice to the IRS (Fed. R. Bankr. P. 3002(c)(6) and 3003(c)(3)), and that the tardily filed claim would be allowed in a Chapter 7 case (11 U.S.C. §§ 726(a)(1) and 502(b)(9)) and the IRS must receive at least as much as it would receive in a Chapter 7 liquidation (11 U.S.C. § 1129(a)(7)(A)(ii)).

2023). The proof of claim is prima facie evidence of the validity and amount of the claim, Fed. R. Bankr. P. 3001(f), and no objection to the IRS's claim in the Aberdeen case has been filed. Accordingly, the IRS's claim in the Aberdeen case is deemed allowed. 11 U.S.C. § 502(a).

The lack of any objection is consistent with the Debtor's Schedules in the Aberdeen case, which list the IRS's secured claim as undisputed. ECF No. 1 at 21-22, Schedule D (item 2.4). "When a debtor schedules a claim as undisputed, the debtor has admitted under the penalty of perjury that the claim exists in the amount as scheduled." *In re Falwell*, 434 B.R. 779, 789 (Bankr. W.D. Va. 2009); *see also In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions."). Contradictory declarations in the Plan and Disclosure Statement that now say the IRS's claim is "in dispute" (ECF No. 77 at 12) cannot override this admission. The Debtor has not amended its schedules.

Although the Debtor scheduled the IRS's secured claim in the Aberdeen case in the amount of $4.7 million, the larger amount on the proof of claim controls because the claim supersedes the schedules. *See* Bankruptcy Rule 3003(c)(4) ("A proof of claim or interest executed and filed in accordance with this subdivision shall supersede any scheduling of that claim or interest pursuant to §521(a)(1) of the Code."). The portion of the Plan that defines a claim as "Disputed" to the extent that the amount on the proof of claim exceeds the amount scheduled (§ 1.47) should thus be rejected as contrary to the Bankruptcy Code and Rules.[10]

### 3.    The Amount of the IRS's Allowed Claims Should Be Fixed

Per Claim 2-1, then, the IRS's secured claim in the Aberdeen case should be allowed in the amount of $5,955,355.14. Because this amount is for the same underlying tax debt as the

---

[10] The Disclosure Statement similarly uses the incorrect amount of $5,735,582.56 for the IRS's claim. ECF No. 77 at 7.

IRS's unsecured priority claim in the Brickchurch case, the IRS's priority claim in that case should be allowed in the same amount, with the understanding that this amount need only be paid once.[11] The IRS's smaller unsecured general claims in both cases are undisputed and therefore should be allowed as filed too.[12]

The IRS is also entitled to interest on its claim. Plan § 2.3 states that Priority Tax Claims will be paid "with post-petition interest at the federal judgment rate" but that is not the correct interest rate to apply in this instance. Section 511 of the Bankruptcy Code provides that, "the rate of interest shall be the rate determined under applicable nonbankruptcy law." The "nonbankruptcy law" that governs the rate of interest to be paid on federal tax claims is in 26 U.S.C. §§ 6601 and 6621; *see also* 28 U.S.C. § 1961(c)(1) (applying Title 26 interest rates to tax judgments). Plan § 2.3 should therefore be corrected to state that the IRS's Priority Tax Claim will be paid in the amount of $5,955,355.14, with interest at the rate provided for in 26 U.S.C. § 6621 accruing from and after the Aberdeen petition date (August 2, 2023).

### 4.    The Debtors Have No Other Viable Defense to the IRS's Claims

Although the Debtors may resist this outcome, they have no grounds on which to do so. They do not have standing to raise Ms. Blouin's personal defenses to her tax liabilities in what is ostensibly a corporate bankruptcy. *See In re Kowalczyk*, 600 B.R. 806, 814 (Bankr. D.N.D. 2019) ("In the taxing context, it is a well-established principle of law that third parties lack standing to challenge another's tax liability."); *Middlesex Sav. Bank v. Johnson*, 777 F.Supp.

---

[11] Claim 13-1 in the Brickchurch case reflects an unsecured priority claim for $5,685,582.56. The amount is lower than the secured claim amount in the Aberdeen case solely due to the accrual of additional interest through Aberdeen's later petition date.

[12] Because these amounts are well established, there is no reason to estimate the IRS's claims under Plan § 5.2. In any event, we reiterate our objections to that section of the Plan insofar as it would allow estimation of the IRS's claims and then, if those claims are later allowed in larger amounts, bar the IRS from seeking disgorgement from prior distributees. *See supra* § I.E.

1024, 1029 (D. Mass. 1991) ("The fact that a party may bear the ultimate economic burden as a result of payment of a tax does not make that party the taxpayer or establish standing.").

The Bankruptcy Court's "related to" jurisdiction in 28 U.S.C. § 1334 generally does not extend so far as to allow the determination of a non-debtor's § 6672 liability in a corporate bankruptcy case. *See, e.g., Quattrone Accountants, Inc. v. I.R.S.*, 895 F.2d 921, 927 (3d Cir. 1990). As the Second Circuit has said, "simply because the debtor corporation is also liable for the taxes is no reason for the bankruptcy court to assume jurisdiction over the liability of the non-debtor." *In re Brandt-Airflex Corp.*, 843 F.2d 90, 96 (2d Cir. 1988) (cleaned up); *see also In re USA United Fleet, Inc.*, 496 B.R. 79, 83 (Bankr. E.D.N.Y. 2013) (noting that § 505(a) "does not confer authority to determine the tax liability of a non-debtor").

To be sure, the IRS broadly agrees with Bay Point that Debtors' machinations throughout these cases have evinced "an attempt to benefit Blouin – not Debtors' creditors," (ECF No. 58 at 3), further demonstrating that they are merely Blouin's nominees and alter egos.[13] But Debtors cannot have it both ways by simultaneously insisting upon their separateness from Ms. Blouin yet doing her bidding in raising her personal defenses to the tax.

Debtors may yet suggest that the Bankruptcy Court should delay payment on the IRS's claims because Ms. Blouin herself has challenged her tax liabilities in a separate case that she filed in U.S. District Court last year, with the logic being that if she prevails there then the

---

[13] In the interest of not making this objection longer than it already is, we will not catalog the ever-growing body of evidence supporting the nominee and alter-ego relationships, which now includes the extensive correspondence between Bay Point and Ms. Blouin that clearly show her as the Debtors' sole decision-maker. *See, e.g.*, ECF No. 12 (exhibits to Bay Point motion to dismiss). The relatively recent "Control Dispute" described in the Plan, which calls into question whether Ms. Blouin remains in control of the Debtor entities, does not affect this analysis because the tax liens attached long before the "Control Dispute" arose. Although the Control Dispute certainly complicates the question of who has authority *now* to make decisions on behalf of the Debtors, it does not have any bearing on this objection. In any event, Ms. Blouin's proxy under the Plan is Matthew Kabatoff, her husband—not exactly an independent third party.

amount Debtors would have to pay on the IRS's claims will be reduced. *See* ECF No. 77 at 12

(Disclosure Statement citing District Court case). But that suit is no reason to delay a distribution

to the IRS. The District Court case is a quiet-title action that Ms. Blouin filed pursuant to 28

U.S.C. § 2410 in an attempt to obtain a judicial determination that the tax liens do not attach to

376 Gin Lane. Although Ms. Blouin's District Court complaint raised various objections to her

tax liability, such objections are beyond the scope of a § 2410 action, which "does not authorize

a taxpayer to challenge an IRS assessment of his tax liability" but rather is limited to "procedural

irregularities" with the tax liens. *Kulawy v. United States*, 917 F.2d 729, 733 (2d Cir. 1990); *see

also Follum v. United States*, 199 F.3d 1322, 1999 WL 1012454 (Table), at *2 (2d Cir. Oct. 15,

1999) ("Section 2410 has universally been construed not to extend to a suit brought by a

taxpayer for the sole purpose of challenging the validity or amount of an underlying tax

assessment."). Ms. Blouin's § 2410 action will also be moot if the Aberdeen property is sold free

and clear of the tax liens under 11 U.S.C. § 363, and the IRS has not objected to the Debtors'

motion to do exactly that. As a result, the pending § 2410 action in District Court should be no

impediment to immediate payment of the IRS's claims through the Plan.[14]

    This would not deny Ms. Blouin the opportunity to challenge her tax liabilities. Indeed, if

she has funds available to pay the tax as an "Exit Advance" to establish a "Disputed Claims

Reserve," then she should simply pay the IRS in full outside bankruptcy and then seek a refund

in accordance with IRS procedures (*see* 26 U.S.C. § 7422(a)), which is the normal course when

someone wishes to challenge their tax liability. *See Hynard v. I.R.S.*, 881 F. Supp. 92, 94

---

[14] The United States counterclaimed in the District Court case seeking a money judgment against
Ms. Blouin, and that counterclaim will also be moot if the IRS's claims are paid. Discovery has
lately been stymied in the District Court case by the Control Dispute and by Ms. Blouin's having
discharged her counsel. Her counsel was permitted to withdraw by order dated October 10, 2023,
and the case is presently stayed as no successor counsel has yet filed an appearance.

(E.D.N.Y. 1994) ("in order to gain access to federal district court for a review of an IRS determination, the taxpayer must first satisfy (in other words, pay) the assessment and then file a claim for a refund" (citing *Flora v. United States*, 362 U.S. 145 (1960)); *see also SEC v. Credit Bancorp., Ltd.*, 297 F.3d 127, 139 (2d Cir. 2002) ("The 'pay first, litigate later' procedure is not unusual."). If Ms. Blouin were to do that, then the IRS would withdraw its claims in this Court. The IRS has advised Ms. Blouin several times (via her counsel) that she should pay and seek a refund, but she has not taken that path, preferring instead to use the bankruptcy process to try to extract value from her properties without paying the tax. The Court should not let her do that.

## B.    The IRS's Overlapping Secured and Unsecured Priority Claims in the Two Cases Should Both Be Treated as a Unitary Tax Claim

Again, the IRS's unsecured priority claim in the Brickchurch case and secured claim in the Aberdeen case are both for the same underlying trust fund recovery penalty liabilities that the IRS assessed against Ms. Blouin pursuant to 26 U.S.C. § 6672.  The Bankruptcy Code requires secured claims for such debts to be treated no worse than an unsecured claim for such debts, *i.e.*, payments in the same manner and over the same periods.  *See* 11 U.S.C. §1129(a)(9)(C) and (D). To avoid inconsistent treatment that is contrary to the Code, the IRS requests that both claims be treated as a unitary claim that needs to be paid in full only once, with interest from the effective date of the Plan.

These § 6672 trust fund liabilities are entitled to priority treatment under 11 U.S.C. § 507(a)(8)(C). *See DeChiaro v. N.Y. State Tax Comm'n*, 760 F.2d 432, 433 (2d Cir. 1985) ("A trust fund tax is always given a priority[.]"); *In re Lettieri*, 506 B.R. 208, 209 (Bankr. W.D.N.Y. 2014) ("trust fund taxes are priority claims under section 507(a)(8)"); *In re Thomas*, 222 B.R. 742, 746-47 (Bankr. W.D. Pa. 1998) (liabilities assessed pursuant to § 6672 "fall within the

ambit of Code § 507(a)(8)(C) and are therefore entitled to priority treatment").[15] Claims that are entitled to priority under § 507(a)(8) cannot be classified in a Chapter 11 plan. *See* 11 U.S.C. § 1123(a)(1) ("a plan shall . . . designate, subject to section 1122 of this title, classes of claims, *other than* claims of a kind specified in section . . . 507(a)(8)" (emphasis added); *see also In re Bronx 439 E. 135th Street D.T. Building Corp.*, Case No. 11–15855 (MG), 2014 WL 200996 at *6 (Bankr. S.D.N.Y. Jan. 17, 2014).

To be confirmable, a Chapter 11 plan must, "with respect to a claim of a kind specified in section 507(a)(8)," provide for payment "of a total value, as of the effective date of the plan, equal to the allowed amount of such claim[.]" § 1129(a)(9)(C). The same is true "with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim[.]" § 1129(a)(9)(D). Here, the IRS's secured claim in the Aberdeen case comes within § 1129(a)(9)(D) because, but for its secured status, it would be an unsecured priority claim under § 507(a)(8) and subject to § 1129(a)(9)(C).

The Plan provides for treatment of the IRS's priority claim in the Brickchurch case as a "Priority Tax Claim" that "shall be paid in full" (§ 2.3) "as determined pursuant to" § 5.9, but that section only requires a "Pro Rata share" and relies on the funding of a "Disputed Claims Reserve" and "Exit Advances."  The treatment of the IRS's secured claim in the Aberdeen case as a "Class 2" creditor claim (§ 3.2) is even less promising. Specifically, § 3.2 states that the IRS's secured claim "shall be paid from the Sale Proceeds in accordance with the priority

---

[15] Plan § 9.10 ("no distribution shall be made on any Claim of a Governmental Unit for any punitive or exemplary damages or on account of any fine, penalty, or forfeiture") does not apply to trust fund liabilities. Although § 6672 uses the word "penalty" in describing them, that "does not alter their essential character as taxes." *United States v. Sotelo*, 436 U.S. 268, 275 (1978). In any event, the Plan cannot categorically subordinate penalties.  *See United States v. Noland*, 517 U.S. 535, 543 (1996).

19

provisions set forth in Sections 5.8 and 5.9, up to the full Allowed amount thereof." In other words, the IRS's secured claim will be paid only if funds remain available for that claim under the priority order set forth elsewhere in the Plan. This is at odds with § 1129(a)(9)(D)'s mandate that a secured claim for a priority tax receive "cash payments, in the same manner and over the same period, as prescribed in subparagraph (C)," *i.e.*, payments of "a total value, as of the effective date of the plan, equal to the allowed amount of such claim."

There is no way to reconcile this inconsistent treatment of the two claims that are for the same underlying tax liability in the Plan as it is drafted. The IRS proposes fixing this inconsistency by having both claims treated as a unitary claim that must be paid at least in the manner and over the period provided for unsecured priority claims. This treatment would remedy the violation of § 1129(a)(9)(D) that is present in § 3.2 of the Plan.

### C. To the Extent Claims Need to be Classified as Secured or Unsecured, the Plan's Treatment of the IRS's Class 2 Secured Claim Should Be Amended

If the Court disagrees with the proposal in the preceding section of this brief, then the IRS alternatively requests, to the extent that the Plan's separate claims must be classified, that the Plan's classification of creditors be revised. In addition to the problem that the Plan's treatment of the IRS's secured claim for a priority tax violates § 1129(a)(9)(D) as discussed above—making the Plan not confirmable as drafted—this part of the Plan has three other significant issues that need to be addressed.[16]

---

[16] We do not address the Plan's reservation of other parties' rights to dispute the validity and priority of the federal tax liens (*see* §§ 1.58 and 3.2) because that is largely irrelevant in the plan-confirmation context. The IRS's claim must be treated the same under § 1129(a)(9) regardless of whether it is a secured or unsecured claim for the priority taxes. More to the point, these IRS claims must be paid in full under the Plan regardless of whether the IRS has valid liens that have priority over Bay Point or not. On the off chance this matters, we note that a challenge to the validity or priority of liens would have to be raised via adversary proceeding, *see* Fed. R. Bankr. P. 7001(2). In such a hypothetical future proceeding, the IRS anticipates it would contend that its

(continued...)

### 1.    The Plan Discriminates Against the IRS and in Favor of Bay Point

The Code requires that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees[17] to a less favorable treatment of such particular claim or interest[.]" 11 U.S.C. § 1123(a)(4). "Claims are similar if they have 'substantially similar rights to the debtor's assets.'" *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992)).

Although the Plan places the claim of Bay Point in Class 1 and the claim of the IRS in Class 2, the claims are substantially similar. They are both secured claims that compete with one another for lien priority. In fact, the Plan sets forth a priority order under which the IRS is ahead of a portion of Bay Point's claim (albeit subject to Bay Point's right to dispute this later). § 5.8.

Yet the Plan gives Bay Point more favorable treatment than the IRS. While any objection to the IRS's claims may indefinitely delay payment to the IRS as long as a Disputed Claims Reserve is established, Bay Point is not subjected to any such delay. Rather, "distributions to Bay Point under the Joint Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve." Plan § 5.11; *see also id.* § 3.1 (stating that Bay Point is to be paid immediately "up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing."). These Plan provisions exist even though the Debtors do, in fact,

---

secured claim against the Aberdeen property has priority over at least part of Bay Point's claim because the IRS recorded Notices of Federal Tax Lien ("NFTLs") prior to the date that Bay Point loaned funds. And irrespective of any technical deficiency, the NFTLs were legally effective because they gave actual notice of the IRS's lien. We also note that the Plan's definition of "Federal Tax Liens" (§ 1.58) refers to only two of the 12 NFTLs that the IRS has recorded against the Aberdeen property. The IRS should not be bound by this incomplete definition.

[17] The IRS does not agree to less favorable treatment.

dispute a substantial portion of Bay Point's claim. Nonetheless, the Debtors have agreed that funds distributed to Bay Point will be paid immediately subject to clawback. Plan § 5.11.

Relegating the IRS to a payment delay while Bay Point is paid immediately is unwarranted and in violation of the Code. *See U.S. on Behalf of I.R.S. v. Woodway Stone Co., Inc.*, 187 B.R. 916, 918 (W.D. Va. 1995) (finding bankruptcy court discriminated against IRS in violation of § 1123(a)(4) where "IRS never agreed to wait for payment on its claim while other secured creditors . . . began receiving satisfaction of their claims"); *see also* § 1129(b)(1) (allowing confirmation "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan"). To remedy this unequal treatment, the Court should order that both the IRS and Bay Point must be paid at closing in the full amounts of their asserted claims, subject only to later clawback by the Debtors. Such an order would have the additional benefit of saving the time and expense associated with administering a Disputed Claims Reserve.

### 2.    The Court Should Bar Any Payment to Blouin Before IRS Is Paid

Another unjust side effect of relegating the IRS to a Disputed Claims Reserve while everyone else is paid immediately is that it means that Ms. Blouin herself may receive a distribution before the IRS—even though she is the taxpayer who owes the tax in the first place.

As the Plan is structured, Debtors can defer payment on the IRS's claims by asserting that they are "Disputed" at any time prior to the "Effective Date"[18] and establishing a "Disputed

---

[18] The Plan defines the "Effective Date" as occurring when conditions specified elsewhere in the Plan are met. *See* §§ 1.49, 7.4 (note that § 1.49 has an incorrect cross-reference to § 8.1). This is too indefinite. *See In re Cardinal Congregate I*, 121 B.R. 760, 766 (Bankr. S.D. Ohio 1990) ("the Disclosure Statement must clearly advise parties what the Effective Date will be without using a term defined only in the plan."). The Effective Date (and corresponding deadline for objections) should be fixed more definitely, e.g., with objections due within 30 days of the confirmation order.

Claims Reserve." *See* Plan §§ 5.2, 5.8, 5.9. The Plan also allows Ms. Blouin, as a purported

unsecured creditor (*see* Plan § 3.5),[19] as well as her other fully owned entities (called "Equity

Interests" in the Plan, *see* §§ 1.50, 3.6) to receive distributions, even as the higher-priority class

of IRS claims is not actually satisfied but rather subjected to a Disputed Claims Reserve and

indefinite postponement on payment. In short, the Plan permits Ms. Blouin to extract value from

the Gin Lane Properties while her taxes remain unpaid.

Letting her do that would violate the absolute priority rule of 11 U.S.C. § 1129(b)(2).

"That rule provides that a reorganization plan may not give 'property' to the holders of any

junior claims or interests 'on account of' those claims or interests, unless all classes of senior

claims either receive the full value of their claims or give their consent." *Dish Network Corp. v.*

*DBSD North America, Inc.*, 634 F.3d 79, 88 (2d Cir. 2011); *see also* In re RYYZ, LLC, 490 B.R.

29, 44 (Bankr. E.D.N.Y. 2013) ("'The absolute priority rule provides that a dissenting class of

unsecured creditors must be provided for in full before any junior class can receive or retain any

property under a reorganization plan.'" (quoting *Nw. Bank Worthington v. Ahlers*, 485 U.S. 197,

202 (1988)) (cleaned up)); *In re Micro-Acoustics Corp.*, 34 B.R. 279, 284 (S.D.N.Y. 1983)

(absolute priority rule means "no class may receive anything of value until senior classes have

received full compensation for the value of their claims."). Thus, "the absolute priority rule of

§ 1129(b)(2)(B) serves as an absolute bar to distributions in contravention of the waterfall." *In re*

*MCO Wash, Inc.*, 555 B.R. 159, 163 (Bankr. E.D.N.Y. 2016) (citing *Dish Network*).

The Plan's structure is also illogical because the IRS has a lien on all of Ms. Blouin's

property and rights to property (26 U.S.C. § 6321), including any right that she may have to

receive a distribution in these bankruptcy cases, meaning that any distribution to Ms. Blouin

---

[19] As of this filing, Ms. Blouin has not filed a proof of claim in either case.

should be redirected to the IRS anyway (up to the amount of the IRS's claim). The IRS can, for example, collect via administrative levy (26 U.S.C. § 6331) against a bankruptcy distribution that would otherwise go to a delinquent taxpayer. *E.g., In re Beam*, 192 F.3d 941, 944-45 (9th Cir. 1999). If the Disputed Claims Reserve is intended to curtail the IRS's rights to collect taxes outside bankruptcy, then that would violate the Anti-Injunction Act (26 U.S.C. § 7421(a)[20]).

As noted above, if Ms. Blouin has funds available to pay the IRS's tax claims as an "Exit Advance" and establish a "Disputed Claims Reserve,"[21] then she should simply pay the IRS in full outside bankruptcy and then seek a refund in accordance with IRS procedures.[22] The Plan's convoluted efforts to circumvent normal IRS procedures should be rejected. The IRS requests that the Plan be amended to state that no distribution will be made to Ms. Blouin or the Equity Holders unless and until the IRS's claims are paid in full.

### 3. The Plan Misclassifies IRS's Priority Claim in the Brickchurch Case

It is further inconsistent, and unjustified, for the Plan to state in § 3.2 that if "the Brickchurch Property is sold as a separate lot, the IRS shall have a Class 5 unsecured claim to be paid *pro rata* and *pari passu* with other unsecured creditors of Brickchurch." ECF No. 76 at 16. This proposed *pro rata* distribution plainly violates the full-payment rule of § 1129(a)(9)(C) that

---

[20] The Anti-Injunction Act provides, subject to certain statutory exceptions inapplicable here, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The Act "is applicable to bankruptcy courts." *Prisco v. IRS*, No. 1:13-MC-0066, 2013 WL 6004183, at *4 (N.D.N.Y. Nov. 13, 2013). "The federal courts of appeals which have spoken on the point are in agreement that the Anti-Injunction act prevents bankruptcy courts from enjoining Internal Revenue Service proceedings against 'responsible persons' where trust fund taxes have not been paid by their company." *McRory Corp. v. State*, 212 B.R. 229, 232 (S.D.N.Y. 1997).

[21] Those funds themselves would be encumbered by the tax liens and should not be used to pay other non-tax debts.

[22] Alternatively, if she does not have such funds available, then the IRS has a feasibility concern. We reiterate the request for Ms. Blouin to submit a financial statement.

applies to the IRS's priority claim in the Brickchurch case. A modified plan or confirmation order should make clear that if the Brickchurch Property is sold as a separate lot, then the IRS's priority claim will be paid in full as required by § 1129(a)(9)(C).

### D.    The IRS Is Impaired Under the Plan and Entitled to Vote

Based on the foregoing, the Plan is wrong to say that the IRS's claim is unimpaired. "Claims are unimpaired if they retain all of their prepetition legal, equitable, and contractual rights against the debtor." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n. 14 (1999); *see also* § 1124(1). The "standard for impairment is very lenient and any alteration of the rights constitutes impairment even if the value of the rights is enhanced." *In re Greenwood Point LP*, 445 B.R. 885, 906 (Bankr. S.D. In. 2011) (quotation omitted). This standard is met by several terms of the Plan that violate IRS's rights both under the Bankruptcy Code and to collect the tax outside bankruptcy. The Plan's overall structure of subjecting the IRS's claims to post-confirmation dispute, and extending the potential date for payment on the claim beyond even the effective date (*see* Plan § 7.4(d)), impairs the IRS's rights to collect on the claim. *See In re New Midland Plaza Assocs.*, 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000) ("if a class of claims is not paid in full with interest on the effective date, the class is impaired.").

Accordingly, the IRS is an impaired creditor that is entitled to vote on the Plan. The IRS rejects the Plan as currently drafted, though the IRS holds out hope that the Plan could be amended in keeping with this objection and later earn the IRS's support.

### CONCLUSION

The IRS asks that the Court sustain this objection and order further modification of the Plan and Disclosure Statement as requested herein. Specifically, the Court should order the following relief:

(A)    Debtors must supplement the Disclosure Statement to include their computation

of their tax basis in the two Gin Lane properties and to provide all backup documentation to the IRS for its prompt review.

(B)     Debtors must append a detailed financial statement from Ms. Blouin to the Disclosure Statement, signed by Ms. Blouin under penalty of perjury, that explains the sources of funding for the "Exit Advances" that she would potentially have to pay under the Plan and the amount she has at her disposal from such sources.

(C)     The Plan and Disclosure Statement must be amended to remove all references to a 26 U.S.C. § 1031 like-kind exchange.

(D)     The Plan must be amended to state that no Administrative Expense Claims Bar Date is applicable to the IRS.

(E)     Plan § 5.2 must be amended to state that the IRS's postpetition administrative tax claim cannot be "estimated" other than in accordance with 11 U.S.C. § 505 after it is incurred, and that the IRS may seek disgorgement from other distributees in the event that its claims are not paid in full.

(F)     Plan §§ 4.1 and 4.5(b) must be amended to clarify that tax returns must be filed on behalf of the Debtors, that taxes must be paid as in the ordinary course of business, and that any exculpation clauses with respect to the Decision Makers and Plan Administrator are invalid as to the IRS.

(G)     The Plan must be further amended to state that:

(1)     the IRS's secured claim in the Aberdeen case and priority claim in the Brickchurch case shall be treated as a unitary priority claim, without any determination of its secured status for purposes of the manner and period of payments, which is undisputed and allowed in the amount of $5,955,355.14, with interest at the rate provided for in 26 U.S.C. § 6621 accruing from and after the Aberdeen the effective date, and with this

amount only to be paid once;

*or alternatively,*

      (2)    under the claim classification scheme,

            [i]    the IRS's secured claim will be paid in full under the Plan in accordance with 11 U.S.C. § 1129(a)(9)(D),

            [ii]    the IRS will be paid in full on the effective date subject to clawback and not subject to any Disputed Claims Reserve,

            [iii]    nothing will be paid to Ms. Blouin, Equity Holders, or any other creditor in a junior class unless and until the IRS is paid in full, and,

            [iv]    the IRS has an unsecured priority claim (rather than an unsecured general claim) in the Brickchurch case that will be paid in full if the Brickchurch property is sold as a separate lot.

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

/s/ Edward J. Murphy
EDWARD J. MURPHY
ERIC A. ASHBY II
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C.  20044
Tel: 202-307-6064 / 202-514-6508
Fax: 202-514-5238
Edward.J.Murphy@usdoj.gov
Eric.A.Ashby@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2023, I served the foregoing document electronically upon all parties of record through the Court's Electronic Case Filing System on those parties that have consented to such service.

> */s/ Edward J. Murphy*
> EDWARD J. MURPHY
> Trial Attorney
> United States Department of Justice, Tax Division