## FIRST AMENDED APPROVED BIDDING PROCEDURES

These attached first amended terms and conditions of sale (the "***Approved Bid Procedures***") are being promulgated in connection with (i) *Debtors' Joint Motion Seeking Entry of an Order Under Bankruptcy Code Sections 363(a), (b), (f), and (m) and Bankruptcy Rules 2002, 6004, and 9004: (i) Authorizing Debtors to Sell to the Highest and Best Bidder at an Auction Sale the Estates' Interest in the Real Properties Known as, (a) 366 Gin Lane, Southampton, New York 11968; and (b) 376 Gin Lane, Southampton, New York 11968; (ii) Scheduling a Hearing to Approve Such Sale to the Highest and Best Bidder; (iii) Approving Certain Bidding Procedures; and (iv) Approving the Manner and Extent of Notice of Such Auction Hearing* (ECF No. 46, the "***Sale Motion***"), as the same was granted by that certain *Order Approving Bid Procedures* (ECF No. 104, the "***Sale Order***") entered by the United States Bankruptcy Court, Eastern District of New York ("***Bankruptcy Court***") in the jointly administered bankruptcy cases styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (the "Jointly Administered Cases"); and (ii) that certain *First Amended Joint Chapter 11 Plan of Liquidation* (the "***Joint Plan***") filed by Debtors Aberdeen Enterprises, Inc. and Brickchurch Enterprises, Inc. in the Jointly Administered Cases.

The Debtors will offer their Properties for Sale,[1] collectively and individually, contemporaneously through a Private Sale Process[2] and an Auction Process.[3] The Private Sale Process will be conducted in accordance with these Approved Bid Procedures and the Private Sale Procedures attached hereto as <u>Exhibit 1</u> (the "***Private Sale Procedures***"). The Auction Process will be conducted in accordance with these Approved Bid Procedures and, to the extent that Concierge is retained as the Auctioneer, Concierge's Bidder Terms and Conditions, as such Bidder Terms and Conditions have been modified by the Auction Procedures appended thereto, each of which are attached hereto as <u>Exhibit 2</u> (the "***Auction Procedures***").

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the General Definitions affixed to the Auction Procedures and the Private Sale Procedures, each as <u>Appendix A</u> thereto.

[2] "***Private Sale Process***" shall mean that process for the solicitation and consummation of a Private Sale as set forth in the Private Sale Procedures.

[3] "***Auction Process***" shall mean that process for the solicitation and consummation of a Sale through an Auction as set forth in the Auction Procedures.

1.    **Definitions.**

(a)    "***Administrative Expense Claim***" means a Claim for the costs and expenses of administering the respective Cases allowed under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) the awarded compensation and reimbursement of expenses for the Debtors' respective bankruptcy counsel and other professionals.

(b)    "***Allowed***" means, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no objection to allowance has been interposed within the applicable period; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

(c)    "***Approved Bid Procedures***" has the meaning ascribed to such term in the introductory section hereof.

(d)    "***Auction Procedures***" has the meaning ascribed to such term in the introductory section hereof.

(e)    "***Auction Process***" has the meaning ascribed to such term in the introductory section hereof.

(f)    "***Auctioneer***" means any auctioneer engaged by the Debtors to assist with the Auction. For the avoidance of doubt, the term "Auctioneer" shall specifically refer to Concierge Auctions, LLC upon the Bankruptcy Court's entry of an order authorizing the retention of Concierge.

(g)    "***Bankruptcy Code***" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

(h)    "***Bankruptcy Court***" has the meaning ascribed to such term in the introductory section hereof.

(i)    "***Bay Point***" shall mean Bay Point Capital Partners II, LP.

(j)     "***Bay Point Debt***" shall mean all amounts owing to Bay Point by one or both of the Debtors, including, without limitation, the DIP Loan Obligations, the JGB Judgment, and the Morgan Stanley Judgment.

(k)     "***Buyer***" shall mean the High Bidder or Successful Offeror, as the case may be, that consummates a Sale of one or both of the Properties.

(l)     "***Cases***" means, collectively, the jointly administered bankruptcy cases styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST), each being a "***Case***."

(m)     "***Cash***" means lawful currency of the United States of America.

(n)     "***Claim***" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

(o)     "***Credit Bid***" shall have the meaning ascribed to such term in Section 4 of these Approved Bid Procedures.

(p)     "***Credit Bidding***" shall have the meaning ascribed to such term in Section 4 of these Approved Bid Procedures.

(q)     "***Debtors***" means, collectively, Brickchurch and Aberdeen, each being a "***Debtor***."

(r)     "***Decision Makers***" shall mean, collectively, Bay Point and Kabatoff, each being a "***Decision Maker***."

(s)     "***DIP Financing Order***" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

(t)     "***DIP Loan Obligations***" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

(u)     "***Estates***" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "***Estate***."

(v)     "***Estate Professional***" a professional retained by one or both of the Estates.

(w)     "***Final Order***" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United

States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing.  The possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to an order will not cause it not to be a Final Order.

(x)     "***Gross Sale Proceeds***" means the gross proceeds realized from a Sale (excluding the amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code).

(y)     "***JGB Assigned Documents***" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

(z)     "***JGB Judgment***" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

(aa)    "***Joint Plan***" has the meaning ascribed to such term in the introductory section hereof.

(bb)    "***Kabatoff***" shall mean Mathew Kabatoff.

(cc)    "***Lien***" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

(dd)    "***Morgan Stanley Judgment***" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

(ee)    "***Net Sale Proceeds***" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, Auctioneer fees (in the case that such Sale occurs pursuant to an Auction), brokerage fees, closing costs, and documentary costs, if any; *provided that*, for the avoidance of doubt, Net Sale Proceeds shall not include the non-cash amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code or otherwise; and *further provided that* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

(ff)     "*Non-Estate Professional*" means a person that has performed services beneficial to a Debtor or its Estate but who does not qualify as an Estate Professional because such person is not engaged by the Debtor(s) or the Estate(s).

(gg)    "*Petition Date*" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing the Bankruptcy Cases were filed.

(hh)    "*Potential Purchaser*" means a person that has become a Registered Bidder or that has otherwise satisfied the Debtors that such person has the financial wherewithal to consummate a Sale of one or both of the Properties.

(ii)     "*Private Sale Procedures*" has the meaning ascribed to such term in the introductory section hereof.

(jj)     "*Private Sale Process*" has the meaning ascribed to such term in the introductory section hereof.

(kk)    "*Retention Agreement*" an agreement between an Estate Professional and an Estate, which has been approved by the Bankruptcy Court, pursuant to which the Estate Professional has agreed to provide certain services to such Estate in return for the compensation set forth therein.

(ll)     "*Retention Order*" an order of the Bankruptcy Court approving the terms of a Retention Agreement and authorizing the Debtor to enter into the same.

(mm)   "*Sale Motion*" has the meaning ascribed to such term in the introductory section hereof.

(nn)    "*Sale Order*" has the meaning ascribed to such term in the introductory section hereof.

(oo)    "*Sale Process*" means the process of soliciting and consummating a Sale, which shall include the Private Sale Process and Auction Process.

(pp)    "*Secured Claim*" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

(qq)    "*Secured Creditor*" means the holder of a Secured Claim against one or both of the Properties.

(rr)     "**_Stalking Horse Bid_**" has the meaning ascribed to such term in Section 5 of these Approved Bid Procedures.

(ss)     "**_Stalking Horse Bidder_**" has the meaning ascribed to such term in Section 5 of these Approved Bid Procedures.

(tt)     "**_Stalking Horse Breakup Fee_**" has the meaning ascribed to such term in Section 5 of these Approved Bid Procedures.

(uu)     "**_Stalking Horse Expense Reimbursement_**" has the meaning ascribed to such term in Section 5 of these Approved Bid Procedures.

(vv)     "**_Transferred Encumbrances_**" has the meaning ascribed to such term in Section 2 of these Approved Bid Procedures.

2.   **Authority.**  The Decision Makers shall jointly make decisions on behalf of the Debtors with respect to the Sale Process, any such decisions requiring mutual agreement of the Decision Makers, or, if the Decision Makers cannot reach an agreement between themselves, such decisions shall be made in accordance with further order of the Bankruptcy Court.

3.   **Due Diligence.**  The Debtors, via the Listing Brokers and/or the Auctioneer, shall afford each Potential Purchaser due diligence access to the Properties upon reasonable request; _provided that_, for the avoidance of doubt, nothing contained herein shall prevent Debtors from voluntarily providing due diligence access to the Properties to any person regardless of their status as a Potential Purchaser. Due diligence access shall include access to onsite inspections, surveys, title reports, professional property inspections, and such other matters which a Potential Purchaser may reasonably request and to which the Debtors may agree, which such Due Diligence process shall conclude no later than (i) with respect to the Auction Process, the conclusion of the Auction; and (ii) with respect to the Private Sale Process, and solely with respect to the Qualified Offeror submitting a Qualified Offer, upon the submission of such Qualified Offer to Debtors.

4.   **Credit Bid.**  A Secured Creditor may credit bid any amount up to the full amount of its Secured Claim as a bid, part of a bid, or series of bids for such Properties (or the respective Property) pursuant to 11 U.S.C. 363(k) and applicable law (each, a "<u>Credit Bid</u>," and the act of submitting a Credit Bid being, "<u>Credit Bidding</u>"). Except as otherwise expressly stated herein, each Credit Bid shall be treated in the same manner as a Cash bid and the Secured Creditor submitting the Credit Bid shall be entitled to offset the amount of such bid (or any part thereof) against the amount of the Secured Claim owing to such Secured Creditor. Notwithstanding anything to the contrary herein, each Secured Creditor is automatically deemed a Registered Bidder and each Credit Bid is automatically deemed to meet all requirements for a valid bid. For the avoidance of doubt, Bay Point shall be permitted to submit a bid that includes (or is made up solely of) a Credit Bid despite Bay Point's status as a Decision Maker and regardless of any role that Bay Point plays in the Sale Process, including regardless of

whether Bay Point or anyone related to Bay Point is otherwise a consulting party with respect to any aspect of the Sale Process. For the avoidance of doubt, the amount of the secured debt so bid as a Credit Bid shall be deemed to be the "Purchase Price" with respect to such Credit Bid; *provided that* if the total bid submitted by a Secured Creditor exceeds the Credit Bid portion of such bid, then the "Purchase Price" with respect to such bid shall be the total amount of the bid.

5. **Stalking Horse Bids.** The Debtors shall be permitted to select a bid submitted by a Registered Bidder to serve as a stalking horse bid (the "<u>Stalking Horse Bid</u>"). The Registered Bidder submitting the Stalking Horse Bid shall be referred to as the "<u>Stalking Horse Bidder</u>"). The Stalking Horse Bid and the Stalking Horse Bidder shall be subject to the following terms and conditions:

(a) <u>Stalking Horse Bid Protections</u>.  In the event that a Stalking Horse Bid is selected with respect to a Property (or the Properties) and a Sale of such Property (or Properties) to a person other than the Stalking Horse Bidder is consummated, such Stalking Horse Bidder shall be entitled to:

(i) a break-up fee (the "<u>Stalking Horse Breakup Fee</u>") in the amount of one percent (1.00%) of the Stalking Horse Bid; *provided that*, for the avoidance  of doubt, the Stalking Horse Breakup Fee shall be calculated only upon the initial Stalking Horse Bid and shall not include any overbids subsequently submitted by the Stalking Horse Bidder;

(ii) reimbursement for all reasonable expenses, up to a maximum amount of Five Hundred Thousand Dollars ($500,000.00), incurred by the Stalking Horse Bidder in connection with the Stalking Horse Bid, including those expenses incurred in performing due diligence with respect to one or more of the Properties, negotiation and documentation of the Stalking Horse Bid, and participation in the Auction (the "<u>Stalking Horse Expense Reimbursement</u>").

(b) <u>Additional Provisions Applicable to Bay Point</u>. Notwithstanding anything to the contrary herein, Bay Point shall be permitted to serve in the role as a Stalking Horse Bidder, without the consent of the Debtors, if Bay Point chooses to submit a Credit Bid in the full amount of its Secured Claim and agrees that it shall not be permitted to receive a Stalking Horse Breakup Fee and/or Stalking Horse Expense Reimbursement; *provided that* nothing contained herein shall prevent the Debtors from choosing Bay Point to be the Stalking Horse Bidder despite Bay Point's instance upon receiving a Stalking Horse Breakup Fee and/or Stalking Horse Expense Reimbursement.

6. **Post-Defaults Sale to Bay Point.** In the event that (i) the High Bidder and each of the Backup Bidders breach their respective obligations under the Auction Procedures and/or the Purchase and Sale Contract, or otherwise fail to consummate the proposed Sale, through no fault of the Sellers, and (ii) Bay Point has submitted a Credit Bid, the Sellers shall offer the Properties (or subject to Property) for Sale to Bay Point for the

amount of its Credit Bid, and, upon acceptance, Bay Point shall be deemed the High Bidder and its Credit Bid shall become the High Bid, without further approval of the Bankruptcy Court; *provided that* if the total bid submitted by a Bay Point exceeds the Credit Bid, such total bid submitted by Bay Point shall become the High Bid.

7.     **Addition Buyers' Premium Terms.**

   (a)   <u>Bay Point Exclusion</u>.  Bay Point shall not be required to pay a Buyer's Premium on any amount Credit Bid by Bay Point regardless of whether it is subsequently determined that the amount of the Bay Point Debt is less than the good faith estimate of the same Credit Bid by Bay Point. If Bay Point submits a bid in excess of the amount of the good faith estimate of the Bay Point Debt, Bay Point shall pay a Buyer's Premium only on that portion of its bid that exceeds the good faith estimate of the Bay Point Debt.

   (b)   <u>Private Sale Exclusion</u>.  For the avoidance of doubt, a Successful Offeror that closes a Private Sale for one or more of the Properties shall not be required to remit a Buyer's Premium; *provided that* for the avoidance of doubt, the Auctioneer and Listing Brokers shall be entitled to compensation from the Gross Sale Proceeds of any Private Sale in accordance with Section 8 of this Agreement.

   (c)   <u>Insufficient Buyer's Premium</u>.  To the extent that there is an insufficient amount in the Buyer's Premium to make the distributions required pursuant to Section 8 of these Approved Bid Procedures, including in the situation where no Buyer's Premium is collected through a Private Sale, the distributions required pursuant to Section 8 of these Approved Bid Procedures shall be paid at Closing from the Gross Sale Proceeds prior to the distribution of any Net Sale Proceeds to the Sellers.

8.     **Compensation to Professionals.**

   (a)   <u>Estate Professionals</u>.  Subject to the terms of any Retention Agreement between an Estate Professional and the Estate, and further subject to the terms of the Retention Order approving the same, the Debtors shall remit the compensation and reimbursable expenses required pursuant to a Retention Agreement to the respective Estate Professional from the Buyer's Premium or otherwise in accordance with the terms of Section 7(c) of these Approved Bid Procedures.

   (b)   <u>Non-Estate Professionals</u>.  The Debtors shall compensate certain other Non-Estate Professionals in accordance with (i) the terms of a Retention Agreement (i.e., the Buyer's Broker (as that term is defined in the Retention Agreement between the Listing Brokers and the Estates)) and any Retention Order entered with respect to the same; or (ii) as otherwise approved by order of the Bankruptcy Court from the Buyer's Premium or otherwise in accordance with the terms of Section 7(c) of these Approved Bid Procedures

9. **<u>Modification of Approved Bid Procedures</u>.**  The Debtors shall have the right, with the consent of Bay Point but without further order of the Bankruptcy Court, to modify these Approved Bid Procedures, including modifying the timeline of the Sale Process and the deadlines set forth in the Bid Procedures, as the Debtors deem necessary to promote consummation of the Joint Plan and/or maximize the return to their respective Estates from the Sale of the Properties; *provided that*, notwithstanding the foregoing, the Debtors shall not be permitted to modify the date of the Auction without approval of the Bankruptcy Court. If the Bid Procedures are modified, the Debtors shall provide notice of the same to the Stalking Horse (if any), the Plan Administrator, the United States Trustee, the Internal Revenue Service, the Listing Brokers, the Auctioneer, and any Potential Purchasers that have expressed written interest in participating in the Sale Process.

## Exhibit A

## PRIVATE SALE PROCEDURES

1.    **Details and Overview of the Private Sale Process**

    (a)    <u>The Properties</u>.    The Sellers are the owners, respectively, of the following iconic Southampton Properties (collectively, the "***Properties***," each being a "***Property***"):

        (i)    366 Gin Lane, Southampton, New York 11968, which is owned by Brickchurch Enterprises, Inc. ("***Brickchurch***"); and

        (ii)    376 Gin Lane, Southampton, New York 11968, which is owned by Aberdeen Enterprises, Inc. ("***Aberdeen***," and together with Brickchurch, the "***Sellers***," each being a "***Seller***").

    (b)    <u>Private Sale Format</u>.  The Sellers will offer the Properties for sale, both individually and collectively (each, a "***Private Sale***"), through the process described herein (the "***Private Sale Process***"). All Qualified Offers must be received by **January 10, 2024** (the "***Qualified Offer Deadline***"). The Sellers will alert any Qualified Offeror that its Qualified Offer has been accepted on or before **January 14, 2024** (the "***Private Sale Deadline***"). If the Sellers do not accept a Qualified Offer for a Property on or before January 14, 2024, the Property will no longer be available for Private Sale and sale by Auction will be the exclusive venue for any offer and acceptance thereof with respect to the Sale of either Property, which such Auction is scheduled to conclude on **January 24, 2024** in accordance with <u>Section 14</u> herein.

    (c)    <u>Listing Brokers</u>.  The Properties will be offered for Private Sale through the following brokers (the "***Listing Brokers***"):

> Tim Davis
> Ernest Cervi
> The Corcoran Group
> 24 Main Street
> Southampton, New York 11968
> Phone: _____
> Email: tgdavis@corcoran.com
>        ernest.cervi@corcoran.com
>
> Bespoke Real Estate
> Cody Vichinsky
> Joe De Sane
> Bespoke Real Estate
> 903 Montauk Highway
> Water Mill, New York 11976
> Phone: 631.500.9030
> Email: cody@bespokerealestate.com
>        jd@bespokerealestate.com

> Sotheby's International Realty
> Nanette Hansen
> Harald Grant
> Sotheby's International Realty
> 50 Nugent Street
> Southampton, New York 11968
> Phone: 631.283.0600
> Email: nanette.hansen@sothebys.realty
>            harald.grant@sothebys.realty

2.    **Due Diligence.**    Potential bidders desiring due diligence with respect to the Properties, including, but not limited to onsite inspections, surveys, title reports, and professional property inspections, should reach out to the Listing Brokers.

3.    **Qualified Offers.**    Only a Qualified Offeror may submit an offer to purchase one or both Properties through a Private Sale. To become a "***Qualified Offeror***," the Sellers, in their sole and absolute discretion, must determine that the offeror is financially able to consummate the proposed Private Sale pursuant to the terms of the offer submitted by such offeror.

4.    **Qualified Offers.**    Each offer submitted by a Qualified Offeror that meets the following requirements shall be deemed a "***Qualified Offer***:"

> (a)    Each Qualified Offer shall be stated as an unqualified offer to purchase one or both of the Properties in an amount of Cash[1] (the "***Purchase Price***"), without any contingencies other than as expressly permitted hereby, subject only to acceptance by the Sellers (or the respective Seller) and the entry of any necessary Sale Confirmation Order;

> (b)    To the extent that any part of a Qualified Offer is being financed by a person other than the Qualified Offeror, such financing must be, in the sole discretion of the Sellers, committed financing from a financially sound financier and be subject only to such contingencies that Sellers believe to be reasonable and to not to cause unnecessary risk to the Private Sale Process;

> (c)    Each Qualified Offer shall be accompanied by a Purchase and Sale Contract in a form substantially similar to that which is attached hereto as Appendix A for the purchase of the Property (or Properties) (each, a "***Purchase and Sale Contract***"); *provided that,* notwithstanding the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the those bid procedures approved by the Bankruptcy Court pursuant to that certain *Order Approving Bid Procedures*, entered on November 27, 2023 by the Bankruptcy Court, in the jointly administered bankruptcy cases styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (the "***Sale and Bid Procedures Order***"), as the same may be amended from time-to-time consistent with the terms thereof (the "***Approved Bid Procedures***").

foregoing, the Sellers and the Qualified Offeror shall be permitted to jointly make modifications to the Purchase and Sale Contract as each may expressly agree to in writing; *but further provided that* any modifications to the Purchase and Sale Contract must comply and be consistent with the Approved Bid Procedures.

5.  **Submission of Qualified Offers.**  All Qualified Offers shall be in the form of an offer letter in a form substantially similar to that which is attached hereto as <u>Appendix B</u> (each, an "<u>Offer Letter</u>"). All Qualified Offers shall be submitted to Sellers via the Listing Brokers.

6.  **Qualified Offer Deadline.** All Qualified Offers must be submitted to the Sellers on or before the Qualified Offer Deadline.

7.  **Deposits.**

    (a)  <u>Initial Deposit</u>.  Contemporaneously with the submission of its Qualified Offer, the Qualified Offeror shall deposit into escrow with the Escrow Agent an amount equal to the amount of five hundred thousand dollars ($500,000.00) (each, an "***Initial Deposit***"). The Initial Deposit shall be non-refundable unless the Seller rejects the Qualified Offer or the Purchase and Sale Agreement associated with such Initial Deposit is terminated pursuant to its terms other than as a result of a breach by Purchaser.

    (b)  <u>Good Faith Deposit</u>.  Within one (1) Business Day of a Seller's acceptance of a Qualified Offer subject only to any requisite Bankruptcy Court approval, the Qualified Offeror shall deposit into escrow with the Escrow Agent an amount equal to the greater of (a) five percent (5.00%) of the Purchase Price minus the amount of the Initial Deposit; and (b) Five Million Dollars ($5,000,000.00) minus the amount of the Initial Deposit (the greater of such amounts being a "***Secondary Deposit***," and together with the Initial Deposit, the "***Deposits***."

    (c)  <u>Forfeiture of Deposits</u>.  Notwithstanding anything to the contrary herein, any Successful Offeror that (i) breaches its obligations under a Purchase and Sale Contract duly executed by the Seller; or (ii) attempts to revoke its Qualified Offer after or prior to the execution of a Purchase and Sale Agreement; or (iii) refuses to execute any agreement reasonably required to consummate the Sale proposed by the Purchase and Sale Contract, shall be deemed to have completely and permanently relinquished, released, and waived any right that such Successful Offeror had with respect to any Deposit(s) remitted in connection with the Qualified Offer.

8.  **Determination of Qualified Offer Status.**  Upon determination that any offer is not a Qualified Offer, the Sellers, or the Listing Broker at the direction of the Sellers, shall notify the offeror of such determination forthwith and shall provide such offeror with the basis for such determination.

9.  **Acceptance of a Qualified Offer.**  At any point prior to the Qualified Offer Deadline, the Sellers may accept a Qualified Offer for the purchase of the Properties, and each respective

Seller may accept a Qualified Offer for the purchase of the Property owned by such Seller, through a Private Sale (each, an "***Acceptance Decision***"). In determining whether to accept a Qualified Offer, the Debtors shall exercise their reasonable business judgment, and may, but are not required to, consult with any significant constituency or Creditors or other stakeholders. For the avoidance of doubt, the Debtors may not accept a Qualified Offer unless such Qualified Offer is greater than the amount of the Bay Point Debt (without consideration of any objection thereto that may be filed), or, to the extent that the Bay Point Debt is not fully secured, the secured portion of the same, unless Bay Point shall consent to Debtors' acceptance of such Qualified Offer. Upon an Acceptance Decision, the Qualified Offeror that submitted the Qualified Offer that is the subject of the Acceptance Decision shall be deemed a "***Successful Offeror***") and such Qualified Offer shall be deemed an "***Accepted Offer***"). The proposed Private Sale set forth in an Accepted Offer shall be an "***Accepted Private Sale***."

10. **Closing of the Private Sale(s).**

(a) <u>Time is of the Essence.</u> Time is of the essence with respect to all of the actions and deadlines set forth herein, including, without limitation, those actions and deadlines relating to the closing of the Private Sale(s).

(b) <u>Sale Confirmation Order.</u> Sellers are debtors in bankruptcy and, as such, the Private Sale Process is being conducted pursuant to the terms of the United States Bankruptcy Code. As part of this process, the Sellers received Bankruptcy Court approval to conduct the Private Sale Process pursuant to the terms set forth in the Sale and Bid Procedures Order, a copy of which is available from the Listing Brokers. As set forth in the Sale and Bid Procedures Order, if a party-in-interest objects to a proposed Private Sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the Private Sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed Private Sale, the Sellers' ability to consummate such proposed Private Sale will be contingent upon the Sellers receiving an order from the Bankruptcy Court, after the Sale Confirmation Hearing, approving such Private Sale (each, a "***Sale Confirmation Order***"). Notwithstanding such contingency on the part of the Sellers, each Qualified Offer and Accepted Offer shall remain irrevocable. In addition to the foregoing, the Sellers and/or the Successful Offeror may request that the Bankruptcy Court hold a Sale Confirmation Hearing or enter a Sale Confirmation Order without objecting to the proposed Private Sale. Unless the Bankruptcy Court holds a Sale Confirmation Hearing or the Sellers and/or Successful Offeror requests entry of a Sale Confirmation Order, no further order of the Bankruptcy Court is necessary for the Sellers to consummate the Private Sale(s).

(c) <u>Closing Date and Place.</u> Closing shall take place (i) at such location as may be mutually agreed upon by the Seller and Successful Offeror; and (ii) on a date that is not less than three (3) business days after the later of (A) Seller's duly authorized execution of this

Contract, (B) the entry of a Sale Confirmation Order if the same has been properly requested or is otherwise required by the Bankruptcy Court; and (C) such other later date as may be mutually agreed to in writing between the Seller and Successful Offeror.

(d)  <u>Title Insurance</u>.  Sellers shall convey the Properties by delivery of a quitclaim deed or deeds. At Sellers' option, if a Successful Offeror's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Sellers, the Sellers may arrange for the issuance of a title insurance policy by a reputable title company, if such Successful Offeror is unable to do so, at the sole cost and expense of such Successful Offeror, at no additional premium. Sellers shall provide all documents reasonably required by the Successful Offeror's title company for them to "omit" any exceptions from the Successful Offeror's title policy.

(e)  <u>Transfer of Possession</u>.  The Sellers shall turnover possession of each Property at the Closing of the Private Sale with respect to the same to the respective Buyer or its designee, together with all files and records pertaining to such Property, including, but not limited to construction documents, building permits, violations, architectural plans, leases and repair invoices to the extent that any such documents exist within the possession, custody, or control of the Sellers at that time.

**11.  <u>Breach of an Offer Letter / Purchase and Sale Contract</u>.**

(a)  <u>Damages</u>.  A Qualified Offeror and/or Successful Offeror that breaches or otherwise defaults under the terms of its Offer Letter and/or Purchase and Sale Contract shall be liable to the Seller(s) for damages resulting therefrom. The Sellers shall have all rights, claims, defenses, and remedies available to them, whether at law or in equity.

(b)  <u>Forfeiture of Deposits</u>.  Notwithstanding anything to the contrary herein, any Qualified Offeror and/or Successful Offeror that breaches or otherwise defaults under the terms of its Offer Letter and/or Purchase and Sale Contract shall completely and permanently relinquish, release, and waive any right that such Qualified Offeror/Successful Offeror had with respect to any Deposit remitted in connection with the Qualified Offer/Accepted Offer. For the avoidance of doubt, the foregoing forfeiture of the Deposit shall in no way limit the Sellers other rights, claims, defenses, and remedies, whether at law or in equity.

**12.  <u>Submission to Jurisdiction of the Bankruptcy Court</u>.**  The Bankruptcy Court shall have exclusive jurisdiction over all matters related to the Private Sale Process, any Private Sale, and the Sellers, and all matters arising prior to the Closing of the Private Sale related to the Properties, and the submission of a Qualified Offer shall be deemed an agreement by the Qualified Offeror to submit itself to such exclusive jurisdiction of the Bankruptcy Court for all such matters.

**13.  <u>Modification of Private Sale Procedures</u>.**  The Sellers shall have the sole right and authority to modify these Private Sale Procedures, including modifying the timeline and the deadlines with respect hereto; *provided that*, for the avoidance of doubt, the Sellers shall not be permitted to modify the date of the Auction without approval of the Bankruptcy Court;

and *further provided that* nothing contained herein shall prevent the Bankruptcy Court from entering an order modifying the Approved Bid Procedures, including these Private Sale Procedures.

14. **<u>Auction.</u>** Contemporaneously with the Private Sale Process, the Sellers will offer the Properties for sale, collectively and individually, via a no reserve auction (the "***Auction***"). The Auction will be conducted via digital bidding and will conclude at a live auction at the Sotheby's Auction House on **January 24, 2024**, at which bids may be submitted via live bid, telephonic proxy bid, or the digital bidding platform. Anyone desiring additional information with respect to the Auction should reach out to Concierge Auctions, LLC:

> Concierge Auctions, LLC
> notices@conciergeauctions.com
> (or by facsimile at 888-317-9503)

Additional information with respect to the Auction can be obtained from [www.conciergeauctions.com](http://www.conciergeauctions.com).

**Appendix    A**

December 14, 2023

*Via Email*

> Aberdeen Enterprises, Inc.
> One Liberty Plaza
> 165 Broadway, 23rd Floor
> New York, New York 10006
> *CharlesAndros@BayPointAdvisors.com*
> *MKabatoff@LBTHolding.com*

> Brickchurch Enterprises, Inc.
> One Liberty Plaza
> 165 Broadway, 23rd Floor
> New York, New York 10006
> *CharlesAndros@BayPointAdvisors.com*
> *MKabatoff@LBTHolding.com*

Re:  Offer for Purchase of _____

Dear Messrs. Andros and Kabatoff:

I am pleased to submit the herein discussed offer (the "***Offer***") for the purchase of the following real property: _____ (the "***Property***").

This offer letter (the "***Offer Letter***") is submitted pursuant to the terms of the Approved Bid Procedures[1] as promulgated in the Bankruptcy Cases. This Offer Letter, along with the enclosed Residential Contract of Sale (the "***Sale and Purchase Contract***," and collectively with the Offer Letter, the "***Contracts***"),[2] are binding contracts and shall be irrevocable by the Purchaser,[3] *provided that* nothing contained herein shall prevent the termination of the Sale and Purchase Agreement in accordance with the terms thereof.

Approved Bid Procedures.  Purchaser acknowledges and represents that it has obtained a copy of the Approved Bid Procedures, that it has had the opportunity to review the Approved Bid Procedures with the legal counsel of its choosing, and that Purchaser understands and agrees to the terms of the Approved Bid Procedures.

---

[1] As used herein, the term "***Approved Bid Procedures***" shall mean those bid procedures approved by the Bankruptcy Court pursuant to that certain *Order Approving Bid Procedures I* (the "***Sale and Bid Procedures Order***"), entered on November 27, 2023 by the Bankruptcy Court, in the jointly administered bankruptcy cases styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (the "***Bankruptcy Cases***"), as the same may be amended from time-to-time consistent with the terms thereof (the "***Approved Bid Procedures***").

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale and Purchase Contract.

[3] The term "***Purchaser***," as used herein, shall have the same meaning as is ascribed to such term in the Offer Letter.

<u>Furnishing of Information</u>.  The Purchaser acknowledges and agrees that it will provide Seller[4] with any information reasonably requested by Seller that would permit Seller to determine whether (i) the Purchaser is financially able to consummate the proposed sale pursuant to the terms of the Contracts; and (ii) any financing that the Purchaser proposes to use for any portion of the Purchase Price is committed financing from a financially sound financier and be subject only to such contingencies that Seller believes to be reasonable and to not to cause unnecessary risk.

<u>Redline</u>.  The Purchaser hereby encloses a redline (the "***Redline***") showing all changes, revisions, and modifications between the draft residential contract of sale attached to the Approved Bid Procedures and the Purchase and Sale Contract. The Purchaser represents and warrants that the Redline is a true and accurate reflection of all such changes, revisions, and modifications and that any change, revision, or modification that is not accurately reflected on such Redline shall not be enforceable against the Seller unless the Seller expressly agrees to the be subject to same in writing outside of the Purchase and Sale Agreement itself.

<u>Deposits</u>.  Contemporaneously herewith, Purchaser has remitted its Initial Deposit in the amount of five hundred thousand dollars ($500,000.00) to the Escrowee. The Initial Deposit shall be non-refundable unless the Seller rejects the Offer or the Purchase and Sale Agreement associated with such Initial Deposit is terminated pursuant to its terms other than as a result of a breach by Purchaser.

Within one (1) Business Day of the Acceptance Date,[5] the Offeror shall deposit into escrow with the Escrowee an amount equal to the greater of (a) five percent (5.00%) of the Purchase Price minus the amount of the Initial Deposit; and (b) Five Million Dollars ($5,000,000.00) minus the amount of the Initial Deposit (the greater of such amounts being a "***Secondary Deposit***," and together with the Initial Deposit, the "***Deposits***."

Purchaser acknowledges and agrees that that if Purchaser (i) breaches its obligations under a Purchase and Sale Contract duly executed by the Seller; or (ii) attempts to revoke its Offer after or prior to the execution of a Purchase and Sale Agreement; or (iii) refuses to execute any agreement reasonably required to consummate the sale proposed by the Purchase and Sale Contract, Purchaser shall be deemed to have completely and permanently relinquished, released, and waive any right that such Purchaser had with respect to any Deposit(s) remitted in connection with the Offer.

<u>Sale Confirmation Order</u>.  Purchaser acknowledges and agrees that Sellers are debtors in bankruptcy and, as such, the sale contemplated by the Sale and Purchase Contract, as well as Seller's ability to bind itself to the Sale and Purchase Contract, is contingent on approval and authorization of the Bankruptcy Court. Seller previously received Bankruptcy Court approval to conduct the sale process and enter into an agreement to sell the Property without further order of

---

[4] The term "***Seller***," as used herein, shall have the same meaning as is ascribed to such term in the Offer Letter.
[5] The term "***Acceptance Date***," as used herein, shall mean that date upon which Seller notifies the Purchaser that the Seller has accepted the Offer, subject only to any requisite Bankruptcy Court approval.

the Bankruptcy Court, *provided that*, pursuant to the terms of the Sale and Bid Procedures Order, if a party-in-interest objects to a proposed sale of the Property, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 (the "*Sale Confirmation Hearing*") for the purpose of considering the confirmation of the sale of the Property and entering a further order with respect to the same (any such order confirming and authorizing the proposed sale, a "*Sale Confirmation Order*"). Purchaser acknowledges and agrees that, notwithstanding such contingency on the part of the Seller, this Offer shall remain irrevocable.

In addition to the foregoing, the Seller and/or the Purchaser may request that the Bankruptcy Court hold a Sale Confirmation Hearing or enter a Sale Confirmation Order without objecting to the proposed Private Sale. Purchaser agrees that if it requires entry of a Sale Confirmation Order, it shall provide notice of the same (each a "*Sale Confirmation Notice*") to Seller on or before the first (1st) Business Day following the Acceptance Date (the "*Hearing Request Deadline*"). If Purchaser fails to provide a Sale Confirmation Notice by the Hearing Request Deadline, Purchaser shall be deemed to have waived its right to request Bankruptcy Court entry of a Sale Confirmation Order; *provided that* nothing contained herein shall prevent Seller from agreeing to permit Purchaser to request entry of a Sale Confirmation Order despite Purchaser's failure to provide a Sale Confirmation Notice by the Hearing Request Deadline. If Purchaser timely provides a Sale Confirmation Notice, then on or before the second (2nd) Business Day after the Acceptance Date, the Purchaser shall provide Seller with the proposed form of Sale Confirmation Order that it will request the Bankruptcy Court to enter (the "*Proposed Sale Confirmation Order*"). Purchaser agrees that, notwithstanding anything to the contrary herein, Purchaser will not seek entry of a Proposed Sale Confirmation Order unless Seller has expressly consented to the same in writing.

Breach of Offer Letter / Purchase and Sale Contract.  Purchaser shall be liable to Seller for any damages resulting from any breach or other default under the terms of this Offer Letter and/or the Purchase and Sale Contract. The Seller shall have all rights, claims, defenses, and remedies available to it, whether at law or in equity. Notwithstanding the foregoing, and without limitation of the same, a breach or other default under the terms of this Offer Letter and/or the Purchase and Sale Contract shall immediately result, without further action on the part of Seller, in the complete and permanent relinquishment, release, and waiver any right that Purchaser has with respect to any Deposit.

Submission to Jurisdiction of the Bankruptcy Court.  The Bankruptcy Court shall have exclusive jurisdiction over all matters related to this Offer Letter, the Offer, the Purchase and Sale Agreement, the Sellers, and all matters related to the Property arising prior to the Closing of the proposed sale, and the submission of this Offer Letter and the Offer contained herein shall be deemed the Purchaser's voluntarily and irrevocable submission to such exclusive jurisdiction of the Bankruptcy Court for all such matters.

Modification of Private Sale Procedures.  Purchaser acknowledges and agrees that Seller has the right and authority to modify the Approved Bid Procedures in accordance therewith (each, a "*Modification*") and that any such Modification shall not terminate Purchaser's obligations under

the Contracts, such obligations remaining valid, binding, and enforceable despite any such Modification; *provided that* if the Purchaser reasonably believes any such Modification shall have a material effect upon the Offer, the Purchaser shall have the right to provide notice to Seller of the same within five (5) Business Days of receiving notice of such Modification, including specifically identifying the alleged material effect and providing information reasonably requested by Seller with respect to the same, and Seller shall have the right to confirm that such Modification does not apply to the Purchaser and/or Offer or agree to such other accommodations as Purchaser has agreed to.

Submitted, Agreed To, and Acknowledged By:

**PURCHASER:**

_____

By: _____

Title: _____

Date: _____

cc:    Tim Davis (tgdavis@corcoran.com)
        Ernest Cervi (ernest.cervi@corcoran.com)
        Cody Vichinsky (cody@bespokerealestate.com)
        Joe De Sane (jd@bespokerealestate.com)
        Nanette Hansen (nanette.hansen@sothebys.realty)
        Harald Grant (harald.grant@sothebys.realty)
        Camisha Simmons (camisha@simmonslegal.solutions)
        Kevin Nash (kjnash@gwulaw.com)
        Ted Donovan (tdonovan@gwulaw.com)
        John F. Isbell (john@jfi-law.com)
        John C. Allerding (john.allerding@thompsonhine.com)

# Appendix B

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

*Warning:  No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This Contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this Contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

This Contract of Sale (this "**Contract**") is made as of _____, _____ between ABERDEEN ENTERPRISES, INC., Address: 376 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417524 and BRICKCHURCH ENTERPRISES, INC. Address: 376 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417521 (individually              and              collectively,              "**Seller**")              and _____, Address:  _____, Social Security Number/ Fed. I.D. No(s): _____ ("**Purchaser**, and collectively with the Seller, the "**Parties**," each a "**Party**").

The parties hereby agree as follows:

     1.   **Premises**. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon, more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:   366 Gin Lane and 376 Gin Lane.   Street Address: 366 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.014; and (b) 376 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.013, together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway (collectively the "**Premises**"). Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser

*Residential Contract of Sale Signature Page*

may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

      2.   **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (*strike out inapplicable items*) (collectively with the Premises, the "*Property*").

Excluded from this sale are furniture and household furnishings.

      3.   **Purchase Price**. The purchase price (the "*Purchase Price*") is

_____U.S. Dollars  ($_____), payable as follows:

      (a)   by Purchaser's transfer to the Escrowee of Cash,[1] the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this Contract (the "*Initial Deposit*") in the amount of Five Hundred Thousand U.S. Dollars:

$    500,000.00    .

      (b)   by Purchaser's transfer to the Escrowee of Cash, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this Contract (the "*Secondary Deposit*," and collectively with the Initial Deposit, the "*Deposit*") in an amount equal to _____ U.S. Dollars:

$_____.

      (c)   balance at Closing in accordance with paragraph 7:

$_____.

---

[1] As used herein, the term "**Cash**" shall mean official currency of the United States that is immediately available to the person in possession, custody, or control of such funds.

4. **Deposits in Escrow**.

(a)    Seller's escrow agent, _____ (**"Escrowee"**) shall hold the Deposit in escrow in a segregated bank account at _____, address: _____, until Closing or sooner termination of this Contract and shall pay over or apply the Deposit in accordance with the terms of this paragraph. Escrowee shall hold the Deposit in a non-interest bearing account for the benefit of the parties. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Deposit shall be paid by Escrowee to Seller. If for any reason Closing does not occur the Escrowee shall hold the Deposit pending (i) Notice to the Escrowee from both Parties jointly instructing the Escrowee on disbursement of the Deposit, or any portion thereof; or (ii) an order from the Bankruptcy Court instructing the Escrowee on how it is to remit such Deposit. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)    The Parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c)    Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d)    Escrowee acknowledges receipt of the Deposit and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Contract.

5. **Acceptable Funds**. All money payable under this Contract, unless otherwise specified, shall be paid by:

(a)    Cash;

(b)    Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller,

or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser; and

(c)    As otherwise agreed to in writing by Seller or Seller's attorney.

6.    **Checks**.

(a)    Purchaser hereby unconditionally guarantees the payment of all checks delivered by or for the account of Purchaser in payment of the Purchase Price, apportionments or otherwise, whether such checks are issued by Purchaser, the lending institution issuing the mortgage, lender's attorneys (from special, trust, mortgage, escrow or other accounts) or any other source.  Purchaser waives presentment, protest, notice of protest and any other notice to which the Purchaser may be entitled.  This guaranty shall include of all Seller's collection expenses, including reasonable attorney's fees, and shall survive termination of the Contract and delivery of the deed.

(b)    If a check delivered by or for the account of Purchaser in payment of the Purchase Price is dishonored for any reason by the bank upon which it is drawn, other than for bank error, then Seller, in addition to any other rights or remedies Seller may have, may, at Seller's sole option, terminate the Contract, and thereupon Seller shall be relieved of all obligations under the Contract, including but not limited to liability for all brokerage commissions, for which Purchaser shall indemnify and defend Seller.

7.    **Bankruptcy Sale**.    Sellers are debtors in bankruptcy and, as such, this transactions contemplated herein are subject to and governed by the terms of the United States Bankruptcy Code and the orders entered by the United States Bankruptcy Court for the Eastern District of New York (the "***Bankruptcy Court***") in the jointly administered bankruptcy cases styled as styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (collectively and individually, the "***Bankruptcy Case***"). As part of this process, the Sellers received Bankruptcy Court approval to sell the Properties (as the same may be amended from time to time, the "***Sale and Bid Procedures Order***"); *provided that*, if a party-in-interest objects to proposed sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed sale of the Properties, the Sellers' ability to consummate such proposed sale is contingent upon the Sellers receiving an order from the Bankruptcy Court, after the Sale Confirmation Hearing, approving such Private Sale (each, a "***Sale Confirmation Order***"). Notwithstanding such contingency on the part of the Sellers, this Contract and the Purchaser's obligations hereunder shall remain irrevocable.

8.    **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to:

(a)    Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the Property or their use;

(b)    Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)    Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)    Real estate taxes that are a lien, but are not yet due and payable;

(e)    Covenants, restrictions, reservations and easements of record and utility easements whether or not of record, if any;

(f)    Possible projections and encroachments of retaining walls, hedges, walls, fences, garages, sheds, patios, decks, steps, landings, stoops, cornices, coping and trim, driveways, ramps, walkways, cellar doors, chutes, plantings, sprinkler systems and pumps, or similar structures and installations (all of the foregoing individually and

collectively referred to as "*minor encroachments*") and variations among record lines, the tax map and minor encroachments;

        (g)   State of facts shown on survey dated _____ by _____ and any additional facts a personal inspection or such survey brought down to date would show;

        (h)   [to be added: exceptions listed in Seller's title insurance policy and easements, etc. from deed to Seller].

      9.   **Governmental Violations and Orders**. Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters; *provided, however,* that notwithstanding the foregoing or anything else to the contrary herein, Seller shall not be required to remove any violations or notices of violations affecting the Property.

      10.   **Seller's Representations**.

      (a)   Seller represents and warrants to Purchaser that:

        (i)   The Premises abut or have a right of access to a public road;

        (ii)   Subject to entry of any necessary Sale Confirmation Order, (A) Seller shall have the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract; (B) Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Contract or the consummation of the transactions contemplated hereby; (C) the execution and delivery of this Contract and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller.  This Contract constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to (a) entry of the orders of the Bankruptcy Court authorizing the transaction contemplated herein, and (b) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

        (iii)   Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code (**"IRC"**) Section 1445, as amended, and the regulations promulgated thereunder (collectively **"FIRPTA"**);

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except (i) Aberdeen Enterprises, Inc. and (ii) Brickchurch Enterprises, Inc., respectively.

(b) Seller covenants and warrants that all of the representations and warranties set forth in this Contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

(d) Neither the execution, delivery and performance of this Contract, nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration (other than approval by the Bankruptcy Court) under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Seller.

11. **Condition of Property**.

(a) Purchaser and its authorized representatives shall have the right, one (1) time prior to Closing and upon reasonable notice (by telephone or otherwise) to Seller, to perform a final walk-through of the Property before Closing; *provided that*, for the avoidance of doubt, the Purchaser shall not have the right to terminate this Contract on the basis of the condition of the Property and any material change in the condition of the Property, beyond ordinary wear and tear, shall give rise only to an obligation on the part of the Seller to either (i) repair such damage so as to put the Property back into the condition that such Property was in at the time of the submission of this Contract; or (ii) provide Purchaser with reasonable compensation with respect such damage. To the extent that there is a dispute regarding the condition of the Property and the Seller's obligations under this Section 11(a), such dispute shall not be a basis for the Parties not Closing and the Parties shall complete the Closing of the transaction contemplated hereby subject to a holdback from the distribution of the Net Sale Proceeds to the Seller at Closing in an amount sufficient to permit the Seller to comply with its obligations under this Section 11(a) (each, a "*Holdback*") with the Parties' respective rights to such Holdback to be subsequently determined pursuant to either (i) express written agreement between the Parties; or (ii) a final order issued by the Bankruptcy Court.

(b) Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other Property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this Contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or

oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other Property included in the sale, given or made by Seller, its representatives, or any broker.

(c)    Purchaser is purchasing the Property in its "AS IS" condition on the date hereof, with all faults.  Between the date hereof and Closing, the Property will be subject to use, wear and tear, loss of trees, erosion and other deterioration, for which the Purchaser shall have no claim against Seller or any rights by reason thereof.  Purchaser represents and warrants to Seller that Purchaser has made full examination and investigation of the Property and related information before entering into this Contract, and that in entering into this Contract, Purchaser has not been induced by, and has not relied upon, any representations, covenants, warranties or statements, whether oral or written or expressed or implied, made by Seller (except as otherwise specifically set forth herein) or by any real estate broker or any other person representing or purporting to represent Seller, concerning the Property, its state of title, condition or state of repair, income, rents, expenses, operations, environmental condition, the presence or absence of any materials, including but not limited to formaldehyde insulation or hazardous building materials, radon, asbestos, insecticides or pesticides of any kind and/or nature, hazardous waste (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Premises) wetlands (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Property) or any other substance or material, paint containing lead or any other additives, the condition of any fuel oil or gasoline storage tanks which may now or heretofore have been located at the Premises, or the impact thereon if located on adjacent properties, infestation of any insects or pests, description of the Property, including the size, area or dimensions of the lot, its value, the cost of operating or maintaining the Property, the physical condition of the Property, the operation or use to which the Property may be applied, development rights, landmark or historic designation, subdivision, school district or the zoning thereof, soil bearing capacity, elevations, insurability, access to public roads, the character, quality, legal use, availability of water, electric, sewer, telephone or public utilities of any kind, the subsurface conditions of the Premises, the suitability of the soil or subsurface conditions for any use to which the Purchaser may wish to utilize the subject Premises, availability of tax benefits, abatements or exemptions or any other matter or thing affecting or relating to the Property.  Purchaser shall have no claim against Seller for Seller's failure to make any representations, covenants, warranties or statements covering the foregoing.  Seller shall pay all post-petition utility and other service charges accrued for the period from and after the bankruptcy petition date through the date of Closing, to the extent billed therefor; in the normal course.

(d)    Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property.  Purchaser also hereby waives, releases, and discharges all rights, claims,

and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

      12.   **Insurable Title**.

      (a)   Seller shall give and Purchaser shall accept such title as _____ shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this Contract.

      (b) At Sellers' option, if Purchaser's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Seller, the Seller may arrange for the issuance of a title insurance policy by a reputable title company, if Purchaser is unable to do so, at the sole cost and expense of Purchaser, at no additional premium. Seller shall provide all documents reasonably required by the such title company for them to "omit" any standard exceptions from Purchaser's title policy, or any exceptions otherwise required to be removed in accordance with the terms herein.

      13.   **Closing, Deed and Title**.

      (a)   **"Closing"** means the settlement of the obligations of Seller and Purchaser to each other under this Contract, including the payment of the Purchase Price to Seller, and the delivery to Purchaser of a general warranty deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Property, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

      (b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

      14.   **Closing Date and Place**. Closing shall take place at the office of _____ at _____ (prevailing Eastern time), on or before February 20, 2024 or such later date as shall be ordered by the Bankruptcy Court. The date for Closing set forth in this Section 14 is herein referred to as the "<u>Closing Date</u>". **"Time shall be of the essence"** as to Purchaser's performance on the Closing Date.

15.  **Conditions to Closing**. This Contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)  The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this Contract;

(b)  The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the Property authorizing their use as a single family dwelling at the date of Closing;

(c)  The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from the Internal Revenue Service. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the Purchase Price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service;

(d)  The delivery of the Property, including all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises;

(e)  All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the Property and all appliances which are included in this sale being in working order as of the date of Closing;

(f)  If the Premises are a one or two family house, delivery by the Parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Property a smoke detecting alarm device or devices;

(g)  The delivery by the Parties of any other affidavits required as a condition of recording the deed;

(h)  Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law; and

(i)  The Bankruptcy Court shall have entered a Sale Confirmation Order with respect to the transaction(s) contemplated herein, if the same has been requested or is otherwise required under the terms of the Sale and Bid Procedures Order, and no court

of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Contract.

16. **Deed Transfer and Recording Taxes**.

(a)    Purchaser shall execute, acknowledge where appropriate, and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the New York State Department of Taxation and Finance (or, to the order of Buyer's title insurance company) for the amount of any Real Estate Transfer Tax imposed by Article 31 of the Tax Law of the State of New York, together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller (each, a "***Real Estate Transfer Tax***"); *provided, however,* that nothing contained herein shall create any liability for any Real Estate Transfer Tax and shall not require Seller to pay any Real Estate Transfer Tax that it is not required to pay pursuant to any applicable provision of the Bankruptcy Code or otherwise. Purchaser shall duly execute and swear to said return and at the Closing shall cause the check and such documents to be delivered to Buyer's title insurance company for delivery to the Suffolk County Clerk promptly after the Closing.

(b)    To the extent not excused by applicable law, including application of the Bankruptcy Code, Purchaser shall execute, acknowledge where appropriate and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the Suffolk County Clerk (or, to the order of Buyer's title insurance company) for the amount of the Peconic Bay Region Community Preservation Fund imposed by Article 31-D of the Tax Law of the State of New York (the "***Peconic Tax***"), together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller.

(c)    The obligations under this paragraph 16 shall survive the termination of this Contract.

17. **Cost Allocation, Apportionments, and Other Adjustments; Water Meter and Installment Assessments**.

(a)    To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:  (i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; and (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) At Closing, all Diligence costs shall be allocated as Purchaser Closing costs and paid by Purchaser in accordance with Section 21(a).

(f) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

(g) For the purpose of making the apportionments required herein, such apportionments shall be made on the basis of a 365-day year for the actual number of days elapsed and calculated as of midnight of the day preceding the Closing. Any assessment installment due subsequent to the Closing Date shall be assumed by Purchaser.  Charges for any transferable service contracts that Purchaser has agreed to accept shall be apportioned as of the Closing.

18. **Allowance for Unpaid Taxes, etc**. Seller has the option to credit Purchaser as an adjustment to the Purchase Price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

19. **Use of Purchase Price to Remove Encumbrances**. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the Cash balance of the Purchase Price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments.

20. **Professional Fees**.  Seller shall be responsible for the payment of the following costs and fees related to the transaction(s) described herein:

(a)    Seller shall be solely responsible for remitting payment to Seller's listing brokers in such amount as required pursuant Seller's agreement with such listing brokers, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's broker's fees.

(b) Seller shall remit payment to Seller's auctioneer in such amount (if any) as may be required pursuant to Seller's agreement with such auctioneer, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's auctioneer fees.

(c) Seller shall remit payment to Purchaser's broker (if any) in the amount of one percent (1.00%) of the Purchase Price, subject to approval by the Bankruptcy Court. Nothing provided for herein shall prevent Purchaser from compensating its broker above and beyond the amount paid by the Seller hereunder.

(d) Seller shall remit payment to the Escrowee for the Escrowee's services, subject to approval of the Bankruptcy Court. Purchaser shall not be liable for the payment of the Escrowee's fees.

21.    **Due Diligence; Seller's Inability to Convey; Limitations of Liability; No Conditions or Contingencies**.

(a)    As of the date hereof, (i) all Premises diligence items (collectively, the "***Diligence***"), which may include but not be limited to (1) an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company, (2) a Premises survey, and/or (3) a property inspection report covering the Premises have been ordered and, if available, provided to Purchaser and Purchaser hereby acknowledges its receipt and review of the same; or (ii) to the extent any Diligence items have not been provided to Purchaser, Purchaser hereby waives receipt and review of the same. Costs for all Diligence items provided to Purchaser shall be allocated as Purchaser costs and paid by Purchaser at Closing.

(b) (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this Contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "***Defects***"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the Purchase Price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this Contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. For the avoidance of doubt, this paragraph shall not provide Purchaser with a right to extend the Closing as a result of any financing conditions and,

as further provided in <u>Section 21(e)</u> hereunder, there shall be no financing contingency available to Purchaser.  If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser still be unwilling to waive the same and to close title without abatement of the Purchase Price, then either party may apply to the Bankruptcy Court for an order authorizing the termination of this Contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, prior to Closing the Seller shall take such actions necessary to obtain and effectuate a release and/or discharge of the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof; *provided that* nothing contained herein shall permit the Seller to encumber the Property or otherwise take any action that would reasonably be believed to cause a Defect. Any action taken by Seller to remove any such defect or encumbrance shall not be deemed an admission on Seller's part that Seller is obligated to remove same or that such defect or encumbrance is one which would give Purchaser the right to cancel the Contract. Seller shall not be required to take or bring any action or proceeding or any other steps to remove any Defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Contract or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

(c) The Bankruptcy Court has entered the Sale and Bid Procedures Order providing that the Property is being sold to Purchaser free and clear of liens, claims and encumbrances. To the extent that the Purchaser or its title insurer desires a further order of the Bankruptcy Court supplementing the Sale and Bid Procedures Order ,the Seller shall request that the Bankruptcy Court enter a Sale Confirmation Order with such additional provisions as the Purchaser shall reasonably request.

(d) Anything herein to the contrary notwithstanding, any judgments, mortgage liens, other encumbrances, encroachments or any other Defects may be, and shall be deemed satisfied upon Seller depositing with the title company funds sufficient to satisfy same in full, together with the cost of recording the satisfaction instrument(s) and/or causing a title company to affirmatively insure title to the Premises that are the subject of this Contract.

(e) Purchaser acknowledges that there are no conditions or contingencies to the Closing (including but not limited to financial, due diligence, feasibility and inspection contingencies) other than as explicitly specified in this Contract.

22. **Venue, Jurisdiction, Prevailing Party**.  Any legal action or proceeding with respect to this Contract shall be brought in the Bankruptcy Court and by execution and delivery of this Contract, each Party to this Contract hereby accepts, generally and unconditionally, the jurisdiction of the. Bankruptcy Court.  Each Party to this Contract hereby expressly and irrevocably submits the person of such party to this Contract to the in personal jurisdiction of

the Bankruptcy Court in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Contract. To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Contract or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Contract in the Bankruptcy Court. To the fullest extent permitted under applicable law, each Party to this Contract irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court or that this Contract or the subject matter hereof may not be enforced in or by the Bankruptcy Court. In the event of any such legal action, the prevailing Party shall be entitled to reimbursement from the non-prevailing Party of all reasonable attorney's fees and costs/expenses of the prevailing Party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party. The obligations under this paragraph 22 shall survive the termination of this Contract.

23. **Termination**.

(a)    This Contract may be terminated at any time prior to Closing, as follows:

(i)    Bankruptcy Court refuses to enter a Sale Confirmation Order if the same is required pursuant to the terms of the Sale and Bid Procedures Order; or

(ii)    the Bankruptcy Court enters an order terminating the Contract.

(b)    If this Contract is terminated pursuant to its terms, other than as a result of Purchaser's default, this Contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Deposit to Purchaser; *provided that* nothing contained herein shall prevent the Parties from agreeing to other terms governing the effect of termination, subject to any necessary approval of the Bankruptcy Court.

(c)    The obligations under this paragraph 23 shall survive the termination of this Contract

24. **Defaults and Remedies**.

(a)    If Purchaser defaults hereunder, Seller's shall be entitled to receive and retain the Deposit as liquidated damages, it being agreed that Seller's damages in

case of Purchaser's default might be impossible to ascertain and that the Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty; *provided, however,* that nothing contained herein shall prevent Seller from seeking damages in excess of those provided for in this Section 24(a) if it is so able to establish the same.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

25.    **Purchaser's Lien**. All money paid on account of this Contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this Contract.

26.    **Notices**. Any notice or other communication (**"Notice"**) Any notice under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered to each of the following:

If to Purchaser:    _____

_____

_____

_____

Email: _____

*-with copy to-*

_____

_____

_____

_____

Email: _____

If to Seller:    Mathew Kabatoff
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
mkabatoff@lbtholding.com

*-and-*

Bay Point Capital Partners II, LP
c/o Charles Andros

Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
CharlesAndros@BayPointAdvisors.com

*-with copy to-*
Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

*-and-*

John F. Isbell, Esq.
The Law Offices of John F. Isbell LLC
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
John@jfi-law.com

*-and-*

John C. Allerding, Esq.
Thompson Hine LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to Escrowee:    _____
                   _____
                   _____
                   _____
                   Email: _____

     To the extent that a physical address and an email address are provided above, delivery shall be by both (a) overnight delivery, with confirmation of delivery, by United States mail or any nationally recognized commercial carrier; and (b) email. Any notice hereunder shall be deemed to have been given upon the earlier of (i) dispatch of the electronic mail; and (ii) delivery of the physical mail.

     27.  **No Assignment**. This Contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

28.   **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than The Corcoran Group, Sotheby's International Realty, and Bespoke Real Estate (collectively, **"Broker"**) and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this Contract.

29.   **Waiver of Trial by Jury**.  SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS CONTRACT

30.   **Lead Warning Statement and Lead Based Paint Provision**.  Purchaser acknowledges receipt of an Environmental Protection Agency approved lead hazard information pamphlet. Purchaser further acknowledges that it is aware that any residential dwelling that was built prior to 1978 may present exposure to lead from lead-based paint. Purchaser acknowledges that it is aware that the Premises were or might have been built prior to 1978 and is waiving the opportunity to conduct a risk assessment or inspection

31.   **Truth In Heating Law**.  Under New York Energy Law Section 17-103, commonly known as "Truth in Heating Law", Purchaser has the right to a summary of the heating and/or cooling bills or a complete set of said bills relating to the Property and information concerning the insulation in the Property.  Purchaser expressly waives the right to insulation, heating and cooling information and copies or a summary of any of said bills as to which Purchaser may be entitled and does not request them in connection with this transaction

32.   **Certificate of Occupancy**.  Nothing contained in this Contract shall be construed to require Seller to seek or obtain a variance or zoning change or, to make any alteration or modification to the Property or spend any sum in order to obtain such Certificate of Occupancy or other certificate. If any variance or zoning change or any modification or alteration to the Property is required by the municipality as a condition precedent to the issuance of said Certificate of Occupancy or other certificate, Seller shall have the option of terminating the Contract and returning the Deposit hereunder.

33.   **Repairs/Alterations**.  Notwithstanding anything to the contrary contained in this Contract, Seller shall not be obligated to make any repairs or alterations to the Property

34.   **Smoke Detector and Carbon Monoxide Affidavit**.   Supplementing Paragraph 16 of the Contract, Seller shall provide at Closing an affidavit stating that at

the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law.

35.    **Property Condition Disclosure Act**.  Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property.  Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

36.    **Miscellaneous**.

(a)    <u>Complete Agreement</u>.    All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this Contract; it completely expresses their full agreement and has been entered into after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Contract.

(b)    <u>No Waiver; Binding on Heirs</u>;  Neither this Contract nor any provision thereof may be waived, changed or cancelled except in writing. Subject to Section 27 of this Contract and without altering or amending the provisions thereof, this Contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this Contract.

(c)    <u>Interpretation</u>.  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this Contract may require it. The captions in this Contract are for convenience of reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

(d)    <u>Effectiveness</u>.  Submission by the Seller of this Contract for execution by the Purchaser shall confer no rights, nor impose any obligations on Seller. This Contract shall not be binding or effective until (i) duly executed and delivered by Seller and Purchaser; and (ii) the Bankruptcy Court has entered any requisite Sale Confirmation Order; *provided that*, notwithstanding the foregoing, the Purchaser's execution of this Contract shall make such Contract irrevocable unless (1) such revocation is expressly consented to by the Seller in writing; or (2) the Seller is unable to obtain a Sale Confirmation Order with respect to the transaction contemplated herein.

(e) <u>IRS Reporting Requirements</u>.  Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(f) <u>Further Actions</u>.  Each Party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this Contract. This subparagraph shall survive Closing.

(g) <u>No Third Party Beneficiaries</u>.  This Contract is intended for the exclusive benefit of the Parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(h) This Contract may be amended or modified only in writing signed by both Parties and approved by the Bankruptcy Court, if necessary.

(i)  Whenever possible, each provision of this Contract shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Contract is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Contract.

(j)  This Contract has been entered into and shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles.

(k)  This Contract, including any riders, amendments, and/or additions, may be executed by electronic, facsimile, or PDF signature and/or in any number of counterparts and each of such electronic, facsimile, or PDF signature and/or counterpart shall for all purposes be deemed to be an original; and all such electronic, facsimile, or PDF signatures and/or counterparts shall together constitute but one and the same Contract.

(l)  The Parties have been given the opportunity to seek legal advice and to have this Contract reviewed by an independent attorney prior to signing it. This Contract shall be construed as if it has been jointly drafted by both Parties. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in interpreting this Contract.

(m) No delay or omission to exercise any right, power, or remedy accruing to a Party under this Contract shall impair any right, power, or remedy of such Party, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Contract (i) shall be effective unless it is in writing and signed by the Party against whom such waiver or

consent is sought to be enforced; (ii) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (iii) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

(n) Each of the Parties shall take such other actions and execute such documents consistent with this Contract as may be reasonably requested by any other Party in furtherance of consummating the transaction(s) contemplated hereby.

(o) This Contract is an important legal document. Each Party acknowledges that it has been advised to consult legal counsel before signing this Contract and has signed this Contract after having the opportunity to consult with legal counsel of its choosing. No Party has provided legal advice (including but not limited to tax advice) to another Party or acted as legal counsel to another Party. Each Party hereby confirms that it has carefully read this Contract in its entirety and that it understands all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Contract has been duly executed by the parties hereto as of the date set forth above.

**SELLER:**

ABERDEEN ENTERPRISES, INC.

By: _____

Printed Name: _____

Title: _____

**BUYER:**

_____

By: _____

Printed Name: _____

Title: _____

**SELLER:**

BRICKCHURCH ENTERPRISES, INC.

By: _____

Printed Name: _____

Title: _____

**BUYER:**

_____

By: _____

Printed Name: _____

Title: _____

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

Receipt of the Initial Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

_____
Escrowee

Receipt of the Secondary Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

_____
Escrowee

*Residential Contract of Sale Escrowee Acknowledgment*

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

**PREMISES:**

| | |
|---|---|
| Section: | 029.00 |
| Block: | 01.00 |
| Lots: | 017.013 and 017.014 |
| County or Town: | Southampton |
| Street No. Address: | 366 and 376 Gin Lane |

## Exhibit B

## AUCTION PROCEDURES

1.  **Details and Overview of the Auction Process**

    (a)  <u>The Properties</u>.  The Sellers are the owners, respectively, of the following iconic Southampton Properties:

        (i)  366 Gin Lane, Southampton, New York 11968, which is owned by Brickchurch; and

        (ii)  376 Gin Lane, Southampton, New York 11968, which is owned by Aberdeen.

    (b)  <u>Auction Format</u>.  The Sellers will offer the Properties for Sale, collectively and individually, via a no reserve auction pursuant to the terms set forth in the Concierge Bidder Terms and Conditions, as the same have been amended and modified by the Approved Bid Procedures (the "***Auction***"). The Auction will be conducted via digital bidding through Concierge's Digital Bidding Platform and will conclude at a live auction at the Sotheby's Auction House on **January 24, 2024** (the "***Live Auction***").

    (c)  <u>Defined Terms</u>.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the General Definitions affixed hereto as <u>Appendix A</u>.

2.  **No Representations or Warranties.**  Each Property shall be sold "AS IS", "WHERE IS", "WITH ALL FAULTS", without representations, warranties, covenants or guarantees of any kind, nature, or description whatsoever; *provided that* nothing contained herein shall limit the relief that may be granted by the Bankruptcy Court pursuant to 11 U.S.C. § 363. Each Property shall be conveyed to the High Bidder free and clear of all liens, claims, and encumbrances of any kind or nature thereon (collectively, the "***Transferred Encumbrances***"), with such Transferred Encumbrances to attach to the Net Sale Proceeds generated by such Property in the same order of priority as such Transferred Encumbrances encumbered such Property prior to such Sale. Each High Bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and information in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Properties, or the completeness of any information provided in connection with the Properties and/or the Sale Process (including each and every aspect thereof). Without limiting the "AS IS, WHERE IS" nature of the Sale(s), the Sale(s) shall be subject to, among other things, (a) any state of facts that an accurate survey may show, (b) any covenants, restrictions and easements of record, (c) any state of facts a physical inspection may show, (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof, and (e) environmental conditions, including without limitation, the Properties' compliance or lack of compliance with environmental laws, and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the subject Property.

3.    **Registered Bidders.**  Only a Registered Bidder may bid on one or more of the Properties through the Auction. To become a Registered Bidder, a bidder must (a) register with Concierge; (b) agree to be bound by the terms of the Approved Bid Procedures; (c) agree to be bound by Concierge's Bidder Terms and Conditions; (c) submit an Initial Deposit (as that term is defined herein); and (d) provide Sellers and/or Concierge with information that either may reasonably request to confirm each such bidder's financial wherewithal to consummate the proposed Sale.

4.    **Submission of Bids.**  Each bid submitted by a Registered Bidder shall be an unqualified, irrevocable offer to purchase one or both of the Properties in an amount of Cash (the "***Purchase Price***"), without any contingencies or conditions other than as expressly permitted hereby, subject only to being deemed the highest and best bid by the Sellers and the entry of any requisite Sale Confirmation Order by the Bankruptcy Court; *provided* that, to the extent that any part of such is being financed by a person other than the Qualified Bidder, such financing must be committed financing from a financially sound financier and shall not be subject to any contingencies. Prior to the Live Auction, bids must be submitted to Concierge via Concierge's Digital Bidding Platform, which is at available at www.conciergeauctions.com. At the Live Auction, Registered Bidders' bids may be via live bid, telephonic proxy bid, and the Digital Bidding Platform; *provided that* Concierge reserves the right to limit or expand the method by which bids may be submitted, whether at or before the Live Auction.

5.    **Purchase and Sale Agreement.**  The submission of a bid shall be deemed an offer by the Registered Bidder to execute the Purchase and Sale Contract which is attached hereto as Appendix B for the purchase of the Property (or Properties) (each, a "***Purchase and Sale Contract***"), subject only to such bid immediately upon being deemed the highest and best bidder at the conclusion of the Auction and the entry of any necessary Sale Confirmation Order, and shall be further agreement that the failure of the Registered Bidder to immediately execute such Purchase and Sale Contract shall result in the immediate and permanent forfeiture of all Deposits to the Sellers (or the respective Seller owning the Property that is the subject of such bid); *provided that,* notwithstanding the foregoing, the Sellers and the Registered Bidder shall be permitted to jointly make modifications to the Purchase and Sale Contract as each may expressly agree to in writing; *but further provided that* any modifications to the Purchase and Sale Contract must comply and be consistent with the Approved Bid Procedures.

6.    **Buyer's Premium.**

(a)    Buyer's Premium. Each High Bid shall be subject to a buyer's premium in an amount of twelve percent (12.00%) of the High Bid (the "***Buyer's Premium***"). For the avoidance of doubt, the Buyer's Premium shall be an amount paid by the High Bidder on top of the Purchase Price. The Buyer's Premium shall be paid by the High Bidder at Closing to the Escrow Agent. No Registered Bidder other than the High Bidder shall be required to pay a Buyer's Premium.

(b)    Starting Bid Incentive. A High Bidder that submits an initial bid by **January 10, 2024** (each, a "***Qualifying Starting Bid***") shall be entitled to a credit (the "***Starting Bid***

*Incentive*" against any Buyer's Premium owed by such High Bidder in the amount of six percent (6.00%) of the Qualifying Starting Bid. For the avoidance of doubt, the Starting Bid Incentive shall be calculated only on the Qualifying Starting Bid (i.e., the amount of the High Bidder's bid as of January 10, 2024) and shall not include any overbids or other increases to such bid after such date. Subject to the terms of this Section 6(b), the Starting Bid Incentive shall be available to any High Bidder, including a Backup Bidder that is named the High Bidder after a breach or default of the prior High Bidder, that is prepared to close the Sale on or before February 20, 2024 or such later date as shall be ordered by the Bankruptcy Court.

7. <u>**Deposits.**</u>

(a)  <u>Initial Deposit</u>.  Each bidder that desires to become a Registered Bidder must remit a good faith deposit in the amount of five hundred thousand dollars ($500,000.00) (each, an "***Initial Deposit***") to Novare National Settlement Service, LLC and/or Ultra Escrow. Within two (2) business days following the determination of the winning bidder at Auction, such winning bidder's Initial Deposit will be transferred to the Escrow Agent pending the Closing of a Sale(s) of the Properties. At Closing, the Initial Deposit submitted by the High Bidder will be applied to the amount due from the High Bidder to consummate the Sale. Each Initial Deposit submitted by a Registered Bidder that is not the High Bidder or a Backup Bidder will be returned to such Registered Bidder on or before the third (3rd) business day following the conclusion of the Live Auction; *provided that*, notwithstanding the foregoing, no breaching or defaulting High Bidder, which shall include breaching or defaulting High Bidder that was previously a Backup Bidder, shall be entitled to a return of their Initial Deposit, such breaching or defaulting High Bidder having completely and permanently relinquished, released, and waived any right to its Initial Deposit pursuant to Section 7(c) hereof.

(b)  <u>Secondary Deposit</u>.  A Registered Bidder that is named the High Bidder shall remit to the Escrow Agent, within two (2) business days of being notified that such Registered Bidder has been named the High Bidder, a good faith deposit in the amount equal to twelve percent (12.00%) of its High Bid, less the Initial Deposit (each "***Secondary Deposit***" and, together with the Initial Deposit, the "***Deposit***"). At Closing, the Secondary Deposit submitted by the High Bidder will be applied to the amount due from the High Bidder to consummate the Sale. In the situation where the Bankruptcy Court conducts a Sale Confirmation Hearing and a Sale Confirmation Order is not subsequently entered, the Deposit will be returned to the High Bidder within three (3) business days of the scheduled Closing of the Sale(s) of the Properties in accordance with the terms of the Purchase and Sale Contract.

(c)  <u>Forfeiture of Deposits</u>.  Notwithstanding anything to the contrary herein, including the naming of a Backup Bidder as the High Bidder after a breach by the prior High Bidder, any Registered Bidder, including any High Bidder(s) and Backup Bidder(s), that (i) breaches its obligations under a Purchase and Sale Contract duly executed by one or both of the Sellers; or (ii) attempts to revoke its bid (including any High Bid and/or Backup Bid) after or prior to the execution of a Purchase and Sale Agreement; or (iii) refuses to execute a Purchase and Sale Contract, and/or any other agreement reasonably required

to consummate the Sale, shall completely and permanently relinquish, release, and waive any right that such Registered Bidder had with respect to any Deposit(s) remitted in connection with the Auction.

8. **Due Diligence.** To the extent not posted to the Property page of Concierge's Digital Bidding Platform, potential bidders desiring additional due diligence with respect to the Properties, including, but not limited to onsite inspections, surveys, title reports, and professional property inspections, should reach out to the Listing Brokers for the Property. Notwithstanding the foregoing as of the commencement of the Auction (i) all Property due diligence shall be deemed completed by all potential bidders and (ii) all Registered Bidders are deemed to have accepted each Property in the condition set forth in Section 2 as of the conclusion of the Auction.

9. **Selection of High Bid and Backup Bids.**

   (a) <u>High Bid(s)</u>.  The bid that will result in the highest net Sale proceeds being remitted to a Seller for a respective Property, or a bid that results in the highest net Sale proceeds for the combined Properties that is higher than any other combination of bids for each individual Property, shall be selected and announced at the conclusion of the Live Auction as the highest and best bid (the "***High Bid***"). The bidder submitting the High Bid shall become the "***High Bidder***."

   (b) <u>Backup Bids</u>.  The bids that are not selected as the High Bid shall be ranked according to the net Sale proceeds expected to be remitted to the Seller from such bid or the combination of such bid with other bids. The two (2) highest ranked bids or combinations of bids, other than the High Bid, shall remain open, valid, and irrevocable until the Closing of the Sale of each of the Properties (each being a "***Backup Bid***").

   (c) <u>Rejection of Bids</u>.  Prior to the announcement of a High Bid, Concierge, with the consent of the Sellers, may reject any bid for any reason; *provided that* neither Concierge nor the Sellers shall be permitted to reject a Credit Bid submitted by a Secured Creditor.

   (d) <u>No Reserve Auction</u>.  The Auction shall be conducted as a no reserve auction. A Seller shall not be permitted to counter or reject a High Bid announced by Concierge in accordance with the terms of the Approved Bid Procedures. Upon the announcement of the High Bid, the Seller(s) shall be required to work in good faith to consummate the proposed Sale in accordance with the terms of the Approved Bid Procedures.

10. **Submission to Jurisdiction of the Bankruptcy Court.**  The Bankruptcy Court shall have exclusive jurisdiction over all matters related to the Auction, the bids, the Sale, and the Sellers, and all matters arising prior to the Closing of the Sale related to the Properties, and the submission of a bid shall be deemed an agreement by the Registered Bidder to submit itself to such exclusive jurisdiction of the Bankruptcy Court for all such matters. For the avoidance of doubt, this provision shall expressly modify and supersede any arbitration requirement and/or rights in the Bidder Terms and Conditions with respect to the above-mentioned matters.

11. **Credit Bidding.** As more fully set forth in the Approved Bid Procedures, a Secured Creditor may submit a Credit Bid in any amount up to the full amount of its Secured Claim as a bid, part of a bid, or series of bids for one or both of the Properties.

12. **Stalking Horse Bids.** As more fully set forth in the Approved Bid Procedures, (a) the Sellers may select one bid with respect to each Property (or one combined bid for both Properties) to serve as the Stalking Horse Bid; and (b) the Stalking Horse Bidder may be entitled to certain expense reimbursement and a breakup fee. Any Registered Bidder that wishes to obtain more information regarding becoming a Stalking Hose Bidder, or that wishes to submit a Stalking Horse Bid, should review the Approved Bid Procedures.

13. **No Acceptance of Tardy Bids.** Absent irregularities in the conduct of the Auction, Concierge will not consider bids made after the announcement of the High Bid.

14. **Closing of the Sale(s).**

   (a) <u>Time is of the Essence. Time is of the essence with respect to all of the actions and deadlines set forth herein, including, without limitation, those actions and deadlines relating to the closing of the Sale(s).</u>

   (b) <u>Sale Confirmation Order</u>. Sellers are debtors in bankruptcy and, as such, this Auction is being conducted pursuant to the terms of the United States Bankruptcy Code. As part of this process, the Sellers received Bankruptcy Court approval to conduct the Auction pursuant to the terms set forth in the Sale and Bid Procedures Order, a copy of which has been made available on the Digital Bidding Platform. As set forth in the Sale and Bid Procedures Order, if a party-in-interest objects to a proposed sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the Sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed Sale, the Sellers' ability to consummate such proposed Sale will be contingent upon the Sellers receiving a Sale Confirmation Order from the Bankruptcy Court after the Sale Confirmation Hearing. Notwithstanding such contingency on the part of the Sellers, each High Bid and each Backup Bid shall remain irrevocable. In addition to the foregoing, the Sellers and/or the High Bidder may request that the Bankruptcy Court hold a Sale Confirmation Hearing or enter a Sale Confirmation Order without objecting to the proposed sale. Unless the Bankruptcy Court holds a Sale Confirmation Hearing or the Sellers and/or High Bidder requests entry of a Sale Confirmation Order, no further order of the Bankruptcy Court is necessary for the Sellers to consummate the Sale(s).

   (c) <u>Closing Date and Place</u>. Closing shall take place (i) at such location as may be mutually agreed upon by the Seller and High Bidder; and (ii) on or before February 20, 2024 or such later date as may be ordered by the Bankruptcy Court.

(d)   <u>Sale to Backup Bidder</u>.  In the event that the High Bidder breaches its obligations under these Auction Procedures and/or the Purchase and Sale Contract, or otherwise fails to consummate the proposed Sale, through no fault of the Sellers, the Sellers shall sell the Properties (or subject Property) to the Backup Bidder with the next highest and best bid, such Backup Bidder becoming the High Bidder and its bid becoming the High Bid, without further approval of the Bankruptcy Court. The Sellers may exercise their rights under this provision immediately upon a breach or default by the High Bidder or and at any time up until Closing of the Sale of the respective Property. Notwithstanding anything to the contrary herein, a bidder's breach of its obligations under the Purchase and Sale Contract duly executed by a Seller shall result in a complete forfeiture of all rights, claims, and interest in any Deposit submitted by such bidder and shall subject such bidder to such other damages, claims, defenses, and remedies as such Seller may have under the Purchase and Sale Contract and/or applicable law.

(e)   <u>Return of Backup Bidder Initial Deposits</u>.  Within three (3) business days of the Closing of the Sale(s), the Escrow Agent shall return the Initial Deposits submitted by the Backup Bidder(s); *provided that* any Backup Bidder that was subsequently named a High Bidder shall not be entitled to a return of their Initial Deposit.

(f)   <u>Title Insurance</u>.  Sellers shall convey the Properties by delivery of a general warranty deed or deeds. At Sellers' option, if a High Bidder's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Sellers, the Sellers may arrange for the issuance of a title insurance policy by a reputable title company, if such High Bidder is unable to do so, at the sole cost and expense of such High Bidder, at no additional premium. Sellers shall provide all documents reasonably required by the High Bidder's title company for them to "omit" any exceptions from the High Bidder's title policy.

(g)   <u>Transfer of Possession</u>.  The Sellers shall turnover possession of each Property at the Closing of the Sale with respect to the same to the respective Buyer or its designee, together with all files and records pertaining to such Property, including, but not limited to construction documents, building permits, violations, architectural plans, leases and repair invoices to the extent that any such documents exist within the possession, custody, or control of the Sellers at that time.

15.   **Modification of Auction Procedures.**  The Sellers shall have the sole right and authority to modify these Auction Procedures, including modifying the timeline and the deadlines with respect hereto; *provided that*, notwithstanding the foregoing, the Sellers shall not be permitted to modify the date of the Auction without approval of the Bankruptcy Court; and *further provided that* nothing contained herein shall prevent the Bankruptcy Court from entering an order modifying the Approved Bid Procedures, including these Auction Procedures.

16.   **Supplementation of the Auction Procedures.**  Concierge shall have the authority to supplement the terms of these Auction Procedures in any way consistent with the Approved Bid Procedures, including these Auction Procedures, if Concierge reasonably believes that

such supplementation is in the best interests of the Sellers and is likely to promote a robust Auction. Concierge may exercise its authority hereunder via the posting of notices or by oral announcements made before or during the Auction. Notwithstanding the foregoing, Concierge shall not have the authority to alter the Approved Bid Procedures or these Auction Procedures, including the timeline and deadlines set forth therein, and shall not make announcements or implement any processes inconsistent therewith. The Approved Bid Procedures, including these Auction Procedures, shall control over any oral announcement or written notice provided by Concierge.

17. **<u>Private Sale Option</u>.** The Properties will be offered for Private Sale until January 14, 2024, by which date, if a Purchase and Sale Contract applicable to one or both Properties has not been duly executed by a buyer and the applicable Seller in accordance with the Private Sale process, the Auction shall be the exclusive venue for any offer and acceptance with respect to the purchase and Sale of either Property. All offers for a Private Sale must be submitted to the Sellers by January 10, 2024. Persons interested in submitting an offer for a Private Sale should reach out to the Listing Brokers for additional information. The Listing Brokers can be contacted using the contact information included in the General Definitions.

# Appendix    A

## GENERAL DEFINITIONS

1.  "*Aberdeen*" shall mean Aberdeen Enterprises, Inc.

2.  "*Aberdeen Property*" shall mean that certain the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

3.  "*Approved Bid Procedures*" shall mean those bid procedures approved by the Bankruptcy Court pursuant to the Sale and Bid Procedures Order, as the same may be amended from time-to-time consistent with the terms thereof.

4.  "*Auction*" shall have the meaning ascribed to such term in Section 1(b) of the Auction Procedures.

5.  "*Auction Procedures*" shall mean the Auction Procedures to which these General Definitions have been affixed as Appendix A.

6.  "*Backup Bid*" shall have the meaning ascribed to such term in Section 9 of the Auction Procedures.

7.  "*Backup Bidder*" shall mean a Registered Bidder that is the holder of a Backup Bid.

8.  "*Bankruptcy Court*" shall mean the United States Bankruptcy Court for the Eastern District of New York.

9.  "*Bidder Terms and Conditions*" shall mean the Concierge Auctions, LLC Bidder Terms and Conditions as the same are available on the Digital Bidding Platform.

10. "*Brickchurch*" shall mean Brickchurch Enterprises, Inc.

11. "*Brickchurch Property*" shall mean that certain the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

12. "*Buyer*" shall have the meaning ascribed to such term in the Approved Bid Procedures.

13. "*Buyer's Premium*" shall have the meaning ascribed to such term in Section 5 of the Auction Procedures.

14. "*Cash*" means lawful currency of the United States of America.

15. "*Closing*" shall mean the action of consummating a Sale, including, without limitation, the final and unconditional transfer of the Purchase Price and the Buyer's Premium to the Escrow Agent by the Buyer and the final and unconditional transfer of the ownership of a Property (or both Properties) to the Buyer, and the full and authorized execution of any documents with respect thereto.

16. "*Concierge*" shall mean Concierge Auctions, LLC.

17.   "**Credit Bid**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

18.   "**Deposits**" shall mean, collectively, the Initial Deposit and the Secondary Deposits submitted by a Registered Bidder, each being a "**Deposit**."

19.   "**Digital Bidding Platform**" shall mean the digital bidding platform operated by Concierge and publicly available at www.conciergeauctions.com; *provided that* only Registered Bidders shall be permitted to submit bids for the Properties.

20.   "**Escrow Agent**" shall mean that certain escrow agent chosen by the Sellers to assist with the Closing and consummation of a Sale.

21.   "**General Definitions**" means this document and the general definitions set forth herein.

22.   "**High Bid**" shall have the meaning ascribed to such term in Section 9 of the Auction Procedures.

23.   "**High Bidder**" shall have the meaning ascribed to such term in Section 9 of the Auction Procedures.

24.   "**Initial Deposit**" shall have the meaning ascribed to such term in Section 6 of the Auction Procedures.

25.   "**Listing Brokers**" mean, collectively, each of the following:

> Tim Davis
> Ernest Cervi
> The Corcoran Group
> 24 Main Street
> Southampton, New York 11968
> Phone:   _____
> Email:   tgdavis@corcoran.com
>             ernest.cervi@corcoran.com
>
> Cody Vichinsky
> Joe De Sane
> Bespoke Real Estate
> 903 Montauk Highway
> Water Mill, New York 11976
> Phone:   631.500.9030
> Email:   cody@bespokerealestate.com
>             jd@bespokerealestate.com
>
> Nanette Hansen
> Harald Grant
> Sotheby's International Realty
> 50 Nugent Street

Southampton, New York 11968
Phone:  631.283.0600
Email:  nanette.hansen@sothebys.realty
          harald.grant@sothebys.realty

26.    "***Live Auction***" shall have the meaning ascribed to such term in Section 1(c) of the Auction Procedures.

27.    "***Private Sale***" shall mean a Sale of one or more of the Properties through the Private Sale Process.

28.    "***Private Sale Procedures***" mean those procedures governing the Private Sale Process.

29.    "***Properties***" shall mean the Aberdeen Property and the Brickchurch Property, collectively, each being a "**Property**."

30.    "***Purchase and Sale Contract***" shall have the meaning ascribed so such term in Section 4 of the Auction Procedures.

31.    "***Purchase Price***" shall have the meaning ascribed to such term in Section 3 of the Auction Procedures.

32.    "***Qualifying Starting Bid***" shall have the meaning ascribed to such term in Section 5 of the Auction Procedures.

33.    "***Sale***" shall mean a fully consummated sale of one or both of the Properties.

34.    "***Sale and Bid Procedures Order***" shall mean that certain *Order Approving Bid Procedures*, entered on November 27, 2023 by the Bankruptcy Court, in the jointly administered bankruptcy cases styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST).

35.    "***Sale Confirmation Hearing***" shall have the meaning ascribed to such term in Section 14 of the Auction Procedures.

36.    "***Sale Confirmation Order***" shall mean any post-confirmation order of the Bankruptcy Court required for a Seller to consummate a Sale, whether as a result of an objection to the Sale or at the request of the High Bidder or Seller.

37.    "***Secondary Deposit***" shall have the meaning ascribed to such term in Section 6 of the Auction Procedures.

38.    "***Secured Claim***" shall have the meaning ascribed to such term in the Approved Bid Procedures.

39.    "***Secured Creditor***" shall have the meaning ascribed to such term in the Approved Bid Procedures.

40.    "***Sellers***" shall mean, collectively, Brickchurch and Aberdeen, each being a "**Seller**."

41.    "***Stalking Horse Bid***" shall have the meaning ascribed to such term in the Approved Bid Procedures.

42.    "***Stalking Horse Bidder***" shall have the meaning ascribed to such term in the Approved Bid Procedures.

43.    "***Starting Bid Incentive***" shall have the meaning ascribed to such term in the Auction Procedures.

44.    "***Registered Bidders***" shall mean those persons that have registered to bid through the Digital Bidding Platform pursuant to the Auction Procedures and Concierge's Bidder Terms and Conditions, each being a "***Registered Bidder***."

# **Appendix B**

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

*Warning:  No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This Contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this Contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

This Contract of Sale (this "**Contract**") is made as of _____, _____ between ABERDEEN ENTERPRISES, INC., Address: 376 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417524 and BRICKCHURCH ENTERPRISES, INC. Address: 376 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417521 (individually and collectively, "**Seller**") and _____, Address: _____, Social Security Number/ Fed. I.D. No(s): _____ ("**Purchaser**, and collectively with the Seller, the "**Parties**," each a "**Party**").

The parties hereby agree as follows:

    1.    **Premises**. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon, more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:   366 Gin Lane and 376 Gin Lane.   Street Address: 366 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.014; and (b) 376 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.013, together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway (collectively the "**Premises**"). Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser

may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2.    **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (*strike out inapplicable items*) (collectively with the Premises, the "*Property*").

Excluded from this sale are furniture and household furnishings.

3.    **Purchase Price**. The purchase price (the "*Purchase Price*") is

_____U.S. Dollars  ($_____), payable as follows:

(a)    by Purchaser's transfer to the Escrowee of Cash,[1] the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this Contract (the "*Initial Deposit*") in the amount of Five Hundred Thousand U.S. Dollars:

$     500,000.00     .

(b)    by Purchaser's transfer to the Escrowee of Cash, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this Contract (the "*Secondary Deposit*," and collectively with the Initial Deposit, the "*Deposit*") in an amount equal to _____ U.S. Dollars:

$_____.

(c)    balance at Closing in accordance with paragraph 7:

$_____.

---

[1] As used herein, the term "**Cash**" shall mean official currency of the United States that is immediately available to the person in possession, custody, or control of such funds.

4.    **Deposits in Escrow**.

(a)    Seller's escrow agent, _____ (**"Escrowee"**) shall hold the Deposit in escrow in a segregated bank account at _____, address: _____, until Closing or sooner termination of this Contract and shall pay over or apply the Deposit in accordance with the terms of this paragraph. Escrowee shall hold the Deposit in a non-interest bearing account for the benefit of the parties. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Deposit shall be paid by Escrowee to Seller. If for any reason Closing does not occur the Escrowee shall hold the Deposit pending (i) Notice to the Escrowee from both Parties jointly instructing the Escrowee on disbursement of the Deposit, or any portion thereof; or (ii) an order from the Bankruptcy Court instructing the Escrowee on how it is to remit such Deposit. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)    The Parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c)    Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d)    Escrowee acknowledges receipt of the Deposit and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Contract.

5.    **Acceptable Funds**. All money payable under this Contract, unless otherwise specified, shall be paid by:

(a)    Cash;

(b)    Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller,

or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser; and

        (c)    As otherwise agreed to in writing by Seller or Seller's attorney.

    6.   **Checks**.

        (a)    Purchaser hereby unconditionally guarantees the payment of all checks delivered by or for the account of Purchaser in payment of the Purchase Price, apportionments or otherwise, whether such checks are issued by Purchaser, the lending institution issuing the mortgage, lender's attorneys (from special, trust, mortgage, escrow or other accounts) or any other source. Purchaser waives presentment, protest, notice of protest and any other notice to which the Purchaser may be entitled. This guaranty shall include of all Seller's collection expenses, including reasonable attorney's fees, and shall survive termination of the Contract and delivery of the deed.

        (b)    If a check delivered by or for the account of Purchaser in payment of the Purchase Price is dishonored for any reason by the bank upon which it is drawn, other than for bank error, then Seller, in addition to any other rights or remedies Seller may have, may, at Seller's sole option, terminate the Contract, and thereupon Seller shall be relieved of all obligations under the Contract, including but not limited to liability for all brokerage commissions, for which Purchaser shall indemnify and defend Seller.

7.     **Bankruptcy Sale**.    Sellers are debtors in bankruptcy and, as such, this transactions contemplated herein are subject to and governed by the terms of the United States Bankruptcy Code and the orders entered by the United States Bankruptcy Court for the Eastern District of New York (the "***Bankruptcy Court***") in the jointly administered bankruptcy cases styled as styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (collectively and individually, the "***Bankruptcy Case***"). As part of this process, the Sellers received Bankruptcy Court approval to sell the Properties (as the same may be amended from time to time, the "***Sale and Bid Procedures Order***"); *provided that*, if a party-in-interest objects to a proposed sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed sale of the Properties, the Sellers' ability to consummate such proposed sale is contingent upon the Sellers receiving an order from the Bankruptcy Court, after the Sale Confirmation Hearing, approving such Private Sale (each, a "***Sale Confirmation Order***"). Notwithstanding such contingency on the part of the Sellers, this Contract and the Purchaser's obligations hereunder shall remain irrevocable.

8.     **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to:

(a)     Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the Property or their use;

(b)     Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)     Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)     Real estate taxes that are a lien, but are not yet due and payable;

(e)     Covenants, restrictions, reservations and easements of record and utility easements whether or not of record, if any;

(f)     Possible projections and encroachments of retaining walls, hedges, walls, fences, garages, sheds, patios, decks, steps, landings, stoops, cornices, coping and trim, driveways, ramps, walkways, cellar doors, chutes, plantings, sprinkler systems and pumps, or similar structures and installations (all of the foregoing individually and

collectively referred to as "*minor encroachments*") and variations among record lines, the tax map and minor encroachments;

        (g)   State of facts shown on survey dated _____ by _____ and any additional facts a personal inspection or such survey brought down to date would show;

        (h)   [to be added: exceptions listed in Seller's title insurance policy and easements, etc. from deed to Seller].

        9.    **Governmental Violations and Orders**. Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters; *provided, however,* that notwithstanding the foregoing or anything else to the contrary herein, Seller shall not be required to remove any violations or notices of violations affecting the Property.

        10.   **Seller's Representations**.

        (a)   Seller represents and warrants to Purchaser that:

        (i)   The Premises abut or have a right of access to a public road;

        (ii)   Subject to entry of any necessary Sale Confirmation Order, (A) Seller shall have the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract; (B) Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Contract or the consummation of the transactions contemplated hereby; (C) the execution and delivery of this Contract and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. This Contract constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to (a) entry of the orders of the Bankruptcy Court authorizing the transaction contemplated herein, and (b) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

        (iii)   Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code (**"IRC"**) Section 1445, as amended, and the regulations promulgated thereunder (collectively **"FIRPTA"**);

(iv)    The Premises are not affected by any exemptions or abatements of taxes; and

(v)    Seller has been known by no other name for the past ten years, except (i) Aberdeen Enterprises, Inc. and (ii) Brickchurch Enterprises, Inc., respectively.

(b)    Seller covenants and warrants that all of the representations and warranties set forth in this Contract shall be true and correct at Closing.

(c)    Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

(d)    Neither the execution, delivery and performance of this Contract, nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration (other than approval by the Bankruptcy Court) under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Seller.

11.    **Condition of Property**.

(a)    Purchaser and its authorized representatives shall have the right, one (1) time prior to Closing and upon reasonable notice (by telephone or otherwise) to Seller, to perform a final walk-through of the Property before Closing; *provided that*, for the avoidance of doubt, the Purchaser shall not have the right to terminate this Contract on the basis of the condition of the Property and any material change in the condition of the Property, beyond ordinary wear and tear, shall give rise only to an obligation on the part of the Seller to either (i) repair such damage so as to put the Property back into the condition that such Property was in at the time of the submission of this Contract; or (ii) provide Purchaser with reasonable compensation with respect such damage. To the extent that there is a dispute regarding the condition of the Property and the Seller's obligations under this Section 11(a), such dispute shall not be a basis for the Parties not Closing and the Parties shall complete the Closing of the transaction contemplated hereby subject to a holdback from the distribution of the Net Sale Proceeds to the Seller at Closing in an amount sufficient to permit the Seller to comply with its obligations under this Section 11(a) (each, a "***Holdback***") with the Parties' respective rights to such Holdback to be subsequently determined pursuant to either (i) express written agreement between the Parties; or (ii) a final order issued by the Bankruptcy Court.

(b)    Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other Property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this Contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or

oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other Property included in the sale, given or made by Seller, its representatives, or any broker.

(c)    Purchaser is purchasing the Property in its "AS IS" condition on the date hereof, with all faults.  Between the date hereof and Closing, the Property will be subject to use, wear and tear, loss of trees, erosion and other deterioration, for which the Purchaser shall have no claim against Seller or any rights by reason thereof.  Purchaser represents and warrants to Seller that Purchaser has made full examination and investigation of the Property and related information before entering into this Contract, and that in entering into this Contract, Purchaser has not been induced by, and has not relied upon, any representations, covenants, warranties or statements, whether oral or written or expressed or implied, made by Seller (except as otherwise specifically set forth herein) or by any real estate broker or any other person representing or purporting to represent Seller, concerning the Property, its state of title, condition or state of repair, income, rents, expenses, operations, environmental condition, the presence or absence of any materials, including but not limited to formaldehyde insulation or hazardous building materials, radon, asbestos, insecticides or pesticides of any kind and/or nature, hazardous waste (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Premises) wetlands (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Property) or any other substance or material, paint containing lead or any other additives, the condition of any fuel oil or gasoline storage tanks which may now or heretofore have been located at the Premises, or the impact thereon if located on adjacent properties, infestation of any insects or pests, description of the Property, including the size, area or dimensions of the lot, its value, the cost of operating or maintaining the Property, the physical condition of the Property, the operation or use to which the Property may be applied, development rights, landmark or historic designation, subdivision, school district or the zoning thereof, soil bearing capacity, elevations, insurability, access to public roads, the character, quality, legal use, availability of water, electric, sewer, telephone or public utilities of any kind, the subsurface conditions of the Premises, the suitability of the soil or subsurface conditions for any use to which the Purchaser may wish to utilize the subject Premises, availability of tax benefits, abatements or exemptions or any other matter or thing affecting or relating to the Property.  Purchaser shall have no claim against Seller for Seller's failure to make any representations, covenants, warranties or statements covering the foregoing. Seller shall pay all post-petition utility and other service charges accrued for the period from and after the bankruptcy petition date through the date of Closing, to the extent billed therefor; in the normal course.

(d)    Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property.  Purchaser also hereby waives, releases, and discharges all rights, claims,

and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

12. **Insurable Title**.

(a) Seller shall give and Purchaser shall accept such title as _____ shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this Contract.

(b) At Sellers' option, if Purchaser's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Seller, the Seller may arrange for the issuance of a title insurance policy by a reputable title company, if Purchaser is unable to do so, at the sole cost and expense of Purchaser, at no additional premium. Seller shall provide all documents reasonably required by the such title company for them to "omit" any standard exceptions from Purchaser's title policy, or any exceptions otherwise required to be removed in accordance with the terms herein.

13. **Closing, Deed and Title**.

(a) **"Closing"** means the settlement of the obligations of Seller and Purchaser to each other under this Contract, including the payment of the Purchase Price to Seller, and the delivery to Purchaser of a general warranty deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Property, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

14. **Closing Date and Place**. Closing shall take place at the office of _____ at _____ (prevailing Eastern time), on or before February 20, 2024 or such later date as shall be ordered by the Bankruptcy Court. The date for Closing set forth in this Section 14 is herein referred to as the "Closing Date". **"Time shall be of the essence"** as to Purchaser's performance on the Closing Date.

15.   **Conditions to Closing**. This Contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)   The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this Contract;

(b)   The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the Property authorizing their use as a single family dwelling at the date of Closing;

(c)   The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from the Internal Revenue Service. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the Purchase Price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service;

(d)   The delivery of the Property, including all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises;

(e)   All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the Property and all appliances which are included in this sale being in working order as of the date of Closing;

(f)   If the Premises are a one or two family house, delivery by the Parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Property a smoke detecting alarm device or devices;

(g)   The delivery by the Parties of any other affidavits required as a condition of recording the deed;

(h)   Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law; and

(i)   The Bankruptcy Court shall have entered a Sale Confirmation Order with respect to the transaction(s) contemplated herein, if the same has been requested or is otherwise required under the terms of the Sale and Bid Procedures Order, and no court

of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Contract.

16.    **Deed Transfer and Recording Taxes**.

(a)    Purchaser shall execute, acknowledge where appropriate, and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the New York State Department of Taxation and Finance (or, to the order of Buyer's title insurance company) for the amount of any Real Estate Transfer Tax imposed by Article 31 of the Tax Law of the State of New York, together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller (each, a "***Real Estate Transfer Tax***"); *provided, however,* that nothing contained herein shall create any liability for any Real Estate Transfer Tax and shall not require Seller to pay any Real Estate Transfer Tax that it is not required to pay pursuant to any applicable provision of the Bankruptcy Code or otherwise. Purchaser shall duly execute and swear to said return and at the Closing shall cause the check and such documents to be delivered to Buyer's title insurance company for delivery to the Suffolk County Clerk promptly after the Closing.

(b)    To the extent not excused by applicable law, including application of the Bankruptcy Code, Purchaser shall execute, acknowledge where appropriate and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the Suffolk County Clerk (or, to the order of Buyer's title insurance company) for the amount of the Peconic Bay Region Community Preservation Fund imposed by Article 31-D of the Tax Law of the State of New York (the "***Peconic Tax***"), together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller.

(c)    The obligations under this paragraph 16 shall survive the termination of this Contract.

17.    **Cost Allocation, Apportionments, and Other Adjustments; Water Meter and Installment Assessments**.

(a)    To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:  (i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; and (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) At Closing, all Diligence costs shall be allocated as Purchaser Closing costs and paid by Purchaser in accordance with Section 21(a).

(f) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

(g) For the purpose of making the apportionments required herein, such apportionments shall be made on the basis of a 365-day year for the actual number of days elapsed and calculated as of midnight of the day preceding the Closing. Any assessment installment due subsequent to the Closing Date shall be assumed by Purchaser.  Charges for any transferable service contracts that Purchaser has agreed to accept shall be apportioned as of the Closing.

18.  **Allowance for Unpaid Taxes, etc**. Seller has the option to credit Purchaser as an adjustment to the Purchase Price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

19.  **Use of Purchase Price to Remove Encumbrances**. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the Cash balance of the Purchase Price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments.

20.  **Professional Fees**.  Seller shall be responsible for the payment of the following costs and fees related to the transaction(s) described herein:

(a)  Seller shall be solely responsible for remitting payment to Seller's listing brokers in such amount as required pursuant Seller's agreement with such listing brokers, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's broker's fees.

(b) Seller shall remit payment to Seller's auctioneer in such amount (if any) as may be required pursuant to Seller's agreement with such auctioneer, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's auctioneer fees.

(c) Seller shall remit payment to Purchaser's broker (if any) in the amount of one percent (1.00%) of the Purchase Price, subject to approval by the Bankruptcy Court. Nothing provided for herein shall prevent Purchaser from compensating its broker above and beyond the amount paid by the Seller hereunder.

(d) Seller shall remit payment to the Escrowee for the Escrowee's services, subject to approval of the Bankruptcy Court. Purchaser shall not be liable for the payment of the Escrowee's fees.

21. **Due Diligence; Seller's Inability to Convey; Limitations of Liability; No Conditions or Contingencies**.

(a)     As of the date hereof, (i) all Premises diligence items (collectively, the "*Diligence*"), which may include but not be limited to (1) an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company, (2) a Premises survey, and/or (3) a property inspection report covering the Premises have been ordered and, if available, provided to Purchaser and Purchaser hereby acknowledges its receipt and review of the same; or (ii) to the extent any Diligence items have not been provided to Purchaser, Purchaser hereby waives receipt and review of the same. Costs for all Diligence items provided to Purchaser shall be allocated as Purchaser costs and paid by Purchaser at Closing.

(b) (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this Contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "*Defects*"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the Purchase Price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this Contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. For the avoidance of doubt, this paragraph shall not provide Purchaser with a right to extend the Closing as a result of any financing conditions and,

as further provided in <u>Section 21(e)</u> hereunder, there shall be no financing contingency available to Purchaser.  If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser still be unwilling to waive the same and to close title without abatement of the Purchase Price, then either party may apply to the Bankruptcy Court for an order authorizing the termination of this Contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, prior to Closing the Seller shall take such actions necessary to obtain and effectuate a release and/or discharge of the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof; *provided that* nothing contained herein shall permit the Seller to encumber the Property or otherwise take any action that would reasonably be believed to cause a Defect. Any action taken by Seller to remove any such defect or encumbrance shall not be deemed an admission on Seller's part that Seller is obligated to remove same or that such defect or encumbrance is one which would give Purchaser the right to cancel the Contract. Seller shall not be required to take or bring any action or proceeding or any other steps to remove any Defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Contract or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

(c) The Bankruptcy Court has entered the Sale and Bid Procedures Order providing that the Property is being sold to Purchaser free and clear of liens, claims and encumbrances. To the extent that the Purchaser or its title insurer desires a further order of the Bankruptcy Court supplementing the Sale and Bid Procedures Order ,the Seller shall request that the Bankruptcy Court enter a Sale Confirmation Order with such additional provisions as the Purchaser shall reasonably request.

(d) Anything herein to the contrary notwithstanding, any judgments, mortgage liens, other encumbrances, encroachments or any other Defects may be, and shall be deemed satisfied upon Seller depositing with the title company funds sufficient to satisfy same in full, together with the cost of recording the satisfaction instrument(s) and/or causing a title company to affirmatively insure title to the Premises that are the subject of this Contract.

(e) Purchaser acknowledges that there are no conditions or contingencies to the Closing (including but not limited to financial, due diligence, feasibility and inspection contingencies) other than as explicitly specified in this Contract.

22.   **Venue, Jurisdiction, Prevailing Party**.  Any legal action or proceeding with respect to this Contract shall be brought in the Bankruptcy Court and by execution and delivery of this Contract, each Party to this Contract hereby accepts, generally and unconditionally, the jurisdiction of the. Bankruptcy Court.  Each Party to this Contract hereby expressly and irrevocably submits the person of such party to this Contract to the in personal jurisdiction of

the Bankruptcy Court in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Contract. To the fullest extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Contract or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Contract in the Bankruptcy Court. To the fullest extent permitted under applicable law, each Party to this Contract irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court or that this Contract or the subject matter hereof may not be enforced in or by the Bankruptcy Court. In the event of any such legal action, the prevailing Party shall be entitled to reimbursement from the non-prevailing Party of all reasonable attorney's fees and costs/expenses of the prevailing Party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party. The obligations under this paragraph 22 shall survive the termination of this Contract.

23. **Termination**.

(a)   This Contract may be terminated at any time prior to Closing, as follows:

(i)   Bankruptcy Court refuses to enter a Sale Confirmation Order if the same is required pursuant to the terms of the Sale and Bid Procedures Order; or

(ii)   the Bankruptcy Court enters an order terminating the Contract.

(b)   If this Contract is terminated pursuant to its terms, other than as a result of Purchaser's default, this Contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Deposit to Purchaser; *provided that* nothing contained herein shall prevent the Parties from agreeing to other terms governing the effect of termination, subject to any necessary approval of the Bankruptcy Court.

(c)   The obligations under this paragraph 23 shall survive the termination of this Contract

24. **Defaults and Remedies**.

(a)   If Purchaser defaults hereunder, Seller's shall be entitled to receive and retain the Deposit as liquidated damages, it being agreed that Seller's damages in

case of Purchaser's default might be impossible to ascertain and that the Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty; *provided, however,* that nothing contained herein shall prevent Seller from seeking damages in excess of those provided for in this Section 24(a) if it is so able to establish the same.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

25. **Purchaser's Lien**. All money paid on account of this Contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this Contract.

26. **Notices**. Any notice or other communication (**"Notice"**) Any notice under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered to each of the following:

If to Purchaser:

_____
_____
_____
_____
Email: _____

*-with copy to-*

_____
_____
_____
_____
Email: _____

If to Seller:

Mathew Kabatoff
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
mkabatoff@lbtholding.com

*-and-*

Bay Point Capital Partners II, LP
c/o Charles Andros

Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
CharlesAndros@BayPointAdvisors.com

*-with copy to-*
Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

*-and-*

John F. Isbell, Esq.
The Law Offices of John F. Isbell LLC
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
John@jfi-law.com

*-and-*

John C. Allerding, Esq.
Thompson Hine LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to Escrowee:        _____

                       _____

                       _____

                       _____

                       Email: _____


To the extent that a physical address and an email address are provided above, delivery shall be by both (a) overnight delivery, with confirmation of delivery, by United States mail or any nationally recognized commercial carrier; and (b) email. Any notice hereunder shall be deemed to have been given upon the earlier of (i) dispatch of the electronic mail; and (ii) delivery of the physical mail.

27.    **No Assignment**. This Contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

28. **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than The Corcoran Group, Sotheby's International Realty, and Bespoke Real Estate (collectively, **"Broker"**) and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this Contract.

29. **Waiver of Trial by Jury**.  SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS CONTRACT

30. **Lead Warning Statement and Lead Based Paint Provision**.  Purchaser acknowledges receipt of an Environmental Protection Agency approved lead hazard information pamphlet. Purchaser further acknowledges that it is aware that any residential dwelling that was built prior to 1978 may present exposure to lead from lead-based paint. Purchaser acknowledges that it is aware that the Premises were or might have been built prior to 1978 and is waiving the opportunity to conduct a risk assessment or inspection

31. **Truth In Heating Law**.  Under New York Energy Law Section 17-103, commonly known as "Truth in Heating Law", Purchaser has the right to a summary of the heating and/or cooling bills or a complete set of said bills relating to the Property and information concerning the insulation in the Property.  Purchaser expressly waives the right to insulation, heating and cooling information and copies or a summary of any of said bills as to which Purchaser may be entitled and does not request them in connection with this transaction

32. **Certificate of Occupancy**.  Nothing contained in this Contract shall be construed to require Seller to seek or obtain a variance or zoning change or, to make any alteration or modification to the Property or spend any sum in order to obtain such Certificate of Occupancy or other certificate. If any variance or zoning change or any modification or alteration to the Property is required by the municipality as a condition precedent to the issuance of said Certificate of Occupancy or other certificate, Seller shall have the option of terminating the Contract and returning the Deposit hereunder.

33. **Repairs/Alterations**.  Notwithstanding anything to the contrary contained in this Contract, Seller shall not be obligated to make any repairs or alterations to the Property

34. **Smoke Detector and Carbon Monoxide Affidavit**.  Supplementing Paragraph 16 of the Contract, Seller shall provide at Closing an affidavit stating that at

the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law.

35.  **Property Condition Disclosure Act**.  Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property.  Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

36.  **Miscellaneous**.

(a)  <u>Complete Agreement</u>.   All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this Contract; it completely expresses their full agreement and has been entered into after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Contract.

(b)  <u>No Waiver; Binding on Heirs</u>; Neither this Contract nor any provision thereof may be waived, changed or cancelled except in writing. Subject to Section 27 of this Contract and without altering or amending the provisions thereof, this Contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this Contract.

(c)  <u>Interpretation</u>.  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this Contract may require it. The captions in this Contract are for convenience of reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

(d)  <u>Effectiveness</u>.  Submission by the Seller of this Contract for execution by the Purchaser shall confer no rights, nor impose any obligations on Seller. This Contract shall not be binding or effective until (i) duly executed and delivered by Seller and Purchaser; and (ii) the Bankruptcy Court has entered any requisite Sale Confirmation Order; *provided that*, notwithstanding the foregoing, the Purchaser's execution of this Contract shall make such Contract irrevocable unless (1) such revocation is expressly consented to by the Seller in writing; or (2) the Seller is unable to obtain a Sale Confirmation Order with respect to the transaction contemplated herein.

(e) <u>IRS Reporting Requirements</u>.  Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(f) <u>Further Actions</u>.  Each Party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this Contract. This subparagraph shall survive Closing.

(g) <u>No Third Party Beneficiaries</u>.  This Contract is intended for the exclusive benefit of the Parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(h) This Contract may be amended or modified only in writing signed by both Parties and approved by the Bankruptcy Court, if necessary.

(i)  Whenever possible, each provision of this Contract shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Contract is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Contract.

(j) This Contract has been entered into and shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles.

(k)  This Contract, including any riders, amendments, and/or additions, may be executed by electronic, facsimile, or PDF signature and/or in any number of counterparts and each of such electronic, facsimile, or PDF signature and/or counterpart shall for all purposes be deemed to be an original; and all such electronic, facsimile, or PDF signatures and/or counterparts shall together constitute but one and the same Contract.

(l)  The Parties have been given the opportunity to seek legal advice and to have this Contract reviewed by an independent attorney prior to signing it. This Contract shall be construed as if it has been jointly drafted by both Parties. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in interpreting this Contract.

(m) No delay or omission to exercise any right, power, or remedy accruing to a Party under this Contract shall impair any right, power, or remedy of such Party, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Contract (i) shall be effective unless it is in writing and signed by the Party against whom such waiver or

consent is sought to be enforced; (ii) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (iii) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

(n) Each of the Parties shall take such other actions and execute such documents consistent with this Contract as may be reasonably requested by any other Party in furtherance of consummating the transaction(s) contemplated hereby.

(o) This Contract is an important legal document. Each Party acknowledges that it has been advised to consult legal counsel before signing this Contract and has signed this Contract after having the opportunity to consult with legal counsel of its choosing. No Party has provided legal advice (including but not limited to tax advice) to another Party or acted as legal counsel to another Party. Each Party hereby confirms that it has carefully read this Contract in its entirety and that it understands all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Contract has been duly executed by the parties hereto as of the date set forth above.

**SELLER:**                           **SELLER:**

ABERDEEN ENTERPRISES, INC.        BRICKCHURCH ENTERPRISES, INC.

By: _____     By: _____

Printed Name: _____     Printed Name: _____

Title: _____     Title: _____

**BUYER:**                            **BUYER:**

_____          _____

By: _____     By: _____

Printed Name: _____     Printed Name: _____

Title: _____     Title: _____

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

Receipt of the Initial Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

_____
Escrowee

Receipt of the Secondary Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

_____
Escrowee

*Residential Contract of Sale Escrowee Acknowledgment*

RESIDENTIAL CONTRACT OF SALE (2000)
This form was originally prepared by the Real Property Law Section of the New York State Bar Association and the Committee on Real Property Law of the Association of the Bar of the City of New York.  This form may have been altered by the user and any such alterations may not be apparent.  To view or download the original unaltered text of this form, visit the Real Estate Law page at www.abcny.org.

**PREMISES:**

| | |
|---|---|
| Section: | 029.00 |
| Block: | 01.00 |
| Lots: | 017.013 and 017.014 |
| County or Town: | Southampton |
| Street No. Address: | 366 and 376 Gin Lane |