IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC. | Case No. 23-72834-AST |
| BRICKCHURCH ENTERPRISES, INC. | Case No. 22-70914-AST |
| Debtors. | Jointly Administered |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) CONFIRMING BAY
POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS' SECOND AMENDED
JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE;
(II) APPROVING BAY POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS'
JOINT DISCLOSURE STATEMENT; AND APPROVING THE SALE TRANSACTIONS
(AS DEFINED HEREIN); AND (IV) GRANTING RELATED RELIEF
[Related Doc. Nos. 215, 218]**

This matter came before the Court on February 27, 2024, at a combined hearing to consider

approval of *Bay Point Capital Partners II, LP's and the Debtors' Joint Disclosure Statement* [D.I.

218] and confirmation of *Bay Point Capital Partners II, LP's and the Debtors' Second Amended

Joint Liquidating Plan under Chapter 11 of the Bankruptcy Code* [D.I. 215]. The procedural

history of the Debtors' chapter 11 cases is summarized as follows:

a. On April 30, 2022, Brickchurch Enterprises, Inc. ("**Brickchurch**") filed a petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of New York (this "**Court**") under Case No. 22-70914 (the "**Brickchurch Case**");

b. On August 2, 2023, Aberdeen Enterprises, Inc. ("**Aberdeen**", and collectively with Brickchurch, the "**Debtors**"), filed a separate petition for relief under Chapter 11 of the Bankruptcy Code in this Court under Case No. 23-72834 (the "**Aberdeen Case**", and collectively with the Brickchurch Case, these "**Chapter 11 Cases**");

c. On September 6, 2023, this Court entered an *Order Granting Motion for Joint Administration*, which provided for the joint administration of the Debtors' Chapter 11 Cases;

d.　　On September 5, 2023, the Debtors filed a *Joint Motion Seeking Entry of an Order Under Bankruptcy Code Sections 363(a), (b), (f), and (m) and Bankruptcy Rules 2002, 6004, and 9004: (I) Authorizing Debtors to Sell to the Highest and Best Bidder at an Auction Sale the Estates' Interest in the Real Properties Known as (a) 366 Gin Lane, Southampton, New York 11968 and (b) 376 Gin Lane, Southampton, New York 11968; and (II) Scheduling a Hearing to Approve Such Sale to the Highest and Best Bidder; and (III) Approving Certain Bidding Procedures; and (IV) Approving the Manner and Extent of Notice of Such Auction Hearing* [D.I. 46] (the "**Sale Motion**");

e.　　On October 10, 2023, the Court entered an *Order Scheduling a Concurrent Hearing to Consider Approval of the Debtors' Joint Disclosure Statement and Confirmation of the Debtors' Plan of Reorganization* [D.I. 74] (the "**Order Scheduling a Concurrent Hearing**"), which scheduled the combined hearing on approval of the Debtors' original joint disclosure statement and original joint plan (the "**Confirmation Hearing**"). On the same day, the Court entered a *Contested Matter Scheduling Order* [D.I. 75];

f.　　On October 11, 2023, the Debtors filed their *First Amended Joint Chapter 11 Liquidating Plan* [D.I. 76] (the "**First Am. Plan**") and their *First Amended Disclosure Statement* [D.I. 77] (the "**First Am. Disclosure Statement**");

g.　　On October 12, 2023, a copy of the following documents were served on all creditors and parties in interest in these cases: (i) a ballot, (ii) the First Am. Plan, (iii) the First Am. Disclosure Statement, and (iv) the Court's Order Scheduling a Concurrent Hearing. *See Affidavit of Service of Randy Lowry* [D.I. 78];

h.　　On October 27, 2023, counsel for Debtor Aberdeen filed a *Certification Re: Balloting* [D.I. 87] (the "**Aberdeen Certification**"). The Aberdeen Certification states that the Debtors solicited ballots from all creditors and interests holders, and only two ballots were received – Bay Point voted to accept the Debtors' First Am. Joint Plan, and the IRS voted to reject the Debtors' First Am. Joint Plan;

i.　　On November 13, 2023, a Notice of Adjournment was entered, indicating that the hearing to consider the First Am. Plan and First Am. Disclosure Statement was adjourned to December 20, 2023. *See Notice of Adjournment* [D.I. 95];

j.　　On November 22, 2023, the Court entered that certain *Order Approving Bid Procedures* [D.I. 104] (the "**Sale Order**"). Among other things, the Sale Order approved those certain *Bidding Procedures* [D.I. 67-1], which were

subsequently modified pursuant to those certain *First Amended Approved Bidding Procedures* [D.I. 116] (as may be amended, supplemented, or modified further from time to time, the "**Approved Bid Procedures**");

k.  On November 29, 2023, the Court entered an Order adjourning the Confirmation Hearing to January 17, 2024. *See Amended Order* [D.I. 108]. The Court also entered a *Contested Matter Scheduling Order* [D.I. 109];

l.  On January 12, 2024, the Debtors and Bay Point Capital Partners II, LP ("**Bay Point**", and collectively with the Debtors, the "**Plan Proponents**") filed a *Joint Application and Motion for an Order (I) Authorizing the Retention of Concierge Auctions, LLC as Auctioneer, and (II) Modifying or Granting Relief from E.D.N.Y. LBR 6005-1(C)* [D.I. 140] (the "**Application to Employ**"). Among other things, the Application to Employ sought Court authorization for the Debtors to employ and retain Concierge Auctions, LLC to market the Properties through the conclusion of a live auction (the "**Live Auction**"), and (ii) conduct and hold the Live Auction.  The Application to Employ was granted by Order entered January 26, 2024 [D.I. 163];

m.  Pursuant to the Approved Bid Procedures, the Debtors sought to offer the Properties for Sale, collectively and individually, contemporaneously through a Private Sale Process and an Auction Process (as those terms are defined in the Approved Bidding Procedures). Pursuant to the Private Sale Process, the deadline for the Debtors to accept a Qualified Offer (as such term is defined in the Approved Bid Procedures) was January 14, 2024. Contemporaneously with the Private Sale Process, the Debtors offered the Properties for Sale, collectively and individually, via a no reserve auction (the "**Auction**"). The Auction was conducted via digital bidding and concluded at the Live Auction at the Sotheby's Auction House on January 24, 2024. At the Auction, High Bids were selected with respect to both Properties;

n.  On January 17, 2024, the Confirmation Hearing was adjourned to February 13, 2024;

o.  On January 27, 2024, counsel for Bay Point wrote a letter to the Court (i) notifying the Court of the results of the Auction, (ii) notifying the Court that Bay Point and the Debtors were finalizing a consensual plan of liquidation, and (iii) requesting an additional extension through January 30, 2024, to file an amended plan. [D.I. 168];

p.  On January 30, 2024, Bay Point's filed its *Chapter 11 Liquidating Plan* [D.I. 173] ("**Bay Point's Original Plan**") and *Disclosure Statement* [D.I. 174];

q.      On February 9, 2024, the Debtors filed an unsigned *Second Amended Joint Chapter 11 Liquidating Plan* [D.I. 193] (the "**Second Am. Plan**"), incorporating most of the provisions of Bay Point's Original Plan;

r.      On February 12, 2024, Bay Point filed its (i) *First Amended Chapter 11 Liquidating Plan* [D.I. 194], (ii) *First Amended Disclosure Statement* [D.I. 195], and (iii) *Memorandum of Law in Support of (I) Approval of Bay Point's First Amended Disclosure Statement, and (II) Confirmation of Bay Point's First Amended Plan*. These filings were served to all the parties listed in the Certificates of Service, which were filed on February 12, 2024 [D.I. 204, 205];

s.      On February 12, 2024, Bay Point also filed several declarations in support of approval of the Sale of the Properties (the "**Sale Transactions**"), including, (i) the *Declaration of Chad Roffers* [D.I. 198], (ii) the *Declaration of Charlos Andros* [D.I. 199], (iii) the *Declaration of Timothy Davis* [D.I. 200], (iv) the *Declaration of John C. Allerding* [D.I. 202] and (v) the *Declaration of Harald Grant* [D.I. 203] (collectively, the "**Declarations**");

t.      At the February 13, 2024 hearing, the Court found that the Debtors' Properties had been extensively marketed, the sale process followed by the parties was fair, vigorous, and resulted in the highest and best achievable value for the Properties, and the Court approved the Sale of the Debtors' Properties;

u.      On February 14, 2024, the Plan Proponents filed the *Bay Point Capital Partners II, LP's and the Debtors' Joint Liquidating Plan under Chapter 11 of the Bankruptcy Code* [D.I. 209];

v.      On February 16, 2024, the Plan Proponents filed (i) the *Bay Point Capital Partners II, LP's and the Debtors' First Amended Joint Liquidating Plan under Chapter 11 of the Bankruptcy Code* [D.I. 210]; (ii) the *Bay Point Capital Partners II, LP's and the Debtors' Second Amended Joint Liquidating Plan under Chapter 11 of the Bankruptcy Code* [D.I. 215] (the "**Plan**" or the "**Joint Plan**"); (iii) the *Bay Point Capital Partners II, LP's and the Debtors' Joint Disclosure Statement* [D.I. 218] (the "**Disclosure Statement**"); and (iii) the *Notice of (I) Hearing on Approval of Disclosure Statement and Confirmation of Joint Plan, (II) Procedures for Objecting to Disclosure Statement and Joint Plan, and (III) Deadline to Vote on Joint Plan* [D.I. 217] (the "**Confirmation Hearing Notice**");

w.      Copies of the Purchase and Sale Agreements (collectively, the "**Purchase and Sale Agreements**") for the properties located at 366 Gin Lane and 376 Gin Lane, Southampton, New York 11968 (collectively, the "**Properties**") are attached as Exhibits A and B to the Plan;

x.    On February 16, 2024, the Court entered an *Amended Contested Matter Scheduling Order* [D.I. 214] (the "**Scheduling Order**"), which adjourned the Confirmation Hearing to February 27, 2024, and established certain deadlines in connection therewith;

y.    On February 16, 2024, and as set forth more fully in the *Amended Certificate of Service* [D.I. 223] filed on February 20, 2024 (the "**Amended Certificate of Service**"), Bay Point caused the Plan, Disclosure Statement, Confirmation Hearing Notice, and Scheduling Order to be served on all necessary creditors and parties in interest;

z.    On February 26, 2024, the Plan Proponents filed the Voting Report (as defined herein); and

aa.    On February 27, 2024, the Confirmation Hearing was held.

**NOW THEREFORE**, the Court having found that service of the Plan,[1] the Disclosure Statement, the Scheduling Order, and Confirmation Hearing Notice was proper; and notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation of the Plan or approval of the Disclosure Statement has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the legal and factual bases set forth in the documents filed in support of confirmation of the Plan and approval of the Disclosure Statement, the Declarations, and other evidence and testimony presented at the Confirmation Hearing establish just cause for the relief granted herein; and the relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact and conclusions of law, and orders:

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

### A. FINDINGS AND CONCLUSIONS

1.      The findings and conclusions set forth herein and in the record of the Confirmation Hearing, including the summary of the procedural history of the Debtors' Chapter 11 Cases set forth above, constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

2.      All findings, conclusions, orders and rulings of the Court as stated on the record at the February 27th Confirmation Hearing are incorporated herein by reference.

### B. JURISDICTION, VENUE, AND CORE PROCEEDING

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Court's General Order of Reference. Confirmation of the Plan and approval of the Disclosure Statement are core proceedings pursuant to 28 U.S.C. § 157(b), and the Court has exclusive jurisdiction to enter a final order determining that the Plan and Disclosure Statement comply with the applicable provisions of the Bankruptcy Code and should be confirmed and approved. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### C. ELIGIBILITY FOR RELIEF

4.      The Debtors were and are eligible for relief under Section 109 of the Bankruptcy Code.

### D. NOTICE

5.      This Court takes notice of all filings on the dockets of the Chapter 11 Cases maintained by the Clerk of this Court.

### E. OBJECTIONS

6.     A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities. As presented on the record at the Confirmation Hearing, and as provided in this Order (this "**Confirmation Order**" or this "**Order**"), the consensual resolutions of those objections that were resolved at or prior to the Confirmation Hearing satisfy all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, are in the best interests of the Debtors and their estates, and are hereby approved. No objecting creditor or other party provided evidence of a viable and reasonable alternative to the Debtors' Sale Transactions and Plan as proposed, and as now before this Court. All unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Confirmation of the Plan, approval of the Sale Transactions, or approval of the Disclosure Statement are overruled on the merits.

**F.     BURDEN OF PROOF – CONFIRMATION OF THE PLAN AND APPROVAL OF THE DISCLOSURE STATEMENT**

7.     The Plan Proponents have met their burden of proving the applicable elements of Sections 1125 and 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.  In the alternative, to the extent the clear and convincing standard applies, the Plan Proponents have satisfied this standard.  Each witness who testified on behalf of the Plan Proponents at the Confirmation Hearing or submitted a declaration in support of confirmation of the Plan, approval of the Sale, and/or approval of the Disclosure Statement, was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**G.     NOTICE**

8.     As evidenced by the applicable certificates and affidavits of service, the Plan Proponents have provided due, adequate, and sufficient notice of the Plan, the Sale Transactions, the Disclosure Statement, the Confirmation Hearing, the objection deadline, and the voting

deadline, to Holders of Claims and Interests and other Entities with an interest in the Debtors' property and have otherwise complied with the notice requirements of the Bankruptcy Code, the Bankruptcy Rules, this Court's orders, and applicable nonbankruptcy law. Such notice was adequate and sufficient pursuant to Sections 1125 and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, and 3020, and other applicable law and rules, and no other or further notice is or shall be required.

### H. THE DISCLOSURE STATEMENT

9. The Disclosure Statement is comprehensive and contains adequate information. The Disclosure Statement sets forth information with respect to, among other things, the following: (a) the terms of the Plan, (b) events preceding the Debtors' Chapter 11 Cases; (c) the Debtors' relationships with creditors; (d) the events that led to the development of the Plan; (e) the legal effects of the Plan; (f) the value of distributions to be received by holders of claims against the Debtors' estates; (g) risk factors affecting the Plan; (h) the method and timing of distributions under the Plan; (i) the voting procedures and confirmation requirements for the Plan; (j) the Sale Transactions; (k) a statement explaining that the Plan satisfies the "best interest test" under Section 1129(a)(7) of the Bankruptcy Code even though certain classes of claims and interests are impaired by the Plan; (l) appropriate disclaimers; (m) certain tax consequences of the Plan; and (n) Plan alternatives. The Disclosure Statement satisfies Section 1125 of the Bankruptcy Code.

### I. VOTING REPORT

10. Votes on the Plan were properly solicited after disclosure of "adequate information" as defined in Section 1125 of the Bankruptcy Code. Prior to the Confirmation Hearing, the Plan Proponents filed the Voting Report. As evidenced by the Voting Report and based on the record before the Court, the procedures used to tabulate Ballots were fair and conducted in accordance

with the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. The Ballot the Plan Proponents used to solicit votes to accept or reject the Plan from the only Voting Class (as defined herein) adequately addressed the particular needs of the Chapter 11 Cases and was appropriate for the Voting Class to vote to accept or reject the Plan.

11.    The Holder of Claims in Class 1 (Secured Claims of Bay Point) was eligible to vote on the Plan (the "**Voting Class**"). Holders of Claims or Interests in Classes 2, 3, 4, and 5 were not entitled to vote to accept or reject the Plan (the "**Non-Voting Classes**"). Holders of Claims in Classes 2 and 3 were unimpaired, and conclusively presumed to have accepted the Plan. Holders of Claims and Interests in Classes 4 and 5 will receive no distributions under the Plan, and are deemed to have rejected the Plan. As evidenced by the Voting Report, Class 1 voted to accept the Plan in accordance with the requirements of Sections 1124, 1126, and 1129 of the Bankruptcy Code.

**J.    SOLICITATION**

12.    As evidenced by the Voting Report and applicable certificates of service, the Plan, the Disclosure Statement (including the Ballot attached thereto), the Scheduling Order, and the Confirmation Hearing Notice (the "**Solicitation Package**") were transmitted and served to all Holders in the Voting Class, in compliance with the Bankruptcy Code, including Sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, the Local Bankruptcy Rules, any applicable orders of this Court, and any applicable nonbankruptcy law. Transmission and service of the Solicitation Package was timely, adequate, and sufficient. No further notice or service is required. Under Sections 1126(f) and 1126(g) of the Bankruptcy Code, the Plan Proponents were not required to solicit votes from the Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

### K. MODIFICATIONS TO THE PLAN

13. Pursuant to Section 1127 of the Bankruptcy Code, any modifications to the Plan described or set forth in this Confirmation Order constitute technical changes, are immaterial, or do not adversely affect the treatment of any Claim or Interest under the Plan, or are modifications to which the adversely affected parties have consented. These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and solicitation materials, and notice of these modifications was adequate and appropriate under all the facts and circumstances of these Chapter 11 Cases.

14. Pursuant to Bankruptcy Rule 3019, any modifications herein do not require additional disclosure under Section 1125 of the Bankruptcy Code or the resolicitation of votes under Section 1126 of the Bankruptcy Code.

### L. BANKRUPTCY RULE 3016

15. The Plan is dated and identifies the Plan Proponents submitting it. Thus, the Plan satisfies Bankruptcy Rule 3016(a). The Plan Proponents have appropriately filed the Plan and Disclosure Statement with the Court, thus satisfying Bankruptcy Rule 3016(b).

### M. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE

16. Based on all the Court filings, including Declarations, affidavits, and certificates, as well as the arguments and the evidence presented and admitted at the Confirmation Hearing, the Plan Proponents have demonstrated that the Plan complies with all relevant provisions of Section 1129 of the Bankruptcy Code.

    **a. THE PLAN SATISFIES ALL APPLICABLE REQUIREMENTS OF SECTION 1129(A) OF THE BANKRUPTCY CODE**

        **i. The Plan Complies with Section 1129(a)(1)**

17.     Section 1129(a)(1) of the Bankruptcy Code requires the court to confirm a plan only if the plan complies with the applicable provisions of the Bankruptcy Code.  Sections 1122 and 1123 are the substantive provisions that are most relevant in satisfying Section 1129(a)(1).  Section 1122 governs classification of claims and interests, and Section 1123 sets forth the provisions that are required to be included - and those that may be included - in a Chapter 11 plan.  The Plan satisfies the requirements of Section 1129(a)(1).

(a)     <u>Classification of Claims and Interests (§§ 1122 and 1123(a)(1))</u>

18.     Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, subject to Section 1122, classes of claims, other than claims of the kind specified in Sections 507(a)(2) (administrative expenses), 507(a)(3) (involuntary case gap claims), or 507(a)(8) (unsecured priority tax claims), and classes of interests.  In designating classes of claims and interests in the Plan, the Plan Proponents have satisfied the requirement of Section 1123(a)(1).  Under Section 1122(a) of the Bankruptcy Code, a claim or interest may be placed in a particular class under a plan only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan only places claims or interests in each class that are substantially similar to the other claims or interests in the Class.  Thus, the Plan complies with Section 1122(a).

(b)     <u>Identification of Unimpaired Claims and Interests (§ 1123(a)(2))</u>

19.     Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify any class of claims or interests that is not impaired under the plan.  The Plan specifies the classes of claims that are not impaired under the Plan.  Specifically, Classes 2 and 3 are unimpaired. Thus, the Plan complies with Section 1123(a)(3).

(c)     <u>Specification of Treatment of Impaired Claims (§ 1123(a)(3))</u>

20.     Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify the treatment of any class of claims or interests that is impaired under the plan.  The Plan specifies the treatment of claims in Classes 1, 4, and 5, which are impaired.  Thus, the Plan complies with Section 1123(a)(4).

(d)     Same Treatment for Class Members (§ 1123(a)(4))

21.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment. The Plan provides for the same treatment of each claim or interest of a particular class and complies with Section 1123(a)(4).

(e)     Adequate Means for Implementation (§ 1123(a)(5))

22.     Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide adequate means for the plan's implementation and provides a number of examples of methods for doing so. One such method is "sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of property of the estate among those having an interest in such property of the estate."  11 U.S.C. § 1123(a)(5)(D).  The examples of adequate means for implementation of a plan provided in Section 1123(a)(5) are illustrative and the section does not exclude or limit any other means.  Here, the Plan contains adequate means of implementation; namely, the Sale of the Properties.

(f)     Issuance of Non-Voting Equity Securities (§ 1123(a)(6))

23.     Section 1123(a)(6) of the Bankruptcy Code generally requires that a plan provide for the inclusion in the charter of the debtor, if the debtor is a corporation, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power an appropriate distribution of such power among such classes, including, in

12

the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default and the payment of such dividends. The Plan is a liquidating plan and does not provide for the issuance of equity securities. Accordingly, Section 1123(a)(6) is not applicable.

(g)    <u>Selection of Directors and Officers (§ 1123(a)(7))</u>

24. Section 1123(a)(7) of the Bankruptcy Code states that a plan shall contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee under the plan. Section 1129(a)(5) augments Section 1123(a)(7) and requires, as a condition of confirmation, that the proponents of the plan disclose the identity and affiliation of any individuals proposed to serve, after confirmation of the plan, as directors, officers, or voting trustees of the debtor, or of any affiliate of the debtor participating in a plan with the debtor, or of a successor to the debtor under the plan. In addition, Section 1129(a)(5)(A)(ii) requires that the appointment or continuance of any director, officer or voting trustee be consistent with the interests of creditors and equity security holders and with public policy. As set forth in the introductory section of the Plan, pending the closing of the Sales, the Debtors shall continue to be jointly managed and operated by Mathew Kabatoff and Bay Point, consistent with the Approved Bid Procedures, unless otherwise provided in the Plan. After the Effective Date, Kabatoff alone shall remain as the sole Decision Maker (as such term is defined in the Plan) and fiduciary for the Debtors' respective bankruptcy Estates and shall be charged with the responsibility to file necessary tax returns on behalf of the Debtors and their estates. The Plan, therefore, satisfies Section 1123(a)(7) of the Bankruptcy Code.

(h)     Discretionary Plan Provisions in Section 1123(b)

25.     Section 1123(b) of the Bankruptcy Code grants broad authority to proponents of Chapter 11 plans to include discretionary plan provisions.  In accordance with Section 1123(b), the Plan contains various discretionary provisions, each of which is (i) appropriate and necessary to effectuate the Sale Transactions contemplated in the Plan for the benefit of all stakeholders in these bankruptcy cases, and (ii) consistent with the applicable provisions of the Bankruptcy Code:

*The Plan's Treatment of Classes (§ 1123(b)(1))*

26.     Section 1123(b)(1) of the Bankruptcy Code allows a plan to "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). The Plan impairs Classes 1, 4, and 5, but leaves Classes 2 and 3 unimpaired.

*The Plan's Treatment of Leases and Executory Contracts (§ 1123(b)(2))*

27.     Section 1123(b)(2) of the Bankruptcy Code permits a plan, subject to Section 365, to "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section."  11 U.S.C. § 1123(b)(2).  Article VI of the Plan states that, on the Plan's effective date, all executory contracts to which each Debtor is a party shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.

*The Sale of the Properties Pursuant to the Plan (§ 1123(b)(4))*

28.     Section 1123(b)(4) of the Bankruptcy Code permits a plan to provide for the "sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4). Article IV of the Plan provides for the Sale of the Properties and the distribution of sale proceeds for the benefit of the Debtors' creditors. The Sale of the Properties pursuant to the Plan should be and is approved.

*Modification of Claims (§ 1123(b)(5))*

14

29.     Section 1123(b)(5) allows a plan to, *inter alia*, modify the rights of holders of secured claims and unsecured claims or leave unaffected the rights of holders of any class of claims.  Here, to the extent the Plan modifies the rights of holders of claims or interests, such modifications should be and are approved.

### *The Plan's Limited Exculpation Provisions are Approved*

30.     The Plan contains two narrowly tailored exculpation provisions for the benefit of the Decision Makers and the Escrow Agent.  Section 4.1 of the Plan states the following, in relevant part, with respect to the Decision Makers:

> Except for gross negligence or willful misconduct, the Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan; provided, however, that nothing contained herein shall in any way negate Kabatoff's fiduciary responsibilities on behalf of the Debtors' estates.

*Plan*, at 18.

31.     Next, Section 4.5(b) states the following with respect to the Escrow Agent:

> The Escrow Agent shall not be deemed an officer or agent of the Debtors.  The Escrow Agent may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan.  Except for gross negligence, or willful misconduct, the Escrow Agent shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan (including, without limitation, distributions of Sale Proceeds pursuant to the Plan), the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with or related to the Plan, except in the case of gross negligence or willful misconduct. For the avoidance of doubt, the Escrow Agent shall have no responsibility or liability to any entity

for the failure of Kabatoff to fulfill any of his obligations under the Plan. The Escrow Agent is not a receiver, trustee, or assignee.

*Plan*, at 20.

32. The Plan's exculpatory provisions are reasonable in scope, necessary, and essential to the Plan's execution. Removing the Plan's exculpation provisions would likely unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition. For all of the reasons, and as demonstrated at the Confirmation Hearing, the Plan's exculpation provisions are necessary, appropriate, and should be and are approved.

<u>*The Plan's Injunctions are Narrowly Tailored and Reasonable*</u>

33. Section 7.1 of the Plan contains the following injunction against interference with the Plan:

> **Injunction Against Interference with Plan**. Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that,* for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.

*Plan*, at 30.

34. Next, Section 4.5(c) of the Plan states:

> **No Interference**. No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Escrow Agent in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Escrow Agent in the performance of its duties; *provided that,* nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

*Plan*, at 20-21.

35. These injunctions are reasonable in scope, necessary for the Plan's execution, and should be and are hereby approved.

*The Plan's Provisions are Consistent with the Other Provisions of the Bankruptcy Code (§ 1123(b)(5))*

36. Section 1123(b)(6) of the Bankruptcy Code permits a plan to include "any other appropriate provision not inconsistent with the applicable provisions of this title." The provisions in the Plan are necessary and appropriate to effectuate and consummate the Plan's provisions (including the Sale of the Properties contemplated therein) for the benefit of all stakeholders in these bankruptcy cases. The Plan provisions are consistent with the applicable provisions of the Bankruptcy Code.

## ii. The Plan Complies with Section 1129(a)(2)

37. Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. Section 1125 generally prohibits the solicitation of acceptances or rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information." 11 U.S.C. § 1125(b). Section 1126 provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. 11 U.S.C. § 1126. The Plan complies with Section 1129(a)(2) of the Bankruptcy Code.

38. On October 10, 2023, the Court entered the Order Scheduling a Concurrent Hearing to consider confirmation of the Debtors' original joint plan and approval of the Debtors' original

joint disclosure statement. On the same day, the Court entered a *Contested Matter Scheduling Order* [D.I. 75].

39.     On October 11, 2023, the Debtors filed their First Am. Plan and their First Am. Disclosure Statement.

40.     On October 12, 2023, copies of the following documents were served on all necessary creditors and parties in interest: (i) a ballot, (ii) the First Am. Plan, (iii) the First Am. Disclosure Statement, and (iv) the Court's Order Scheduling a Concurrent Hearing. *See Affidavit of Service of Randy Lowry* [D.I. 78].

41.     On October 27, 2023, counsel for Debtor Aberdeen filed the Aberdeen Certification, stating that the Debtors solicitated ballots from all creditors and interest holders, and only two ballots were received – Bay Point voted to accept the Debtors' First Am. Joint Plan, and the IRS voted to reject the Debtors' First Am. Joint Plan.

42.     On November 13, 2023, a Notice of Adjournment was entered, indicating that the hearing to consider the First Am. Plan and First Am. Disclosure Statement was adjourned to December 20, 2023. *See Notice of Adjournment* [D.I. 95].

43.     On November 29, 2023, the Court entered an Order adjourning the Confirmation Hearing to January 17, 2024. *See Amended Order* [D.I. 108]. The Court also entered a *Contested Matter Scheduling Order* [D.I. 109]. On January 17, 2024, the Confirmation Hearing was adjourned to February 13, 2024.

44.     On January 27, 2024, counsel for Bay Point wrote a letter to the Court (i) notifying the Court of the results of the Auction, (ii) notifying the Court that Bay Point and the Debtors were finalizing a consensual plan of liquidation, and (iii) requesting an additional extension through January 30, 2024, to file an amended plan. [D.I. 168].

45.     On January 30, 2024, Bay Point's Original Plan and Bay Point's Original Disclosure Statement were filed.

46.     On February 9, 2024, the Debtors filed their Second Am. Plan, incorporating most of the provisions of Bay Point's Original Plan.

47.     On February 12, 2024, Bay Point filed its (i) *First Amended Chapter 11 Liquidating Plan* [D.I. 194], (ii) *First Amended Disclosure Statement* [D.I. 195], and (iii) *Memorandum of Law in Support of (I) Approval of Bay Point's First Amended Disclosure Statement, and (II) Confirmation of Bay Point's First Amended Plan*. These filings were made by Bay Point in part to address the concerns raised by various objections to Bay Point's Original Plan. These filings were properly served upon all the parties listed in the Certificates of Service that were filed on February 12, 2024 [D.I. 204, 205].

48.     At the February 13, 2024 hearing, the Court found that the Debtors' Properties had been extensively marketed, the sale process followed by the parties was fair, vigorous, and resulted in the highest and best achievable value for the Properties, and the Court approved the Sale of the Debtors' Properties.

49.     On February 14, 2024, the Plan Proponents filed *Bay Point Capital Partners II, LP's and the Debtors' Joint Liquidating Plan under Chapter 11 of the Bankruptcy Code* [D.I. 209].

50.     On February 16, 2024, the Plan Proponents filed (i) the Plan, (ii) the Disclosure Statement; and (iii) the Confirmation Hearing Notice (collectively, the "**Filed Documents**").  On the same day, the Court entered the Scheduling Order, establishing certain deadlines in connection with the adjourned Confirmation Hearing.

51.     The Filed Documents were properly served on all necessary creditors and parties in interest. As set forth more fully in the Amended Certificate of Service, on February 16, 2023,

the Filed Documents were (i) served electronically upon the counsel and parties of record who consented to such service through the Court's Electronic Case Filing System; (ii) served via direct e-mail to the individuals listed in Exhibit A to the Amended Certificate of Service; (iii) deposited with a Federal Express carrier for Priority Overnight delivery to the parties listed in Exhibit B to the Amended Certificate of Service; and (iv) deposited with a USPS carrier for Overnight Express delivery to the parties listed in Exhibit C to the Amended Certificate of Service. Moreover, on February 17, 2024, the Filed Documents were also deposited with a courier for immediate hand delivery to Federal Express for Priority Overnight delivery to the parties listed in the service list attached as Exhibit D to the Amended Certificate of Service (each of whom had already received service via other means). Finally, on February 18 and 19, 2024, the Filed Documents were served via direct e-mail to the parties listed in the service list attached as Exhibit E to the Amended Certificate of Service.

52.     The Plan Proponents did not solicit votes from Classes 2 and 3 of the Plan, which are unimpaired, and conclusively presumed to have accepted the Plan pursuant to Section 1126(f). The Plan Proponents likewise did not solicit votes from Classes 4 and 5, which are not entitled to any distributions under the Plan and are deemed to reject the Plan pursuant to Section 1126(g). Class 1 is the only impaired Class entitled to vote on the Plan. The Plan Proponents delivered a ballot to Bay Point, who is the only holder of Claims in Class 1 entitled to vote on the Plan. As evidenced by the Voting Report, Bay Point timely submitted its Ballot and voted to accept the Plan, thereby satisfying Section 1126(c) of the Bankruptcy Code.

53.     Accordingly, the Plan satisfies Section 1129(a)(2) of the Bankruptcy Code.

### iii.     <u>The Plan Complies with Section 1129(a)(3)</u>

54.     Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  The Plan was proposed in good faith. The Plan has the legitimate purpose of selling the Properties and distributing the Sale proceeds with the goal of maximizing the returns available to creditors.  Additionally, none of the mechanisms contained in the Plan are "forbidden by law."  The Plan is consistent with the objectives and purposes of the Bankruptcy Code and was made with honesty and good intentions and with a basis for expecting that, under the circumstances, it was the best means for maximizing any recovery for the Debtors' creditors. Therefore, the Plan has been proposed in good faith, not by any means forbidden by law, and complies with Section 1129(a)(3).

### iv.      The Plan Complies with Section 1129(a)(4)

55.     Section 1129(a)(4) of the Bankruptcy Code requires that any payment made or to be made by the proponent, the debtor, or by a person issuing securities, or acquiring property under the plan, for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the court, as reasonable. The procedures provided by the Plan for review and ultimate determination by the Court of the professional fees and expenses to be paid by the Debtors satisfy the requirement of Section 1129(a)(4). The Plan complies with Section 1129(a)(4).

### v.      The Plan Complies with Section 1129(a)(5)

56.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the debtor; that the appointment or continuance of such party be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed

by the reorganized debtors. The Plan explains that, pending the closing of the Sales, the Debtors shall continue to be jointly managed and operated by the Decision Makers, consistent with the Approved Bid Procedures, unless otherwise provided in the Plan. The Plan also states that, after the Effective Date, Kabatoff alone shall remain as the sole Decision Maker and fiduciary for the Debtors' respective bankruptcy Estates and shall be charged with the responsibility to file necessary tax returns on behalf of the Debtors and their estates. Thus, the requirements of Section 1129(a)(5) have been satisfied.

### vi.    The Plan Complies with Section 1129(a)(7)

57.    Section 1129(a)(7) of the Bankruptcy Code sets forth the "best interest of creditors" test. That section provides that with respect to each impaired class of claims or interests, each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan property of a value, as of the effective date, not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 on such date.

58.    The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee, as well as those fees and expenses that might be payable to attorneys and other professionals that such a trustee might engage. Those fees and expenses, as well as other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid fees and expenses incurred by the Debtors during the Chapter 11 Cases, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition unsecured claims. There is no reason to believe that a Chapter 7 liquidation will result in a higher Sale price than the proposed Chapter 11 liquidation. Because of the substantial secured debt that encumbers the Properties, which continues to accrue interest, the secured debt will undoubtedly be greater through a Chapter 7 liquidation (which is expected to take significantly

longer than the Chapter 11 liquidation proposed as part of the Plan), resulting in a lower (or at least no greater) recovery for unsecured claims. This is in addition to Chapter 7 trustee fees, which are anticipated to be several million dollars, and legal fees that would be incurred by the Chapter 7 trustee in administering the bankruptcy estate. All of these fees will be avoided by having the Properties sold in accordance with the provisions of the Plan. Moreover, the sale will almost certainly be completed in substantially less time than a sale in a Chapter 7 liquidation.

59.     The best interests test does not apply to holders of Claims in Classes 2 and 3 as they are unimpaired. The best interests test is also satisfied with regard to Classes 4 and 5, because while the holders of Claims in Classes 4 and 5 will not receive any distribution under the Plan, they similarly would not receive any distribution in a Chapter 7 liquidation, and thus their treatment is not less favorable under the Plan than what they would receive in a Chapter 7 liquidation.  As applied to Classes 4 and 5, all holders of impaired claims and interests will receive property with a value not less than the value such holders would receive in a liquidation under Chapter 7 of the Bankruptcy Code.  Based upon the foregoing, the best interests test is satisfied.

### vii.    The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8)

60.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or not be impaired by the plan, or the proponent must satisfy the cramdown provisions of Section 1129(b) with respect to such classes of claims or equity.  Class 1 is the only impaired class entitled to vote on the Plan.  Class 1 has accepted the Plan.  Classes 2 and 3 are unimpaired and therefore conclusively deemed to accept the Plan.  *See* 11 U.S.C. § 1126(f).  Classes 4 and 5 are impaired but are deemed to reject the Plan.  *See* 11 U.S.C. § 1126(g). Even though certain classes are deemed to reject the Plan, the Plan is confirmable because it satisfies Section 1129(b), as explained below.

### viii.     **The Plan Complies with Section 1129(a)(9)**

61.     Section 1129(a)(9) of the Bankruptcy Code provides, in relevant part, that except

to the extent that the holder of a particular claim agrees to a different treatment of such claim, the

plan must provide that:

> (A)     with respect to a claim of a kind specified in section
> 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan,
> the holder of such claim will receive on account of such claim cash
> equal to the allowed amount of such claim;
>
> (B)     with respect to a class of claims of a kind specified in section
> 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title,
> each holder of a claim of such class will receive (i) if such class has
> accepted the plan, deferred cash payments of a value, as of the
> effective date of the plan, equal to the allowed amount of such claim;
> or (ii) if such class has not accepted the plan, cash on the effective
> date of the plan equal to the allowed amount of such claim;
>
> (C)     with respect to a claim of a kind specified in section
> 507(a)(8) of this title, the holder of such claim will receive on
> account of such claim regular installment payments in cash (i) of a
> total value, as of the effective date of the plan, equal to the allowed
> amount of such claim; (ii) over a period ending not later than 5 years
> after the date of the order for relief under section 301, 302, or 303;
> and (iii) in a manner not less favorable than the most favored
> nonpriority unsecured claim provided for by the plan (other than
> cash payments made to a class of creditors under section 1122(b));
> and
>
> (D)     with respect to a secured claim which would otherwise meet
> the description of an unsecured claim of a governmental unit under
> section 507(a)(8), but for the secured status of that claim, the holder
> of that claim will receive on account of that claim, cash payments,
> in the same manner and over the same period, as prescribed in
> subparagraph (C).

11 U.S.C. § 1129(a)(9)(A)-(D).

62.     Here, the Plan provides for the payment in full of the Non-Tax Priority Claims in

Class 3. The Plan's proposed treatment of Allowed Administrative Expense Claims, Professional

Fee Claims, and Allowed Priority Tax Claims was agreed to by the holders of such claims on or prior to the Confirmation Hearing. The Plan, therefore, complies with Section 1129(a)(9)(C).

### ix.     The Plan Complies with Section 1129(a)(10)

63.     Section 1129(a)(10) provides that to the extent there are impaired classes of claims, at least one impaired class of claims must accept the Plan. The Plan satisfies this requirement, since Bay Point, the only Holder of Claims in the Voting Class, has voted to accept the Plan.

### x.     The Plan Complies with Section 1129(a)(11)

64.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation. The feasibility test requires the court to determine whether the plan is workable and has a reasonable likelihood of success. The Debtors will have sufficient funds from the Sale Proceeds to make the distributions set forth in Sections 5.8 and 5.9 of the Plan and consummate the terms of the Plan.  Consequently, the Plan has more than a reasonable likelihood of success and satisfies the feasibility requirements of Section 1129(a)(11) of the Bankruptcy Code.

### xi.     The Plan Complies with Section 1129(a)(12)

65.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. Section 2.4 of the Plan provides, in relevant part, that:

> [T]he Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal,

conversion or entry of a final decree, shall be paid from the
Bankruptcy Fees Reserve.

*Plan*, at 13. Therefore, the Plan satisfies all applicable requirements of Section 1129(a)(12) of the

Bankruptcy Code.

### xii.     The Other Provisions of Section 1129(a) are Either Inapplicable or Satisfied

66.     Section 1129(a)(6) does not apply, since the Debtors were never the type of

business that was subject to rate controls from a governmental entity.  The Debtors do not have

obligations for "retiree benefits," thus Section 1129(a)(13) is not applicable.   The Debtors have

no obligations to pay domestic support obligations, so Section 1129(a)(14) is not applicable.  The

Debtors are not individuals, so Section 1129(a)(15) does not apply.  Finally, the Debtors are not a

nonprofit entity, so Section 1129(a)(16) is not applicable.

67.     For all of the reasons, and the additional reasons set forth by the Plan Proponents,

the Court finds that the Plan satisfies Section 1129(a) of the Bankruptcy Code.

### b.     THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE

68.     Because not all classes have accepted the Plan, the Plan Proponents seek

confirmation pursuant to Section 1129(b) of the Bankruptcy Code.   Section 1129(b) of the

Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where one or

more impaired classes of claims and interests does not accept a plan, as required by Section

1129(a)(8). This mechanism is frequently referred to as a "cram down."  Section 1129(b) provides

in pertinent part:

> If all of the applicable requirements of subsection (a) of this section
> other than paragraph (8) are met with respect to a plan, the court, on
> request of the proponent of the plan, shall confirm the plan
> notwithstanding the requirements of such paragraph if the plan does
> not discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).

69.     The holder(s) of the claims in Classes 4 and 5 are impaired and deemed to have rejected the Plan.  Accordingly, the Plan Proponents invoke Section 1129(b) with respect to Classes 4 and 5.  The Plan (i) does not discriminate unfairly, and (ii) is fair and equitable.

### i.     The Plan Does Not Discriminate Unfairly

70.     Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes—it only prohibits unfair discrimination. A plan unfairly discriminates only if similar classes are treated differently without a reasonable basis for the disparate treatment. As between two classes of claims, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests; or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. Under the Plan, all impaired classes are treated in a manner that is consistent with the treatment of other classes that are similarly situated, if any, and no class will receive payments or property with an aggregate value greater than the aggregate value of the allowed claims or interests in such Class. Accordingly, the Plan does not discriminate unfairly as to any impaired class.

### ii.     The Plan is Fair and Equitable

71.     Pursuant to Section 1129(b)(2) of the Bankruptcy Code, a plan must be fair and equitable with respect to each class that rejects the Plan. Indeed, the "absolute priority rule" requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than full value for their claims or interests, no holder of claims or interests in a junior class may receive or retain any property under the plan.

72. Under the Plan, Class 1 is impaired but has voted to accept the Plan. Classes 2 and 3 are unimpaired and conclusively deemed to accept the Plan. *See* 11 U.S.C. § 1126(f). Classes 4 and 5 are impaired but will receive no distributions under the Plan. Thus, Classes 4 and 5 are deemed to reject the Plan. *See* 11 U.S.C. § 1126(g). The Plan is fair and equitable with respect to Classes 4 and 5 despite the fact that neither class will receive any distributions under the Plan because there are no classes junior to Classes 4 and 5 that will receive distributions under the Plan. Given this fact, and the above facts, the Plan is fair and equitable to the holders of claims and interests in these Classes 4 and 5.

### c. THE PLAN COMPLIES WITH ALL OTHER APPLICABLE PROVISIONS OF SECTION 1129 OF THE BANKRUPTCY CODE

73. The Plan also satisfies the remaining provisions of Section 1129 of the Bankruptcy Code. First, Section 1129(c) generally provides that the court may confirm only one plan. Although multiple plans have been filed over the course of these cases, the Plan Proponents have agreed on the terms of the Plan, which is the only plan presently before the Court. Second, the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 and the Plan, therefore, satisfies the requirements of Section 1129(d) of the Bankruptcy Code. Third, Section 1129(e) is not applicable since the Debtors' cases are not "small business cases." The Plan, therefore, satisfies the Bankruptcy Code's confirmation requirements.

### N. GOOD FAITH – SECTION 1125(E)

74. The Plan Proponents have acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the Plan, the Sale Transactions, and this Confirmation Order, including the solicitation of

acceptances of the Plan, and are therefore entitled to the protections set forth in Section 1125(e) of the Bankruptcy Code.

### O.    SATISFACTION OF CONFIRMATION REQUIREMENTS

75.    Based on the foregoing, the Plan satisfies all applicable requirements for confirmation thereof set forth in Section 1129 of the Bankruptcy Code.

### P.    LIKELIHOOD OF SATISFACTION OF CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

76.    Each of the conditions precedent to the Effective Date, as set forth in Article 7.5 of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with the Plan; *provided*, *however*, pursuant to the Plan, none of the conditions precedent can be waived by the Debtors or any other party in interest without the express written consent of Bay Point.

### Q.    IMPLEMENTATION

77.    All documents necessary to implement the Plan (including the Sale thereunder) and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.  The Plan Proponents are authorized to take any actions reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

### R.    THE SALE OF THE PROPERTIES

78.    The Purchase and Sale Agreements were negotiated, proposed, and entered into by the Debtors and the "**Purchasers**" identified in such agreements, without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Purchasers have engaged in any conduct that would cause or permit the Purchase and Sale Agreements to be avoided under Bankruptcy Code Section 363(n).

79.     The Purchasers are consummating the Sale Transactions in good faith and are good faith buyers within the meaning of Section 363(m) of the Bankruptcy Code. The Purchasers have proceeded in good faith in all respects in connection with the Sale Transactions. The Purchasers are, therefore, entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code.

80.     The Debtors' marketing process with respect to the Sale Transactions afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. The Purchase and Sale Agreements constitute the highest and best offers for the Properties, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Purchase and Sale Agreements constitute the highest and best offers constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the Purchase and Sale Agreements and the consummation of the Sale Transactions is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

81.     The consideration provided by the Purchasers pursuant to the Purchase and Sale Agreements (a) is fair and reasonable, (b) is the highest or best offer for the respective Property and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and all other applicable law. The Sale Transactions may not be avoided, and costs or damages may not be imposed or awarded as a result of or in any way relating to the Sale, under Bankruptcy Code Section 363(n) or any other provisions of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar state or federal laws.

82.     The Purchasers are not mere continuations of the Debtors or their estates and there is no continuity of enterprise or common identity between the Purchasers and any of the Debtors. The Purchasers are not holding themselves out to the public as a continuation of any of the Debtors. The Purchasers are not successors to the Debtors or their estates by reason of any theory of law or equity, and the Sale of the Properties does not amount to a consolidation, merger, or *de facto* merger of the Purchasers with or into any of the Debtors. The Purchasers entered into the Purchase and Sale Agreements in material reliance on and with fair consideration provided for the Sale Transactions being free and clear of all liens, claims, encumbrances and other interests relating to the Debtors and the Properties which existed immediately prior to consummation of the Sale Transactions, other than the recorded instruments set forth in Schedule A hereto, including any claims based on any theory of law or equity giving rise to successor or vicarious liabilities of any kind or nature. The Purchasers would not have entered into the Purchase and Sale Agreements or the Sale Transactions without such terms and the findings herein.

83.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied. Therefore, the Debtors may sell the Properties, through the Plan, pursuant to the Purchase and Sale Agreements free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than the recorded instruments set forth in Schedule A hereto. In addition to and without limiting the foregoing, the proposed Sale Transactions are to be consummated under the Plan, and the Properties to be sold pursuant to the Sale Transactions are dealt with by the Plan and this Confirmation Order. Therefore, except as expressly provided under the Purchase and Sale Agreements, the Plan, or this Confirmation Order, the Debtors may sell property pursuant to the Purchase and Sale Agreements free and clear of any claims, liens, encumbrances, or other interests

of any kind or nature whatsoever, other than the recorded instruments set forth in Schedule A hereto, pursuant to Section 1141(c) of the Bankruptcy Code.

84.     The Debtors may sell such property free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever (other than the recorded instruments set forth in Schedule A hereto) because, in each case, one or more of the standards set forth in Sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied. All holders of such claims, liens, encumbrances, or other interests against the Debtors, their estates, or any of the assets subject to the Sale Transactions (a) who did not object, or who withdrew their objections, to the Sale Transactions are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code and (b) are bound by the Plan pursuant to Section 1141(a) of the Bankruptcy Code.

85.     The Purchase and Sale Agreements were not entered into, and the Sale Transactions are not consummated, for the purpose of hindering, delaying or defrauding the Debtors' creditors under the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or any other applicable law. Neither the Debtors nor the Purchasers have entered into the Purchase and Sale Agreements, or are consummating the Sale Transactions, for any fraudulent or otherwise improper purpose.

### S.     DISCLOSURE OF FACTS

86.     The Plan Proponents have disclosed all material facts regarding the Plan, the Sale Transactions, the Disclosure Statement, and the adoption, implementation, and execution of the other matters provided for under the Plan involving corporation action to be taken by or required of the Debtors.

### T.     GOOD FAITH

87.     The Plan Proponents have acted in good faith in proposing and negotiating the Plan. The Plan Proponents will continue to be acting in good faith if they proceed to consummate the Plan and the agreements, transactions, and transfers contemplated thereby and take the actions authorized and directed by this Confirmation Order.

## ORDER

BASED ON THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

### A.     OBJECTIONS

88.     All objections to the Plan, the Sale Transactions, and the Disclosure Statement, and other responses, comments, statements, or reservation of rights, if any, in opposition to the Plan, the Sale Transactions, and the Disclosure Statement, have been overruled in their entirety and on the merits to the extent not otherwise withdrawn, waived, or otherwise resolved by the Plan Proponents prior to entry of this Confirmation Order or on the record at, the Confirmation Hearing, unless otherwise indicated herein. All withdrawn objections, if any, are deemed withdrawn with prejudice.

### B.     CONFIRMATION OF PLAN AND APPROVAL OF DISCLOSURE STATEMENT

89.     Disclosure Statement.  The Disclosure Statement contains adequate information and is **APPROVED.**

90.     Confirmation.  The Plan, including (a) all of the modifications to the Plan filed with the Court prior to or during the Confirmation Hearing and (b) all documents and exhibits attached or incorporated into the Plan, is **CONFIRMED** pursuant to Section 1129 of the Bankruptcy Code. A copy of the Plan in the form confirmed is attached hereto as **Exhibit 1**.

### C.     REFERENCE TO PLAN PROVISIONS

91.     The failure to specifically describe, include, or refer to any particular article, section, or provision of the Plan or the Purchase and Sale Agreements in this Confirmation Order shall not diminish or impair the effectiveness or enforceability of such article, section, or provision, nor constitute a waiver thereof, and such provision shall have the same validity, binding effect, and enforceability as every other provision, it being the intent of this Court that the Plan and the Sale Transactions contemplated thereunder be approved in their entirety and incorporated herein by reference.

**D.     INJUNCTION PROVISIONS**

92.     Pursuant to Bankruptcy Rule 3020(c)(1), the following injunction provisions in the Plan are hereby approved and will be immediately effective on the Effective Date without further order or action by the Court or any other party:

> **Injunction Against Interference with Plan.** Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that,* for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.

> **No Interference**. No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Escrow Agent in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Escrow Agent in the performance of its duties; *provided that,* nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

### E. APPROVAL OF PURCHASE AND SALE AGREEMENTS FOR THE PROPERTIES

93. The Purchase and Sale Agreements for the Properties, and all the terms and conditions thereof, are hereby **APPROVED**.

94. The failure to specifically include or make reference to any particular provision of the Purchase and Sale Agreements in this Confirmation Order shall not diminish or impair the effectiveness of such provisions.

95. The Sale Process, including the consummation of one or more Sales, was conducted in accordance with the Approved Bid Procedures.

96. Pursuant to Sections 105(a), 363(b), and 1123(b)(4) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transactions pursuant to and in accordance with the terms and conditions of the Purchase and Sale Agreements, the Plan, and this Confirmation Order, and (b) execute and deliver, perform under, consummate, and implement additional instruments and documents that may be reasonably necessary or desirable to consummate the Sale Transactions. Kabatoff is hereby designated as the authorized signatory for the Debtors and in such role is authorized and directed to execute all closing documents necessary to close the Sale Transactions.

97. Pursuant to Sections 105(a), 363(f), 365(f), 1129(b)(2)(A)(ii), 1141(a), and 1141(c) of the Bankruptcy Code, subject to the closing of the Sale Transactions, and except for the recorded instruments set forth in Schedule A hereto, the Properties shall be sold, transferred to and vested in the Purchasers free and clear of any and all liens, claims, encumbrances, and other interests, other than the recorded instruments set forth in Schedule A hereto, to the fullest extent permitted by section 363(f) and Section 1141(c) of the Bankruptcy Code.

98.     Subject to entry of Court orders approving requested fees and expenses, the Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) the fees and expenses of the Auctioneer with respect to such Property; (ii) the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; and (iii) any other closing costs associated with the Sale of such Property.

99.     The Properties shall remain in the Debtors' respective Estates under Section 541(a) of the Bankruptcy Code until the closing of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation. Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims, except for the recorded instruments set forth in Schedule A hereto. The Confirmation Order shall contain appropriate provisions, consistent with Section 1142 of the Bankruptcy Code, authorizing and directing any necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

100.     The Escrow Agent shall hold the proceeds of the Sale(s) of the Properties in the Escrow DIP Account established by the Debtors at a depository institution that has been previously approved by the UST with the Escrow Agent identified as the sole signatory on such account. The Debtors' appointment of the Escrow Agent is hereby approved; the Escrow Agent is authorized and directed to (i) hold the proceeds of the Sale(s) in the Escrow DIP Account, and (ii) distribute

the Sale Proceeds and other funds of the Estates on the Distribution Date strictly in accordance with the provisions of the Plan.

101.     The Escrow Agent shall not be deemed an officer or agent of the Debtors. The Escrow Agent may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan. Except for gross negligence, or willful misconduct, the Escrow Agent shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan (including, without limitation, distributions of Sale Proceeds pursuant to the Plan), the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with or related to the Plan, except in the case of gross negligence or willful misconduct. For the avoidance of doubt, the Escrow Agent shall have no responsibility or liability to any entity for the failure of Kabatoff to fulfill any of his obligations under the Plan. The Escrow Agent is not a receiver, trustee, or assignee.

102.     Pursuant to Sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors and any other necessary party is authorized and directed to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Plan, that is necessary for consummation of the Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

**F.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

103.     On the Plan's Effective Date, unless otherwise assumed, all Executory Contracts to which the Debtors are a party shall be deemed rejected. Allowed Claims arising from the rejection

of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims. A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

### G.  RECORDATION AND PROPERTY TRANSFERS

104.  This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, provincial, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Pursuant to Section 1146(a) of the Bankruptcy Code, the transfers of property pursuant to the Purchase and Sale Agreements, the Plan, and this Confirmation Order shall not be subject to any stamp or similar tax. Pursuant to Sections 105(a), 1141(a), and 1142(b) of the Bankruptcy Code, each and every federal, state, provincial, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without

payment of any stamp tax or similar tax, recordation fee, or governmental assessment imposed by law.

### H. RESOLUTION OF SPECIFIC OBJECTIONS AND CERTAIN OTHER AGREEMENTS

105. The Plan, attached hereto as confirmed by the Court, contains certain modifications in light of consensual resolutions of those objections that were resolved at or prior to the Confirmation Hearing. A redline of the Plan, as confirmed, compared to the Plan as it appears at D.I. 215 is attached hereto as **Exhibit 2**. Among the modifications reflected in the Plan are (i) a $100,000 reserve for the claim of Dream Yards Landscaping, Inc., pending further proceedings to determine the extent and value of its secured claim (if any) arising from the filing of a mechanics' lien against the Aberdeen Property, (ii) recognition of the standing of parties-in-interest to file objections to the claims of creditors and administrative expense claimants, (iii) deletion of the provision in Section 4.1 of the Plan prohibiting Louise Blouin from "taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan," and (iv) additional language confirming that following the Effective Date of the Plan, Mathew Kabatoff shall be the sole Decision Maker (as such term is defined in the Plan), and aside from his role as Decision Maker, Mr. Kabatoff shall serve as the fiduciary for the Debtors and their Estates, and shall be responsible for causing to be prepared and filed all necessary tax returns on behalf of the Debtors.

106. Unless otherwise agreed to by each of the Debtors, Bay Point, and the Purchasers, the discretion of which is in each of their respective sole and absolute discretion, Blouin shall vacate the Properties and completely remove all her personal property from each of the Properties, including, without limitation, the entire exterior premises constituting the same, no later than March 4, 2024.

107.     Unless otherwise agreed to by each of the Debtors, Bay Point, and the Purchasers, the discretion of which is in each of their respective sole and absolute discretion, the Properties shall be put into broom-swept condition and made available to the Purchasers for inspection no later than March 5, 2024 at 11:00 a.m. (Eastern).

108.     The Debtors are hereby authorized and directed to close the Sales Transactions at 2:00 p.m. (Eastern) on March 5, 2024, or as soon as practicable thereafter (the "Closing Deadline"); *provided that* if the Debtors and Bay Point each consent to an extension of the Closing Deadline, such consent being in each of their sole and absolute discretion, the Closing Deadline shall be extended consistent with their agreement, and no such extension shall be deemed a breach of any provision of this Confirmation Order or the Purchase and Sale Agreements; *and further provided that* nothing contained herein shall require the Purchasers to close the Sale Transactions unless the conditions precedent in the Purchase and Sale Agreements have been satisfied. Notwithstanding the foregoing, all persons, including the Debtors, Blouin, Bay Point, and the Purchasers, are directed and ordered to use their respective best efforts to close the Sale Transactions at or before the Closing Deadline.

## I.     NOTICE OF CONFIRMATION ORDER, EFFECTIVE DATE, AND SUBSTANTIAL CONSUMMATION

109.     Following entry of the Confirmation Order and satisfaction of the conditions in Section 7.5 of the Plan, the Debtors shall file a notice with the Bankruptcy Court of the Effective Date and substantial consummation of the Plan. The Debtors shall promptly serve such notice on all creditors and parties in interest.

## J     SUBSTANTIAL CONSUMMATION

110.     On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to Sections 1101 and 1127 of the Bankruptcy Code.

### K.     BINDING EFFECT

111.     Bankruptcy Rule 3020(e) states that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  Bankruptcy Rule 6004(h) provides a similar stay to orders authorizing the use, sale, or lease of property (other than cash collateral).  *See* Fed. R. Bankr. P. 6004(h).   Each rule also permits modification of the imposed stay upon court order.

112.     As stated on the record at the hearing held by this Court on February 27, 2024 whereat this Court orally approved the Disclosure Statement and confirmed the Plan, any party-in-interest seeking an appeal of the relief granted by this Confirmation Order has the right to immediately appeal, including the right to file any such appeal prior to the entry of this Confirmation Order. The Court, having found sufficient cause shown, hereby modifies the stays under Rules 3020(e), and 6004(h) such that this Confirmation Order shall be stayed until 5:00 p.m. (Eastern) on March 4, 2024, at which time the stay shall terminate, and expressly directs entry of judgment as set forth herein. The Purchasers, being good faith purchasers under Section 363(m) of the Bankruptcy Code, may close the Sale Transactions contemplated by the Purchase and Sale Agreements at any time after 5:00 p.m. (Eastern) on Tuesday, March 4, 2024, unless a further stay is entered by a court having jurisdiction of this matter. The Escrow Agent is authorized and directed to make distributions under the Plan on the Distribution Date.

### L.     RESERVATION OF RIGHTS

113.     Prior to the Effective Date, neither the filing of the Plan, any statement or provision contained in the Plan, the Disclosure Statement, or this Confirmation Order, nor the taking of any action by the Debtors, Bay Point, or any other entity with respect to the Plan, the Disclosure Statement, or this Confirmation Order shall be deemed to be an admission or waiver of any rights

of: (i) any Debtor with respect to the Holders of Claims or Equity Interests or any other Entity; or (ii) any Holder of a Claim or an Equity Interest or other Entity.

### M. HEADINGS

114. The headings in the Confirmation Order are for reference purposes only and shall not affect in any way the meaning or interpretation of the Confirmation Order.

### N. GOVERNING TERMS

115. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

### O. FINAL ORDER

116. This Confirmation Order is a final order within the meaning of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

### P. EXEMPTION FROM CERTAIN TRANSFER TAXES AND RECORDING FEES

117. Each Sale constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "**Transfer Taxes**"). For avoidance of doubt, this does not apply to any income, employment, or unemployment tax claims, or capital gains tax, under the Internal Revenue Code, 26 U.S.C. Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton,

shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

### Q.  EFFECTUATING ACTIONS

118.   The Plan Proponents are authorized to take all actions necessary to effectuate the Sale Transactions and the relief granted in this Confirmation Order in accordance with the Plan, to the extent provided herein, without further Order of the Court.

### R.  TAX RETURNS

119.   In accordance with Section 4.1 of the Plan, Kabatoff, as the Debtors' fiduciary, is authorized and directed to prepare and file necessary tax returns on behalf of the Debtors.

### S.  RETENTION OF JURISDICTION

120.   The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Confirmation Order. The Court shall also retain exclusive jurisdiction with respect to each matter set forth in Section 8.1 of the Plan.



Dated: March 1, 2024
      Central Islip, New York

_____
Alan S. Trust
Chief United States Bankruptcy Judge

## <u>SCHEDULE A</u>

1. Declaration recorded November 16, 1982 in Liber 9271 at Page 196.

2. Declaration recorded April 01, 1988 in Liber 10574 at Page 15.

3. Deed of Easement recorded April 15, 1994 in Liber 11672 at Page 959.

4. Easement Agreement recorded December 06, 2004 in Liber 12358 at Page 919.

**EXHIBIT 1**

**(Confirmed Plan)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC. | Case No. 23-72834-AST |
| BRICKCHURCH ENTERPRISES, INC. | Case No. 22-70914-AST |
| Debtors. | Jointly Administered |

### BAY POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS' SECOND AMENDED JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Bay Point Capital Partners II, LP ("Bay Point"), together with Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch", and collectively with Aberdeen, the "Debtors" and each a "Debtor"), propose this second amended joint liquidating plan (the "Plan") under Chapter 11 of the Bankruptcy Code.

The Debtors have pursued a Sale of their valuable and iconic, contiguous ocean front properties (as defined herein). The bid procedures governing the Sale were the subject of a separate application filed by the Debtors, were approved by the Bankruptcy Court (the "Approved Bid Procedures") pursuant to an Order entered on November 22, 2023 [D.I. 104], were amended by the Debtors on December 15, 2023 [D.I. 116] and again on January 26, 2024 [D.I. 166], and shall be deemed incorporated by reference for purposes of the Plan.

On January 24, 2024, the Debtors held an Auction under the terms of the Approved Bid Procedures. The highest and best bids at the Auction were in the respective sums of $40,500,000 (376 Gin Lane) and $38,500,000 (366 Gin Lane). Pursuant to the terms of the Approved Bid Procedures, the above-referenced bids are subject to a buyer's premium in the amount of $3,660,000 and $3,420,000, respectively. In addition, the prospective purchasers have agreed to

increase the amount of the high bid by $1,501,440 (376 Gin Lane) and $1,425,280 (366 Gin Lane), contingent upon the Properties being sold pursuant to the Plan and 11 U.S.C. § 1146 being applicable to relieve the prospective purchasers of their obligations to pay any transfer taxes with respect to the Sales of the Properties. The high bids for the Properties, plus the buyer's premiums and the contingent bid enhancements, provide for a combined total purchase price of $89,006,720 (the "Gross Sale Proceeds"). Copies of the respective Purchase and Sale Agreements for each Property are annexed hereto as Exhibit A and Exhibit B.

On January 30, 2024, Bay Point filed its *Chapter 11 Liquidating Plan* [D.I. 173] (the "Initial Bay Point Plan"). On February 12, 2023, Bay Point filed its *First Amended Chapter 11 Liquidating Plan* [D.I. 194] (collectively with the Initial Bay Point Plan, the "Bay Point Plan"). Contemporaneously, with the submission of this Plan, Bay Point will withdraw the Bay Point Plan.

On February 14, 2024, Bay Point and the Debtors filed their *Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code* [D.I. 209], which is amended and replaced by this Plan.

This Plan is proposed by Bay Point and the Debtors (collectively, the "Plan Proponents") and is intended to provide an efficient and effective method for distributing the Sale Proceeds resulting from the Auction and other monetary assets of the Debtors. Pending the closing of the Sales, the Debtors shall continue to be jointly managed and operated by Mathew Kabatoff ("Kabatoff") and Bay Point, consistent with the Approved Bid Procedures, unless otherwise provided herein. After the Effective Date, Kabatoff alone shall remain as the sole Decision Maker and fiduciary for the Debtors' respective bankruptcy Estates and shall be charged with the responsibility to file necessary tax returns on behalf of the Debtors and their estates.

# ARTICLE I

# DEFINITIONS

All capitalized terms used herein shall have the meanings set forth below.

1.1     "**Aberdeen**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.2     "**Aberdeen Administrative Expense Claim**" means an Administrative Expense Claim against Aberdeen.

1.3     "**Aberdeen Priority Claim**" means a Priority Claim against Aberdeen.

1.4     "**Aberdeen Property**" means the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

1.5     "**Aberdeen Unsecured Claim**" means an Unsecured Claim against Aberdeen.

1.6     "**Administrative Expense Claims Bar Date**" shall mean the first Business Day that is thirty (30) days after the Effective Date.

1.7     "**Administrative Expense Claim**" means a Claim for the costs and expenses of administering the respective Cases under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) Professional Fee Claims.

1.8     "**Allowed**" means, except as otherwise provided herein, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has been scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

1.9     "**Approved Bid Procedures**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.10    "**Auction**" shall have the meaning as ascribed to such term in the Approved Bid Procedures.

1.11    "**Bankruptcy Cases**" means, collectively, the above-captioned cases, each being a "**Bankruptcy Case**."

1.12 "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

1.13 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York.

1.14 "**Bankruptcy Fees**" means (i) all fees and charges against the Estate under section 1930 of title 28 of the United States Code, and (ii) a Claim for reasonable compensation for services rendered, and reimbursement of actual and necessary expenses incurred, by the Escrow Agent as awarded by a Final Order of the Bankruptcy Court.

1.15 "**Bankruptcy Fees Reserve**" means the segregated account established pursuant to Section 5.3 of the Plan.

1.16 "**Bay Point**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.17 "**Bay Point Collateral Documents**" means (i) each security instrument, mortgage, deed of trust, document, pledge agreement, subordination agreement, account control agreement, or any other agreement pursuant to which either Debtor or any other Person granted Bay Point a Lien to secure repayment of the DIP Loan Obligations; and (ii) each of the JGB Assigned Documents.

1.18 "**Bay Point Debt**" shall have the meaning ascribed to such term in Section 3.1 of the Plan.

1.19 "**Bay Point Loan Documents**" means, collectively, the DIP Loan Documents, the Morgan Stanley Judgment, and each of the documents related to the debt referenced in the Morgan Stanley Judgment that were assigned to Bay Point.

1.20 "**Blouin**" means Louise Blouin, indirect upstream beneficial equity holder and Creditor of the Debtors.

1.21 "**Brickchurch**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.22 "**Brickchurch Administrative Expense Claim**" is an Administrative Expense Claim against Brickchurch.

1.23 "**Brickchurch Priority Claim**" means a Priority Claim against Brickchurch.

1.24 "**Brickchurch Property**" means the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

1.25 "**Brickchurch Unsecured Claim**" means an Unsecured Claim against Brickchurch.

1.26     "**Broker**" means the person or firm engaged by the Debtors, with consent of both Decision Makers, and approved by the Bankruptcy Court to market and sell the Properties.

1.27     "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.28     "**Cases**" means, collectively, the above-captioned, jointly administered Chapter 11 cases commenced by the Debtors in the Bankruptcy Court, each being a "**Case**."

1.29     "**Cash**" means lawful currency of the United States of America.

1.30     "**Claim**" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

1.31     "**Claims Objection Deadline**" shall mean (A) for Administrative Expense Claims, the later of (i) thirty (30) days after a request for payment, or Proof of Claim, seeking allowance of the Claim is filed, and (ii) thirty (30) days after entry of this Confirmation Order, and (B) for all Claims other than Administrative Expense Claims, thirty (30) days after the entry of this Confirmation Order.

1.32     "**Closing**," means that time at which the Debtors, after and pursuant to a Sale Approval Order, consummate one or more Sales of the Properties.

1.33     "**Confirmation**" means the entry of the Confirmation Order.

1.34     "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court to consider confirmation of the Plan.

1.35     "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1129.

1.36     "**Credit Bid**" means the right of Bay Point pursuant to 11 U.S.C. §363(k) to bid its Secured Claims at the Auction.

1.37     "**Creditor**" means the holder of a Claim against one or both of the Debtors.

1.38     "**Debtors**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.39     "**Decision Makers**" means, collectively, Bay Point and Kabatoff, each being a "**Decision Maker**;" *provided that*, notwithstanding anything to the contrary herein, Bay Point shall have the right, in its sole and absolute discretion, to withdraw as a Decision Maker. In the event that Bay Point withdraws as a Decision Maker, the terms "Decision Makers" and "Decision Maker" shall refer only to Kabatoff.

1.40    "**DIP Financing Order**" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

1.41    "**DIP Lender Superpriority Claim**" means that Allowed Administrative Claim in the amount of the DIP Loan Obligations, granted to Bay Point pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over all other Administrative Expense Claims, adequate protection and other diminution claims, Unsecured Claims, and all other Claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including Administrative Expense Claims or other Claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code, or any other section of the Bankruptcy Code, whether or not such Administrative Expense Claims or Claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, except as otherwise provided herein.

1.42    "**DIP Loan Documents**" means (i) the Loan and Security Agreement, dated November 9, 2022, by and among Debtor, Aberdeen, and Bay Point (the "**DIP Loan Agreement**"), and (ii) each of the Bay Point Collateral Documents.

1.43    "**DIP Loan Obligations**" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

1.44    "**Disclosure Statement**" means the Disclosure Statement for the Plan, including all exhibits, attachments, or amendments thereto, approved by Order of the Bankruptcy Court.

1.45    "**Disputed Claims Reserves**" means, collectively, the segregated account(s) established pursuant to Section 5.2 of the Plan for the payment of Disputed Claims to the extent such Disputed Claims are Allowed by a Final Order, each being a "**Disputed Claims Reserve**."

1.46    "**Disputed**" means, except as otherwise provided herein, with respect to a Claim, (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been timely filed; (b) any Claim that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Final Order; *provided however, that* until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in its entirety if: (A) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (B) no corresponding Claim has been listed in the Schedules; *and further provided that* until the earlier of (I) the filing of an objection to a Proof of Claim or (II) the last date to file objections to Claims as

established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in that amount by which the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules. Claims arising from the rejection of Executory Contracts will be treated as Disputed Claims unless and until such Claims have been settled, withdrawn, or determined by a Final Order. Notwithstanding the foregoing, any Claims held by Bay Point shall not be Disputed Claims, but shall be subject to the clawback provisions set forth in Section 5.11.

1.47  "**Distribution Date**" means the Effective Date or such other date as soon as reasonably practicable as may be set by the Debtors for the distribution of Sale Proceeds in accordance with the terms of the Plan.

1.48  "**Effective Date**" means the date upon which all of the conditions to effectiveness of the Plan as set forth in Section 7.5 of the Plan have been satisfied.

1.49  "**Equity Interests**" means the ownership interests of Aberdeen Enterprises (BVI) Ltd. and Brickchurch Enterprises (BVI) Ltd. in the respective Debtors.

1.50  "**Escrow Agent**" means Gary Herbst, or such other person selected by Debtors to hold the Bankruptcy Fees Reserve, Disputed Claims Reserves and the Professional Fee Reserve, and to disburse the Sale Proceeds and other funds of the Estate strictly in accordance with the Plan and order of the Bankruptcy Court.

1.51  "**Estates**" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "**Estate**."

1.52  "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" of the Debtor as such terms are used in section 365 of the Bankruptcy Code.

1.53  "**Federal Tax Liens**" includes and means, collectively, (a) that certain Lien filed by the IRS on August 17, 2022 against the Aberdeen Property with the Suffolk County Clerk (Recording No: LFED00034063); and (b) that certain Lien filed by the IRS on February 17, 2023 against the Aberdeen Property with the Suffolk County Clerk (Recording No. LFED00034390), each being a "**Federal Tax Lien**;" *provided that,* nothing contained herein shall be an admission or an acknowledgement of the validity of above-referenced Federal Tax Liens, nor shall anything herein prejudice any person's (including either Debtor's or Bay Point's) right to challenge the validity of any Lien asserted against either Property by the IRS.

1.54  "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing.  The possibility that a motion under Rule 59 or Rule 60 of the Federal

Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to an order will not cause it not to be a Final Order.

1.55 "**Governmental Unit**" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory a municipality, or a foreign state; or other foreign or domestic government.

1.56 "**Gross Sale Proceeds**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.57 "**IRS**" means the United States Internal Revenue Service.

1.58 "**IRS Litigation Reservation**" shall have the meaning ascribed to such term in Section 2.1 of the Plan.

1.59 "**JGB Assigned Documents**" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

1.60 "**JGB Judgment**" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

1.61 "**Plan**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.62 "**Kabatoff**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.63 "**Lien**" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

1.64 "**Morgan Stanley Judgment**" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

1.65 "**Net Sale Proceeds**" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, brokerage fees, closing costs, and documentary costs, if any; *provided that,* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

1.66 "**Petition Date**" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing these Chapter 11 cases were filed.

1.67 "**Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including each Priority Tax Claim.

1.68 "**Priority Tax Claim**" means any Allowed Unsecured Claim of a federal, state or local taxing authority that is entitled to priority under 11 U.S.C. § 507(a)(8).

1.69 "**Private Sale**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.70 "**Professional**" means a professional employed by a Debtor under section 11 U.S.C. §327.

1.71 "**Professional Fee Claim**" means a Claim for compensation for services rendered, and reimbursement of expenses incurred by a Professional as awarded by a Final Order of the Bankruptcy Court; *provided that*, for the avoidance of doubt, the fees of the Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction shall be paid directly from Gross Sale Proceeds without further order of the Bankruptcy Court and shall not be deemed to have a Professional Fee Claim; *and further provided that* a Broker whose retention has been approved by the Bankruptcy Court that does not solicit an offer that results in a consummated Sale of a Property may have a Professional Fee Claim in accordance with the approved retention application, subject to the rights of Debtors and any party in interest to object to the same.

1.72 "**Professional Fees Reserve**" shall have the meaning ascribed to it under Section 5.3A of the Plan.

1.73 "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.74 "**Properties**" means collectively the Aberdeen Property and the Brickchurch Property, each being a "**Property**."

1.75 "**Qualified Bidder**" has the meaning ascribed to such term in the Approved Bid Procedures, and shall, for the avoidance of doubt, include Bay Point by virtue of its Credit Bid rights.

1.76 "**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.77   "**Sale**" shall mean a sale of the Properties, whether through a single transaction or multiple transactions, pursuant to one or more Sale Approval Orders.

1.78   "**Sale Approval Order**" means an order of the Bankruptcy Court authorizing and directing the sale of one or more of the Properties pursuant to 11 U.S.C. § 363 or any other applicable provision of the Bankruptcy Code, including the Confirmation Order.

1.79   "**Sale Proceeds**" means the Net Sale Proceeds available from a Sale of a Property as defined in the introductory section of the Plan.

1.80   "**Sale Process**" shall have the meaning ascribed to such term in Section 4.2 of the Plan.

1.81   "**Schedules**" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtors with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.82   "**Section 1031**" shall have the meaning ascribed to such term in Section 4.9 of the Plan.

1.83   "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.84   "**Successful Bid(s)**" shall mean the highest and best bid for one or both of the Properties as (i) collectively recommended by Debtors and Bay Point and approved by the Bankruptcy Court; or (ii) as decided by the Bankruptcy Court after notice and hearing of the same if Debtors and Bay Point are not able to agree on the same.

1.85   "**Successful Bidder**" shall mean the Qualified Bidder that submits a Successful Bid.

1.86   "**Transfer Taxes**" means, without limitation, (a) Suffolk County or other applicable local real property transfer taxes, including but not limited to the Peconic Bay transfer tax; (b) New York state TP 584 deed and transfer taxes; and (c) any and all other stamp taxes, similar taxes, or mansion taxes, which, but for the applicability of § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of the Plan.

1.87   "**Transferred Encumbrances**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.88 "**Unsecured Claim**" means an Allowed Claim which is not an Administrative Claim, a Bankruptcy Fee, a Priority Claim, a Post-Petition Administrative Tax Claim, or a Secured Claim.

1.89 "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim against one or both of the Debtors.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full, or such other amount as agreed upon with the holders of such unclassified Claims.

2.1 **Administrative Expense Claims**. Each holder of an Allowed Administrative Expense Claim - other than the DIP Lender Superpriority Claim and any Administrative Expense Claim held by the IRS - shall be paid in full satisfaction of its Claim, pursuant to agreement or Final Order, the amounts specified in Sections 5.8 and 5.9 of the Plan. Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim. For the avoidance of doubt, the $1 million payment to the IRS under Section 2.3 is only a partial payment, to be made from the Sale Proceeds at Closing, and shall not be treated as a full satisfaction of any claim or expense. Nothing contained in the Plan shall otherwise prejudice the rights and claims of the non-debtor parties in connection with the pending litigation entitled *Aberdeen Enterprises Inc. v. USA*, 2:22-cv-07190 (E.D.N.Y.) all of which are hereby preserved to the fullest extent possible (the "IRS Litigation Reservation").

Except as otherwise set forth herein or in 11 U.S.C. § 503(b)(1)(D), requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the

Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties. The bar under this paragraph shall not apply to any administrative expense of the IRS, including any administrative expense that could be the subject matter of a request under 11 U.S.C. § 505(b)(2), or to the DIP Lender Superpriority Claim.

      2.2   **Professional Fees**. All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. Pending consideration of the application, appropriate reserves shall be established as set forth herein from the Sale Proceeds in accordance with the provisions of Section 5.3A of the Plan to pay Professional Fee Claims as Allowed; *provided*, *however*, that notwithstanding anything to the contrary herein, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, plus expenses; the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall be $100,000, plus expenses, through confirmation of the Plan (subject to Bankruptcy Court approval), plus an additional amount for post-confirmation services not to exceed an agreed upon cap of $40,000; and the Allowed Professional Fee Claim of Duane Morris LLP shall not exceed $151,905.95.

      Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed

Professional Fee Claim, and the Professional shall have no further recourse against the Debtors or Bay Point for such Claim.

2.3 **Priority Tax Claims**. The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

The IRS shall receive the fixed sum of $1 million for application toward the IRS's Administrative Expense Claims and Priority Tax Claims in these cases. The IRS's Administrative Expense Claims and Priority Tax Claims are Allowed in full and are not Disputed for all purposes without prejudice to the IRS Litigation Reservation. The IRS agrees to accept partial payment towards its claims and expenses as set forth in this Section. The IRS may apply all or any part of the $1 million payment toward its Administrative Expense Claim or Priority Tax Claim in its sole discretion. This $1 million distribution to the IRS shall not be subject to any Disputed Claims Reserve under Section 5.2 of this Plan. Rather, the full $1 million will be distributed to the IRS from the Sale Proceeds at Closing; notwithstanding anything else to the contrary herein, the $1 million payment shall not be subject to return, disgorgement, or refund for any reason whatsoever.

2.4 **Bankruptcy Fees**.

    (a)    <u>Quarterly United States Trustee Fees</u>. The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of final decree, shall be paid from the Bankruptcy Fees Reserve.

     (b)    <u>Escrow Agent Fees</u>.  The Bankruptcy Fees payable to the Escrow Agent shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Escrow Agent shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

     (c)    <u>Funding</u>.  The Debtors shall use the Sale Proceeds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

## ARTICLE III

## <u>CLASSIFICATION AND TREATMENT OF CLAIMS</u>

Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| <u>Class</u> | <u>Designation</u> | <u>Impaired</u> | <u>Entitled to Vote</u> |
|---|---|---|---|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

## <u>Class 1: Secured Claims of Bay Point</u>

3.1    **<u>Classification</u>** – Class 1 consists of the Secured Claims of Bay Point, which include the following: (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment (collectively, the "<u>Bay Point Debt</u>"). The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen

Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property). Nonetheless, this potential lien-priority dispute between the IRS and Bay Point will be moot if the auction sale is confirmed because then there will be no funds available for distribution toward a third-priority lien against the Aberdeen Property.

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order, and such excess amount shall thereafter be distributed in accordance with the Bankruptcy Code.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11

U.S.C. § 506(b) and the DIP Financing Order; *provided, however*, that nothing contained herein shall prejudice any right that the Debtors or a party-in-interest may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *further provided that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* this reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and *further provided that* this reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.  For the avoidance of doubt, the decision of the Debtors to challenge the amount of the Bay Point Debt may be made following the Effective Date without the concurrence of Bay Point as a Decision Maker. Any challenge shall be filed within thirty (30) days of the Effective Date.

       <u>**Voting**</u> – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

<u>**Class 2:  Secured Claims of New York State Department of Taxation and Finance**</u>

     3.2    <u>**Classification**</u> – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

**Class 3:  Non-Tax Priority Claims**

3.3    **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

**Treatment** – The Debtors do not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000 in the aggregate.

**Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

**Class 4:  General Unsecured Claims**

3.4    **Classification** – Class 4 consists of all Unsecured Claims.

**Treatment** – Class 4 will not receive any distributions under the Plan.

**Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**Class 5:  Equity Interests**

3.5    **Classification** – Class 5 consists of the Equity Interests in the Debtors.

**Treatment** – Class 5 will not receive any distributions under the Plan.

**Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1 **Authority to Act / Limitation of Liability.** Each act and every decision to be made by Debtors under the Plan through the Effective Date shall be made at the direction, and shall be completely consistent with such direction, of the Decision Makers, such direction being valid and enforceable only upon the mutual agreement of both Decision Makers; *provided*, *however*, that after the Effective Date, Kabatoff alone shall remain as the sole Decision Maker (as such term is defined in the Plan) and aside from his role as the sole Decision Maker, Kabatoff shall be the fiduciary for the Debtors and their respective bankruptcy Estates and shall be charged with the responsibility to file all necessary tax returns and execute all closing documents necessary to close the Sale Transactions on behalf of the Debtors and their estates. Prior to the Effective Date, if the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third parties as appropriate to assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. Kabatoff shall have the responsibility to file, or cause to be filed, all necessary tax returns or similar reports with the appropriate taxing authorities.

18

Except for gross negligence or willful misconduct, the Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan; *provided*, *however*, that nothing contained herein shall in any way negate Kabatoff's fiduciary responsibilities on behalf of the Debtors' estates.

4.2     **Sale Free and Clear of All Claims, Liens, Taxes and Interests.**  The Plan shall be funded through the disposition of the Sale Proceeds, funds currently in the Debtors' possession, and any remaining funds previously advanced by Bay Point to the Debtors pursuant to the DIP Financing Order.

4.3     **[Reserved].**

4.4     **Provisions Relating to the Sale Process.**

    (a)     Approved Bid Procedures.  The Sale Process, including the consummation of one or more Sales, was conducted in accordance with the Approved Bid Procedures.

    (b)     Free and Clear Sale(s).  All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation, except as paid at Closing.

    (c)     **[Reserved].**

    (d)     Deadline to Close.  The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024 or such other date as fixed by the Court**.

    (e)     Payment of Sale Transaction Costs.  The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii)

subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) any other closing costs associated with the Sale of such Property; and (iv) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(f)     Vesting of Assets.  The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the closing of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation.  Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing any necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

## 4.5     **The Escrow Agent**.

(a)     Escrow Agent.  The Escrow Agent shall hold the proceeds of the Sale(s) of the Properties in the separate DIP account (the "**Escrow DIP Account**") established by the Debtors at a depository institution that has been previously approved by the UST with the Escrow Agent identified as the sole signatory on such account. The Confirmation Order shall approve the Debtors' appointment of the Escrow Agent, with the power and duty to (i) hold the proceeds of the Sale(s) in the Escrow DIP Account, and (ii) distribute the Sale Proceeds and other funds of the Estates strictly in accordance with the provisions of the Plan.

(b)     Escrow Agent Protections.  The Escrow Agent shall not be deemed an officer or agent of the Debtors.  The Escrow Agent may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan.  Except for gross negligence, or willful misconduct, the Escrow Agent shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan (including, without limitation, distributions of Sale Proceeds pursuant to the Plan), the Disclosure Statement or any contract,

instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with or related to the Plan, except in the case of gross negligence or willful misconduct. For the avoidance of doubt, the Escrow Agent shall have no responsibility or liability to any entity for the failure of Kabatoff to fulfill any of his obligations under the Plan. The Escrow Agent is not a receiver, trustee, or assignee.

(c)    <u>No Interference</u>. No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Escrow Agent in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Escrow Agent in the performance of its duties; *provided that*, nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

(d)    <u>Execution of Documents</u>. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors and any other necessary party shall be authorized, and shall be directed by the Confirmation Order, to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Plan, that is necessary for consummation of the Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

(e)    <u>Filing of Documents</u>. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.6    **Transfer Taxes**. The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "<u>Transfer Taxes</u>"). For

avoidance of doubt, this does not apply to any income, employment, or unemployment tax claims, or capital gains tax, under the Internal Revenue Code, 26 U.S.C. Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

4.7     **[Reserved].**

4.8     **Preservation of Causes of Action.**   Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective bankruptcy estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and proceeds realized thereon shall be distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court after payment of reasonable attorney's fees.

4.9     **1031 Exchange Provisions.** Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan, nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986 as amended ("Section 1031"), including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

4.10    **Filing of Documents.**    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.11    **Preservation of Insurance.**    The Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor, the Properties (or any individual Property), or any other Person or entity. Likewise, the Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or any insurance carrier.

**ARTICLE V**

**DISTRIBUTIONS**

5.1    **Method of Payment**.    Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

5.2    **Disputed Claims Reserves**.    No distributions shall be made with respect to any Disputed Claim. Instead, the Escrow Agent shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute, including, but not limited to (i) Disputed Secured Claims (ii) Disputed Claims entitled to treatment as Administrative Expenses or as Priority Claims

pursuant to sections 503 and 507 of the Bankruptcy Code, (iii) Disputed Claims of Governmental Units for any tax, and (iv) any disputed cure amount. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan. Furthermore, the IRS's Allowed Administrative Expense Claim and Allowed Priority Tax Claim are not subject to this Section 5.2 because those Claims are Allowed in full and are not Disputed, and the IRS agrees to accept a partial payment toward those claims and expenses in the amount of $1 million, as set forth in Section 2.3.

5.3 **Bankruptcy Fee Reserve.** The Debtors shall utilize the Sale Proceeds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

5.3A **Professional Fees Reserve.** The Debtors shall utilize the Sale Proceeds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor(s) | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $140,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |
| Aberdeen and Brickchurch | The Law Offices of Avrum J. Rosen, PLLC | $50,676.50 |
| Aberdeen and Brickchurch | TBD Tax Professional for Assistance with Preparation and Filing of Tax Returns | $10,000 (estimated) |

For the avoidance of doubt, and subject to Sections 5.8, 5.9, and 5.12, the inclusion of the above-referenced amounts in the Professional Fees Reserve shall not be a request or an agreement by the Debtors or Bay Point that such Professional shall have an Allowed Claim in such amount.

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Escrow Agent for distribution in accordance with the provisions of Sections 5.8 and 5.9.

5.4     **Prosecution of Objections.**  Any party-in-interest, including the Debtors, shall have the right to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims. Objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding that, Brickchurch's objection to the IRS's claim (ECF No. 205 in Case No. 22-70914) is withdrawn and the IRS's claim in the Brickchurch case (Claims Register, Clam No. 13-1) is Allowed as filed. The IRS's claim in the Aberdeen case (Claims Register, Claim No. 2-1) is also Allowed as filed. As set forth in Section 2.3, the IRS has agreed to accept a partial payment of $1 million total toward its Allowed Administrative Expense Claims and/or Allowed Priority Tax Claims in these cases, as set forth in Section 2.3.  Notwithstanding the foregoing, the Plan shall not impact the IRS Litigation Reservation which is preserved.

5.5     **Distribution After Allowance.**  Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

5.6     **Distribution After Disallowance.**  The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

5.7     **Delivery of Distributions.**  Distributions to holders of Allowed Claims shall be made: (i) at the address set forth on the respective Proof(s) of Claim or other request(s) for payment filed by the holder of such Allowed Claim; (ii) at the addresses set forth in any written notices of address change delivered to the Debtors; or (iii) at the address reflected in the Schedules if no

Proof of Claim, or other request for payment, is filed and the Debtors have not received a written notice of change of address.

5.8 **Distribution to Allowed Claims Against Aberdeen.**

(A) Except as otherwise provided herein, the Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $45,661,440, less the closing adjustments identified in <u>Schedule A</u> attached hereto, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

    (i) $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

    (ii) $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

    (iii) $26,767,332.93 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

    (iv) $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

    (v) Up to $300,000 shall be paid towards Bankruptcy Fees;

    (vi) $575,000 shall be paid to the IRS for application to the IRS's Administrative Expense Claim and/or Priority Tax Claim in the Aberdeen case (subject to the provisions set forth in Section 2.3 of this Plan);

    (vii) Subject to Bankruptcy Court approval, $100,000 shall be paid to Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims for services rendered up to confirmation of the Plan; *provided*, that Goldberg Weprin Finkel Goldstein LLP shall be entitled to (a) an additional amount of up to $20,000 to close the transaction relating to the Sales of the Properties and, (b) up to $20,000 for services related to closing the Bankruptcy Cases;

    (viii) Up to $25,382.75 for payment of the Professional Fee Claim of The Law Offices of Avrum J. Rosen, PLLC;

    (ix) The Allowed amount, not to exceed $10,000, of the Professional Fee Claim of the TBD Tax Professional for assistance with preparation and filing of tax returns;

    (x) The Allowed amount, not to exceed $30,000, of an Administrative

Expense Claim that may be filed by Kabatoff, in full payment of the same; and

(xi)    Any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(B)    Any remaining monetary or liquidated assets of Aberdeen, including funds on deposit in any debtor-in-possession bank accounts, shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code; *provided, however*, that the sum of $108,317.25 which is comprised of certain casualty insurance proceeds related to the Aberdeen property in which Bay Point has a first priority security interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations.

(C)    Notwithstanding the foregoing, there shall be reserved from the distribution of Sale Proceeds to Bay Point pursuant to Section 5.8(A)(iii) above the sum of $100,000 to be held by the Escrow Agent pending further proceedings to determine the extent and value (if any) of the secured claim asserted by Dream Yards Landscaping, Inc. ("Dream Yards") arising from its filing of mechanics' lien against the Aberdeen Property. The Escrow Agent shall distribute to Dream Yards such amount (if any) as may be determined by entry of a Final Order of the Court, or by agreement of the Debtors, Bay Point and Dream Yards, to be the amount of its secured claim.

### 5.9    Distribution to Allowed Claims Against Brickchurch.

(A)    The Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $43,345,280, less the closing adjustments identified in Schedule A attached hereto, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(i)    $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

(ii)    $30,509,867.53 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(iii)    $10,231,354.21 shall be paid to Bay Point for application to outstanding Obligations under the DIP Loan Documents;

(iv)    $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

(v)    Up to $300,000 shall be paid towards Bankruptcy Fees;

(vi)    $425,000 shall be paid to the IRS for application to the IRS's Allowed

Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.3 of the Plan).

(vii)   Up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and $151,905.95 shall be paid to Duane Morris LLP in full payment of its Allowed Professional Fee Claims;

(viii)   Up to $25,382.75 for payment of the Professional Fee Claim of The Law Offices of Avrum J. Rosen, PLLC;

(ix)   The Allowed amount, not to exceed $10,000, of the Professional Fee Claim of the TBD Tax Professional for assistance with preparation and filing of tax returns;

(x)   The Allowed amount, not to exceed $30,000, of an Administrative Expense Claim that may be filed by Kabatoff, in full payment of the same; and

(xi)   Any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(B)   Any remaining monetary or liquidated assets of Brickchurch, including funds on deposit in any debtor-in-possession bank account, shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.10   **Creditor's Right to Accept Lesser Payment**.  For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

5.11   **Estates' Right to Clawback**.  For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be re-distributed

without any further payment to Bay Point in accordance with the priority provisions of the Bankruptcy Code.

5.12 **Agreements as to Certain Professional Fees.** Goldberg Weprin Finkel Goldstein LLP and Simmons Legal PLLC have agreed to limit their request for compensation to those amounts set forth in Sections 5.8(A)(vii) and 5.9(A)(vii), respectively. In consideration thereof, Bay Point has agreed that it will not challenge (a) an award of an Allowed Claim to Goldberg Weprin Finkel Goldstein LLP in the amount specified in Section 5.8(A)(vii); and/or (b) an award of an Allowed Claim to Simmons Legal PLLC in the amount specified in Section 5.9(A)(vii).

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1 **Rejection of Executory Contracts.** On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2 **Rejection Damages Claims.** Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims.

6.3 **Bar to Rejection Claims.** A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## ARTICLE VII

## CONFIRMATION AND CONSUMATION OF THE PLAN

7.1 **Injunction Against Interference with Plan. Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan;** *provided that***, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.**

7.2 **[Reserved].**

7.3 **No Discharge.** Pursuant to section 1141(d)(3) of the Bankruptcy Code, as applicable, the Debtors will not be discharged from debts that arose prior to Confirmation.

7.4 **Liens and Claims.** All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

7.5 **Conditions to Effective Date.** The Plan will not become effective, and the Effective Date will not occur, unless and until:

      (a) the Confirmation Order, including a provision waiving the stay under Fed. R. Bankr. P. 3020(e), shall have been entered;

(b)    the Sale Approval Order, including a provision waiving the stay under Fed. R. Bankr. P. 6004(h), shall have been entered;

(c)    the Sale Transaction shall have closed; and

(d)    the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

7.6    **Binding Effect.**  Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## ARTICLE VIII

## RETENTION OF JURISDICTION

8.1    **Retention of Jurisdiction**.  The Bankruptcy Court shall retain post-confirmation jurisdiction over the following matters:

(a)    To issue any orders necessary or appropriate to authorize the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code.

(b)    To adjudicate any dispute relating to the sale of the Properties;

(c)    To resolve all matters and disputes arising under or relating to the Plan, including, without limitation, (i) disputes relating to the Sale Process; (ii) any disputes relating to, or involving the amount of the allowance of Claims; and (iii) distribution or disbursement of the Sale Proceeds;

(d)     To Allow or disallow in whole or in part any objections to Claims filed prior to the Closing that have not been previously Allowed or disallowed;

(e)     To grant or deny the applications for allowance of final compensation and reimbursement of expenses of Professionals;

(f)     To enter an order or final decree concluding the Cases following the Sale of the Properties, payment of allowed claims, resolution of all disputes, and distribution of all reserves;

(g)     To compel the Debtors, Blouin, the Escrow Agent, or any other person to take such action and execute such documents, or to refrain from such action, as may be necessary to effectuate the Plan;

(h)     To enter Orders that may be necessary or appropriate to implement or consummate the provisions of the Plan and to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Cases;

(i)     Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j)     Approve modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, and modifications of the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k)     Issue and enforce injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     To enter a Sale Approval Order with respect to the Properties regardless of the failure to timely achieve substantial consummation of the Plan and regardless of whether the Plan shall become effective pursuant to Section 7.5 of the Plan;

(n)     Issue any Orders necessary to consummate a sale of the Properties pursuant to 11 U.S.C. 363 or any other applicable provision of the Bankruptcy Code after any failure to timely achieve substantial consummation the Plan and/or any failure of the Plan to become effective pursuant to Section 7.5 of the Plan; and

(o)     Issue any Orders as may be appropriate to convert the Cases to chapter 7 if the Plan is not substantially consummated or otherwise fails to become effective pursuant to Section 7.5 of the Plan.

## ARTICLE IX

## GENERAL PROVISIONS

9.1     **Orders in Aid of Consummation.**  Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation and/or consummation of the Plan directing the implementation of matters or actions required by the Plan.

9.2     **Compliance with Tax Requirements.**  In connection with the Plan, the Debtors shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and distributions under the Plan shall be subject to applicable withholding and reporting requirements; *provided, however*, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under

section 1146 of the Bankruptcy Code. For the avoidance of doubt, the foregoing *provisio* does not apply to any income, employment, or unemployment tax claim, or capital gains tax, under the Internal Revenue Code, 26 U.S.C. § 1 *et seq*. Notwithstanding anything else to the contrary, nothing contained in the Plan determines the federal tax effects of the Plan.

9.3    **Due Authorization by Creditors.**    Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4    **Amendments and Modifications.**    The Plan may be altered, amended or modified by Debtors, solely with the consent of Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; *provided that* Debtors may only modify the Approved Bid Procedures consistent with the terms of such Approved Bid Procedures.

9.5    **Revocation.**    Bay Point may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

9.6    **Request for Relief under Section 1129(b).**    If the Plan is accepted by one or more, but not all, classes of Creditors that are found to be impaired by the Plan, Bay Point may request

confirmation under section 1129(b) of the Bankruptcy Code, subject to any modification of the Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

9.7 **Filing of Additional Documents**. Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor or Bay Point may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9.8 **Headings**. The headings in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9 **Computation of Time**. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10 **Successors and Assigns**. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11 **Notices**. All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein.

If to Brickchurch Enterprises, Inc.:

Simmons Legal PLLC
Camisha L. Simmons, Esq.
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Camisha@SimmonsLegal.Solutions

If to Aberdeen Enterprises, Inc.:

Goldberg Weprin Finkel Goldstein LLP
Kevin Nash
125 Park Avenue, 12th Floor
New York, New York 10017

knash@gwfglaw.com

If to the holders of the Equity Interests:

    Brickchurch Enterprises (BVI) Ltd.
    165 Broadway, 23rd Floor
    New York, New York 10006
    lt@ltbholding.com

    *-and-*

    Aberdeen Enterprises (BVI) Ltd.
    165 Broadway, 23rd Floor
    New York, New York 10006
    lt@lbtholding.com

If to Bay Point Capital Partners II, LP:

    The Law Offices of John F. Isbell LLC
    John F. Isbell, Esq.
    3050 Peachtree Road NW, Suite 740
    Atlanta, Georgia 30305
    John@JFI-Law.com

    *-and-*

    Thompson Hine LLP
    John C. Allerding, Esq.
    3560 Lenox Road NE, Suite 1600
    Atlanta, Georgia 30326
    John.Allerding@ThompsonHine.com

If to any other Creditor:

    At (a) the addresses set forth on the applicable Proofs of Claim or other request for payment filed by such holder, (b) the addresses set forth in any written notices of address changes delivered to the Debtors, or (c) the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

If to any entity that has filed a notice of appearance:

    At the address set forth on such notice of appearance.

9.12 **Other Actions.** Nothing contained herein shall prevent any person from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan; *provided, however,* that no person shall take action expressly prohibited by or contrary to the express provisions of this Plan.

9.13 **Severability.** In the event any provision of the Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

9.14 **Business Day.** In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

9.15 **Quarterly Fees**. All fees payable pursuant to 28 U.S.C. § 1930, together with any applicable interest thereon, shall be paid by the Debtors until the closing of the Cases under 11 U.S.C. §350(a).

9.16 **Post-Confirmation Reports**. The Debtors shall file quarterly status reports until the Cases are closed.

9.17 **Continuation of the Debtors**. The Debtors shall continue in existence, duly authorized to carry out the terms of the Plan and the distribution of the Sale Proceeds. The Debtors shall not be dissolved until after the entry of a Final Decree closing the Cases. If the holders of the Equity Interest determine it desirable for the Debtors to exist after the closing of the Cases, and such continued existence does not prejudice any Creditors, nothing contained herein shall prevent the Equity Interest holders from choosing to continue the corporate existence of the Debtors.

**ARTICLE X**

**CLOSING OR CONVERSION OF THE CASE**

10.1 **Substantial Consummation.** Following entry of the Confirmation Order and

satisfaction of the conditions in Section 7.5 of the Plan, Debtors shall file a notice with the Bankruptcy Court of the substantial consummation of the Plan. Upon the filing of such notice of substantial consummation, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

10.2  **Closing of the Case.**  Within fourteen (14) days following the full administration of the Debtors' Estates, the Debtors shall file, on notice to the United States Trustee's Office, an application and proposed order seeking a final decree, closing the Cases pursuant to Bankruptcy Rule 3022.

10.3  **Conversion or Dismissal of the Cases Following Plan Failure.**  If the Plan is unable to be substantially consummated, then, after entry of any Sale Approval Orders pursuant to Section 10.3 of the Plan, the Bankruptcy Court shall, upon the request of the Debtors or on its own volition, enter an Order (a) converting the Bankruptcy Cases to chapter 7 cases and appointing a chapter 7 trustee; or (b) dismissing the Bankruptcy Cases.

*[Remainder of Page Intentionally Left Blank]*

**Exhibit A**

*Warning: No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This Contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this Contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

This Contract of Sale (this "***Contract***") is made as of February 2, 2024 (the "***Effective Date***") between BRICKCHURCH ENTERPRISES, INC., Address: 366 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417521 ("***Seller***") and 366 GIN LANE, LLC, a limited liability company organized under the laws of the State of New York ("***Purchaser***, and collectively with the Seller, the "***Parties***," each a "***Party***"), as nominee of that certain bidder assigned bidder number 570117 by Concierge Auctions, LLC in accordance with that certain Auction[1] conducted by Concierge Auctions, LLC on January 24, 2024 pursuant to the terms of the Bid Procedures, who himself was deemed by Seller to be the High Bidder at the Auction.

The parties hereby agree as follows:

1.          **Premises**. Seller shall sell and convey and Purchaser shall purchase that certain parcel of land, together with all buildings and improvements thereon, more fully described on "Schedule A", annexed hereto and made a part hereof and also known as 366 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.014; together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway (collectively the "***Premises***"). Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to the same in the Second Amended Approved Bidding Procedures filed at ECF No. 166, as the same may be amended from time to time pursuant to the terms thereof, in *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834 pending before the United States Bankruptcy Court for the Eastern District of New York (the "Bid Procedures").

thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2.         **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (*strike out inapplicable items*) (collectively with the Premises, the "***Property***").

Excluded from this sale are furniture and household furnishings and all personal property, including without limitation all paintings, sculpture and other works of art.

3.         **Purchase Price**. Subject to Paragraph 4 of this Contract, the purchase price (the "***Purchase Price***") is Forty-One Million Nine Hundred Twenty Thousand and 00/100 U.S. Dollars ($41,920,000.00) (as the same may be modified by the Bid Enhancement as set forth in Paragraph 4 of this Contract, the "***Purchase Price***"), which amount consists of the High Bid and the Buyer's Premium, payable as follows:

(a)         by Purchaser's transfer to the Escrowee of Cash,[2] the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5 of this Contract (the "***Initial Deposit***") in the amount of Two Hundred Fifty Thousand and 00/100 U.S. Dollars:

$     250,000.00     .

(b)         by Purchaser's transfer to the Escrowee of Cash on the date Seller provides Escrowee payment instructions to Purchaser (provided that if such Escrowee payment instructions are provided to purchaser later than 2:00 p.m. (prevailing Eastern time), then on the immediately following business day), to be held in escrow pursuant to paragraph 5 of this Contract (the "***Secondary Deposit***," and collectively with the Initial Deposit, the "***Deposit***") in an amount of Four Million Three Hundred Seventy Thousand and 00/100 U.S. Dollars:

---

[2] As used herein, the term "**Cash**" shall mean official currency of the United States that is immediately available to the person in possession, custody, or control of such funds.

$   4,370,000.00

(c)             by, subject to any modification of the Purchase Price pursuant to Paragraph 4 of this Contract, Purchaser's transfer to Escrowee of the Cash balance of the Purchase Price at Closing in accordance with paragraph 5 in an amount of Thirty-Seven Million Three Hundred Thousand and 00/100 Dollars:

$   37,300,000.00 .

4.        **Bid Enhancement.**

(a)             Notwithstanding anything to the contrary herein, if the sale/transfer of the Property as discussed herein is consummated pursuant to a plan of liquidation or reorganization that is confirmed under chapter 11 of title 11 of the United States Code in such a manner that 11 U.S.C. § 1146 is applicable to relieve the Seller and Purchaser from payment of the following taxes: (i) the Peconic Bay Tax, as the same is set forth in New York Consolidated Laws, Town Law – TWN § 64-e (Peconic Bay region community preservation funds); (ii) the NYS Transfer Tax, as the same is set forth in New York Consolidated Laws, Tax Law – TAX § 1402 (Imposition of Tax); and (iii) the Mansion Tax, as the same is set forth in New York Consolidated Laws, Tax Law – TAX § 1402-a (Additional Tax) (any such plan of liquidation or reorganization being a, "*Plan*"), then the Purchase Price as set forth in Paragraph 3 of this Contract shall be increased by One Million Four Hundred Twenty-Five Thousand Two Hundred Eighty and 00/100 Dollars ($1,425,280.00) (the "*Bid Enhancement*") to Forty-Three Million Three Hundred Forty-Five Thousand Two Hundred Eighty and 00/100 Dollars ($43,345,280.00). For the avoidance of doubt, upon the Bankruptcy Court's entry of an order confirming a Plan, the term "Purchase Price" as it is defined in Paragraph 3 shall be automatically redefined to mean Forty-Three Million Three Hundred Forty-Five Thousand Two Hundred Eighty and 00/100 Dollars ($43,345,280.00) and the Cash balance that the Purchaser is required to remit pursuant to Paragraph 3(c) of this Contract shall mean Thirty-Eight Million Seven Hundred Twenty-Five Thousand Two Hundred Eighty and 00/100 Dollars ($38,725,280.00).

(b)             For the avoidance of doubt, nothing contained herein shall require the Purchaser to make the Bid Enhancement payment if the Court fails to enter an order confirming a Plan on or before the Termination Date.

5.        **Deposits in Escrow.**

(a)             Gary F. Herbst, as the Seller's Chief Liquidating Officer, ("*Escrowee*") shall hold the Deposit in escrow in a segregated bank account (the "*Escrow Account*") pursuant to that certain Interim Order Authorizing the Retention of Gary F. Herbst as Chief Liquidating Officer Pursuant to Sections 327(A) and 328(A) of the Bankruptcy Code and Bankruptcy Rule 2014(A) (the "*Escrow Order*") until Closing or sooner termination of this Contract and shall pay over or apply the Deposit in

accordance with the terms of this Contract. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Deposit shall be paid by Escrowee to Seller. If for any reason Closing does not occur the Escrowee shall hold the Deposit pending an order from the Bankruptcy Court instructing the Escrowee on how it is to remit such Deposit. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)         The Parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c)         Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d)         Escrowee acknowledges receipt of the Deposit and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Contract.

(e)         Seller shall bear the risk of loss with respect to the funds held in the Escrow Account.

6.         **Acceptable Funds.** All money payable under this Contract, unless otherwise specified, shall be paid by:

(a)         Cash;

(b)         Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser; and

(c)         As otherwise agreed to in writing by Seller or Seller's attorney.

7.      **Checks**

(a)           Purchaser hereby unconditionally guarantees the payment of all checks delivered by or for the account of Purchaser in payment of the Purchase Price, apportionments or otherwise, whether such checks are issued by Purchaser, the lending institution issuing the mortgage, lender's attorneys (from special, trust, mortgage, escrow or other accounts) or any other source. Purchaser waives presentment, protest, notice of protest and any other notice to which the Purchaser may be entitled. This guaranty shall include of all Seller's collection expenses, including reasonable attorney's fees, and shall survive termination of the Contract and delivery of the deed.

(b)           If a check delivered by or for the account of Purchaser in payment of the Purchase Price is dishonored for any reason by the bank upon which it is drawn, other than for bank error, then Seller, in addition to any other rights or remedies Seller may have, may, at Seller's sole option, terminate the Contract, and thereupon Seller shall be relieved of all obligations under the Contract, including but not limited to liability for all brokerage commissions, for which Purchaser shall indemnify and defend Seller.

8.      **Bankruptcy Sale**.  Seller is a debtor in bankruptcy and, as such, the transactions contemplated herein are subject to and governed by the terms of the United States Bankruptcy Code and the orders entered by the United States Bankruptcy Court for the Eastern District of New York (the "***Bankruptcy Court***") in the jointly administered bankruptcy cases styled as styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (collectively and individually, the "***Bankruptcy Case***"). As part of this process, the Seller received Bankruptcy Court approval to sell the Properties (as the same may be amended from time to time, the "***Sale and Bid Procedures Order***"); *provided that*, if a party-in-interest objects to a proposed sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed sale of the Properties, the Seller's ability to consummate such proposed sale is contingent upon the Seller receiving an order from the Bankruptcy Court, after the Sale Confirmation Hearing, approving such Private Sale (each, a "***Sale Confirmation Order***"). Notwithstanding such contingency on the part of the Seller, this Contract and the Purchaser's obligations hereunder shall remain irrevocable.

9.      **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to the following (collectively sometimes referred to in this Contract as the "Permitted Exceptions"):

(a)             Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the Property or their use;

(b)             Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)             Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)             Real estate taxes that are a lien, but are not yet due and payable;

(e)             Covenants, restrictions, reservations and easements of record and utility easements whether or not of record, if any;

(f)             Possible projections and encroachments of retaining walls, hedges, walls, fences, garages, sheds, patios, decks, steps, landings, stoops, cornices, coping and trim, driveways, ramps, walkways, cellar doors, chutes, plantings, sprinkler systems and pumps, or similar structures and installations (all of the foregoing individually and collectively referred to as "*minor encroachments*") and variations among record lines, the tax map and minor encroachments;

(g)             State of facts shown on survey dated July 13, 2018, Title No: RTNY-32162, issued by NY Land Surveyor P.C. and any additional facts a personal inspection or such survey brought down to date would show;

(h)             Subject to removal of applicable exceptions in accordance with the Bankruptcy Code and the Sale Confirmation Order, all exceptions listed (a) in that certain Limited Update of Title Search issued by Certified Title Corporation (the "*Title Update*") with an effective date of January 9, 2024 and (b) in that certain Loan Policy issued by Chicago Title Insurance Company for the benefit of Bay Point Capital Partners II, LP , and dated March 9, 2023, which is attached to the Title Update.

10.      **Governmental Violations and Orders**. Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters; *provided, however*, that notwithstanding the foregoing or anything else to the contrary herein, Seller shall not be required to remove any violations or notices of violations affecting the Property.

11.      **Seller's Representations**.

(a)          Seller represents and warrants to Purchaser that:

(i)          The Premises abut or have a right of access to a public road;

(ii)          Subject to entry of any necessary Sale Confirmation Order, (A) Seller shall have the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract; (B) Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Contract or the consummation of the transactions contemplated hereby; (C) the execution and delivery of this Contract and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. This Contract constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to (a) entry of the orders of the Bankruptcy Court authorizing the transaction contemplated herein, and (b) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

(iii)          Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("*IRC*") Section 1445, as amended, and the regulations promulgated thereunder (collectively "*FIRPTA*");

(iv)          The Premises are not affected by any exemptions or abatements of taxes; and

(v)          Seller has been known by no other name for the past ten years, except Brickchurch Enterprises, Inc.

(b)          Seller covenants and warrants that all of the representations and warranties set forth in this Contract shall be true and correct at Closing.

(c)          Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

(d)          Neither the execution, delivery and performance of this Contract, nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration (other than approval by the Bankruptcy Court) under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Seller.

12.     **Condition of Property**.

(a)          Purchaser and its authorized representatives shall have the right, one (1) time prior to Closing and upon reasonable notice (by telephone or otherwise) to Seller, to perform a final walk-through of the Property before Closing; *provided that*, for the avoidance of doubt, the Purchaser shall not have the right to terminate this Contract on the basis of the condition of the Property and any material change in the condition of the Property, beyond ordinary wear and tear, shall give rise only to an obligation on the part of the Seller to either (i) repair such damage so as to put the Property back into the condition that such Property was in at the time of the submission of this Contract; or (ii) provide Purchaser with reasonable compensation with respect such damage. To the extent that there is a dispute regarding the condition of the Property and the Seller's obligations under this Paragraph 12(a), such dispute shall not be a basis for the Parties not Closing and the Parties shall complete the Closing of the transaction contemplated hereby subject to a holdback from the distribution of the Net Sale Proceeds to the Seller at Closing in an amount sufficient to permit the Seller to comply with its obligations under this Paragraph 12(a) (each, a "***Holdback***") with the Parties' respective rights to such Holdback to be subsequently determined pursuant to either (i) express written agreement between the Parties; or (ii) a final order issued by the Bankruptcy Court.

(b)          Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other Property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this Contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other Property included in the sale, given or made by Seller, its representatives, or any broker.

(c)          Purchaser is purchasing the Property in its "AS IS" condition on the date hereof, with all faults. Between the date hereof and Closing, the Property will be subject to use, wear and tear, loss of trees, erosion and other deterioration, for which the Purchaser shall have no claim against Seller or any rights by reason thereof. Purchaser represents and warrants to Seller that Purchaser has made full examination and investigation of the Property and related information before entering into this Contract, and that in entering into this Contract, Purchaser has not been induced by, and has not relied upon, any representations, covenants, warranties or statements, whether oral or written or expressed or implied, made by Seller (except as otherwise specifically set forth herein) or by any real estate broker or any other person representing or purporting to represent Seller, concerning the Property, its state of title, condition or state of repair, income, rents, expenses, operations, environmental condition, the presence or absence of any materials, including but not limited to formaldehyde insulation or hazardous building materials, radon, asbestos, insecticides or pesticides of any kind and/or nature, hazardous waste (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Premises) wetlands (as same may be defined under any statutes, ordinances, local laws, rules or regulations of

any municipal agency having jurisdiction over the Property) or any other substance or material, paint containing lead or any other additives, the condition of any fuel oil or gasoline storage tanks which may now or heretofore have been located at the Premises, or the impact thereon if located on adjacent properties, infestation of any insects or pests, description of the Property, including the size, area or dimensions of the lot, its value, the cost of operating or maintaining the Property, the physical condition of the Property, the operation or use to which the Property may be applied, development rights, landmark or historic designation, subdivision, school district or the zoning thereof, soil bearing capacity, elevations, insurability, access to public roads, the character, quality, legal use, availability of water, electric, sewer, telephone or public utilities of any kind, the subsurface conditions of the Premises, the suitability of the soil or subsurface conditions for any use to which the Purchaser may wish to utilize the subject Premises, availability of tax benefits, abatements or exemptions or any other matter or thing affecting or relating to the Property. Purchaser shall have no claim against Seller for Seller's failure to make any representations, covenants, warranties or statements covering the foregoing. Seller shall pay all post-petition utility and other service charges accrued for the period from and after the bankruptcy petition date through the date of Closing, to the extent billed therefor; in the normal course.

(d)         Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property. Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

13.    **Insurable Title.**

(a)         Seller shall give and Purchaser shall accept such title as any reputable title insurance company licensed to do business in the state of New York ("**_Title Company_**") shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this Contract.

(b)         At Seller's option, if Purchaser's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Seller, the Seller may arrange for the issuance of a title insurance policy by a reputable title company, if Purchaser is unable to do so, at the sole cost and expense of Purchaser, at no additional premium. Seller shall provide all documents reasonably required by the such title company for them to "omit" any standard exceptions from Purchaser's title policy, or any exceptions otherwise required to be removed in accordance with the terms herein.

14.     **Closing, Deed and Title**.

(a)             **"Closing"** means the settlement of the obligations of Seller and Purchaser to each other under this Contract, including the payment of the Purchase Price to Seller, and the delivery to Purchaser of a general warranty deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Property, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b)             If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

15.     **Closing Date and Place**. Closing shall take place through an escrow closing with Title Company and/or Escrowee at noon (12:00 pm) (prevailing Eastern time), on or before **February 20, 2024** or such later date as shall be ordered by the Bankruptcy Court. The date for Closing set forth in this Paragraph 15 is herein referred to as the "Closing Date". **"Time shall be of the essence"** as to Purchaser's performance on the Closing Date.

16.     **Conditions to Closing**. This Contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)             The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this Contract;

(b)             The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the Property authorizing their use as a single family dwelling at the date of Closing;

(c)             The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from the Internal Revenue Service. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the Purchase Price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service;

(d)                The delivery of the Property, including all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises;

(e)                All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the Property and all appliances which are included in this sale being in working order as of the date of Closing;

(f)                If the Premises are a one or two family house, delivery by the Parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Property a smoke detecting alarm device or devices;

(g)                The delivery by the Parties of any other affidavits required as a condition of recording the deed;

(h)                Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law; and

(i)                The Bankruptcy Court shall have entered a Sale Confirmation Order with respect to the transaction(s) contemplated herein, if the same has been requested or is otherwise required under the terms of the Sale and Bid Procedures Order, and no court of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Contract.

17.        **Deed Transfer and Recording Taxes.**

(a)                Purchaser shall execute, acknowledge where appropriate, and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the New York State Department of Taxation and Finance (or, to the order of Purchaser's title insurance company) for the amount of any Real Estate Transfer Tax imposed by Article 31 of the Tax Law of the State of New York, together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller (each, a "***Real Estate Transfer Tax***"); *provided, however,* that nothing contained herein shall create any liability for any Real Estate Transfer Tax and shall not require Seller to pay any Real Estate Transfer Tax that it is not required to pay pursuant to any applicable provision of the Bankruptcy Code or otherwise. Purchaser shall duly execute and swear to said return and at the Closing shall cause the check and such documents to be delivered to Purchaser's title insurance company for delivery to the Suffolk County Clerk promptly after the Closing.

(b)　　　　　To the extent not excused by applicable law, including application of the Bankruptcy Code, Purchaser shall execute, acknowledge where appropriate and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the Suffolk County Clerk (or, to the order of Purchaser's title insurance company) for the amount of the Peconic Bay Region Community Preservation Fund imposed by Article 31-D of the Tax Law of the State of New York (the "*Peconic Tax*"), together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller.

(c)　　　　　The obligations under this paragraph 17 shall survive the termination of this Contract.

18.　　　**Cost Allocation, Apportionments, and Other Adjustments; Water Meter and Installment Assessments**.

(a)　　　　　To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:  (i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (iv) vault charges; and (v) rents as and when collected.

(b)　　　　　If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c)　　　　　If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d)　　　　　If at the date of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)　　　　　At Closing, all Diligence costs shall be allocated as Purchaser Closing costs and paid by Purchaser in accordance with Paragraph 22(a).

(f)　　　　　Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

(g)　　　　　For the purpose of making the apportionments required herein, such apportionments shall be made on the basis of a 365-day year for the actual number of days elapsed and calculated as of midnight of the day preceding the Closing. Any assessment installment due subsequent to the Closing Date shall be assumed by

Purchaser. Charges for any transferable service contracts that Purchaser has agreed to accept shall be apportioned as of the Closing.

19.      **Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the Purchase Price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

20.      **Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the Cash balance of the Purchase Price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments.

21.      **Professional Fees.**   Seller shall be responsible for the payment of the following costs and fees related to the transaction(s) described herein:

(a)      Seller shall be solely responsible for remitting payment to Seller's listing brokers in such amount as required pursuant Seller's agreement with such listing brokers, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's broker's fees.

(b)      Seller shall remit payment to Seller's auctioneer in such amount (if any) as may be required pursuant to Seller's agreement with such auctioneer, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's auctioneer fees.

(c)      Seller shall remit payment to Purchaser's broker, Compass, in the amount of Three Hundred Eighty-Five Thousand and 00/100 Dollars ($385,000.00), subject to approval by the Bankruptcy Court. Nothing provided for herein shall prevent Purchaser from compensating its broker above and beyond the amount paid by the Seller hereunder.

22.      **Due Diligence; Seller's Inability to Convey; Limitations of Liability; No Conditions or Contingencies.**

(a)      As of the date hereof, (i) all Premises diligence items (collectively, the *"Diligence"*), which may include but not be limited to (1) an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company, (2) a Premises survey, and/or (3) a property inspection report covering the Premises have been ordered and, if available, provided to Purchaser and Purchaser hereby acknowledges its receipt and review of the same; or (ii) to the extent any Diligence items

have not been provided to Purchaser, Purchaser hereby waives receipt and review of the same. Costs for all Diligence items provided to Purchaser shall be allocated as Purchaser costs and paid by Purchaser at Closing.

(b)          (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this Contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called **"*Defects*"**), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the Purchase Price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this Contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. For the avoidance of doubt, this paragraph shall not provide Purchaser with a right to extend the Closing as a result of any financing conditions and, as further provided in Paragraph 22(e) hereunder, there shall be no financing contingency available to Purchaser. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the Purchase Price, then either party may apply to the Bankruptcy Court for an order authorizing the termination of this Contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, prior to Closing the Seller shall take such actions necessary to obtain and effectuate a release and/or discharge of the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof; *provided that* nothing contained herein shall permit the Seller to encumber the Property or otherwise take any action that would reasonably be believed to cause a Defect. Any action taken by Seller to remove any such defect or encumbrance shall not be deemed an admission on Seller's part that Seller is obligated to remove same or that such defect or encumbrance is one which would give Purchaser the right to cancel the Contract. Seller shall not be required to take or bring any action or proceeding or any other steps to remove any Defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Contract or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

(c)          The Bankruptcy Court has entered the Sale and Bid Procedures Order providing that the Property is being sold to Purchaser free and clear of liens, claims and encumbrances. To the extent that the Purchaser or its title insurer desires a further

order of the Bankruptcy Court supplementing the Sale and Bid Procedures Order ,the Seller shall request that the Bankruptcy Court enter a Sale Confirmation Order with such additional provisions as the Purchaser shall reasonably request.

(d)          Anything herein to the contrary notwithstanding, any judgments, mortgage liens, other encumbrances, encroachments or any other Defects may be, and shall be deemed satisfied upon Seller depositing with the title company funds sufficient to satisfy same in full, together with the cost of recording the satisfaction instrument(s) and/or causing a title company to affirmatively insure title to the Premises that are the subject of this Contract.

(e)          Purchaser acknowledges that there are no conditions or contingencies to the Closing (including but not limited to financial, due diligence, feasibility and inspection contingencies) other than as explicitly specified in this Contract.

23.      **Venue, Jurisdiction, Prevailing Party**. Any legal action or proceeding with respect to this Contract shall be brought in the Bankruptcy Court and by execution and delivery of this Contract, each Party to this Contract hereby accepts, generally and unconditionally, the jurisdiction of the Bankruptcy Court. Each Party to this Contract hereby expressly and irrevocably submits the person of such party to this Contract to the in personal jurisdiction of the Bankruptcy Court in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Contract. To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Contract or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Contract in the Bankruptcy Court. To the fullest extent permitted under applicable law, each Party to this Contract irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court or that this Contract or the subject matter hereof may not be enforced in or by the Bankruptcy Court. In the event of any such legal action, the prevailing Party shall be entitled to reimbursement from the non-prevailing Party of all reasonable attorney's fees and costs/expenses of the prevailing Party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party. The obligations under this paragraph 23 shall survive the termination of this Contract.

24.      **Termination**.

(a)          This Contract may be terminated at any time prior to Closing (the date of any such termination being a "Termination Date"), as follows:

(i)      Bankruptcy Court refuses to enter a Sale Confirmation Order by April 12, 2024;

(ii)    The Purchaser may terminate the Contract, and request a refund of the Deposits – which the Seller shall not oppose – if the Court does not enter a Sale Confirmation Order on or before April 12, 2024; or

(iii)    the Bankruptcy Court enters an order terminating the Contract.

(b)    If this Contract is terminated pursuant to its terms, other than as a result of Purchaser's default, this Contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: Seller shall promptly refund or cause the Escrowee to refund, or seek any necessary Bankruptcy Court order that would permit it to promptly refund or cause the Escrowee to refund, the Deposit to Purchaser; *provided that* nothing contained herein shall prevent the Parties from agreeing to other terms governing the effect of termination, subject to any necessary approval of the Bankruptcy Court. For purposes of this Paragraph 24, the term "promptly" shall mean within three (3) business days.

(c)    The obligations under this paragraph 24 shall survive the termination of this Contract

25.    **Defaults and Remedies**.

(a)    If Purchaser defaults hereunder, Seller shall be entitled to receive and retain the Deposit as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty; *provided, however,* that nothing contained herein shall prevent Seller from seeking damages in excess of those provided for in this Paragraph 25(a) if it is so able to establish the same.

(b)    If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

26.    **Purchaser's Lien**. All money paid on account of this Contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this Contract.

27.    **Notices**. Any notice or other communication (**"Notice"**) Any notice under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered to each of the following:

If to Purchaser:       Sarah Tadros Awad, Esq.
Romer Debbas LLP
275 Madison Ave, 8th Floor
New York, NY 10016
sawad@romerdebbas.com

If to Seller:          Mathew Kabatoff
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
mkabatoff@lbtholding.com

*-and-*

Bay Point Capital Partners II, LP
c/o Charles Andros
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
CharlesAndros@BayPointAdvisors.com

*-with copy to-*

Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

*-and-*

John F. Isbell, Esq.
The Law Offices of John F. Isbell LLC
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
John@jfi-law.com

*-and-*

John C. Allerding, Esq.
Thompson Hine LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to Escrowee:          Goldberg Weprin Finkel Goldstein LLP
                      125 Park Avenue, 12th Floor
                      New York, New York 10017
                      Phone: 212.221.5700
                      Email: knash@gwulaw.com

    To the extent that a physical address and an email address are provided above, delivery shall be by both (a) overnight delivery, with confirmation of delivery, by United States mail or any nationally recognized commercial carrier; and (b) email. Any notice hereunder shall be deemed to have been given upon the earlier of (i) dispatch of the electronic mail; and (ii) delivery of the physical mail.

28.          **No Assignment**. This Contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

29.          **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than The Corcoran Group, Sotheby's International Realty, and Bespoke Real Estate (collectively, **"Broker"**) and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this Contract.

30.          **Waiver of Trial by Jury**. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS CONTRACT.

31.          **Lead Warning Statement and Lead Based Paint Provision**. Purchaser acknowledges receipt of an Environmental Protection Agency approved lead hazard information pamphlet. Purchaser further acknowledges that it is aware that any residential dwelling that was built prior to 1978 may present exposure to lead from lead-based paint. Purchaser acknowledges that it is aware that the Premises were or might have been built prior to 1978 and is waiving the opportunity to conduct a risk assessment or inspection

32.          **Truth In Heating Law**. Under New York Energy Law Section 17-103, commonly known as "Truth in Heating Law", Purchaser has the right to a summary of the heating and/or cooling bills or a complete set of said bills relating to the Property and information concerning the insulation in the Property. Purchaser expressly waives the right to insulation, heating and cooling information and copies or a summary of any of

said bills as to which Purchaser may be entitled and does not request them in connection with this transaction

33.     **Certificate of Occupancy**. Nothing contained in this Contract shall be construed to require Seller to seek or obtain a variance or zoning change or, to make any alteration or modification to the Property or spend any sum in order to obtain such Certificate of Occupancy or other certificate. If any variance or zoning change or any modification or alteration to the Property is required by the municipality as a condition precedent to the issuance of said Certificate of Occupancy or other certificate, Seller shall have the option of terminating the Contract and returning the Deposit hereunder.

34.     **Repairs/Alterations**. Notwithstanding anything to the contrary contained in this Contract, Seller shall not be obligated to make any repairs or alterations to the Property

35.     **Smoke Detector and Carbon Monoxide Affidavit**. Supplementing Paragraph 16 of the Contract, Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law.

36.     **Property Condition Disclosure Act**. Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property. Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

37.     **Miscellaneous.**

(a)         Complete Agreement.   All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this Contract; it completely expresses their full agreement and has been entered into after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Contract.

(b)         No Waiver; Binding on Heirs; Neither this Contract nor any provision thereof may be waived, changed or cancelled except in writing. Subject to Paragraph 28 of this Contract and without altering or amending the provisions thereof, this Contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize

their respective attorneys to agree in writing to any changes in dates and time periods provided for in this Contract.

(c)        Interpretation.  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this Contract may require it. The captions in this Contract are for convenience of reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

(d)        Effectiveness.  Submission by the Seller of this Contract for execution by the Purchaser shall confer no rights, nor impose any obligations on Seller. This Contract shall not be binding or effective until (i) duly executed and delivered by Seller and Purchaser; and (ii) the Bankruptcy Court has entered any requisite Sale Confirmation Order; *provided that*, notwithstanding the foregoing, the Purchaser's execution of this Contract shall make such Contract irrevocable unless (1) such revocation is expressly consented to by the Seller in writing; or (2) the Seller is unable to obtain a Sale Confirmation Order with respect to the transaction contemplated herein.

(e)        IRS Reporting Requirements.  Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(f)        Further Actions.  Each Party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this Contract. This subparagraph shall survive Closing.

(g)        No Third Party Beneficiaries.  This Contract is intended for the exclusive benefit of the Parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(h)        This Contract may be amended or modified only in writing signed by both Parties and approved by the Bankruptcy Court, if necessary.

(i)        Whenever possible, each provision of this Contract shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Contract is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Contract.

(j)        This Contract has been entered into and shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles.

(k)         This Contract, including any riders, amendments, and/or additions, may be executed by electronic, facsimile, or PDF signature and/or in any number of counterparts and each of such electronic, facsimile, or PDF signature and/or counterpart shall for all purposes be deemed to be an original; and all such electronic, facsimile, or PDF signatures and/or counterparts shall together constitute but one and the same Contract.

(l)         The Parties have been given the opportunity to seek legal advice and to have this Contract reviewed by an independent attorney prior to signing it. This Contract shall be construed as if it has been jointly drafted by both Parties. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in interpreting this Contract.

(m)         No delay or omission to exercise any right, power, or remedy accruing to a Party under this Contract shall impair any right, power, or remedy of such Party, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Contract (i) shall be effective unless it is in writing and signed by the Party against whom such waiver or consent is sought to be enforced; (ii) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (iii) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

(n)         Each of the Parties shall take such other actions and execute such documents consistent with this Contract as may be reasonably requested by any other Party in furtherance of consummating the transaction(s) contemplated hereby.

(o)         This Contract is an important legal document. Each Party acknowledges that it has been advised to consult legal counsel before signing this Contract and has signed this Contract after having the opportunity to consult with legal counsel of its choosing. No Party has provided legal advice (including but not limited to tax advice) to another Party or acted as legal counsel to another Party. Each Party hereby confirms that it has carefully read this Contract in its entirety and that it understands all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Contract has been duly executed by the parties hereto as of the date set forth above.

**SELLER:**

BRICKCHURCH ENTERPRISES, INC.

By: _____

Printed Name: Mathew Kabatoff

Title: Authorized Signatory

**PURCHASER:**

366 GIN LANE, LLC, as Nominee of Bidder No. 570117

By: _____

Printed Name: Andrew Park

Title: Authorized Signatory

*Residential Contract of Sale – 366 Gin Lane - Signature Page*

Receipt of the Initial Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 5 above.

_____
Escrowee

Receipt of the Secondary Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 5 above.

_____
Escrowee

**PREMISES:**

| | |
|---|---|
| Section: | 029.00 |
| Block: | 01.00 |
| Lots: | 017.014 |
| County or Town: | Southampton |
| Street No. Address: | 366 Gin Lane |

**Exhibit B**

*Warning: No representation is made that this form of contract for the sale and purchase reaf estate complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

### NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION

This Contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this Contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

## Residential Contract of Sale

This Contract of Sale (this "***Contract***") is made as of February 2, 2024 (the "***Effective Date***") between ABERDEEN ENTERPRISES, INC., Address: 376 Gin Lane, Southampton, New York 11968, Fed. I.D. No.: 04-3417524 ("***Seller***") and 376 GIN LANE, LLC, a limited liability company organized under the laws of the State of New York ("***Purchaser***, and collectively with the Seller, the "***Parties***," each a "***Party***"), as nominee of that certain bidder assigned bidder number 570117 by Concierge Auctions, LLC in accordance with that certain Auction[1] conducted by Concierge Auctions, LLC on January 24, 2024 pursuant to the terms of the Bid Procedures, who himself was deemed by Seller to be the High Bidder at the Auction.

The parties hereby agree as follows:

1.      **Premises**. Seller shall sell and convey and Purchaser shall purchase that certain parcel of land, together with all buildings and improvements thereon, more fully described on "Schedule A", annexed hereto and made a part hereof and also known as 376 Gin Lane, Southampton, New York 11968, Tax Map Designation: District 0900, Section 029.00, Block: 01.00, Lot: 017.013, together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway (collectively the "***Premises***"). Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to the same in the Second Amended Approved Bidding Procedures filed at ECF No. 166, as the same may be amended from time to time pursuant to the terms thereof, in *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834 pending before the United States Bankruptcy Court for the Eastern District of New York (the "Bid Procedures").

thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2.  **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (*strike out inapplicable items*) (collectively with the Premises, the "*Property*").

Excluded from this sale are furniture and household furnishings and all personal property, including without limitation all paintings, sculpture and other works of art.

3.  **Purchase Price**. Subject to Paragraph 4 of this Contract, the purchase price is Forty-Four Million One Hundred Sixty Thousand and 00/100 U.S. Dollars ($44,160,000.00) (as the same may be modified by the Bid Enhancement as set forth in Paragraph 4 of this Contract, the "*Purchase Price*"), which amount consists of the High Bid and the Buyer's Premium, payable as follows:

(a)  by Purchaser's transfer to the Escrowee of Cash,[2] the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5 of this Contract (the "*Initial Deposit*") in the amount of Two Hundred Fifty Thousand and 00/100 U.S. Dollars:

$   250,000.00

(b)  by Purchaser's transfer to the Escrowee of Cash on the date Seller provides Escrowee payment instructions to Purchaser (provided that if such Escrowee payment instructions are provided to purchaser later than 2:00 p.m. (prevailing Eastern time), then on the immediately following business day), to be held in escrow pursuant to paragraph 5 of this Contract (the "*Secondary Deposit*," and collectively with the Initial Deposit, the "*Deposit*") in an amount of Four Million Six Hundred-Ten Thousand Two Hundred and 00/100 U.S. Dollars:

---

[2] As used herein, the term "**Cash**" shall mean official currency of the United States that is immediately available to the person in possession, custody, or control of such funds.

$    4,610,000.00

(c)             by, subject to any modification of the Purchase Price pursuant to Paragraph 4 of this Contract, Purchaser's transfer to Escrowee of the Cash balance of the Purchase Price at Closing in accordance with paragraph 5 in an amount of Thirty-Nine Million Three Hundred Thousand and 00/100 Dollars:

$    39,300,000.00

### 4.      Bid Enhancement.

(a)             Notwithstanding anything to the contrary herein, if the sale/transfer of the Property as discussed herein is consummated pursuant to a plan of liquidation or reorganization that is confirmed under chapter 11 of title 11 of the United States Code in such a manner that 11 U.S.C. § 1146 is applicable to relieve the Seller and Purchaser from payment of the following taxes: (i) the Peconic Bay Tax, as the same is set forth in New York Consolidated Laws, Town Law – TWN § 64-e (Peconic Bay region community preservation funds); (ii) the NYS Transfer Tax, as the same is set forth in New York Consolidated Laws, Tax Law – TAX § 1402 (Imposition of Tax); and (iii) the Mansion Tax, as the same is set forth in New York Consolidated Laws, Tax Law – TAX § 1402-a (Additional Tax) (any such plan of liquidation or reorganization being a, "**Plan**"), then the Purchase Price as set forth in Paragraph 3 of this Contract shall be increased by One Million Five Hundred and One Thousand Four Hundred Forty and 00/100 Dollars ($1,501,440.00) (the "**Bid Enhancement**") to Forty-Five Million Six Hundred Sixty-One Thousand Four Hundred Forty and 00/100 Dollars ($45,661,440.00). For the avoidance of doubt, upon the Bankruptcy Court's entry of an order confirming a Plan, the term "Purchase Price" as it is defined in Paragraph 3 shall be automatically redefined to mean Forty-Five Million Six Hundred Sixty-One Thousand Four Hundred Forty and 00/100 Dollars ($45,661,440.00) and the Cash balance that the Purchaser is required to remit pursuant to Paragraph 3(c) of this Contract shall mean Forty Million Eight Hundred One Thousand Four Hundred Forty and 00/100 Dollars ($40,801,440.00).

(b)             For the avoidance of doubt, nothing contained herein shall require the Purchaser to make the Bid Enhancement payment if the Court fails to enter an order confirming a Plan on or before the Termination Date.

### 5.      Deposits in Escrow.

(a)             Gary F. Herbst, as the Seller's Chief Liquidating Officer, ("**Escrowee**") shall hold the Deposit in escrow in a segregated bank account (the "**Escrow Account**") pursuant to that certain Interim Order Authorizing the Retention of Gary F. Herbst as Chief Liquidating Officer Pursuant to Sections 327(A) and 328(A) of the Bankruptcy Code and Bankruptcy Rule 2014(A) (the "**Escrow Order**") until Closing or sooner termination of this Contract and shall pay over or apply the Deposit in

accordance with the terms of this Contract. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Deposit shall be paid by Escrowee to Seller. If for any reason Closing does not occur the Escrowee shall hold the Deposit pending an order from the Bankruptcy Court instructing the Escrowee on how it is to remit such Deposit. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)             The Parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c)             Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d)             Escrowee acknowledges receipt of the Deposit and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Contract.

(e)             Seller shall bear the risk of loss with respect to the funds held in the Escrow Account.

6.       **Acceptable Funds**. All money payable under this Contract, unless otherwise specified, shall be paid by:

(a)             Cash;

(b)             Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser; and

(c)             As otherwise agreed to in writing by Seller or Seller's attorney.

7.     Checks.

(a)         Purchaser hereby unconditionally guarantees the payment of all checks delivered by or for the account of Purchaser in payment of the Purchase Price, apportionments or otherwise, whether such checks are issued by Purchaser, the lending institution issuing the mortgage, lender's attorneys (from special, trust, mortgage, escrow or other accounts) or any other source. Purchaser waives presentment, protest, notice of protest and any other notice to which the Purchaser may be entitled. This guaranty shall include of all Seller's collection expenses, including reasonable attorney's fees, and shall survive termination of the Contract and delivery of the deed.

(b)         If a check delivered by or for the account of Purchaser in payment of the Purchase Price is dishonored for any reason by the bank upon which it is drawn, other than for bank error, then Seller, in addition to any other rights or remedies Seller may have, may, at Seller's sole option, terminate the Contract, and thereupon Seller shall be relieved of all obligations under the Contract, including but not limited to liability for all brokerage commissions, for which Purchaser shall indemnify and defend Seller.

8.     **Bankruptcy Sale**.     Seller is a debtor in bankruptcy and, as such, the transactions contemplated herein are subject to and governed by the terms of the United States Bankruptcy Code and the orders entered by the United States Bankruptcy Court for the Eastern District of New York (the "***Bankruptcy Court***") in the jointly administered bankruptcy cases styled as styled as *In re Aberdeen Enterprises, Inc.* (Case No. 23-72834-AST (Lead Case)) and *In re Brickchurch Enterprises, Inc.* (Case No. 22-70914-AST) (collectively and individually, the "***Bankruptcy Case***"). As part of this process, the Seller received Bankruptcy Court approval to sell the Properties (as the same may be amended from time to time, the "***Sale and Bid Procedures Order***"); *provided that*, if a party-in-interest objects to a proposed sale of one or both of the Properties, the Bankruptcy Court will hold a hearing on **February 13, 2024 at 10:00 a.m.** before the Honorable Alan S. Trust, Chief United States Bankruptcy Judge, in Courtroom 960 at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11772 for the purpose of considering the confirmation of the sale of the Properties and entering a further order with respect to the same (the "***Sale Confirmation Hearing***"). If a party-in-interest objects to the proposed sale of the Properties, the Seller's ability to consummate such proposed sale is contingent upon the Seller receiving an order from the Bankruptcy Court, after the Sale Confirmation Hearing, approving such Private Sale (each, a "***Sale Confirmation Order***"). Notwithstanding such contingency on the part of the Seller, this Contract and the Purchaser's obligations hereunder shall remain irrevocable.

9.     **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to the following (collectively sometimes referred to in this Contract as the "Permitted Exceptions"):

(a)          Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the Property or their use;

(b)          Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)          Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)          Real estate taxes that are a lien, but are not yet due and payable;

(e)          Covenants, restrictions, reservations and easements of record and utility easements whether or not of record, if any;

(f)          Possible projections and encroachments of retaining walls, hedges, walls, fences, garages, sheds, patios, decks, steps, landings, stoops, cornices, coping and trim, driveways, ramps, walkways, cellar doors, chutes, plantings, sprinkler systems and pumps, or similar structures and installations (all of the foregoing individually and collectively referred to as "*minor encroachments*") and variations among record lines, the tax map and minor encroachments;

(g)          State of facts shown on survey dated July 13, 2018, Title No: RTNY-32162, issued by NY Land Surveyor P.C and any additional facts a personal inspection or such survey brought down to date would show;

(h)          Subject to removal of applicable exceptions in accordance with the Bankruptcy Code and the Sale Confirmation Order, all exceptions listed (a) in that certain Limited Update of Title Search issued by Certified Title Corporation (the "*Title Update*") with an effective date of January 9, 2024 and (b) in that certain Loan Policy issued by Chicago Title Insurance Company for the benefit of Bay Point Capital Partners II, LP , and dated March 9, 2023, which is attached to the Title Update.

10.          **Governmental Violations and Orders**. Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters; *provided, however,* that notwithstanding the foregoing or anything else to the contrary herein, Seller shall not be required to remove any violations or notices of violations affecting the Property.

11.          **Seller's Representations**.

(a)     Seller represents and warrants to Purchaser that:

(i)     The Premises abut or have a right of access to a public road;

(ii)     Subject to entry of any necessary Sale Confirmation Order, (A) Seller shall have the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract, (B) Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Contract or the consummation of the transactions contemplated hereby; (C) the execution and delivery of this Contract and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. This Contract constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to (a) entry of the orders of the Bankruptcy Court authorizing the transaction contemplated herein, and (b) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

(iii)     Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code (**"IRC"**) Section 1445, as amended, and the regulations promulgated thereunder (collectively **"FIRPTA"**);

(iv)     The Premises are not affected by any exemptions or abatements of taxes; and

(v)     Seller has been known by no other name for the past ten years, except Aberdeen Enterprises, Inc.

(b)     Seller covenants and warrants that all of the representations and warranties set forth in this Contract shall be true and correct at Closing.

(c)     Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

(d)     Neither the execution, delivery and performance of this Contract, nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration (other than approval by the Bankruptcy Court) under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Seller.

12.     **Condition of Property**.

(a)        Purchaser and its authorized representatives shall have the right, one (1) time prior to Closing and upon reasonable notice (by telephone or otherwise) to Seller, to perform a final walk-through of the Property before Closing; *provided that,* for the avoidance of doubt, the Purchaser shall not have the right to terminate this Contract on the basis of the condition of the Property and any material change in the condition of the Property, beyond ordinary wear and tear, shall give rise only to an obligation on the part of the Seller to either (i) repair such damage so as to put the Property back into the condition that such Property was in at the time of the submission of this Contract; or (ii) provide Purchaser with reasonable compensation with respect such damage. To the extent that there is a dispute regarding the condition of the Property and the Seller's obligations under this Paragraph 12(a), such dispute shall not be a basis for the Parties not Closing and the Parties shall complete the Closing of the transaction contemplated hereby subject to a holdback from the distribution of the Net Sale Proceeds to the Seller at Closing in an amount sufficient to permit the Seller to comply with its obligations under this Paragraph 12(a) (each, a "***Holdback***") with the Parties' respective rights to such Holdback to be subsequently determined pursuant to either (i) express written agreement between the Parties; or (ii) a final order issued by the Bankruptcy Court.

(b)        Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other Property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this Contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other Property included in the sale, given or made by Seller, its representatives, or any broker.

(c)        Purchaser is purchasing the Property in its "AS IS" condition on the date hereof, with all faults. Between the date hereof and Closing, the Property will be subject to use, wear and tear, loss of trees, erosion and other deterioration, for which the Purchaser shall have no claim against Seller or any rights by reason thereof. Purchaser represents and warrants to Seller that Purchaser has made full examination and investigation of the Property and related information before entering into this Contract, and that in entering into this Contract, Purchaser has not been induced by, and has not relied upon, any representations, covenants, warranties or statements, whether oral or written or expressed or implied, made by Seller (except as otherwise specifically set forth herein) or by any real estate broker or any other person representing or purporting to represent Seller, concerning the Property, its state of title, condition or state of repair, income, rents, expenses, operations, environmental condition, the presence or absence of any materials, including but not limited to formaldehyde insulation or hazardous building materials, radon, asbestos, insecticides or pesticides of any kind and/or nature, hazardous waste (as same may be defined under any statutes, ordinances, local laws, rules or regulations of any municipal agency having jurisdiction over the Premises) wetlands (as same may be defined under any statutes, ordinances, local laws, rules or regulations of

any municipal agency having jurisdiction over the Property) or any other substance or material, paint containing lead or any other additives, the condition of any fuel oil or gasoline storage tanks which may now or heretofore have been located at the Premises, or the impact thereon if located on adjacent properties, infestation of any insects or pests, description of the Property, including the size, area or dimensions of the lot, its value, the cost of operating or maintaining the Property, the physical condition of the Property, the operation or use to which the Property may be applied, development rights, landmark or historic designation, subdivision, school district or the zoning thereof, soil bearing capacity, elevations, insurability, access to public roads, the character, quality, legal use, availability of water, electric, sewer, telephone or public utilities of any kind, the subsurface conditions of the Premises, the suitability of the soil or subsurface conditions for any use to which the Purchaser may wish to utilize the subject Premises, availability of tax benefits, abatements or exemptions or any other matter or thing affecting or relating to the Property. Purchaser shall have no claim against Seller for Seller's failure to make any representations, covenants, warranties or statements covering the foregoing. Seller shall pay all post-petition utility and other service charges accrued for the period from and after the bankruptcy petition date through the date of Closing, to the extent billed therefor; in the normal course.

(d)         Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property. Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

13.    **Insurable Title.**

(a)         Seller shall give and Purchaser shall accept such title as any reputable title insurance company licensed to do business in the state of New York ("*Title Company*") shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this Contract.

(b)         At Seller's option, if Purchaser's title company refuses to insure title based upon the Sale and Bid Procedures Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by the Seller, the Seller may arrange for the issuance of a title insurance policy by a reputable title company, if Purchaser is unable to do so, at the sole cost and expense of Purchaser, at no additional premium. Seller shall provide all documents reasonably required by the such title company for them to "omit" any standard exceptions from Purchaser's title policy, or any exceptions otherwise required to be removed in accordance with the terms herein.

14      **Closing, Deed and Title.**

(a)            **"Closing"** means the settlement of the obligations of Seller and
Purchaser to each other under this Contract, including the payment of the Purchase Price
to Seller, and the delivery to Purchaser of a general warranty deed in proper statutory
short form for record, duly executed and acknowledged, so as to convey to Purchaser fee
simple title to the Property, free of all encumbrances, except as otherwise herein stated.
The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the
Lien Law.

(b)            If Seller is a corporation, it shall deliver to Purchaser at the time of
Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the
deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation
certifying such resolution and setting forth facts showing that the transfer is in conformity
with the requirements of Section 909 of the Business Corporation Law. The deed in such
case shall contain a recital sufficient to establish compliance with that Section.

15.            **Closing Date and Place.** Closing shall take place through an escrow closing
with Title Company and/or Escrowee at noon (12:00 pm) (prevailing Eastern time), on or
before February 20, 2024 or such later date as shall be ordered by the Bankruptcy Court.
The date for Closing set forth in this Paragraph 15 is herein referred to as the "Closing
Date". **"Time shall be of the essence"** as to Purchaser's performance on the Closing
Date.

16.            **Conditions to Closing.** This Contract and Purchaser's obligation to
purchase the Premises are also subject to and conditioned upon the fulfillment of the
following conditions precedent:

(a)            The accuracy, as of the date of Closing, of the representations and
warranties of Seller made in this Contract;

(b)            The delivery by Seller to Purchaser of a valid and subsisting
Certificate of Occupancy or other required certificate of compliance, or evidence that
none was required, covering the building(s) and all of the other improvements located on
the Property authorizing their use as a single family dwelling at the date of Closing;

(c)            The delivery by Seller to Purchaser of a certificate stating that Seller
is not a foreign person, which certificate shall be in the form then required by FIRPTA or
a withholding certificate from the Internal Revenue Service. If Seller fails to deliver the
aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such
certificate, Purchaser shall deduct and withhold from the Purchase Price a sum equal to
10% thereof (or any lesser amount permitted by law) and shall at Closing remit the
withheld amount with the required forms to the Internal Revenue Service;

(d)          The delivery of the Property, including all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises;

(e)          All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the Property and all appliances which are included in this sale being in working order as of the date of Closing;

(f)          If the Premises are a one or two family house, delivery by the Parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Property a smoke detecting alarm device or devices;

(g)          The delivery by the Parties of any other affidavits required as a condition of recording the deed;

(h)          Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law; and

(i)          The Bankruptcy Court shall have entered a Sale Confirmation Order with respect to the transaction(s) contemplated herein, if the same has been requested or is otherwise required under the terms of the Sale and Bid Procedures Order, and no court of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Contract.

17.          **Deed Transfer and Recording Taxes**.

(a)          Purchaser shall execute, acknowledge where appropriate, and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the New York State Department of Taxation and Finance (or, to the order of Purchaser's title insurance company) for the amount of any Real Estate Transfer Tax imposed by Article 31 of the Tax Law of the State of New York, together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller (each, a "*Real Estate Transfer Tax*"); *provided, however,* that nothing contained herein shall create any liability for any Real Estate Transfer Tax and shall not require Seller to pay any Real Estate Transfer Tax that it is not required to pay pursuant to any applicable provision of the Bankruptcy Code or otherwise. Purchaser shall duly execute and swear to said return and at the Closing shall cause the check and such documents to be delivered to Purchaser's title insurance company for delivery to the Suffolk County Clerk promptly after the Closing.

(b)　　　　　To the extent not excused by applicable law, including application of the Bankruptcy Code, Purchaser shall execute, acknowledge where appropriate and deliver a check (certified, if required) drawn on or by a bank which is a member of the New York Clearing House Association, L.L.C. to the order of the Suffolk County Clerk (or, to the order of Purchaser's title insurance company) for the amount of the Peconic Bay Region Community Preservation Fund imposed by Article 31-D of the Tax Law of the State of New York (the "*Peconic Tax*"), together with the return required thereby and the regulations issued pursuant thereto, duly executed and sworn to by Seller.

(c)　　　　　The obligations under this Paragraph 17 shall survive the termination of this Contract.

18.　　　**Cost Allocation, Apportionments, and Other Adjustments; Water Meter and Installment Assessments**.

(a)　　　　　To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing: (i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed, (ii) fuel; (iii) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (iv) vault charges; and (v) rents as and when collected.

(b)　　　　　If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c)　　　　　If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d)　　　　　If at the date of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)　　　　　At Closing, all Diligence costs shall be allocated as Purchaser Closing costs and paid by Purchaser in accordance with Paragraph 22(a).

(f)　　　　　Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

(g)　　　　　For the purpose of making the apportionments required herein, such apportionments shall be made on the basis of a 365-day year for the actual number of days elapsed and calculated as of midnight of the day preceding the Closing. Any assessment installment due subsequent to the Closing Date shall be assumed by

Purchaser. Charges for any transferable service contracts that Purchaser has agreed to accept shall be apportioned as of the Closing.

19. **Allowance for Unpaid Taxes, etc**. Seller has the option to credit Purchaser as an adjustment to the Purchase Price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

20. **Use of Purchase Price to Remove Encumbrances**. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the Cash balance of the Purchase Price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments.

21. **Professional Fees**. Seller shall be responsible for the payment of the following costs and fees related to the transaction(s) described herein:

(a)        Seller shall be solely responsible for remitting payment to Seller's listing brokers in such amount as required pursuant Seller's agreement with such listing brokers, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's broker's fees.

(b)        Seller shall remit payment to Seller's auctioneer in such amount (if any) as may be required pursuant to Seller's agreement with such auctioneer, as the same has been approved by the Bankruptcy Court. Purchaser shall not be liable for the payment of Seller's auctioneer fees.

(c)        Seller shall remit payment to Purchaser's broker, Compass, in the amount of Four Hundred and Five Thousand and 00/100 Dollars ($405,000.00), subject to approval by the Bankruptcy Court. Nothing provided for herein shall prevent Purchaser from compensating its broker above and beyond the amount paid by the Seller hereunder.

22. **Due Diligence; Seller's Inability to Convey; Limitations of Liability; No Conditions or Contingencies.**

(a)        As of the date hereof, (i) all Premises diligence items (collectively, the "*Diligence*"), which may include but not be limited to (1) an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company, (2) a Premises survey, and/or (3) a property inspection report covering the Premises have been ordered and, if available, provided to Purchaser and Purchaser hereby acknowledges its receipt and review of the same; or (ii) to the extent any Diligence items

have not been provided to Purchaser, Purchaser hereby waives receipt and review of the same. Costs for all Diligence items provided to Purchaser shall be allocated as Purchaser costs and paid by Purchaser at Closing.

(b)    (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this Contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "*Defects*"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the Purchase Price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this Contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. For the avoidance of doubt, this paragraph shall not provide Purchaser with a right to extend the Closing as a result of any financing conditions and, as further provided in Paragraph 22(e) hereunder, there shall be no financing contingency available to Purchaser. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the Purchase Price, then either party may apply to the Bankruptcy Court for an order authorizing the termination of this Contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, prior to Closing the Seller shall take such actions necessary to obtain and effectuate a release and/or discharge of the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof; *provided that* nothing contained herein shall permit the Seller to encumber the Property or otherwise take any action that would reasonably be believed to cause a Defect. Any action taken by Seller to remove any such defect or encumbrance shall not be deemed an admission on Seller's part that Seller is obligated to remove same or that such defect or encumbrance is one which would give Purchaser the right to cancel the Contract. Seller shall not be required to take or bring any action or proceeding or any other steps to remove any Defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Contract or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

(c)    The Bankruptcy Court has entered the Sale and Bid Procedures Order providing that the Property is being sold to Purchaser free and clear of liens, claims and encumbrances. To the extent that the Purchaser or its title insurer desires a further

order of the Bankruptcy Court supplementing the Sale and Bid Procedures Order ,the Seller shall request that the Bankruptcy Court enter a Sale Confirmation Order with such additional provisions as the Purchaser shall reasonably request.

(d)     Anything herein to the contrary notwithstanding, any judgments, mortgage liens, other encumbrances, encroachments or any other Defects may be, and shall be deemed satisfied upon Seller depositing with the title company funds sufficient to satisfy same in full, together with the cost of recording the satisfaction instrument(s) and/or causing a title company to affirmatively insure title to the Premises that are the subject of this Contract.

(e)     Purchaser acknowledges that there are no conditions or contingencies to the Closing (including but not limited to financial, due diligence, feasibility and inspection contingencies) other than as explicitly specified in this Contract.

23.     **Venue, Jurisdiction, Prevailing Party**.  Any legal action or proceeding with respect to this Contract shall be brought in the Bankruptcy Court and by execution and delivery of this Contract, each Party to this Contract hereby accepts, generally and unconditionally, the jurisdiction of the Bankruptcy Court.  Each Party to this Contract hereby expressly and irrevocably submits the person of such party to this Contract to the in personal jurisdiction of the Bankruptcy Court in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Contract. To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Contract or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Contract in the Bankruptcy Court. To the fullest extent permitted under applicable law, each Party to this Contract irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court or that this Contract or the subject matter hereof may not be enforced in or by the Bankruptcy Court. In the event of any such legal action, the prevailing Party shall be entitled to reimbursement from the non-prevailing Party of all reasonable attorney's fees and costs/expenses of the prevailing Party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party. The obligations under this paragraph 23 shall survive the termination of this Contract.

24.     **Termination**.

(a)     This Contract may be terminated at any time prior to Closing (the date of any such termination being a "Termination Date"), as follows:

(i)     Bankruptcy Court refuses to enter a Sale Confirmation Order by April 12, 2024;

(ii)     The Purchaser may terminate the Contract, and request a refund of the Deposits – which the Seller shall not oppose – if the Court does not enter a Sale Confirmation Order on or before April 12, 2024; or

(iii)    the Bankruptcy Court enters an order terminating the Contract.

(b)             If this Contract is terminated pursuant to its terms, other than as a result of Purchaser's default, this Contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: Seller shall promptly refund or cause the Escrowee to refund, or seek any necessary Bankruptcy Court order that would permit it to promptly refund or cause the Escrowee to refund, the Deposit to Purchaser; *provided that* nothing contained herein shall prevent the Parties from agreeing to other terms governing the effect of termination, subject to any necessary approval of the Bankruptcy Court. For purposes of this Paragraph 24, the term "promptly" shall mean within three (3) business days.

(c)             The obligations under this paragraph 24 shall survive the termination of this Contract.

25.     **Defaults and Remedies**.

(a)             If Purchaser defaults hereunder, Seller shall be entitled to receive and retain the Deposit as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty; *provided, however,* that nothing contained herein shall prevent Seller from seeking damages in excess of those provided for in this Paragraph 25(a) if it is so able to establish the same.

(b)             If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity. including, but not limited to, specific performance.

26.     **Purchaser's Lien**. All money paid on account of this Contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this Contract.

27.     **Notices**. Any notice or other communication (**"Notice"**) Any notice under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered to each of the following:

If to Purchaser:  Sarah Tadros Awad, Esq.
Romer Debbas LLP
275 Madison Ave, 8th Floor
New York, NY 10016
sawad@romerdebbas.com

If to Seller:  Mathew Kabatoff
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
mkabatoff@lbtholding.com

*-and-*

Bay Point Capital Partners II, LP
c/o Charles Andros
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
CharlesAndros@BayPointAdvisors.com

*-with copy to-*
Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

*-and-*

John F. Isbell, Esq.
The Law Offices of John F. Isbell LLC
Two Buckhead Road NW, Suite 740
Atlanta, Georgia 740
John@jfi-law.com

*-and-*

John C. Allerding, Esq.
Thompson Hine LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to Escrowee:  Goldberg Weprin Finkel Goldstein LLP

125 Park Avenue, 12th Floor
New York, New York 10017
Phone: 212.221.5700
Email: knash@gwulaw.com

To the extent that a physical address and an email address are provided above, delivery shall be by both (a) overnight delivery, with confirmation of delivery, by United States mail or any nationally recognized commercial carrier; and (b) email. Any notice hereunder shall be deemed to have been given upon the earlier of (i) dispatch of the electronic mail; and (ii) delivery of the physical mail.

28.     **No Assignment**. This Contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

29.     **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than The Corcoran Group, Sotheby's International Realty, and Bespoke Real Estate (collectively, **"Broker"**) and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this Contract.

30.     **Waiver of Trial by Jury**. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS CONTRACT

31.     **Lead Warning Statement and Lead Based Paint Provision**. Purchaser acknowledges receipt of an Environmental Protection Agency approved lead hazard information pamphlet. Purchaser further acknowledges that it is aware that any residential dwelling that was built prior to 1978 may present exposure to lead from lead-based paint. Purchaser acknowledges that it is aware that the Premises were or might have been built prior to 1978 and is waiving the opportunity to conduct a risk assessment or inspection

32.     **Truth In Heating Law**. Under New York Energy Law Section 17-103, commonly known as "Truth in Heating Law", Purchaser has the right to a summary of the heating and/or cooling bills or a complete set of said bills relating to the Property and information concerning the insulation in the Property. Purchaser expressly waives the right to insulation, heating and cooling information and copies or a summary of any of

said bills as to which Purchaser may be entitled and does not request them in connection with this transaction

33.     **Certificate of Occupancy.**   Nothing contained in this Contract shall be construed to require Seller to seek or obtain a variance or zoning change or, to make any alteration or modification to the Property or spend any sum in order to obtain such Certificate of Occupancy or other certificate. If any variance or zoning change or any modification or alteration to the Property is required by the municipality as a condition precedent to the issuance of said Certificate of Occupancy or other certificate, Seller shall have the option of terminating the Contract and returning the Deposit hereunder.

34.     **Repairs/Alterations.**   Notwithstanding anything to the contrary contained in this Contract, Seller shall not be obligated to make any repairs or alterations to the Property

35.     **Smoke Detector and Carbon Monoxide Affidavit.**   Supplementing Paragraph 16 of the Contract, Seller shall provide at Closing an affidavit stating that at the time of transfer of the Property there is installed in the dwelling an operable single station smoke detecting alarm device in accordance with Section 375(5) of the Executive Law and an operable carbon monoxide detector in accordance with Section 378(5)(a) of the Executive Law.

36.     **Property Condition Disclosure Act.**   Purchaser hereby acknowledges the disclosure requirements of the Property Condition Disclosure Act, Real Property Law Article 14, and represents that Purchaser has had an opportunity to make an independent examination and inspection of the Property. Purchaser also hereby waives, releases, and discharges all rights, claims, and actions against Seller and against the Property arising out of, under or in connection with the Property Condition Disclosure Act and Purchaser's sole right and remedy under or pursuant to the Property Condition Disclosure Act shall be the receipt of a Five Hundred Dollar ($500.00) credit at Closing.

37.     **Miscellaneous.**

(a)          Complete Agreement.   All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this Contract; it completely expresses their full agreement and has been entered into after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Contract.

(b)          No Waiver; Binding on Heirs;  Neither this Contract nor any provision thereof may be waived, changed or cancelled except in writing. Subject to Paragraph 28 of this Contract and without altering or amending the provisions thereof, this Contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize

their respective attorneys to agree in writing to any changes in dates and time periods provided for in this Contract.

(c)　　　　Interpretation. Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this Contract may require it. The captions in this Contract are for convenience of reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

(d)　　　　Effectiveness. Submission by the Seller of this Contract for execution by the Purchaser shall confer no rights, nor impose any obligations on Seller. This Contract shall not be binding or effective until (i) duly executed and delivered by Seller and Purchaser; and (ii) the Bankruptcy Court has entered any requisite Sale Confirmation Order; *provided that*, notwithstanding the foregoing, the Purchaser's execution of this Contract shall make such Contract irrevocable unless (1) such revocation is expressly consented to by the Seller in writing; or (2) the Seller is unable to obtain a Sale Confirmation Order with respect to the transaction contemplated herein.

(e)　　　　IRS Reporting Requirements. Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(f)　　　　Further Actions. Each Party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this Contract. This subparagraph shall survive Closing.

(g)　　　　No Third Party Beneficiaries. This Contract is intended for the exclusive benefit of the Parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(h)　　　　This Contract may be amended or modified only in writing signed by both Parties and approved by the Bankruptcy Court, if necessary.

(i)　　　　Whenever possible, each provision of this Contract shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Contract is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Contract.

(j)　　　　This Contract has been entered into and shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles.

(k)           This Contract, including any riders, amendments, and/or additions, may be executed by electronic, facsimile, or PDF signature and/or in any number of counterparts and each of such electronic, facsimile, or PDF signature and/or counterpart shall for all purposes be deemed to be an original; and all such electronic, facsimile, or PDF signatures and/or counterparts shall together constitute but one and the same Contract.

(l)           The Parties have been given the opportunity to seek legal advice and to have this Contract reviewed by an independent attorney prior to signing it. This Contract shall be construed as if it has been jointly drafted by both Parties. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in interpreting this Contract.

(m)           No delay or omission to exercise any right, power, or remedy accruing to a Party under this Contract shall impair any right, power, or remedy of such Party, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Contract (i) shall be effective unless it is in writing and signed by the Party against whom such waiver or consent is sought to be enforced; (ii) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (iii) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

(n)           Each of the Parties shall take such other actions and execute such documents consistent with this Contract as may be reasonably requested by any other Party in furtherance of consummating the transaction(s) contemplated hereby.

(o)           This Contract is an important legal document. Each Party acknowledges that it has been advised to consult legal counsel before signing this Contract and has signed this Contract after having the opportunity to consult with legal counsel of its choosing. No Party has provided legal advice (including but not limited to tax advice) to another Party or acted as legal counsel to another Party. Each Party hereby confirms that it has carefully read this Contract in its entirety and that it understands all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Contract has been duly executed by the parties hereto as of the date set forth above.


**SELLER:**

ABERDEEN ENTERPRISES, INC.

By: _____

Printed Name: _Mathew Kabatoff_____

Title: _Authorized Signatory_____

**PURCHASER:**

376 GIN LANE, LLC, as Nominee of Bidder No. 570117

By: _____

Printed Name: __Andrew Park_____

Title: __Authorized Signatory_____

Receipt of the Initial Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 5 above.

_____
Escrowee

Receipt of the Secondary Deposit is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 5 above.

_____
Escrowee

**PREMISES:**

| | |
|---|---|
| Section: | 029.00 |
| Block: | 01.00 |
| Lots: | 017.013 |
| County or Town: | Southampton |
| Street No. Address: | 376 Gin Lane |

# EXHIBIT 2

**(Redline)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC.<br>BRICKCHURCH ENTERPRISES, INC. | Case No. 23-72834-AST<br>Case No. 22-70914-AST |
| Debtors. | Jointly Administered |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————x
In re:                                          Chapter 11

ABERDEEN ENTERPRISES, INC.,          Case No. 23-72834-AST
BRICKCHURCH ENTERPRISES, INC.        Case No. 22-70914-AST
                          Debtors.          Jointly Administered
———————————————————————x

**BAY POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS' SECOND
AMENDED JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE**

Bay Point Capital Partners II, LP ("Bay Point"), together with Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch", and collectively with Aberdeen, the "Debtors" and each a "Debtor"), propose this second amended joint liquidating plan (the "Plan") under Chapter 11 of the Bankruptcy Code.

The Debtors have pursued a Sale of their valuable and iconic, contiguous ocean front properties (as defined herein). The bid procedures governing the Sale were the subject of a separate application filed by the Debtors, were approved by the Bankruptcy Court (the "Approved Bid Procedures") pursuant to an Order entered on November 22, 2023 [D.I. 104], were amended by the Debtors on December 15, 2023 [D.I. 116] and again on January 26, 2024 [D.I. 166], and shall be deemed incorporated by reference for purposes of the Plan.

On January 24, 2024, the Debtors held an Auction under the terms of the Approved Bid Procedures. The highest and best bids at the Auction were in the respective sums of $40,500,000 (376 Gin Lane) and $38,500,000 (366 Gin Lane). Pursuant to the terms of the Approved Bid Procedures, the above-referenced bids are subject to a buyer's premium in the amount of $3,660,000 and $3,420,000, respectively. In addition, the prospective purchasers have agreed to increase the amount of the high bid by $1,501,440 (376 Gin Lane) and $1,425,280 (366 Gin Lane), contingent upon the Properties being sold pursuant to the Plan and 11 U.S.C. § 1146 being applicable to relieve the prospective purchasers of their obligations to pay any transfer taxes with respect to the Sales of the Properties. The high bids for the Properties, plus the buyer's premiums and the contingent bid enhancements, provide for a combined total purchase price of $89,006,720 (the "Gross Sale Proceeds").    Copies of the respective Purchase and Sale Agreements for each Property are annexed hereto as Exhibit A and Exhibit B.

On January 30, 2024, Bay Point filed its *Chapter 11 Liquidating Plan* [D.I. 173] (the "Initial Bay Point Plan"). On February 12, 2023, Bay Point filed its *First Amended Chapter 11 Liquidating Plan* [D.I. 194] (collectively with the Initial Bay Point Plan, the "Bay Point Plan"). Contemporaneously, with the submission of this Plan, Bay Point will withdraw the Bay Point Plan.

On February 14, 2024, Bay Point and the Debtors filed their *Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code* [D.I. 209], which is amended and replaced by this Plan.

This Plan is proposed by Bay Point and the Debtors (collectively, the "Plan Proponents") and is intended to provide an efficient and effective method for distributing the Sale Proceeds resulting from the Auction and other monetary assets of the Debtors. Pending the closing of the

Sales, the Debtors shall continue to be jointly managed and operated by Mathew Kabatoff ("Kabatoff") and Bay Point, consistent with the Approved Bid Procedures, unless otherwise provided herein. After the Effective Date, Kabatoff alone shall remain as the sole Decision Maker and fiduciary for the Debtors' respective bankruptcy Estates and shall be charged with the responsibility to file necessary tax returns on behalf of the Debtors and their estates.

## ARTICLE I

## DEFINITIONS

All capitalized terms used herein shall have the meanings set forth below.

1.1     "**Aberdeen**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.2     "**Aberdeen Administrative Expense Claim**" means an Administrative Expense Claim against Aberdeen.

1.3     "**Aberdeen Priority Claim**" means a Priority Claim against Aberdeen.

1.4     "**Aberdeen Property**" means the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

1.5     "**Aberdeen Unsecured Claim**" means an Unsecured Claim against Aberdeen.

1.6     "**Administrative Expense Claims Bar Date**" shall mean the first Business Day that is thirty (30) days after the Effective Date.

1.7     "**Administrative Expense Claim**" means a Claim for the costs and expenses of administering the respective Cases under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) Professional Fee Claims.

1.8     "**Allowed**" means, except as otherwise provided herein, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has been scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no

objection to allowance has been interposed within the applicable period fixed by the Plan; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

1.9 "**Approved Bid Procedures**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.10 "**Auction**" shall have the meaning as ascribed to such term in the Approved Bid Procedures.

1.11 "**Bankruptcy Cases**" means, collectively, the above-captioned cases, each being a "**Bankruptcy Case**."

1.12 "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

1.13 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York.

1.14 "**Bankruptcy Fees**" means (i) all fees and charges against the Estate under section 1930 of title 28 of the United States Code, and (ii) a Claim for reasonable compensation for services rendered, and reimbursement of actual and necessary expenses incurred, by the Escrow Agent as awarded by a Final Order of the Bankruptcy Court.

1.15 "**Bankruptcy Fees Reserve**" means the segregated account established pursuant to Section 5.3 of the Plan.

1.16 "**Bay Point**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.17 "**Bay Point Collateral Documents**" means (i) each security instrument, mortgage, deed of trust, document, pledge agreement, subordination agreement, account control agreement, or any other agreement pursuant to which either Debtor or any other Person granted Bay Point a Lien to secure repayment of the DIP Loan Obligations; and (ii) each of the JGB Assigned Documents.

1.18 "**Bay Point Debt**" shall have the meaning ascribed to such term in Section 3.1 of the Plan.

1.19 "**Bay Point Loan Documents**" means, collectively, the DIP Loan Documents, the Morgan Stanley Judgment, and each of the documents related to the debt referenced in the Morgan Stanley Judgment that were assigned to Bay Point.

1.20 "**Blouin**" means Louise Blouin, indirect upstream beneficial equity holder and Creditor of the Debtors.

1.21  "**Brickchurch**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.22  "**Brickchurch Administrative Expense Claim**" is an Administrative Expense Claim against Brickchurch.

1.23  "**Brickchurch Priority Claim**" means a Priority Claim against Brickchurch.

1.24  "**Brickchurch Property**" means the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

1.25  "**Brickchurch Unsecured Claim**" means an Unsecured Claim against Brickchurch.

1.26  "**Broker**" means the person or firm engaged by the Debtors, with consent of both Decision Makers, and approved by the Bankruptcy Court to market and sell the Properties.

1.27  "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.28  "**Cases**" means, collectively, the above-captioned, jointly administered Chapter 11 cases commenced by the Debtors in the Bankruptcy Court, each being a "**Case**."

1.29  "**Cash**" means lawful currency of the United States of America.

1.30  "**Claim**" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

1.31  "**Claims Objection Deadline**" shall mean (A) for Administrative Expense Claims, the later of (i) thirty (30) days after a request for payment, or Proof of Claim, seeking allowance of the Claim is filed, and (ii) ~~one (1) Business Day prior to the Effective Date of the Plan, or such other date fixed by the Bankruptcy Court~~thirty (30) days after entry of this Confirmation Order, and (B) for all Claims other than Administrative Expense Claims, ~~one~~thirty (~~1~~30) ~~business day prior to the Effective Date of the Plan~~days after the entry of this Confirmation Order.

1.32  "**Closing**," means that time at which the Debtors, after and pursuant to a Sale Approval Order, consummate one or more Sales of the Properties.

1.33  "**Confirmation**" means the entry of the Confirmation Order.

1.34 "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court to consider confirmation of the Plan.

1.35 "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1129.

1.36 "**Credit Bid**" means the right of Bay Point pursuant to 11 U.S.C. §363(k) to bid its Secured Claims at the Auction.

1.37 "**Creditor**" means the holder of a Claim against one or both of the Debtors.

1.38 "**Debtors**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.39 "**Decision Makers**" means, collectively, Bay Point and Kabatoff, each being a "**Decision Maker;**" *provided that*, notwithstanding anything to the contrary herein, Bay Point shall have the right, in its sole and absolute discretion, to withdraw as a Decision Maker. In the event that Bay Point withdraws as a Decision Maker, the terms "Decision Makers" and "Decision Maker" shall refer only to Kabatoff.

1.40 "**DIP Financing Order**" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

1.41 "**DIP Lender Superpriority Claim**" means that Allowed Administrative Claim in the amount of the DIP Loan Obligations, granted to Bay Point pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over all other Administrative Expense Claims, adequate protection and other diminution claims, Unsecured Claims, and all other Claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including Administrative Expense Claims or other Claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code, or any other section of the Bankruptcy Code, whether or not such Administrative Expense Claims or Claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, except as otherwise provided herein.

1.42 "**DIP Loan Documents**" means (i) the Loan and Security Agreement, dated November 9, 2022, by and among Debtor, Aberdeen, and Bay Point (the "**DIP Loan Agreement**"), and (ii) each of the Bay Point Collateral Documents.

1.43 "**DIP Loan Obligations**" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

1.44 **"Disclosure Statement"** means the Disclosure Statement for the Plan, including all exhibits, attachments, or amendments thereto, approved by Order of the Bankruptcy Court.

1.45 **"Disputed Claims Reserves"** means, collectively, the segregated account(s) established pursuant to Section 5.2 of the Plan for the payment of Disputed Claims to the extent such Disputed Claims are Allowed by a Final Order, each being a "**Disputed Claims Reserve**."

1.46 **"Disputed"** means, except as otherwise provided herein, with respect to a Claim, (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been timely filed; (b) any Claim that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Final Order; *provided however, that* until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in its entirety if: (A) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (B) no corresponding Claim has been listed in the Schedules; *and further provided that* until the earlier of (I) the filing of an objection to a Proof of Claim or (II) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in that amount by which the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules. Claims arising from the rejection of Executory Contracts will be treated as Disputed Claims unless and until such Claims have been settled, withdrawn, or determined by a Final Order. Notwithstanding the foregoing, any Claims held by Bay Point shall not be Disputed Claims, but shall be subject to the clawback provisions set forth in Section 5.11.

1.47 **"Distribution Date"** means the Effective Date or such other date as soon as reasonably practicable as may be set by the Debtors for the distribution of Sale Proceeds in accordance with the terms of the Plan.

1.48 **"Effective Date"** means the date upon which all of the conditions to effectiveness of the Plan as set forth in Section 7.5 of the Plan have been satisfied.

1.49 **"Equity Interests"** means the ownership interests of Aberdeen Enterprises (BVI) Ltd. and Brickchurch Enterprises (BVI) Ltd. in the respective Debtors.

1.50 **"Escrow Agent"** means Gary Herbst, or such other person selected by Debtors to hold the Bankruptcy Fees Reserve, Disputed Claims Reserves and the

Professional Fee Reserve, and to disburse the Sale Proceeds and other funds of the Estate strictly in accordance with the Plan and order of the Bankruptcy Court.

1.51 "**Estates**" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "**Estate**."

1.52 "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" of the Debtor as such terms are used in section 365 of the Bankruptcy Code.

1.53 "**Federal Tax Liens**" includes and means, collectively, (a) that certain Lien filed by the IRS on August 17, 2022 against the Aberdeen Property with the Suffolk County Clerk (Recording No: LFED00034063); and (b) that certain Lien filed by the IRS on February 17, 2023 against the Aberdeen Property with the Suffolk County Clerk (Recording No. LFED00034390), each being a "**Federal Tax Lien**;" *provided that,* nothing contained herein shall be an admission or an acknowledgement of the validity of above-referenced Federal Tax Liens, nor shall anything herein prejudice any person's (including either Debtor's or Bay Point's) right to challenge the validity of any Lien asserted against either Property by the IRS.

1.54 "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing.  The possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to an order will not cause it not to be a Final Order.

1.55 "**Governmental Unit**" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory a municipality, or a foreign state; or other foreign or domestic government.

1.56 "**Gross Sale Proceeds**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.57 "**IRS**" means the United States Internal Revenue Service.

1.58 "**IRS Litigation Reservation**" shall have the meaning ascribed to such term in Section 2.1 of the Plan.

1.59 "**JGB Assigned Documents**" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

1.60 "**JGB Judgment**" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

1.61 "**Plan**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.62 "**Kabatoff**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.63 "**Lien**" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

1.64 "**Morgan Stanley Judgment**" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

1.65 "**Net Sale Proceeds**" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, brokerage fees, closing costs, and documentary costs, if any; *provided that,* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

1.66 "**Petition Date**" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing these Chapter 11 cases were filed.

1.67 "**Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including each Priority Tax Claim.

1.68 "**Priority Tax Claim**" means any Allowed Unsecured Claim of a federal, state or local taxing authority that is entitled to priority under 11 U.S.C. § 507(a)(8).

1.69 "**Private Sale**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.70 "**Professional**" means a professional employed by a Debtor under section 11 U.S.C. §327.

1.71 "**Professional Fee Claim**" means a Claim for compensation for services rendered, and reimbursement of expenses incurred by a Professional as awarded by a Final Order of the Bankruptcy Court; *provided that*, for the avoidance of doubt, the fees of the Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction shall be paid directly from Gross Sale Proceeds without further order of the Bankruptcy Court and shall not be deemed to have a Professional Fee Claim; *and further provided that* a Broker whose retention has been approved by the Bankruptcy Court that does not solicit an offer that results in a consummated Sale of a Property may have a Professional Fee Claim in accordance with the approved retention application, subject to the rights of Debtors and any party in interest to object to the same.

1.72 "**Professional Fees Reserve**" shall have the meaning ascribed to it under Section 5.3A of the Plan.

1.73 "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.74 "**Properties**" means collectively the Aberdeen Property and the Brickchurch Property, each being a "**Property**."

1.75 "**Qualified Bidder**" has the meaning ascribed to such term in the Approved Bid Procedures, and shall, for the avoidance of doubt, include Bay Point by virtue of its Credit Bid rights.

1.76 "**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.77 "**Sale**" shall mean a sale of the Properties, whether through a single transaction or multiple transactions, pursuant to one or more Sale Approval Orders.

1.78 "**Sale Approval Order**" means an order of the Bankruptcy Court authorizing and directing the sale of one or more of the Properties pursuant to 11 U.S.C. § 363 or any other applicable provision of the Bankruptcy Code, including the Confirmation Order.

1.79 "**Sale Proceeds**" means the Net Sale Proceeds available from a Sale of a Property as defined in the introductory section of the Plan.

1.80 "**Sale Process**" shall have the meaning ascribed to such term in Section 4.2 of the Plan.

1.81    "**Schedules**" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtors with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.82    "**Section 1031**" shall have the meaning ascribed to such term in Section 4.9 of the Plan.

1.83    "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.84    "**Successful Bid(s)**" shall mean the highest and best bid for one or both of the Properties as (i) collectively recommended by Debtors and Bay Point and approved by the Bankruptcy Court; or (ii) as decided by the Bankruptcy Court after notice and hearing of the same if Debtors and Bay Point are not able to agree on the same.

1.85    "**Successful Bidder**" shall mean the Qualified Bidder that submits a Successful Bid.

1.86    "**Transfer Taxes**" means, without limitation, (a) Suffolk County or other applicable local real property transfer taxes, including but not limited to the Peconic Bay transfer tax; (b) New York state TP 584 deed and transfer taxes; and (c) any and all other stamp taxes, similar taxes, or mansion taxes, which, but for the applicability of § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of the Plan.

1.87    "**Transferred Encumbrances**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.88    "**Unsecured Claim**" means an Allowed Claim which is not an Administrative Claim, a Bankruptcy Fee, a Priority Claim, a Post-Petition Administrative Tax Claim, or a Secured Claim.

1.89    "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim against one or both of the Debtors.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full, or such other amount as agreed upon with the holders of such unclassified Claims.

2.1 **Administrative Expense Claims**. Each holder of an Allowed Administrative Expense Claim - other than the DIP Lender Superpriority Claim and any Administrative Expense Claim held by the IRS - shall be paid in full satisfaction of its Claim, pursuant to agreement or Final Order, the amounts specified in Sections 5.8 and 5.9 of the Plan. Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim. For the avoidance of doubt, the $1 million payment to the IRS under Section 2.3 is only a partial payment, to be made from the Sale Proceeds at Closing, and shall not be treated as a full satisfaction of any claim or expense. Nothing contained in the Plan shall otherwise prejudice the rights and claims of the non-debtor parties in connection with the pending litigation entitled *Aberdeen Enterprises Inc. v. USA*, 2:22-cv-07190 (E.D.N.Y.) all of which are hereby preserved to the fullest extent possible (the "IRS Litigation Reservation").

Except as otherwise set forth herein or in 11 U.S.C. § 503(b)(1)(D), requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties. The bar under this paragraph shall not apply to any

administrative expense of the IRS, including any administrative expense that could be the subject matter of a request under 11 U.S.C. § 505(b)(2), or to the DIP Lender Superpriority Claim.

2.2     **Professional Fees**.  All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date.  Pending consideration of the application, appropriate reserves shall be established as set forth herein from the Sale Proceeds in accordance with the provisions of Section 5.3A of the Plan to pay Professional Fee Claims as Allowed; *provided*, *however*, that notwithstanding anything to the contrary herein, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, plus expenses; the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall be $100,000, plus expenses, through confirmation of the Plan (subject to Bankruptcy Court approval), plus an additional amount for post-confirmation services not to exceed an agreed upon cap of $40,000; and the Allowed Professional Fee Claim of Duane Morris LLP shall not exceed $151,905.95.

Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Debtors or Bay Point for such Claim.

2.3     **Priority Tax Claims**.  The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured**

**Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

The IRS shall receive the fixed sum of $1 million for application toward the IRS's Administrative Expense Claims and Priority Tax Claims in these cases. The IRS's Administrative Expense Claims and Priority Tax Claims are Allowed in full and are not Disputed for all purposes without prejudice to the IRS Litigation Reservation. The IRS agrees to accept partial payment towards its claims and expenses as set forth in this Section. The IRS may apply all or any part of the $1 million payment toward its Administrative Expense Claim or Priority Tax Claim in its sole discretion. This $1 million distribution to the IRS shall not be subject to any Disputed Claims Reserve under Section 5.2 of this Plan. Rather, the full $1 million will be distributed to the IRS from the Sale Proceeds at Closing; notwithstanding anything else to the contrary herein, the $1 million payment shall not be subject to return, disgorgement, or refund for any reason whatsoever.

2.4    **Bankruptcy Fees**.

   (a)    Quarterly United States Trustee Fees.  The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of final decree, shall be paid from the Bankruptcy Fees Reserve.

   (b)    Escrow Agent Fees.  The Bankruptcy Fees payable to the Escrow Agent shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Escrow Agent shall serve upon

counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

(c)    <u>Funding</u>.  The Debtors shall use the Sale Proceeds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

## ARTICLE III

## <u>CLASSIFICATION AND TREATMENT OF CLAIMS</u>

Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| | | | |
|---|---|---|---|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

## <u>Class 1: Secured Claims of Bay Point</u>

3.1    **<u>Classification</u>** – Class 1 consists of the Secured Claims of Bay Point, which include the following: (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment (collectively, the "<u>Bay Point Debt</u>"). The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a

third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property). Nonetheless, this potential lien-priority dispute between the IRS and Bay Point will be moot if the auction sale is confirmed because then there will be no funds available for distribution toward a third-priority lien against the Aberdeen Property.

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order, and such excess amount shall thereafter be distributed in accordance with the Bankruptcy Code.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order; *provided, however*, that nothing contained herein shall prejudice any right that the Debtors or a party-in-interest may have to

challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *further provided that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* ~~Debtors'~~ this reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and *further provided that* ~~Debtors'~~ this reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.  For the avoidance of doubt, the decision of the Debtors to challenge the amount of the Bay Point Debt may be made following the Effective Date without the concurrence of Bay Point as a Decision Maker. Any challenge shall be filed within thirty (30) days of the Effective Date.

**Voting** – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

**Class 2:  Secured Claims of New York State Department of Taxation and Finance**

3.2 **Classification** – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

## Class 3: Non-Tax Priority Claims

3.3     **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

**Treatment** – The Debtors do not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000 in the aggregate.

**Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

## Class 4: General Unsecured Claims

3.4     **Classification** – Class 4 consists of all Unsecured Claims.

**Treatment** – Class 4 will not receive any distributions under the Plan.

**Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## Class 5: Equity Interests

3.5     **Classification** – Class 5 consists of the Equity Interests in the Debtors.

**Treatment** – Class 5 will not receive any distributions under the Plan.

**Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     **Authority to Act / Limitation of Liability.**  Each act and every decision to be made by Debtors under the Plan through the Effective Date shall be made at the direction, and shall be completely consistent with such direction, of the Decision Makers, such direction being valid and enforceable only upon the mutual agreement of both Decision Makers; *provided*, *however*, that ~~Kabatoff, as the Debtors' fiduciary, shall be authorized and directed in the Confirmation Order to prepare and file tax returns of the Debtors reflecting the Sale of the Properties and shall be the exclusive Decision Maker after the closing. If~~ after the Effective Date, Kabatoff alone shall remain as the sole Decision Maker (as such term is defined in the Plan) and aside from his role as the sole Decision Maker, Kabatoff shall be the fiduciary for the Debtors and their respective bankruptcy Estates and shall be charged with the responsibility to file all necessary tax returns and execute all closing documents necessary to close the Sale Transactions on behalf of the Debtors and their estates. Prior to the Effective Date, if the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. ~~For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan.~~ The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with

such third parties as appropriate to assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. Kabatoff shall have the responsibility to file, or cause to be filed, all necessary tax returns or similar reports with the appropriate taxing authorities ~~relating to the Debtors and the sale of the Properties~~. **Except for gross negligence or willful misconduct, the Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan;** *provided***,** *however***, that nothing contained herein shall in any way negate Kabatoff's fiduciary responsibilities on behalf of the Debtors' estates.**

4.2 <u>**Sale Free and Clear of All Claims, Liens, Taxes and Interests.**</u> The Plan shall be funded through the disposition of the Sale Proceeds, funds currently in the Debtors' possession, and any remaining funds previously advanced by Bay Point to the Debtors pursuant to the DIP Financing Order.

4.3 **[Reserved].**

4.4 <u>**Provisions Relating to the Sale Process**</u>.

(a) <u>Approved Bid Procedures</u>. The Sale Process, including the consummation of one or more Sales, was conducted in accordance with the Approved Bid Procedures.

(b) <u>Free and Clear Sale(s)</u>. All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation, except as paid at Closing.

(c)     **[Reserved].**

(d)     <u>Deadline to Close</u>.  The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024 or such other date as fixed by the Court**.

(e)     <u>Payment of Sale Transaction Costs</u>.  The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) any other closing costs associated with the Sale of such Property; and (iv) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(f)     <u>Vesting of Assets</u>.  The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the closing of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation.  Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing any necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

4.5     **The Escrow Agent**.

(a)     <u>Escrow Agent</u>.  The Escrow Agent shall hold the proceeds of the Sale(s) of the Properties in the separate DIP account (the "**Escrow DIP Account**") established by the Debtors at a depository institution that has been previously approved by the UST with the Escrow Agent identified as the sole signatory on such account. The Confirmation Order shall approve the Debtors' appointment of the Escrow Agent, with the power and duty to (i) hold the proceeds of the Sale(s) in the Escrow DIP Account, and (ii) distribute the Sale

Proceeds and other funds of the Estates strictly in accordance with the provisions of the Plan.

(b)   <u>Escrow Agent Protections</u>.  The Escrow Agent shall not be deemed an officer or agent of the Debtors.  The Escrow Agent may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan.  Except for gross negligence, or willful misconduct, the Escrow Agent shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan (including, without limitation, distributions of Sale Proceeds pursuant to the Plan), the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with or related to the Plan, except in the case of gross negligence or willful misconduct. For the avoidance of doubt, the Escrow Agent shall have no responsibility or liability to any entity for the failure of Kabatoff to fulfill any of his obligations under the Plan. The Escrow Agent is not a receiver, trustee, or assignee.

(c)   <u>No Interference</u>.  No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Escrow Agent in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Escrow Agent in the performance of its duties; *provided that*, nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

(d)   <u>Execution of Documents</u>. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors and any other necessary party shall be authorized, and shall be directed by the Confirmation Order, to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Plan, that is necessary for consummation of the Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

(e)   <u>Filing of Documents</u>.  Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.6    **Transfer Taxes.** The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "Transfer Taxes"). For avoidance of doubt, this does not apply to any income, employment, or unemployment tax claims, or capital gains tax, under the Internal Revenue Code, 26 U.S.C. Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

4.7    **[Reserved].**

4.8    **Preservation of Causes of Action.** Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective bankruptcy estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and proceeds realized thereon shall be distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court after payment of reasonable attorney's fees.

4.9    **1031 Exchange Provisions.** Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including

with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan, nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986 as amended ("Section 1031"), including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

4.10    **Filing of Documents.**   Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.11    **Preservation of Insurance.**   The Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor, the Properties (or any individual Property), or any other Person or entity. Likewise, the Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or any insurance carrier.

**ARTICLE V**

**DISTRIBUTIONS**

5.1     **Method of Payment**.  Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

5.2     **Disputed Claims Reserves**.  No distributions shall be made with respect to any Disputed Claim. Instead, the Escrow Agent shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute, including, but not limited to (i) Disputed Secured Claims (ii) Disputed Claims entitled to treatment as Administrative Expenses or as Priority Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (iii) Disputed Claims of Governmental Units for any tax, and (iv) any disputed cure amount. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of

all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan. Furthermore, the IRS's Allowed Administrative Expense Claim and Allowed Priority Tax Claim are not subject to this Section 5.2 because those Claims are Allowed in full and are not Disputed, and the IRS agrees to accept a partial payment toward those claims and expenses in the amount of $1 million, as set forth in Section 2.3.

5.3 **Bankruptcy Fee Reserve.** The Debtors shall utilize the Sale Proceeds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

5.3A **Professional Fees Reserve**. The Debtors shall utilize the Sale Proceeds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor(s) | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $140,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |
| Aberdeen and Brickchurch | The Law Offices of Avrum J. Rosen, PLLC | $50,676.50 |
| Aberdeen and Brickchurch | TBD Tax Professional for Assistance with Preparation and Filing of Tax Returns | $10,000 (estimated) |

For the avoidance of doubt, and subject to Sections 5.8, 5.9, and 5.12, the inclusion of the above-referenced amounts in the Professional Fees Reserve shall not be a request or an agreement by the Debtors or Bay Point that such Professional shall have an Allowed Claim in such amount.

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Escrow Agent for distribution in accordance with the provisions of Sections 5.8 and 5.9.

5.4     **Prosecution of Objections.** Any party-in-interest, including the Debtors, shall have the right to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims. Objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding that, Brickchurch's objection to the IRS's claim (ECF No. 205 in Case No. 22-70914) is withdrawn and the IRS's claim in the Brickchurch case (Claims Register, Clam No. 13-1) is Allowed as filed. The IRS's claim in the Aberdeen case (Claims Register, Claim No. 2-1) is also Allowed as filed. As set forth in Section 2.3, the IRS has agreed to accept a partial payment of $1 million total toward its Allowed Administrative Expense Claims and/or Allowed Priority Tax Claims in these cases, as set forth in Section 2.3.  Notwithstanding the foregoing, the Plan shall not impact the IRS Litigation Reservation which is preserved.

5.5     **Distribution After Allowance.** Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve

with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

5.6 **Distribution After Disallowance.** The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

5.7 **Delivery of Distributions.** Distributions to holders of Allowed Claims shall be made: (i) at the address set forth on the respective Proof(s) of Claim or other request(s) for payment filed by the holder of such Allowed Claim; (ii) at the addresses set forth in any written notices of address change delivered to the Debtors; or (iii) at the address reflected in the Schedules if no Proof of Claim, or other request for payment, is filed and the Debtors have not received a written notice of change of address.

5.8 **Distribution to Allowed Claims Against Aberdeen.**

(A) Except as otherwise provided herein, the Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $45,661,440,_less the closing adjustments identified in Schedule A attached hereto, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

    (i) $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

    (ii) $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

    (iii) $26,767,332.93 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

    (iv) $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

    (v) Up to $300,000 shall be paid towards Bankruptcy Fees;

(vi) $575,000 shall be paid to the IRS for application to the IRS's Administrative Expense Claim and/or Priority Tax Claim in the Aberdeen case (subject to the provisions set forth in Section 2.3 of this Plan);

(vii) Subject to Bankruptcy Court approval, $100,000 shall be paid to Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims for services rendered up to confirmation of the Plan; *provided*, that Goldberg Weprin Finkel Goldstein LLP shall be entitled to (a) an additional amount of up to $20,000 to close the transaction relating to the Sales of the Properties and, (b) up to $20,000 for services related to closing the Bankruptcy Cases;

(viii) Up to $25,382.75 for payment of the Professional Fee Claim of The Law Offices of Avrum J. Rosen, PLLC;

(ix) The Allowed amount, not to exceed $10,000, of the Professional Fee Claim of the TBD Tax Professional for assistance with preparation and filing of tax returns;

(x) The Allowed amount, not to exceed $30,000, of an Administrative Expense Claim that may be filed by Kabatoff, in full payment of the same; and

(xi) Any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(B) Any remaining monetary or liquidated assets of Aberdeen, including funds on deposit in any debtor-in-possession bank accounts, shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code; *provided, however*, that the sum of $108,317.25 which is comprised of certain casualty insurance proceeds related to the Aberdeen property in which Bay Point has a first priority security interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations.

(C) Notwithstanding the foregoing, there shall be reserved from the distribution of Sale Proceeds to Bay Point pursuant to Section 5.8(A)(iii) above the sum of $100,000 to be held by the Escrow Agent pending further proceedings to determine the extent and value (if any) of the secured claim asserted by Dream Yards Landscaping, Inc. ("Dream Yards") arising from its filing of mechanics' lien against the Aberdeen Property. The Escrow Agent shall distribute to Dream Yards such amount (if any) as may be determined by entry of a Final Order of the Court, or by agreement of the Debtors, Bay Point and Dream Yards, to be the amount of its secured claim.

**5.9** **Distribution to Allowed Claims Against Brickchurch.**

(A)  The Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $43,345,280, less the closing adjustments identified in <u>Schedule A</u> attached hereto, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

    (i)  $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

    (ii)  $30,509,867.53 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

    (iii)  $10,231,354.21 shall be paid to Bay Point for application to outstanding Obligations under the DIP Loan Documents;

    (iv)  $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

    (v)  Up to $300,000 shall be paid towards Bankruptcy Fees;

    (vi)  $425,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.3 of the Plan).

    (vii)  Up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and $151,905.95 shall be paid to Duane Morris LLP in full payment of its Allowed Professional Fee Claims;

    (viii)  Up to $25,382.75 for payment of the Professional Fee Claim of The Law Offices of Avrum J. Rosen, PLLC;

    (ix)  The Allowed amount, not to exceed $10,000, of the Professional Fee Claim of the TBD Tax Professional for assistance with preparation and filing of tax returns;

    (x)  The Allowed amount, not to exceed $30,000, of an Administrative Expense Claim that may be filed by Kabatoff, in full payment of the same; and

    (xi)  Any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(B)  Any remaining monetary or liquidated assets of Brickchurch, including funds on deposit in any debtor-in-possession bank account, shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.10 **Creditor's Right to Accept Lesser Payment**.  For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

5.11 **Estates' Right to Clawback**.  For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be re-distributed without any further payment to Bay Point in accordance with the priority provisions of the Bankruptcy Code.

5.12 **Agreements as to Certain Professional Fees.**  Goldberg Weprin Finkel Goldstein LLP and Simmons Legal PLLC have agreed to limit their request for compensation to those amounts set forth in Sections 5.8(A)(vii) and 5.9(A)(vii), respectively. In consideration thereof,  Bay Point has agreed that it will not challenge (a) an award of an Allowed Claim to Goldberg Weprin Finkel Goldstein LLP in the amount specified in Section 5.8(A)(vii); and/or (b) an award of an Allowed Claim to Simmons Legal PLLC in the amount specified in Section 5.9(A)(vii).

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1     **Rejection of Executory Contracts.**   On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2     **Rejection Damages Claims.**   Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims.

6.3     **Bar to Rejection Claims.** A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date.  Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## ARTICLE VII

## CONFIRMATION AND CONSUMATION OF THE PLAN

7.1     **Injunction Against Interference with Plan.  Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.**

7.2     **[Reserved].**

7.3    **No Discharge.**   Pursuant to section 1141(d)(3) of the Bankruptcy Code, as applicable, the Debtors will not be discharged from debts that arose prior to Confirmation.

7.4    **Liens and Claims.**   All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

7.5    **Conditions to Effective Date.**   The Plan will not become effective, and the Effective Date will not occur, unless and until:

(a)    the Confirmation Order, including a provision waiving the stay under Fed. R. Bankr. P. 3020(e), shall have been entered;

(b)    the Sale Approval Order, including a provision waiving the stay under Fed. R. Bankr. P. 6004(h), shall have been entered;

(c)    the Sale Transaction shall have closed; and

(d)    the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

7.6    **Binding Effect.**   Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## ARTICLE VIII

## RETENTION OF JURISDICTION

8.1 **Retention of Jurisdiction**. The Bankruptcy Court shall retain post-confirmation jurisdiction over the following matters:

(a) To issue any orders necessary or appropriate to authorize the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code.

(b) To adjudicate any dispute relating to the sale of the Properties;

(c) To resolve all matters and disputes arising under or relating to the Plan, including, without limitation, (i) disputes relating to the Sale Process; (ii) any disputes relating to, or involving the amount of the allowance of Claims; and (iii) distribution or disbursement of the Sale Proceeds;

(d) To Allow or disallow in whole or in part any objections to Claims filed prior to the Closing that have not been previously Allowed or disallowed;

(e) To grant or deny the applications for allowance of final compensation and reimbursement of expenses of Professionals;

(f) To enter an order or final decree concluding the Cases following the Sale of the Properties, payment of allowed claims, resolution of all disputes, and distribution of all reserves;

(g) To compel the Debtors, Blouin, the Escrow Agent, or any other person to take such action and execute such documents, or to refrain from such action, as may be necessary to effectuate the Plan;

(h)     To enter Orders that may be necessary or appropriate to implement or consummate the provisions of the Plan and to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Cases;

(i)     Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j)     Approve modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, and modifications of the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k)     Issue and enforce injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     To enter a Sale Approval Order with respect to the Properties regardless of the failure to timely achieve substantial consummation of the Plan and regardless of whether the Plan shall become effective pursuant to Section 7.5 of the Plan;

(n)     Issue any Orders necessary to consummate a sale of the Properties pursuant to 11 U.S.C. 363 or any other applicable provision of the Bankruptcy Code after any failure to timely achieve substantial consummation the Plan and/or any failure of the Plan to become effective pursuant to Section 7.5 of the Plan; and

(o)     Issue any Orders as may be appropriate to convert the Cases to chapter 7 if the Plan is not substantially consummated or otherwise fails to become effective pursuant to Section 7.5 of the Plan.

## ARTICLE IX

## GENERAL PROVISIONS

9.1     **Orders in Aid of Consummation.**  Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation and/or consummation of the Plan directing the implementation of matters or actions required by the Plan.

9.2     **Compliance with Tax Requirements.**  In connection with the Plan, the Debtors shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and distributions under the Plan shall be subject to applicable withholding and reporting requirements; *provided, however*, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code. For the avoidance of doubt, the foregoing *provisio* does not apply to any income, employment, or unemployment tax claim, or capital gains tax, under the Internal Revenue Code, 26 U.S.C. § 1 *et seq*. Notwithstanding anything else to the contrary, nothing contained in the Plan determines the federal tax effects of the Plan.

9.3     **Due Authorization by Creditors.**  Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express

or implied, that may or can in any way defeat or modify the rights released, or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4    **Amendments and Modifications.**    The Plan may be altered, amended or modified by Debtors, solely with the consent of Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; *provided that* Debtors may only modify the Approved Bid Procedures consistent with the terms of such Approved Bid Procedures.

9.5    **Revocation.**    Bay Point may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

9.6    **Request for Relief under Section 1129(b).**    If the Plan is accepted by one or more, but not all, classes of Creditors that are found to be impaired by the Plan, Bay Point may request confirmation under section 1129(b) of the Bankruptcy Code, subject to any modification of the Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

9.7    **Filing of Additional Documents.**    Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor or Bay Point may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9.8    **Headings.**    The headings in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9 **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10 **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11 **Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein.

If to Brickchurch Enterprises, Inc.:

    Simmons Legal PLLC
    Camisha L. Simmons, Esq.
    6060 N. Central Expressway, Suite 500
    Dallas, Texas 75206
    Camisha@SimmonsLegal.Solutions

If to Aberdeen Enterprises, Inc.:

    Goldberg Weprin Finkel Goldstein LLP
    Kevin Nash
    125 Park Avenue, 12th Floor
    New York, New York 10017
    knash@gwfglaw.com

If to the holders of the Equity Interests:

    Brickchurch Enterprises (BVI) Ltd.
    165 Broadway, 23rd Floor
    New York, New York 10006
    lt@ltbholding.com

    *-and-*

    Aberdeen Enterprises (BVI) Ltd.
    165 Broadway, 23rd Floor
    New York, New York 10006
    lt@lbtholding.com

If to Bay Point Capital Partners II, LP:

        The Law Offices of John F. Isbell LLC
        John F. Isbell, Esq.
        3050 Peachtree Road NW, Suite 740
        Atlanta, Georgia 30305
        John@JFI-Law.com

        *-and-*

        Thompson Hine LLP
        John C. Allerding, Esq.
        3560 Lenox Road NE, Suite 1600
        Atlanta, Georgia 30326
        John.Allerding@ThompsonHine.com

If to any other Creditor:

        At (a) the addresses set forth on the applicable Proofs of Claim or other request for payment filed by such holder, (b) the addresses set forth in any written notices of address changes delivered to the Debtors, or (c) the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

If to any entity that has filed a notice of appearance:

        At the address set forth on such notice of appearance.

9.12    **Other Actions.**  Nothing contained herein shall prevent any person from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan; *provided, however,* that no person shall take action expressly prohibited by or contrary to the express provisions of this Plan.

9.13    **Severability.**  In the event any provision of the Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

9.14    **Business Day.**  In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

9.15 **Quarterly Fees**. All fees payable pursuant to 28 U.S.C. § 1930, together with any applicable interest thereon, shall be paid by the Debtors until the closing of the Cases under 11 U.S.C. §350(a).

9.16 **Post-Confirmation Reports**. The Debtors shall file quarterly status reports until the Cases are closed.

9.17 **Continuation of the Debtors**. The Debtors shall continue in existence, duly authorized to carry out the terms of the Plan and the distribution of the Sale Proceeds. The Debtors shall not be dissolved until after the entry of a Final Decree closing the Cases. If the holders of the Equity Interest determine it desirable for the Debtors to exist after the closing of the Cases, and such continued existence does not prejudice any Creditors, nothing contained herein shall prevent the Equity Interest holders from choosing to continue the corporate existence of the Debtors.

## ARTICLE X

## CLOSING OR CONVERSION OF THE CASE

10.1 **Substantial Consummation**. Following entry of the Confirmation Order and satisfaction of the conditions in Section 7.5 of the Plan, Debtors shall file a notice with the Bankruptcy Court of the substantial consummation of the Plan. Upon the filing of such notice of substantial consummation, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

10.2 **Closing of the Case.** Within fourteen (14) days following the full administration of the Debtors' Estates, the Debtors shall file, on notice to the United States Trustee's Office, an application and proposed order seeking a final decree, closing the Cases pursuant to Bankruptcy Rule 3022.

10.3    **Conversion or Dismissal of the Cases Following Plan Failure.**  If the Plan is unable to be substantially consummated, then, after entry of any Sale Approval Orders pursuant to Section 10.3 of the Plan, the Bankruptcy Court shall, upon the request of the Debtors or on its own volition, enter an Order (a) converting the Bankruptcy Cases to chapter 7 cases and appointing a chapter 7 trustee; or (b) dismissing the Bankruptcy Cases.

*[Remainder of Page Intentionally Left Blank]*

Dated:    New York, NY
         February 28, 2024


Respectfully submitted,

BAY POINT CAPITAL PARTNERS II, LP

    By:   Bay Point Advisors LLC, its
        General Partner

        By:  /s/ Charles Andros_____


BRICKCHURCH ENTERPRISES, INC.    ABERDEEN ENTERPRISES, INC.


By:    /s/Mathew Kabatoff_____    By:    /s/ Mathew Kabatoff_____
      Mathew Kabatoff           Mathew Kabatoff

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 2/28/2024 9:19:36 PM | |
|---|---|
| **Style name:** Thompson Hine Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4859-3414-5444/15/Bay Point-Brickchurch-Aberdeen - Joint Plan.docx | |
| **Modified DMS:** nd://4859-3414-5444/20/Bay Point-Brickchurch-Aberdeen - Joint Plan.docx | |
| **Changes:** | |
| Add | 13 |
| Delete | 17 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 31 |

| Information to identify the case: | | |
|---|---|---|
| Debtor | Aberdeen Enterprises, Inc. | EIN: 04–3417521 |
| | Name | |
| United States Bankruptcy Court   Eastern District of New York | | Date case filed for chapter:   11   8/2/23 |
| Case number:   8–23–72834–ast | | |

# NOTICE OF ENTRY OF ORDER CONFIRMING
# CHAPTER 11 PLAN OF REORGANIZATION

**NOTICE IS HEREBY GIVEN THAT:**

In accordance with Bankruptcy Rule 2002, an order was signed on 3/1/24 confirming the debtor's Chapter 11 Plan of Reorganization.

The Order Confirming the Plan of Reorganization is on file and available for inspection in the Clerk's Office at:

290 Federal Plaza
Central Islip, NY 11722

Dated: March 1, 2024

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLeoc1.jsp** [Notice Confirming Chapter 11 Plan rev. 02/01/17]

# Notice Recipients

District/Off: 0207–8

User: admin

Date Created: 3/1/2024

Case: 8–23–72834–ast

Form ID: 225

Total: 39

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Arthur E Rosenberg | arthur.rosenberg@hklaw.com |
| aty | J Ted Donovan | Tdonovan@gwfglaw.com |
| aty | J Ted Donovan | Tdonovan@gwfglaw.com |
| aty | Kevin J Nash | knash@gwfglaw.com |

TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db        Aberdeen Enterprises, Inc.        376 Gin Ln        Southampton, NY 11968–5077
smg        United States of America        Secretary of the Treasury        15th Street & Pennsylvania Ave. NW        Washington, DC 20220
smg        NYS Unemployment Insurance        Attn: Insolvency Unit        Bldg. #12, Room 256        Albany, NY 12201
smg        NYS Department of Taxation & Finance        Bankruptcy Unit        PO Box 5300        Albany, NY 12205
smg        Internal Revenue Service        PO Box 7346        Philadelphia, PA 19101–7346
smg        NYC Department of Finance        345 Adams Street        Office of Legal Affairs        Brooklyn, NY 11201–3719
smg        United States Trustee        Office of the United States Trustee        Long Island Federal Courthouse        560 Federal Plaza        Central Islip, NY 11722–4437
10225672        Aberdeen Enterprises (BVI) Ltd        The Law Offices of Avrum J. Rosen, PLLC        38 New Street        Huntington, New York 11743
10224026        Anne Rosenbach PC        3 Delta Rd        Massapequa, NY 11758–5504
10224028        Bay Point Capital Partners II L.P.        Thompson Hine LLP        3560 Lenox Rd NE Ste 1600        Atlanta, GA 30326–4274
10224625        Bay Point Capital Partners II, L.P.        THOMPSON HINE LLP        Two Alliance Center        3560 Lenox Road, Suite 1600        Atlanta, Georgia 30326
10224027        Bay Point Capital Partners II, L.P.        Thompson Hine LLP        3560 Lenox Rd NE Ste 1600        Atlanta, GA 30326–4274
10272421        Bay Point Capital Partners II, LP        3050 Peachtree Road NW        Suite 740        Atlanta, Georgia 30305
10224029        Brickchurch Enterprises, Inc.        366 Gin Ln        Southampton, NY 11968–5077
10224030        Dream Yard Landscaping        53 Stern Ave        Flanders, NY 11901–4116
10259898        Dream Yard Landscaping, Inc.        c/o Anne Rosenbach, Esq., PLLC        3 Delta Road        Massapequa, NY 11758
10270935        Duane Morris LLP        Attn: Sommer L. Ross, Esq.        1201 N. Market Street, Suite 501        Wilmington, DE 19801
10224031        Edward J. Murphy        DOJ–Tax        PO Box 55        Washington, DC 20044–0055
10224032        Haynes and Boone LLP        30 Rockefeller Plz Fl 26        New York, NY 10112–0086
10292105        Holland & Knight LLP        31 West 52nd Street        New York, New York 10019        Attn:Arthur E. Rosenberg, Esq.
10224033        Internal Revenue Service        Centralized Insolvency Operations        PO Box 7346        Philadelphia, PA 19101–7346
10224034        JGB Partners, LP        21 Charles St        Westport, CT 06880–5803
10274160        Louise Blouin        BCI Management        165 Broadway, 23rd Floor        New York, NY 10006
10308915        Louise Blouin        TARTER KRINSKY & DROGIN LLP        Attn: David H. Wander, Esq.        1350 Broadway        New York, New York 10018
10309292        Louise Blouin        c/o Tarter Krinsky & Drogin LLP        1350 Broadway, 11th Floor        New York, New York 10018        Attn: Scott S. Markowitz, Esq.
10224035        Morgan Stanley        1 Penn Plz Fl 43        New York, NY 10119–4323
10226499        Morgan Stanley Private Bank, National Association        Roach & Lin, P.C.        6851 Jericho Turnpike, Suite 185        Syosset, New York 11791
10224036        NY State Attorney General        28 Liberty St        New York, NY 10005–1400
10224037        NYS Dept of Taxation        Bankruptcy/Special Procedure        PO Box 5300        Albany, NY 12205–0300
10224815        New York State Department of Taxation & Finance        Bankruptcy Section        P O Box 5300        Albany New York 12205–0300
10224038        Southampton Town Receiver of Taxes        116 Hampton Rd        Southampton, NY 11968–4934
10224039        Suffolk County Attorney        100 Veterans Hwy        Hauppauge, NY 11788–5402
10224040        Suffolk County Comptroller        330 Center Dr        Riverhead, NY 11901–3395
10224041        Suffolk County Water Authority        4060 Sunrise Hwy Ste 100        Oakdale, NY 11769–1005
10224042        Village of Southampton        23 Main St        Southampton, NY 11968–4808

TOTAL: 35