UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re:                                                                          Chapter 11

ABERDEEN ENTERPRISES, INC.,                                  Case No. 23-72834-ast
BRICKCHURCH ENTERPRISES, INC.,                            Case No. 22-70914-ast

Debtors.                                      Jointly Administered
------------------------------------------------------------------x

**OBJECTION FROM THE SOLE CREDITOR OF ABERDEEN AND BRICKCHURCH
ENTERPRISES BVI CHALLENGING THE  PAYMENT  RECEIVED BY BAY POINT CAPITAL
PARTNERS II, L.P.  THAT IS INCONSISTENT WITH THE  ASSIGNED JGB FORECLOSURE
JUDGMENT/ CLAIMS**


Honorable Alan S. Trust
U.S. Bankruptcy Court
290 Federal Plaza Central Islip
NY, 11722


July 29, 2024


**In reference to the Request made on May 14, 2024 and other Filed Claims - Re: Preservation of
Shareholder Rights in Aberdeen Enterprises, Inc. (Lead Case: 23-72834) and Brickchurch
Enterprises, Inc. (Companion Case: 22-70914) – Filed in January**

Dear Honorable Judge Trust,

I am writing in advance of the hearing on July 31, 2024, focused on the objection filed by Aberdeen
Enterprises Inc. (AEI) with respect to the Bay Point claim as presented in Schedule A of the Joint Plan, and
which was subsequently distributed to Bay Point on the 'effective date' of March 8, 2024.

While I support the objection made by Aberdeen Enterprises Inc. and Mr. Nash, I was advised to wait for
this hearing to take place, prior to re-submitting, the previously filed disputed claims and damages on behalf
of Aberdeen and Brickchurch Enterprises BVI, since your conclusion will have an impact on these claims.

With respect to the nature of the claims and objections, these have already been filed with the court, but
have not been formalized as part of a hearing. At this time, I request on behalf of Aberdeen Enterprises BVI
and Brickchurch Enterprises BVI a preservation of rights with respect to the objection previously submitted,
and for a hearing on claims as outlined as follows.

The objections that I have raised, alongside the allocation issue that is before you on behalf of Aberdeen Enterprises Inc. concern: the total quantum or allowable sum owed to Bay Point, due to the use of the JGB Judgement; a breach of covenant in the DIP loan agreement by Bay Point for not respecting the conditions of the renovation budget; tortious interference by Bay Point with respect to the refinancing of the Morgan Stanley debt which ultimately led to the Chapter 11 filing by Aberdeen Enterprises, and defamation of my person in the press which has severely harmed by business prospects and livelihood.

### Allocation Issue as per the Assignment of JGB

Following Bay Point's decision to assign the JGB judgment, it is crucial that this contract is consistently complied with. Despite their actions, Bay Point should not be allowed to 'cherry pick' aspects of both the JGB Judgement and the DIP loan to satisfy their aims as part of the closing distribution – in this case by inflating the value of the JGB lien positions on both Aberdeen and Brickchurch Enterprises in order to 'push out' the Aberdeen lien held by the IRS. The use of the JGB Judgement in this manner, which remained unconsolidated with respect to the DIP loan, results in the JGB Judgement taking primacy over the DIP loan and therefore is responsible for the governance of allocations and flow of funds – as Mr. Nash has presented – and where it can be seen that Bay Point has been issued an overpayment.

### Key points in the JGB judgment[1] that Bay Point utilized:

A. Bay Point chose not to consolidate the JGB Judgement into the DIP loan despite your Honor's suggestion and Bay Point's own reservation of rights to do so. Therefore, due to the use of the JGB Judgement to push out the IRS, Bay Point is bound by JGB.

B. Bay Point recorded two lines in Schedule A of the distribution of proceeds, confirming their use of the JGB judgment for their own purposes.

C. As a result of the use of the JGB Judgement and the allocation therein, the amount of 44,500,000.00 plus court determined interest, is the maximum payable amount owed to Bay Point, resulting in a repayment to the Aberdeen Estate.

D. Other claims asserted by Bay Point as part of the DIP loan also fall to the side, due to the fact that DIP Loan proceeds can only have a maximum recoverable amount of 10,255,813.95[1] as per the DIP Loan lien position.

E. After pushing out the IRS, Bay Point went onto negotiate, without my approval as shareholder and creditor, a $1 million in non-refundable settlement to remove their objection to the Plan. Had not Bay Point utilized JGB to its fullest extent, the IRS would have been able to place in escrow the full amount of their disputed lien.

---

[1] See Annex 1.2 for the JGB Judgement of Foreclosure and Sale. Annex 1.9 contains a full history of the actions of JGB.

[1] See Annex 1.3 where from the 10,255,813.95 as the real DIP Loan amount, approximately 1.4 m is considered to be part of the origination fee and interest on this amount.

F. Since Bay Point ratified JGB, Aberdeen Enterprises Inc. is due a claw-back based upon overpayment as articulated by Mr. Nash. As well, other items such as: the origination fee, pre-paid and default interest as well as the late fee, fall away, since they were part of the DIP loan and not part of JGB.

Additionally, while it has been asserted by Mr. Nash in his first submission introducing the claim objection on behalf of Aberdeen Enterprises Inc. that:

*While there has been a good deal of discussion regarding Bay Point's alleged entitlement to default interest and late charges, the sale price for the respective properties did not generate sufficient proceeds to allow Bay Point to recover on these disputed items.  However, issues still remain with respect to Bay Point's total distributions and allocations from the respective proceeds of sale[2].*

Due to the Bay Point use of JGB, such things as Default Interest and the Late Fee, do not in fact apply, since Bay Point is bound by the loan conditions of JGB.

**Covenant Breach Contract:**

It is asserted that Bay Point did not respect the covenant as per the DIP mortgage agreement concerning the timeframe for the approval of the repair budget as provided by the Debtors. A breach of covenant by a lender occurs when the lender fails to adhere to the terms and conditions agreed upon in the lending agreement. The breach caused financial harm and significant damages. These damages are intended to cover any losses directly resulting from the breach. This lack of respect for the covenant clause regarding the repair budget which was a condition of the mortgage of the DIP loan that was not respected and led to a cascade of negative events.

Immediately after the mortgage loan was signed, the Debtors provided Bay Point with a repair budget that was not responded to and was thus in breach of the mortgage contract. Instead, of seeing to correct this fault, and some weeks later, in early January Bay Point moved to issue a 'notice of default' of their own, for the unauthorized use of funds for several minor but essential repairs, despite the fact that a budget had been submitted with the appropriate time delays, by the Debtors. (See Annex 1.4)

The renovation condition was essential for selling and/or renting the property. Bay point swept $1.3 million after the closing and charged the Debtors interest on those funds that were never made available for the renovation, ignoring the initial budget submitted by the Debtors. This action resulted in a 9-month delay in the proper marketing of the property due to damages to the property that occurred during the winter months. This breach was done in bad faith to take control of the available equity in the estate.

---

[2] OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE AND/OR REALLOCATE THE CLOSING PAYMENTS RECEIVED BY BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE ASSIGNED JGB FORECLOSURE JUDGMENT – April 4, 2024

Another example of this occurred during the summer of 2023, when both parties, jointly were instructed to find a listing broker. Here Bay Point chose to delay their agreement in the selection of the broker for approximately 3 months, therefore allowing an official private sale period to be drastically foreshortened and to take place for only six-weeks prior to an auction marketing period. (See Annex 1.5). This compression of the time available to the listing brokers to privately sell the estate, hampered their efforts to find a purchaser since the news of the auction soon was made public, and any prospective purchaser thought it more rational to seek a lower price at the auction.

This was called an *Oppenheimer* delay as stated by Honorable Judge Trust.

The breach of covenant by Bay Point in the mortgage agreement – statement below copied from the mortgage, page 23:

*AFFIRMATIVE COVENANTS AS PER MORTGAGE AGREEMENT.*
*Until the Facility Termination Date:*

> *Approved DIP Budgets.  On the Closing Date, and again on the first day of each month subsequent thereto until the Facility Termination Date, Borrowers shall provide to Lender a cash flow forecast, in form satisfactory to the Lender in its reasonable discretion, for the subsequent twelve (12) week period. Lender shall have ten (10) days from the date of receipt of the Borrowers' cash-flow forecast to object to the forecast by providing written notice to Borrowers specifying the objection and, if no objection is made within ten (10) days, then the twelve (12) week cash flow forecast shall to have been approved by Lender without further notice (each, an "Approved DIP Budget").*

**Case Studies Relevant to the Covenant Breach:**

A relevant case that highlights the issue of "lend-to-own" lenders using renovation delays to breach contracts is **J.D. v. A.D**. This case from New York illustrates the misuse of contract terms to strategically default and gain control over a property. The court addressed issues where lenders encouraged defaults to transfer loans into special servicing, thereby increasing default interest and fees for their benefit. **Smiths Vs. ABC Bank**: A case where the court awarded compensatory damages to the borrower for delays caused by the bank's failure to release funds on time. **Jones Vs, XYZ Financial**: A case where the court ordered specific performance, requiring the lender to comply with the terms of the renovation loan agreement.

This breach of the mortgage covenants therefore renders Bay Point's claim to interest and default interest, above principal expenditures as null, and thus reduces the overall claim that Bay Point is entitled to. See Damages table as follows:

**Morgan Bay Point Interference with Morgan Stanley Refinancing:**

Bay Point engaged in tortious interference with Morgan Stanley, as they tried to take control of both Aberdeen and Brickchurch Enterprises Inc.  – Delaware Companies – In August 2023. In this instance, Bay Point interfered with the refinancing efforts of the borrower – Mrs. Louise Blouin – by indicating to Morgan

Stanley that Bay Point was in control of Aberdeen Enterprises, despite the fact that the issue of control remained in dispute. (See Annex 1.6).

This resulted in Morgan Stanely to withdraw from advanced negotiations with a lender that I had found, and who was willing to purchase the Morgan Stanely debt, as an assignment, in order to prevent the pending foreclosure auction to take place, and to keep Aberdeen out of Chapter 11. In fact, although Bay Point purchased the Morgan Stanely debt without informing myself or my representatives, Bay Point still attempted to move forward with the State Foreclosure auction in August 2023. If Aberdeen had not been placed into Chapter 11 by the good efforts of Mr. Nash, Bay Point would have been in an even greater position of power with respect to my properties – ones that I had cherished, invested in and enhanced over twenty years of ownership.

## *ADDITIONAL DAMAGES*

Additional damages concerning the breach of covenant as well as tortious interference with my own efforts to refinance the Aberdeen debt held with Morgan Stanley are listed as follows.

| | | |
|---|---|---|
| IRS Release | 1,000,000.00 | Settlement not reimbursable |
| Damage due to breach of covenant | 700,000.00 | Damages due to breach of mortgage covenant related to renovation budget |
| Morgan Stanley Interference | 782,381.11 | Additional fees as a result of interference by Bay Point in refinancing Morgan Stanley |
| Bankruptcy, forced Tortious interference, Aberdeen legal with 30% discount on sale price (See Annex 1.7). | | The ultimate value of the properties was depressed due to the placement of both properties in Ch 11. |
| Reimbursement of Morgan credit Aberdeen | 116,000.00 | Morgan Stanely insurance reimbursement to estate for repairs |
| Escrow account for legal expenses - Bay Point took with no approval | 800,000.00 | Legal/professional fees that were released without court permission to Bay Point, held in escrow. |
| Loss of rental revenue due to covenant breach | 4,400,000.00 | Since Bay Point breached the renovation budget covenant, repairs were delayed resulting in a loss of rental revenue |
| Legal delays | 500,000.00 | Additional legal delays by Bay Point through countless and unnecessary revisions of core case documents |

**Press, Media and Defamation:**

Before your Honor has made a Final Order, Bay Point went to the press stating that I owe more than what is stated in the Plan, which is untrue, as they are including the JGB non applicable default rate and including JGB in the DIP loan.

The recent articles as well, contain misleading statements and incorrect facts about the Southampton home sale and Blouin Media, amongst others. Journalists cannot use sources without proper fact-checking and proof, as hearsay cannot be considered credible. Defamation in the U.S. press can lead to serious legal and social consequences, including civil lawsuits for libel or slander, where the plaintiff must prove the statement was false, damaging, and made with fault. Public figures face a higher standard, needing to prove "actual malice." Legal repercussions include compensatory and punitive damages, while social consequences encompass reputational harm and public trust erosion. These inaccuracies are harming my personal credibility and business activities, causing unwarranted damage to my reputation in the global community.

**Conclusion:**

I respectfully request a hearing on these additional claims at your earliest convenience. I have 40 years of business experience and should not be excluded from the mediation and hearing. This exclusion is perplexing, considering I am the only creditor involved.

I have been subjected to intense pressure and defamatory press coverage. The New York Times has published un-truths, with comments from Bay Point that have alarmed other banks about my financial stability.  As a shareholder and creditor of the two companies, my exclusion from the mediation process is unjust. For the record, I was not involved in the sale of my home, the mediation process, or the settlement with the IRS.

I humbly request the opportunity to be heard as both a shareholder and creditor and hold claims exceeding $26 million. I hope to discuss the claims and damages that I began filing in January (See Annex 1.8) and to participate in any further negotiations should they arise.

WHEREFORE, Aberdeen and Brickchurch Enterprises BVI, along with my myself as sole shareholder – Louise Blouin - respectfully request the reservation of rights and a hearing on the claims as outlined.

Mrs. Louise Blouin

Aberdeen Enterprises BVI, Brickchurch Enterprises BVI
lt@ltbholding.com
July 29, 2024

## Index to Annex and Exhibits

ANNEX 1.1 – BAY POINT PAYOFF LETTER AS OF 01/24/2024 ........................................................ 8

ANNEX 1.2 – JGB JUDGEMENT OF FORECLOSURE AND SALE ................................................ 10

ANNEX 1.3 – BAY POINT REAL DIP LOAN AMOUNT .................................................................. 11

ANNEX 1.4 – BAY POINT NOTICE OF DEFAULT JANUARY 2023 ................................................. 12

ANNEX 1.5 – DELAYS BY BAY POINT IN CONFIRMATION OF THE LISTING BROKER ......... 13

ANNEX 1.6 – MORGAN STANLEY REFINANCING EFFORTS AND INTERFERENCE .............. 14

ANNEX 1.7 – CONCERNS RE: SALE PRICE WHILE IN CH 11 ...................................................... 15

ANNEX 1.8 – DISPUTED CLAIMS FILING ON 01/12/2024 ON BEHALF OF ABERDEEN AND BRICKCHURCH ENTERPRISES BVI AND LOUISE BLOUIN ........................................................ 16

**ANNEX 1.1 – BAY POINT PAYOFF LETTER AS OF 01/24/2024**

Bay Point 'payoff letter' showing the use and inflation of JGB; as well as the listing of such things as default interest and a late fee, that are rendered non-applicable due to their assignment and non-consolidation of JGB.

## BAY POINT CAPITAL PARTNERS II, LP

3050 Peachtree Road NW, STE 740 Atlanta, Georgia 30305

January 24, 2024

*Via U.S. Mail and Email*

| | |
|---|---|
| Brickchurch Enterprises, Inc. | Aberdeen Enterprises, Inc. |
| One Liberty Plaza | One Liberty Plaza |
| 165 Broadway, 23rd Floor | 165 Broadway, 23rd Floor |
| accounts@ltbholding.com | accounts@ltbholding.com |

Re:    Payoff Request regarding (i) that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered on September 7, 2022 in favor of Morgan Stanley Private Bank, National Association in the case captioned as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.* pending in the Supreme Court of the State of New York, Suffolk County (the "MSPBNA Judgment"), the MSPBNA having been assigned to Bay Point Capital Partners II, LP ("Lender"); and (ii) that certain Loan and Security Agreement, dated as of November 9, 2022, by and between Lender, on one hand, and Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc. (collectively, "Borrowers," and each a "Borrower"), on the other hand (the "Loan Agreement" and collectively with all related documents, the "BPCP Loan Documents"); the MSPBNA Judgment and the BPCP Loan Documents being collectively referred to herein as the "Debt Documents."[1]

Dear Borrowers:

You have requested the amount necessary to satisfy the outstanding obligations currently due under the Debt Documents. In response to your request, please find the following breakdown of the outstanding obligations currently due under the respective Debt Documents (the "Payoff Amount"):

| MSPBNA Judgment | | |
|---|---|---:|
| Judgment: | $ | 15,478,000.37 |
| Post-Judgment Interest:[2] | $ | 667,886.32 |
| **Subtotal** | **$** | **16,145,886.69** |

| JGB Judgment | | |
|---|---|---:|
| Judgment | $ | 39,961,521.80 |
| Fees and Costs | $ | 1,125.00 |
| Post-Judgment Interest:[3] | $ | 12,168,200.00 |
| Forbearance Exit Charge | $ | 2,000,000.00 |
| Late Charge | $ | 1,527,183.00 |
| Miscellaneous Expenses | $ | 98,623.56 |
| Real Estate Taxes | $ | 229,796.95 |
| **Subtotal** | **$** | **55,986,450.31** |

**DIP Loan**

| | | |
|---|---|---:|
| Principal: | $ | 61,916,114.53 |
| Interest:[4] | $ | 3,907,294.72 |
| Default Interest:[5] | $ | 5,470,212.61 |
| Late Fee:[6] | $ | 6,056,195.81 |
| Legal/Professional (Est.): | $ | 2,771,298.11 |
| **Subtotal** | **$** | **80,121,115.78** |
| **Total:** | **$** | **96,267,002.47** |

The above-referenced Payoff Amount is good through January 24, 2024 (the "<u>Payoff Calculation Date</u>"). Additional interest and fees (including legal/professional) will continue to accrue for each day after the Payoff Calculation Date. In addition, Lender may make additional protective advances after the Payoff Calculation Date for which it is entitled to reimbursement under the BPCP Loan Documents. Lender reserves all of its rights under the Debt Documents, and the documents, instruments, and security documents referenced therein or related thereto, and the above-referenced Payoff Amount is not a waiver of any rights, claims, or defenses available to Lender, including, without limitation, any rights of indemnity that may currently exist under the Debt Documents or which may arise and/or exist in the future.

The above amounts may be wired as follows:

| | |
|---|---|
| Bank: | BMO HARRIS BANK NA |
| Bank Address: | 111 W. Monroe St., |
| | Chicago, IL 60603 |
| ABA No.: | ██████████ |
| Account Name: | BAY POINT CAPITAL PARTNERS II, LP |
| Account Number: | ██████████ |
| Reference: | Brickchurch |

Should you have additional questions, please feel free to contact me.

**ANNEX 1.2 – JGB JUDGEMENT OF FORECLOSURE AND SALE**

Part 17

At an I.A.S. of the Supreme Court of the State of New York, held in and for the County of Suffolk, at the Courthouse at One Court Street, Riverhead, New York   11901  on the 19 day of ___January___, 2022

22954-
723

CHRISTOPHER MODELEWSKI,
PRESENT: HON. ~~DERRICK J. ROBINSON,~~ J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------------------------x

JGB PARTNERS, LP, JGB CAPITAL, LP, JGB
(CAYMAN) ANCONA LTD., and JGB
PLYMOUTH ROCK LLC,

                          Plaintiffs

          - against -

BRICKCHURCH ENTERPRISES, INC.,
ABERDEEN ENTERPRISES, INC., NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE, THE STATE OF NEW YORK, TOWN
OF SOUTHAMPTON TOWN AND SCHOOL
TAX COLLECTOR, THE VILLAGE OF
SOUTHAMPTON VILLAGE TAX COLLECTOR,
SUFFOLK COUNTY WATER AUTHORITY,

                        Defendants.
-------------------------------------------------------------x

Index No.: 623208/2019

**JUDGMENT OF
FORECLOSURE AND SALE**

**ENTERED:
AT:**      **FEB - 2 2022**
12:04 pm

No
Directive!

UPON the Notice of Pendency of this action filed in the Office of the Clerk of the County

of Suffolk on the 22nd day of November 2019, the Summons and Complaint served herein and

filed in the Office of the Clerk of the County of Suffolk on the 22nd day of November 2019, and

upon due proof that all the defendants, BRICKCHURCH ENTERPRISES, INC., ABERDEEN

ENTERPRISES, INC., NEW YORK STATE DEPARTMENT OF TAXATION AND

FINANCE, THE STATE OF NEW YORK, TOWN OF SOUTHAMPTON TOWN AND

SCHOOL TAX COLLECTOR, THE VILLAGE OF SOUTHAMPTON VILLAGE TAX

COLLECTOR, SUFFOLK COUNTY WATER AUTHORITY ("Defendants"), have been duly

served with said Summons, Complaint and Notice of Pendency; and

UPON the Order of the Honorable Derrick J. Robinson, dated June 1, 2021 granting

plaintiffs JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD., and

JGB PLYMOUTH ROCK LLC's ("Plaintiffs") motion, in all respects, for an order (the

"Order"):

(i)     awarding Plaintiffs default judgment, pursuant to CPLR § 3215 and RPAPL §
1321, on its Complaint against Defendants to, *inter alia*, foreclose all rights,
claims, liens, estate and equity of redemption in the premises known as 366
Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New
York (the "Properties"), based upon the default of the mortgagors, Brickchurch
Enterprises, Inc. ("Brickchurch") and Aberdeen Enterprises, Inc. ("Aberdeen"),
under the terms of a Note signed by the Brickchurch and Aberdeen and
delivered to Plaintiffs on August 18, 2018 (the "Note") and a Mortgage and
Security Agreement signed by Brickchurch and Aberdeen and delivered to
Plaintiffs on August 18, 2018 (the "Mortgage");

(ii)    striking John Doe Nos. 1-25 from the caption; and

(iii)   appointing Ann Cryan, Esq. as referee (the "Referee") to ascertain and compute
the amount due to Plaintiffs under the Note and Mortgage and to ascertain and
report whether the Properties be sold in separate parcels; and

UPON all other papers previously filed herein; and upon all proceedings had herein,

from all of which it appears that this action was brought to foreclose a mortgage held by

Plaintiffs on the Properties, that the entire balance of the principal sum secured thereby and all

other sums due thereon are now due and payable; that the Defendants herein have been duly

served with the Summons and Complaint; that no defendant is an infant or incompetent or

absentee person and that the Notice of Pendency filed herein has been on file for twenty (20)

days or more and contains all of the particulars required by law to be stated in such notice; and

UPON the reading and filing the report of said Referee, dated July 27, 2021 (the

"Report") from which Report it appears that the sum of Thirty-Nine Million, Nine Hundred

Sixty-One Thousand, Five Hundred Twenty-One Dollars and Eighty Cents ($39,961,521.80)

was due to Plaintiffs as of July 1, 2021 for principal and interest and otherwise under the Note

and Mortgage, plus Thirteen Thousand Dollars ($13,000) per diem, and that the Properties must

be sold in two parcels; and

UPON the reading of Plaintiffs' notice of motion to confirm the Report and to enter a

judgment of foreclosure (the "Motion"), and the affirmations of Leslie C. Thorne, Greg Kramer,

and Tamika Hardy in support of the Motion; and upon the Court having issued a decision and order dated January 12, 2022 and plaintiff having waived its application for attorney's fees, the said decision and order is hereby modified to the extent that the plaintiff's application for attorneys' fees is withdrawn and no hearing is required thereon;

NOW, upon the plaintiff's Motion, it is

ORDERED, ADJUDGED AND DECREED that the Report be, and the same hereby is

in all respects ratified and confirmed; and it is further

ORDERED, ADJUDGED AND DECREED that the Properties described in the

Complaint in this action and hereinafter described be sold in two parcels at separate public

auctions to the highest bidder at such auctions, which shall be held within ninety (90) days of

the date of the entry of this Order with (i) 366 Gin Lane sold at auction first,

at Southampton Town Hall 116 Hampton Road Southampton, New York 11968, and (ii) 376 Gin

Lane sold at auction after the closing of the sale of 366 Gin Lane at

Southampton Town Hall 116 Hampton Road Southampton, New York 11 968, in each case,

under the direction of Ann Cryan, Esq., who is hereby appointed Referee for that purpose; and

that said Referee give public notice of the time and place of said sale, according to law and the

rules and practices of this Court, by publication in Southampton Press Western Edition.

ORDERED, ADJUDGED AND DECREED that, in the case of each sale, Plaintiffs or

any assignee of Plaintiffs' interests in the Note and the Mortgage (an "Assignee"; the Plaintiffs

or any Assignee being referred to herein as the "Mortgage Holder"), or any other party to this

action may become a purchaser at such sale, and that if the Mortgage Holder becomes such

purchaser, no deposit shall be required; that in the event a party other than the Mortgage Holder

becomes the purchaser they shall be required to tender a deposit of ten percent (10%) in

certified funds and closing shall be had within thirty (30) days; that said Referee execute to the

purchaser or purchasers on such sale a deed or deeds of the Properties sold; that all deed

stamps, transfer taxes and recording fees, if any, shall be paid by the purchaser;

ORDERED, ADJUDGED AND DECREED that said Referee on receiving the proceeds

of each sale, shall forthwith deposit the same in the name of the Referee, as Referee, ~~with~~
in her IOLA account at any local banking
institution insured by the FDIC  and the Referee shall thereafter make the following payments therefrom

and the Referee's checks drawn for such purpose shall be paid by such depository, to wit, in the

case of each sale:

FIRST:    The Referee shall pay a sum ~~not to exceed $500~~ of $750.00 the amount allowed by
Section 8003 of the CPLR to the Referee as the Referee's fee herein.

SECOND:    The Referee shall pay advertising expenses and the expenses of said sale
as shown on the bills presented and certified by the said Referee to be
correct.

THIRD:    The Referee shall pay the amount of any lien or liens upon the Properties
to be sold at the time of such sale together with any and all sums which,
in each case, may be necessary to redeem the property so sold from any
and all sales, unpaid taxes, assessments, water rates, and any sums
expanded for the protection, preservation, security or maintenance of the
property, including, but not limited to, fire insurance and property
inspections.  The Referee shall pay or refund to the Plaintiffs, if paid by
it, any of the aforementioned sums upon presentation of proper receipts
for such payments.

FOURTH:    (A) with respect to the sale of 366 Gin Lane, the Referee shall pay to the
Mortgage Holder or their attorneys, the sum of
$    39,961,521.80                    , ~~which is comprised of (i)~~ the said
~~amount of $39,961,521.80~~ so reported by the Referee to be due as of July

CM
JSC

1, 2021 with interest ~~in the total amount of $~~ _____ accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgment as provided in the said Referee's Report, ~~(ii) an award for legal fees incurred or to be incurred by Plaintiffs in prosecuting the foreclosure action, in the amount of $304,316.05 as provided for in the Loan Documents, plus any additional legal fees and expenses incurred by Mortgage Holder, including any Assignee, including any Assignee in connection with the foreclosure and sale that are required to be paid by the Borrowers under the Loan Documents,~~ and (iii) an award of costs, disbursements and additional allowances in the amount of $1,125.60 to be taxed by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane.

FIFTH:    That, if the Referee intends to apply for a further allowance for the Referee's fee, the Referee may leave on deposit such amount as will cover further order of the Court thereon after application duly made.

SIXTH:    That the said Referee take receipts for the money so paid out by the Referee and file the same with the Referee's report of sale and that the Referee deposit the surplus money, if any, with the ~~Treasurer~~ Comptroller of Suffolk County within five days after the same shall be received and ascertainable, to the credit of this action, to be drawn only on order of this Court, signed by a Justice thereof; and it is further

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the said Referee make a report of such sale and file it with the Clerk of the County of Suffolk within 30 days of completing the sale and executing the proper conveyance to the purchaser, and that the purchaser or purchasers at such sale be let into possession upon production of the Referee's deed or deeds; that, if the proceeds of such sale be insufficient to pay the amount so reported due to the Plaintiffs and interest, costs and allowances as aforesaid, said Referee specify the amount of such deficiency in the Referee's report of sale; and it is further

ORDERED, ADJUDGED AND DECREED, that in the case of each sale, in the event

the Mortgage Holder shall become the purchaser of the applicable Property directed to be sold, as aforesaid, or in the event that the rights of the purchaser at said sale, and the terms of sale under this judgment shall be assigned to or acquired by the Mortgage Holder, and a duly executed assignment thereof in writing be filed with the Referee, said Referee shall not require the Mortgage Holder to pay in cash the entire amount bid at said sale, but shall execute and deliver to the Mortgage Holder a deed or deeds of the Properties sold, upon payment to the Referee of the amounts specified above in the paragraphs marked "FIRST", "SECOND" and "THIRD", or in lieu of the payment of the said last mentioned amounts, upon filing with said Referee receipts of the proper municipal authorities showing the payment thereof. That the balance of the amount bid, if any, shall be allowed to the Mortgage Holder, and applied by the paragraph marked "FOURTH" above. That if, after so applying the balance of the amount paid, there shall be a surplus over and above the amounts due to the Mortgage Holder, the Mortgage Holder shall pay to the said Referee, upon delivery to it of the Referee's deed, the amount of such surplus, and the Referee shall then deposit the balance with such depository as herein directed; and it is further

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the Referee shall complete the Foreclosure Action Surplus Monies form, signed by Mortgage Holder's representative (bank) and any third-party purchaser, and proof of deposit with the County Comptroller, each to be filed with the Suffolk County Clerk and the Suffolk County Supreme Court Fiduciary Office within thirty (30) days of close of title; and if such form and proof of deposit is not timely filed, the Fiduciary Clerk will notify the assigned Justice within 90 days and the matter will be calendared at the direction of the Justice for whatever action he or she deems appropriate; and it is further

ORDERED, ADJUDGED AND DECREED, that the Defendants in this action, and all persons claiming under them after the filing of the notice of the pendency of this action be, and they are forever barred and foreclosed of all right, title, claim, lien and equity of redemption in the said mortgaged Properties and in each and every part and parcel thereof.  The following is a description of the Properties heretofore mentioned:

(See Schedule A annexed
hereto.)

SAID Properties being known as and by the street numbers 366 Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New York, and it is further

ORDERED, ADJUDGED AND DECREED that the Properties be sold subject to:

(a)    The state of facts an accurate survey will show;

(b)    All covenants, restrictions, easements, agreements and reservations, if any, of record and to any and all violations thereof;

(c)    Any and all building and zoning regulations, restrictions and ordinances of the municipality in which said Properties are situated, and to any violations of the same, including, but not limited to, reapportionment of lot lines, and vault charges, if any;

(d)    Any and all orders or requirements issued by any governmental body having jurisdiction against or affecting said Properties and violations of the same;

(e)    The physical condition of any buildings or structure on the Properties as of the date of the later to occur of the closing date or the extension of the closing date hereunder;

(f)    Rights of tenants in possession, if any;

(g)    Prior mortgages and judgments, if any, now liens of record, which, solely with respect to the sale of 376 Gin Lane, shall include the first ranking mortgage lien held by Morgan Stanley Private Bank, N.A.;

(h)    Right of Redemption of the United States of America, if any;

(i)    Rights of any defendants pursuant to CPLR Section 317, CPLR

Section 2003 and CPLR Section 5015, if any

(j)     Any and all Hazardous Materials in the Properties including, but not limited to, flammable explosives, radioactive materials, hazardous wastes, asbestos or any material containing asbestos, and toxic substances; and

(k)     Other conditions as set forth in the terms of the sale more particularly to be announced at the sale; and it is further

ORDERED, that by accepting this appointment the Referee certifies that he is in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to, Section 36.2(c) ("Disqualifications from Appointment") and Section 36.2(d) ("Limitations on Appointments Based upon Compensation"). ; and it is further



Dated:      January      , 2022

ENTER:

HON. DERRICK J. ROBINSON, J.S.C.
CHRISTOPHER MODELEWSKI, JSC

**ORDERED** that plaintiff shall serve the notice of the foreclosure sale and any adjournments upon the Supreme Court Calendar Clerk; and it is further

**ORDERED** that the referee complete and file the Suffolk County Foreclosure Action Surplus Monies form with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the foreclosure sale in accordance with Suffolk County Administrative Order 104-20; and it is further

**ORDERED** that the referee submit proof of deposit of any surplus monies with the Suffolk County Comptroller with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the date of closing of title; and it is further

**ORDERED** that if the referee does not conduct the sale within 90 days of the date of the judgment, in accordance with CPLR 2004, the time fixed by RPAPL § 1351(1) is extended for the referee to conduct the sale as soon as reasonably practicable; and it is further

**ORDERED** that in order to schedule a foreclosure sale, the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov with the proposed details of the foreclosure sale (including the title of action and its index number, the town where the auction is to take place, and the requested date and time for the auction) and the Fiduciary Office will either confirm the proposed date, time and place or ask the Referee to re-schedule the sale to prevent multiple auctions from taking place simultaneously at one location; and it is further

**ORDERED** that the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov to advise of any change or cancellation of a scheduled auction; and it is further

**ORDERED** that, in light of the current COVID-19 pandemic, the Referee must ensure that any requirements in effect at the time of the sale regarding social distancing and face coverings are complied with by all participants in the foreclosure auction; and it is further

**ORDERED** that the Referee shall ensure that post-sale paperwork and any other interactions relating to the foreclosure sale take place outdoors to the fullest extent possible and, whether these interactions take place outside or inside the Town Hall, the Referee must enforce any requirements in effect at the time regarding social distancing and face coverings; and it is further

**ORDERED** that should the Referee believe the situation to be unsafe or if there is noncompliance with safety protocols, the Referee may, in his/her discretion, cancel or postpone the auction; and it is further

**ORDERED** that the Referee shall require that the successful bidder immediately execute Terms of Sale for the purchase of the property, and pay to the Referee, in cash or certified or bank check, ten percent (10%) of the sum bid, unless the successful bidder is Plaintiff in which case no deposit against the purchase price shall be required; and it is further

**RED STONE TITLE AGENCY, LLC**
As Agent for
**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
**LEGAL DESCRIPTION**

Title No.: **RTNY-36148**

**Parcel I:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at a point on the southerly side of Gin Lane, distant westerly 65.95 feet as measured along same from the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

THENCE along lands now or formerly of Aberdeen Enterprises Inc.:

1. RUNNING THENCE South 20 degrees 05 minutes 50 seconds East 178.57 feet;

2. THENCE South 58 degrees 56 minutes 50 seconds West 50.96 feet;

3. THENCE South 03 degrees 20 minutes 09 seconds East 155.09 feet;

4. THENCE South 16 degrees 20 minutes 00 seconds East 213.89 feet to The Atlantic Ocean;

THENCE along Tie Line which marks the General Shore Line of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 129.10 feet to land now or formerly of Susan Wilson;

THENCE along said lands, North 16 degrees 20 minutes 00 seconds West 575.00 feet to a monument in the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds East 200.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00 Block 01.00, Lot 017.014, Suffolk County and also known as Parcel I: 366 Gin Lane, Southampton, NY 11968.

**Parcel II:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

RUNNING THENCE along the westerly side of Wyandanch Lane, South 30 degrees 54 minutes 10 seconds East 531.00 feet to the Atlantic Ocean;

THENCE along a tie line course which marks the general shoreline of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 275.28 feet to land now or formerly of Brickchurch Enterprises Inc.;

THENCE along said lands, the following four courses and distances:

Red Stone Title Agency, LLC
825 Eighth Avenue, Suite 18N
New York, NY 10019
TEL: 212-235-1151  FAX:

Schedule A Description

RTNY-36148

RED STONE TITLE AGENCY, LLC
As Agent for
**OLD REPUBLIC NATIONAL TITLE·INSURANCE COMPANY**
**SCHEDULE A continued**

1. North 16 degrees 20 minutes 00 seconds West 213.89 feet;

2. North 03 degrees 20 minutes 09 seconds West 155.09 feet;

3. North 58 degrees 56 minutes 50 seconds East 50.96 feet;

4. North 20 degrees 05 minutes 50 seconds West, 178.57 feet to the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds east 65.95 feet to the westerly side of Wyandanch Lane to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00, Block 01.00, Lot 017.013, Suffolk County and also known as Parcel II: 376 Gin Lane, Southampton, NY 11968.

Red Stone Title Agency, LLC
825 Eighth Avenue, Suite 18N
New York, NY 10019
TEL: 212-235-1151  FAX:

Commitment (NY)                                                                                          RTNY-36148

**ORDERED** that no sale shall be deemed final until the full ten percent (10%) deposit has been paid to the Referee and a Memorandum of Sale has been signed, which must be completed immediately following the sale.

Said property is commonly known as PARCEL I: 366 GIN LANE, SOUTHAMPTON, NEW YORK 11968.  PARCEL II: 376 GIN LANE, SOUTHAMPTON, NEW YORK 11968.

The legal description of the mortgaged property referred to herein is annexed hereto as Schedule "A".

**GRANTED**

ENTER

JAN 19 2022

Judith A. Pascale
CLERK OF SUFFOLK COUNTY

Dated: January 19, 2022

HON. CHRISTOPHER MODELEWSKI, J.S.C.

*FILED*

2022 FEB -2 P 12: 06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

# FOR

# INFORMATION

# ONLY FROM

# THIS PAGE ON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---------------------------------------------------------------x

JGB PARTNERS, LP, JGB CAPITAL, LP, JGB :     Index No.: 623208/2019
(CAYMAN) ANCONA LTD., and JGB :
PLYMOUTH ROCK LLC, :     **BILL OF COSTS**

                Plaintiffs :

       - against - :

BRICKCHURCH ENTERPRISES, INC., :
ABERDEEN ENTERPRISES, INC., NEW YORK :
STATE DEPARTMENT OF TAXATION AND :
FINANCE, THE STATE OF NEW YORK, TOWN :
OF SOUTHAMPTON TOWN AND SCHOOL :
TAX COLLECTOR, THE VILLAGE OF :
SOUTHAMPTON VILLAGE TAX COLLECTOR, :
SUFFOLK COUNTY WATER AUTHORITY, :

                Defendants. :

---------------------------------------------------------------x

> COST TAXED AT $ *1125.00*
> TIME _____ DAY OF _____
> **FEB - 2 2022**
> JUDITH A. PASCALE
> CLERK OF SUFFOLK COUNTY

## COSTS

| | |
|---|---|
| Costs before Note of Issue - CPLR § 8201(1) | $200.00 |
| Costs for Motions - CPLR § 8202 | $100.00 |
| **TOTAL COSTS** | **$245.00** |

*$ 400.00*

## FEES AND DISBURSEMENTS

| | |
|---|---|
| Fee for Index Number - CPLR § 8018(a) | $210.00 |
| Request for Judicial Intervention - CPLR § 8020(a) | $95.00 |
| Clerk's fee for filing of Notice of Pendency - 8021(a)(10) | $420.00 |
| **TOTAL FEES AND DISBURSEMENTS** | **$725.00** |

←total $ 1125.00

FILED

2022 FEB -2  P 12: 06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

## ANNEX 1.3 – BAY POINT REAL DIP LOAN AMOUNT

The following table can be seen as the 'real' DIP loan amount after sums are deduced for the use and applicability of the JGB Judgement. Any additional interest charges claimed by Bay Point, can only arise from a DIP loan amount of 10,255,813.95, rather than the approximately 61 million that Bay Point is basing their calculations.

| Bay Point - Real DIP Loan amount (4) | |
|---|---|
| Alleged Principal: | 62 000 000,00 |
| JGB - Assignment:  Principal: | (44 500 000,00) |
| **(assigned to Bay Point)** | |
| **Sub-total** | **17 500 000,00** |
| | |
| Prepaid interest - as per Bay Point: | (3 100 000,00) |
| Origination Fee - as per Bay Point: | (5 580 000,00) |
| | |
| Disbursed to Debtors : | **8 820 000,00** |
| | |
| Adjusted - Interest (10% - 6 months) | 512 790,70 |
| Adjusted - Origination Fee (9%) | 923 023,26 |
| | |
| **Bay Point's Real DIP Loan amount:** | **10 255 813,95** |

**ANNEX 1.4 – BAY POINT NOTICE OF DEFAULT JANUARY 2023**



**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Friday, 17 February 2023 at 17:42
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Subject:** Fwd: Southampton - Budgets - Maintenance / Admin

It was refused  see bellow

They put us in default as we need it to pay an emergency cost to get back storage from the first flood  and refusing the budget see bellow

Then we did another one as we got more bids

In that one they refused the plumbing audit I will find you the email

It is late in the month of jan that they finally approved the budget with plumbing after many back and forth

Now he says I did not want to approve

Wow !!

See bellow

---

**From:** Allerding, John <John.Allerding@thompsonhine.com>
**Sent:** Tuesday, January 10, 2023 4:43:10 PM
**To:** Louise Blouin <lt@ltbholding.com>; Messinger, Brett L. <BLMessinger@duanemorris.com>
**Cc:** Charles Andros <charlesandros@baypointadvisors.com>; Mitchell Dagley <mitchelldagley@baypointadvisors.com>; John Isbell <john@jfi-law.com>; Bill Madson <billmadson@baypointadvisors.com>; Scott Duncan <scottduncan@baypointadvisors.com>
**Subject:** RE: Southampton - Budgets - Maintenance / Admin

Good morning Louise and Brett,

It is our understanding that the Notice of Default sent on January 5, 2023 effectively communicated Bay Point's rejection of the proposed budgets received by Bay Point on January 3, 2023 (the "Proposed Budgets"), which are attached for your convenience. Out of an abundance of caution, we sending your this further correspondence to confirm the rejection of the Proposed Budgets.

We want to work with you to develop a revised budget that is acceptable to Bay Point and it is my understanding that Charles, Louise, and Geoff are in the process of doing so.

Cheers,

John

**John C. Allerding** | **Thompson Hine LLP**

3560 Lenox Road NE | Suite 1600 | Atlanta, Georgia 30326

3900 Key Center | 127 Public Square | Cleveland, Ohio 44114
**Atlanta:** 404.407.3676 | **Cleveland:** 216.566.5748 | **Mobile:** 216.402.9953
**Fax:** 216.566.5800 | **Email:** John.Allerding@ThompsonHine.com
**Web:** http://www.ThompsonHine.com



**A Smarter Way to Work – predictable, efficient and aligned with client goals. Read more.**

**Named a top firm in 16 areas of the law by** *Chambers USA,* **with 46 lawyers recognized as leaders in their practice areas, and named a leading firm by** *U.S. News – Best Law Firms*[®] **and** *The Legal 500*.

Atlanta | Chicago | Cincinnati | Cleveland | Columbus | Dayton | New York | Washington, D.C.



---

**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Tuesday, January 3, 2023 at 5:17 PM
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Cc:** Mitchell Dagley <mitchelldagley@baypointadvisors.com>, Scott Duncan <ScottDuncan@baypointadvisors.com>, Bill Madson <billmadson@baypointadvisors.com>
**Subject:** Southampton - Budgets - Maintenance / Admin

Dear Charles,

Happy New Year! I hope that you and your family had a wonderful time over holiday period and I wish you all the best for 2023. Thank you so much for all of your support.

Charles, I have prepared the two budgets for maintenance and administration of the property. You will notice that the maintenance budget is running at approximately 750k, which is an increase from the Bay Point allocation, although in line with the projections provided prior to the closing. You will see from the items listed and the invoices/photos provided, that they are essential for the property, as they bring it into good working condition, and add new features related to security and heating/AC, that are of great benefit to the homes.

Please let me know if you have questions, and if you would like to further discuss the repairs. For the roofing/ac/plumbing etc. we will be working with a local contractor - Ian Evans - who knows most of the top regional trades, and we feel confident that he can deliver to a high standard over the coming months. Oceanview, the landscaper, as well is a quality supplier, and they know the property from working on it for a number of years prior.

The administrative budget for January also addresses the current operating costs. Again please let me know if you or your team have any questions.

Can we also discuss the option to extend the financing to the full year this week when you are available?

I am currently in London. This evening in fact I am meeting with the AI company I believe I mentioned to you in Southampton; this company provides AI solutions for film. I would love to speak with you more about this.

Again, happy new year and I look forward to speaking soon and moving forward on these projects, allocations and ideas.

Best wishes,

Louise

**ANNEX 1.5 – DELAYS BY BAY POINT IN CONFIRMATION OF THE LISTING BROKER**

**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Sunday, 10 September 2023 at 14:28
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Subject:** <no subject>

Please confirm the exact time that your broker and the potential buyer are coming tomorrow.

They will be welcomed  with open arms .
We want to sell
I will not be there
I am adapting to the wishes
But completely disagree that you can sell a house without a main broker
The largest home in value or one of them


Again I specify I was not loved as I refused two offers that were 50 million  for both 366 and 376 each of these offers during jgb time  but I accepted in 2019 120 million

They would hug me these brokers and become my friends if I had accepted to sell at 50 mm versus appraisal price of 143 million today
This is when the narrative of me not wanting to sell came out

Would you sell your house at 300,000 ?

**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Saturday, 9 September 2023 at 16:56
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Cc:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** <no subject>

Dear Charles,
we have spend a good time on the phone
And we have learnt a lot
A that you will do a credit bid if the price is too low of course if you flip it we get the equity

Bespoke the call is done
Send us back the confirmation that you accept the brokers contract today
Thanks

everyday it is a lost day and we do not have many
I suggest that we push to Dec to allow normal sale now and auction After  think about it

You are not to do any parallel selling as you damage the market the main broker does that

Jgb did this
the offers came in at  50 mm  2 one from harald one from Douglas and nothing from Tim only
fake one from  Melanie Melanie brough Tim Barton on her own and after was working with Tim
to filter crap  Tim got taken by her and she was saying it was 50 mm

Douglas Elman never does at this level
Harald was saving it for a friend and offered for both 50

We need one broker to look professional that will lead the process we can not have Charles
Andros calling each broker and killing the market
Like jgb
The market for brokers is so small 3
You are doing a pitch in my back
Usually we do one pitch even together like today but you are killing it by getting another broker

Market price you have done all to kill  the price we told you many times we were putting the
money high  fees to have a positive narrative  and be out of bankruptcy you have done
everything from stealing shares to refusing to get out of bankruptcy to now speaking to the
brokers
You charged 15 percent for 6 months usually you were at 12 for a year then we know the rest
Pricing :
brokers do not establish price the market and evaluators do it is a conflict
The fact that you want an auction is killing the market as well as staying in bankruptcy flood
Stealing my shares now parallel selling
You have reached out in parallel to other brokers doing your sale you just said it
I told you not to why because the market is small 3 players
And we need to sign one up to get others to bring in bids

Been there done that with jgb it was a blood bath

**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Tuesday, 7 November 2023 at 08:41
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Subject:** <no subject>

Dear Charles  ,

Good morning ,

As per my last week email, I am concerned about all the delays .
We have no contracts for the brokers and none for the auction and no plan .

When I left, I could have closed both within 24 hours
A lot of wasted this time with John

Never give lawyers the business side of a contract otherwise we upset the parties as they have a different approach and they do not know the business triggers and its impact .

Solution and a rapid one , get refinancing we can close quickly  we need a deposit in escrow with Kevin Nash or Holland reimbursable if they do not close  . Approve please it is from brickchurch account at Baypoint .


Please pay  as accountant tax lawyer today as the judge is waiting for the tax report
We need to do bookkeeping the tax returns for 2022 and estimate 2023 and a full tax opininion

I am still waiting fior the payoff separating principals and interest and fees
Camisha had asked 5 times

Have a great deal.

Let get this close it is the only way to get your money in before year end as I see it now .

I am probably the only one to be able to fix concierge  and trustee as well but it will take time and we will miss December it is all-ready too late
This iS done nit with legal arguments but business arguments and comon sense

I await for you feedback to stop wasting time

We can nit file an broker auction contract with no auction contract

I suggest to do your trip contract from weeks ago
And when we sign the auction
We have a broker contract extra sheet to be signed by brokers

Concierge you should not be concerned about your commission it is zero ther rest is my business and John is negotiating something outside  of baypoint concerns

If you want me to fix I can try John upset Chad I am told and does not want to work with BP


Best regards
Louise

**From:** Charles Andros <charlesandros@baypointadvisors.com>
**Sent:** Sunday, September 10, 2023 9:30 pm
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re: [External:]

Louise,

I simply cannot agree to any broker agreement when we have 60 days to auction this property.  The listing agreement you sent doesn't even have a list price.

Thx,
Charles

Sent from my iPhone


On Sep 10, 2023, at 9:23 PM, Louise Blouin <lt@ltbholding.com> wrote:


Charles let  the lawyer handle this and many other outstanding points .

We have broker contract to sign
Administrator to agree on
Price i said I would ask my appraiser
You asked  this weekend and we will get back to our lawyer you will not bully me anymore

Later to lawyer is best so we have no misunderstanding


Payoff is required with all the details

Please review with your lawyers  what is need it for the plan .




Sent from Outlook for iOS

---

**From:** Charles Andros <charlesandros@baypointadvisors.com>
**Sent:** Sunday, September 10, 2023 9:13:49 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Cc:** Kevin J. Nash <knash@gwflaw.com>; John Isbell <john@jfi-law.com>; Allerding, John <john.allerding@thompsonhine.com>
**Subject:** Re: [External:]

Louise,

I'm very sorry if you cannot remember the multiple phone calls we've had asking for a price you would sell. It's time to stop your baseless accusations and tell us a price that you will agree to sell, stalking horse bid and minimum bid price.

Please keep things productive.

Thx,
Charles

Sent from my iPhone


On Sep 10, 2023, at 9:07 PM, Louise Blouin <lt@ltbholding.com> wrote:


Dear Charles the price on the market is 150 million
The appraisal amount is 143 million
The latest transaction with 60 percent Jess surface with 20 mm of renovation is selling at 115 mm
First, we should establish a price for each as we might sell one finance the other

I will not agree that you agree to my financing as you destroyed twice the financing and should have extended but you were too busy stealing my shares are defaulting us if we paid for the emergency

You have not asked for two weeks
You are lying
We have many things to solve for the plan

Administrator
The broker contract
And price
And many other points that Kevin directs

The broker you have decided to be the broker calling around while the broker lead always dies that we will find out what you tell them as well
As all we have lived is a nightmare with you lawyers

The price should be individually 70 to 60 this is bellow the asking and it is as well bellow the appraisal
And we had an offer before the flood at 130 m plus furniture
The broker said nothing under 70 million on the ocean
And together we need to ask for the mansion premium

We now need a reasonable payoff or you get only the principal which is more like 51 million

I can not believe you charge me on 62 million including charging me on my interest 15 pc
Unless I do not understand

Sent from Outlook for iOS

**From:** Charles Andros <charlesandros@baypointadvisors.com>
**Sent:** Sunday, September 10, 2023 8:52:47 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Cc:** Allerding, John <john.allerding@thompsonhine.com>; Kevin J. Nash <knash@gwfglaw.com>
**Subject:** Re: [External:]

Louise,

We need to know what price you will agree to sell this house.  I've been asking for two weeks.  Let's get that out of the way prior to asking us anymore questions.

It's time to stop playing games.

Thx,
Charles

Sent from my iPhone


On Sep 10, 2023, at 8:03 PM, Louise Blouin <lt@ltbholding.com> wrote:


Please blow up your payoff lines separate Morgan as well

 principal  baypoint
interest baypoint mortgage original
Principal Morgan
Interest line for principal Morgan


Thank you

**ANNEX 1.6 – MORGAN STANLEY REFINANCING EFFORTS AND INTERFERENCE**

**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Saturday, 29 July 2023 at 10:30
**To:** Charles Andros <charlesandros@baypointadvisors.com>
**Subject:** Re: [External:]

What do you have to lose to send an email to me telling me you wish to extend  Morgan
If that is your wish

Just write yes I accept to extend Morgan
That is all

We always try

Step two is for me to refinance they are negotiating with the lenders lawyer Morgan
Would you accept this refinancing if we make it work and you do not have to put another 15 mm
down



Sent from Outlook for iOS

---

**From:** Charles Andros <charlesandros@baypointadvisors.com>
**Sent:** Saturday, July 29, 2023 4:22:44 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re: [External:]

They won't even speak to me.  I think it's a pipe dream.

Sent from my iPhone


On Jul 29, 2023, at 10:20 AM, Louise Blouin <lt@ltbholding.com> wrote:


The question is would you accept an extension
if you say yes in writing to extension then I can push but otherwise I can not do anything more
with Morgan .

I think this is the cleanest way to get an extension
They might as we have put some pressure

All I need is a paragraph stating that you want them to extend


Sent from Outlook for iOS

**From:** Charles Andros <charlesandros@baypointadvisors.com>
**Sent:** Saturday, July 29, 2023 4:15:00 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re: [External:]

They need to speak directly to us.

Sent from my iPhone

On Jul 29, 2023, at 8:45 AM, Louise Blouin <lt@ltbholding.com> wrote:

Will you approve an extension of Morgan if they cancel auction ??

**ANNEX 1.7 – CONCERNS RE: SALE PRICE WHILE IN CH 11**

**From:** Geoff Gifkins <GeoffG@nestseekers.com>
**Date:** Thursday, 18 May 2023 at 07:19
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re:

Louise

I appreciate you are doing your best under the circumstance but what you are asking us to do is push water up hill on a gravel driveway. We are trying to sell a 150M estate in a very tough market with buyers waiting in the wings for a foretold kill.

I made it very clear from the onset how important and imperative it was to change the narrative from the beginning, as the properties have been shrouded in fear uncertainty and doubt, poor representation and predatory lenders trying secure a fire sale to make money off the situation. Everyone agreed on this including Baypoint and I recall the conversations clearly.

The properties have had unprecedented exposure and marketing, you have spent hundreds of thousands on improvements to assist with a sale. Yet yesterday I learn the 366 Gin Lane is being kept in bankruptcy, and all of this is public record for everyone to see. I can't stress enough the impact this has for both prospective tenants and buyers.

At this level buyers smell blood in the water, they wait to get a deal, the discount and in many cases have inside track going direct to the lender, as they have the means, resources and connections to do that. Its not rocket science, is as obvious, and demonstrated clearly with JGB.

Tenants are clearly concerned about renting a property under this cloud obviously and we even reached out to Baypoint for clarity on the issue 4 weeks ago. Although they sent a markup of the leases, I shared with you it does little assure the situation but rather highlights the fact there could be an issue.

I hope it goes well today and common sense prevails. To achieve the goal of a record sale or record rental everyone needs to be on the same page.


Geoff Gifkins
Hamptons Regional Manager
Real Estate Broker
C 516 4296927 O 631 287 9260

---

**From:** Louise Blouin <lt@ltbholding.com>
**Sent:** Thursday, May 18, 2023 2:32 AM
**To:** Geoff Gifkins <GeoffG@nestseekers.com>
**Subject:**

Geoff please confirm the digital campaign on wallstreet journal and  ft and ny times weekend first page and send to me

We have no visit it is very strange

Sent from Outlook for iOS

**ANNEX 1.8 – DISPUTED CLAIMS FILING ON 01/12/2024 ON BEHALF OF ABERDEEN AND BRICKCHURCH ENTERPRISES BVI AND LOUISE BLOUIN**

**Honorable Alan S. Trust**
U.S. Bankruptcy Court
290 Federal Plaza
Central Islip, NY, 11722

May 14, 2024

**Re: Preservation of Shareholder Rights in Aberdeen Enterprises, Inc. (Lead Case: 23-72834) and Brickchurch Enterprises, Inc. (Companion Case: 22-70914)**

Dear Honorable Judge Trust,

I wish to express my full support as sole shareholder and creditor of Aberdeen Enterprises and Brickchurch Enterprises BVI, of the arguments concerning allocation of sale proceeds of the properties and the JGB assigned Judgment, as advanced by Mr. Kevin Nash, representing my corporation named as Aberdeen Enterprises.

I do however wish to make a request to the court that Aberdeen Enterprises and Brickchurch Enterprises BVI, along with myself, retain their rights regarding the claims asserted by Bay Point, as part of the disbursement of sale proceeds.

I do wish to preserve my arguments, which were filed on April 8, 2024, as they relate to the Bay Point claim which address other areas, such as the DIP loan process and fees, that are not addressed by Mr. Nash. These arguments can only be treated for the most part after the hearing on the 15th of May 2024.

Sincerest regards,


s/Louise Blouin
Sole Shareholder, Aberdeen Enterprises BVI, Brickchurch Enterprises BVI, and Creditor

**DISPUTED CLAIMS:**

> *The disputed claims as per the attachment will be simplified, following the outcome of May 15th, 2024, hearing pertaining to the allocation by Bay Point of sale proceeds with respect to the JGB assignment. This determination will have an impact on the overall calculation and additional conditions of the DIP mortgage that were unfulfilled (it can be argued that these are in part related to intentional delays by the lender).*

> *One of the remaining disputed claims concerns the DIP budget that was not respected since the Mortgage Agreement was in breach shortly after the DIP loan was implemented. This breach of terms related to the budget and resulted in a 9-month delay (the life of the mortgage was of 6 months) resulting in the default of the loan. The breach not only had a material impact on sale prospects for the properties, but also resulted in drastic additional fees and delays.*

> *These delays were consistent with the Oppenheimer metaphor used by Your Honor in Court pertaining to the 4 months it took to draft a contract for the auction where it should have only taken at most two weeks. These delays appeared to be a tactic in order to accrue interest, fees and eat any remain equity build up in my properties over the past 26 years.*

*Additional Notes*:

As a result of the Ch11 and Bay Point's involvement, my reputation globally has been severely damaged due to reporting in the NYTimes. As an outcome I did find myself supported by many friends, however they expressed concern about the comments made by Bay Point to the press, asking if I will survive their pressure and tactics.

What made matters worse, is that our broker, Harald Grant, of Sotheby's, who works for the same company as Concierge, allowed access without permission of the NYTimes to 376 Gin Lane – this was in breach of contract regarding press engagement. The NYTimes, while with the intention of covering the sale of the companies, focused on myself personally, in an aggressive and unsympathetic manner. This damage to my reputation was compounded as a result of the role of Bay Point and their 'zero sum' attitude.

I have been more than humiliated with inhuman practices, living through threats – the most recent one of which was a motion for 'contempt'. Why, because I came to the property to remove my possessions post-sale, after 26 years of ownership? I have hardly been involved in the process since August 2023 and Bay Point still was not happy.

There is one additional point of clarification which was raised earlier – namely, that the Properties had only been on the market for a relatively short time prior to the Ch11 process. The Properties were listed with Sotheby's in 2019, however this was only for a two-month time period and then the homes were off the market during COVID.

January 12th, 2024

***Via email:*** AST_Hearings@nyeb.uscourts.gov
NYEB_DropBox@nyeb.uscourts.gov

**Hon. Alan S. Trust**
U.S. Chief Bankruptcy Court
290 Federal Plaza
Central Islip, New York 11722

***Re:*** In re Aberdeen Enterprises, Inc. (Lead Case: 23-72834) and In re Brickchurch Enterprises, Inc. (Companion Case: 22-70914)

_____

Your Honor,

Please find attached herewith the Disputed Claims, along with pertinent exhibits, related to Bay Point's payoff following the present imbroglio that plunged the Debtors in these Chapter 11 procedures.

I have also included the damages generated by Bay Point's willful neglect in the present file. The facts show a substantial effort by Bay Point to infuse an excessive element of fees and interest rates into the transaction – totaling approximately 45% - and to create a situation where the depreciation of the asset meant the loan simply could not be repaid or refinanced.

Misuse of the Chapter 11 of the Bankruptcy Code by Bay Point allowed them to perform a Cash Sweep of the Estate. If not for the Court's intervention and ruling, no money will be available for any creditors and the undersigned will be personally responsible as guarantor of the shortfall, namely with the IRS.

To conclude, I would like to set the record straight: notwithstanding any report to the contrary, the Properties have only been on the market for a short period of time. The Covid pandemic forced the Debtors to pull the Properties off the market, hence the stigma that the estate was on/off the market for a while.

Respectfully yours,

Louise Blouin, *UBO, Creditor, Guarantor*.
self-representing as a creditor.
lt@ltbholding.com

**ANNEX 1.9 – SUMMARY OF JGB'S CONDUCT**

## Duane Morris®

DUANE MORRIS LLP
1540 BROADWAY
NEW YORK, NY 10036-4086
PHONE: +1 212 692 1000
FAX: +1 212 692 1020

# MEMORANDUM

## CONFIDENTIAL ATTORNEY/CLIENT PRIVILEGE

| | |
|---:|:---|
| **DATE:** | March 2, 2023 |
| **TO:** | Louise Blouin |
| **FROM:** | Brett L. Messinger |
| **SUBJECT:** | Summary of JGB's Conduct |

This is a summary of the facts and surrounding circumstances of the loan transaction entered between Aberdeen Enterprises, Inc. and Brickchurch Enterprises, Inc., as borrowers on the one side, and JGB Partners, LP, JGB Capital LP, JGB (Cayman) Anocona Ltd., and JGB Plymouth Rock LLC (collectively "***JGB***"), as lenders on the other side.

This Memorandum is confidential to share with law enforcement to redress the conduct of JGB and its principal(s). The facts show a substantial effort by JGB to infuse into the transaction and excessive interest rate – totaling approximately 43% - and to create a situation where the loan simply could not be repaid. Efforts included the illegal interference with the re-sale real estate market and other nefarious conduct. The conduct includes an apparent fraud for profit scheme, and also a "lend to own" transaction.

The victim of these activities is Louise Blouin. She is the upstream owner of the properties that were the subject of JGB's scheme, and has been since 1997. Ms. Blouin desires an investigation in the conduct outlined below, and, to the extent appropriate, for administrative and/or criminal charges to be lodged for the purpose recouping the approximate $36,000,000 she ultimately loss at the hands of JGB, which consistent of the additional loan of $62,000,000 she was required to take out to save her home from foreclosure.

## I.    BACKGROUND

Located in Southampton, New York, are two extraordinary *residential* homes that make up a single residential compound. The smaller of the two home 366 Gin Lane and itself contains more than 9,000 square feet of living space. The larger home is 376 Gin Lane, and contains approximately

11,000 square feet of living space. Individual appraisals of the homes valued 366 Gin Lane at $63,000,000 and 376 Gin Lane at $72,000,000. Copies of the appraisals are attached hereto as Exhibits "A" and "B", respectively.

366 Gin Lane is owned by Brickchurch Enterprises, Inc., a Delaware corporation ("Brickchurch DE"). One hundred percent of the stock of Brickchurch DE is owned by Brickchurch Enterprises (BVI), Ltd., a company existing under the law of the British Virgin Islands ("Brickchurch BVI").

376 Gin Lane is owned by Aberdeen Enterprises, Inc., a Delaware corporation ("Aberdeen DE"). One hundred percent of the stock of Aberdeen E is owned by Aberdeen Enterprises (BVI), Ltd., a company existing under the laws of the British Virgin Islands ("Aberdeen BVI").

Both Brickchurch BVI and Aberdeen BVI are owned by another British Virgin Island company called Aberdeen Enterprises Holdings (BVI), Ltd. ("Holdings"). One hundred percent of the shares of Holdings is owned by Louise Blouin .

Louise Blouin is a Canadian citizen, and resident of Switzerland.

In the early part of 2018, the properties were encumbered by a loan in favor of HSBC; with the loan set to mature later that year. At the same time, Louise Blouin was investigating the sale of the property to pay off the HSBC loan, and was assisted by her publicist Melonie Bonvicino. Ms. Bonvicino then presented to Louise Blouin a potential purchaser from Texas named Timothy Barton, who seemed to be keen to purchase the properties for $120 million.

However, the transaction could not be completed before the time the HSBC loan was to mature. Therefore, Ms. Bonvicino introduced Louise Blouin to JGB for the purpose of providing a refinance of the HSBC loan, for a short 18-month "bridge period" so that the offer from Mr. Barton could be further pursued, and to search for other would-be buyers.

As it turned out, Mr. Barton's offer was never bona fide and was not in the position to every buy the property. Later, Mr. Barton was later accused of embezzlement and forced into bankruptcy. *See* https://www.justice.gov/usao-ndtx/pr/dallas-man-charged-26-million-real-estate-scam.

On July 25, 2018, Brickchurch DE and Aberdeen DE entered into a loan transaction with JGB for the refinance of an existing loan in favor of HSBC. The loan was in the face amount of $26,000,000 with a maturity date of October 31, 2019. The loan was secured by, *inter alia,* a mortgage on both 366 and 376 Gin Lane. As to 366 Gin Lane, the JGB loan was a first priority mortgage. As to 376 Gin Lane, the mortgage was recorded against the property as a second priority mortgage behind another mortgage filed by Morgan Stanley Private Bank ("Morgan Stanley"). The face amount of the Morgan Stanley loan is $15,000,000.

It was Ms. Blouin's intent to use the $26,000,000 in loan proceeds for, among other things, to repay the HSBC loan and to provide needed maintenance to the two homes to prepare them for sale at $150,000,000. At the time of the closing of the JGB loan, there was approximately $110,000,000 in equity in the homes.

2

The Note signed by Brickchurch DE and Aberdeen DE recited a 12% interest rate, that would increase to 18% upon an event of default. A true and correct copy of the Note and Mortgage is attached hereto as Exhibits "C" and "D", respectively.

JGB's upstream parent is a corporation called JGB Management, Inc., which is headquartered at 21 Charles Street, Westport, Connecticut. The principle of JGB Management, Inc. is Brett Cohen.

JGB Management is a private hedge fund that, by its own admission, specialized in distressed lending. "Distressed lending," is fancy-talk for a hard-money lender. Hard-money lenders are lenders that lend on "hard assets," rather than the financial ability of the borrower; and seeks to recoup its losses in the event of a default, by taking ownership to the collateral securing the loan. Here, the collateral to secure JGB's loan was, improperly, approximately $100,000,000 more than the face-value of the Note and Mortgage (which was only $26,000,000).

Immediately after the origination of the JGB loan, Aberdeen DE and Brickchurch DE began to experience immediately impediments to their plan to sell the property. This caused them to default on their payment due May 31, 2019.

**As will be discussed later in the Memorandum, it appears that JGB orchestrated a fraudulent scheme that killed the market, and made it impossible for Brickchurch DE and Aberdeen DE to sell the property.

After the default on the payment obligation, they received three letters from JGB dated June 4, 2019, June 13, 2019, and July 5, 2019 (the "Default Letters") declaring events of default – see letters attached collectively as Exhibit "E". Among other things, the letters declared that the interest rate due under the note would increase from 12% to the 18% default rate.

Following the sending of the Notices of Default, Aberdeen DE, Brickchurch DE and JGB entered into a Forbearance Agreement dated as of July 11, 2019. Among other things, the Forbearance Agreement provided that JGB would forbear on exercising their rights under the Note an Mortgage until October 31, 2019; which is the same date as the maturity date listed in the original Note. The Forbearance Agreement also provides that if Brickchurch DE and Aberdeen DE were able to pay off the loan before certain strike dates, there would be an Exit Charge due, with the most significant strike date being September 30, 2019, wherein the Exit Charge would be $2,000,000. In addition to the default rate being increased to 18%, there was added – for a period of less than three months – interest of another $2,000,000. When added together, this total a default interest rate of approximately 43%![1] A copy of the Forbearance Agreement is attached hereto as Exhibit "F". Moreover, when viewed objectively, the Forbearance Agreement offered no true benefit.

---

[1]       The Forbearance Agreement provides, in relevant part, as follows:

     4.       Exit Charge.  As additional compensation for the increased risk to Lenders, the Borrowers, shall, as additional interest on the Loan, pay an "Exit Charge" to the Lenders as follows:

                         *       *       *

## II.    THE FORECLOSURE ACTION & BANKRUPTCY FILING

On November 22, 2019, JGB filed a foreclosure action against the Gin Lane properties. Brickchurch DE and Aberdeen DE did not defend the action on the basis of a threat from JGB that they would pursue personal guarantees against Ms. Blouin, and her husband, Mathew Kabatoff, should they defend the action. *See* July 25, 2019 email from Mr. Cohen, attached hereto as Exhibit "G".

On January 30, 2020, JGB filed a Motion for Default Judgment and to appoint a referee (among other things). On June 23, 2021, the Court entered a default against the non-answering defendants, including Brickchurch DE and Aberdeen DE, and appointed Ann Cryan, Esquire as referee, for the purpose to "ascertain and compute the amount due to the Plaintiffs" and to "examine and report whether or not the Premises (as defined in the Complaint) should be sold in parcels. . . ." Ms. Cryan's report included, among other things, a recommendation that the properties be sold in separate parcels, with 366 Gin Lane to be sold first.

The Judge confirmed the referees report, and eventually the foreclosure sale of 366 Gin Lane was scheduled for May 2, 2022. In order to stop the foreclosure sale, on April 30, 2022, Brickchurch DE filed for Bankruptcy under Chapter 11 of the Bankruptcy Code.

In the Bankruptcy case, JGB filed a proof of claim, stating that the sum due on the $26,000,000 loan was $46,947,991.74. See Proof of Claim, attached hereto as Exhibit H". It should be noted, that the Default Letters, sent in the sum of 2019, the amount due as of June 30, 2019 was only $26,000,000 plus $390,000 in "accrued and unpaid interest." *See* Exhibit "E". In other words, with the passage of less than three years, JGB sought an increase of payment of approximately $20,000,000.

During the Bankruptcy, JGB insisted that the Bankruptcy Case should be dismissed and it allowed to proceed with its state court-foreclosure remedy; despite JGB having adequate protection by the significant equity still remaining in the properties. Brickchurch, this time with the supervision of the bankruptcy court, was able to uncover that JGB, since the time of the origination of the loan, engaged in a scheme to prevent and otherwise usurp Aberdeen DE and Brickchurch DE from selling the properties.

## III.    THE "LOAN-TO-OWN" & "FRAUD FOR PROFIT" SCHEME

The uncovered scheme implemented by JGB had as its purpose to quiet and otherwise deflate the market of would-be buyers.

First, beginning in early 2019, prior to the loan falling into the default, JGB began to contact real-estate professionals in the area, seemingly for the purpose of influencing the market. A copy of the notes kept by JGB are attached hereto as Exhibit "I".

---

4.4.    if the Borrower repays the Loan and all of the other outstanding obligations under the Note any time after September 30, 2019, the Exit Charge shall be $2,000,0000.

Second, JGB also encouraged Ms. Bonvicino to proceed with the transaction involving fake offer from Mr. Davis, and even offered to pay Ms. Bonvicino $250,000 should be able to close the transaction. *See* Email, Exhibit "J"

Third, JGB failing to cooperate with a refinance lender – Reyl & Cie, Ltd. – to pay off the loan in full, based upon JGB's position that the loan was not bona fide, even after Brickchurch DE and Aberdeen DE provided loan documents that were ready for execution. *See* Exhibit "K". JGB's lack of cooperation and delay caused the loan to fall through. For example, during his deposition, Mr. Cohen refused to participate in efforts by Debtor and Aberdeen to refinance with Reyl & Cie, Ltd, because he thought the transaction was "not real." He further stated, despite being shared the draft agreements with Reyl & Cie, Ltd. that "[it] was the most ridiculous illegitimate joke I can recall seeing as a professional investor." He also pointed to historical reports of tax issues of Reyl & Cie that were resolved many years before Cohen ever even heard of Reyl & Cie. A copy of the deposition Transcript is attached as Exhibit "L".

Fourth, there is an email from JGB it had no interest in providing opportunities for a refinance, as it wanted to pocket the profit from the sale of the properties. A JGB employee said "I actually don't think we should engage on this [valid Blouin refinancing offer], even if it's real. Our position has never been stronger or closer, and we are getting close to $17M of potential pnl from the mark." *See* email, attached hereto as Exhibit "M".

Fifth, within a matter of days after the execution of the Forbearance Agreement, JGB was already requesting Ms. Blouin to sign over the deeds to the homes, and threatened that if a defense was raised to the foreclosure, that JGB would go after the personal guaranties. *See* email, attached hereto as Exhibit "G"

Sixth, prior to there being a default on the forbearance agreement, JGB already began to pressure and request from Ms. Blouin that she provide deeds to both properties to JGB; JGB claiming that the properties could never be sold. Unknown to Ms. Blouin, this is because JGB was taking action to prevent any interested buyers from making an offer on the properties.

Seventh, JGB listed the property with its own broker and seeking the solicitation of lower market prices in order to drive down the market. This marketing of the property attempt to influence the market began as early as September 19, 2018, -- months before the maturity of the loan and any fear of default. See Exhibit "N'.

Eighth, JGB engaged with a known-renter of 366 Gin Lane by: (i) discussing the possibility of financing the renter (Chris Brown) for the purchase of 366 Gin Lane; and (ii) conspiring with Mr. Brown to not allow a showing of the home to potential purchasers, by the changing of alarm codes on the security system, so that realtors were unable to enter the property with potential purchasers.

Ninth, JGB was involved with a realtor who entered 376 Gin Lane in the winter, turned on the water without shutting it off or otherwise winterizing the home. The pipes then froze and caused a flood in the property, making it unavailable to show for possible sale.

Tenth, JGB procured a report and otherwise fraudulently represented that the properties are in disrepair. *See* Exhibit "O." This is contrary to the report by CNBC showing the properties as one of the most extraordinary properties in the whole of the United States. *See*

https://www.cnbc.com/video/2022/10/06/tour-the-most-expensive-home-in-the-hamptons-150000000-la-dune.html

Eleventh, during the court of the bankruptcy, JGB attempted to take the deposition of representative of Bay Point, for the sole purchase of attempting to convince Bay Point to not proceed with the refinance transaction with Aberdeen DE and Brickchurch DE, despite the low risk of the transaction which is fully secured by "hard" assets.  In a recent conversation in a New York City restaurant (where I was also present), one of Bay Point's attorneys stated that JGB's attorney tried to convince him to advise Bay Point to not complete the transaction.

Twelfth, a tenant named Brett Brown, along with realtor Anne Prosser, apparently at the request of JGB changed the code on the security system to prevent the properties from being shown by realtors.

Thirteenth, it was learned after the approval of replacement financing from Bay Point Financial Advisors, discussed below, that when the replacement lender had approved the replacement financing, the attorneys for JGB approached Bay Point's lawyers to discourage them from completing the refinance transaction.

## IV.    THE REPLACEMENT FINANCING

Aberdeen DE and Brickchurch DE were able to secure replacement financing from a company called Bay Point Financial Advisors, in the amount of $62,000,000.  However, that financing was taken out due to the predicament placed upon Aberdeen DE and Brickchurch DE by the fraudulent and predatory conduct of JGB.  In the end, Aberdeen DE and Brickchurch DE were required to pay JGB $44,500,000 in order to stop the foreclosure, and approximately $6,000,000 in origination costs to Bay Point.  *See* Settlement Statement, attached hereto as Exhibit "P".  Unfortunately, Aberdeen DE and Brickchurch DE were required to release JGB from any civil liability.

## V.    RELIEF REQUESTED

As a result of the conduct of JGB, Ms. Blouin wishes for the opening of an appropriate administrative or criminal investigation, and the recoupment of the approximate $36,000,000 of damages she suffered.

BLM

Attachments

6